UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

ANAND GUPTA,                                      16 Civ. ___

            Plaintiff,                       COMPLAINT

        - against -
                                                  PLAINTIFF DEMANDS A
AL JAZEERA AMERICA, LLC and AL                    TRIAL BY JURY
ANSTEY,

            Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

      Plaintiff Anand Gupta ("Gupta" or "plaintiff"), by his attorneys, Vladeck, Raskin &

Clark, P.C., complaining of defendants Al Jazeera America, LLC ("AJAM") and Al Anstey

("Anstey") (collectively, defendants) alleges:

NATURE OF CLAIMS

      1.     Gupta is a highly experienced financial executive, with a long history of

working for media companies.  He has held senior executive-level positions at a number of

companies and is well respected within the media industry for his financial expertise.  Defendants

originally hired Gupta as Senior Vice President of Finance, second-in-command to the acting Chief

Financial Officer ("CFO").  However, the acting CFO left just a few months after Gupta joined

AJAM.  Gupta was then given all the responsibilities and pressures of being CFO of a large

media organization, but without the formal title and without any increase in remuneration.  After

working above his job title and pay grade for more than 16 months, Gupta was finally rewarded

with a promotion and promised a commensurate salary increase in May 2015.  AJAM promoted

Gupta from Senior Vice President to Executive Vice President but did not execute the promised

salary increase.

2.      Almost as soon as Gupta received the promotion, AJAM hired a new Chief Executive Officer ("CEO"), Anstey, who is white and who has been accused of discrimination against South Asian employees.  Anstey recognized Gupta's promotion but repeatedly stalled on increasing his salary.  Gupta is the only employee of South Asian heritage within the leadership team and one of the few employees, if not the only employee, who did not receive a salary increase promised by the former CEO.

3.      On or about January 12, 2016, AJAM announced that it would shut down its television feed on April 12, 2016 and began to wind down its operations.  Defendants used the wind down as an excuse not to pay Gupta the salary increase that AJAM had promised him for almost one year.  Gupta finally had enough of defendants' discrimination and filed a written complaint with AJAM on or about January 27, 2016.  Plaintiff believes that defendants failed to increase his salary because of his Indian ethnicity.

4.      Instead of rectifying their discriminatory actions, defendants retaliated against Gupta for daring to complain.  Contrary to previous promises, Anstey assigned Gupta a small role in the wind down and directed him to work from home.  Defendants hired an outside consultant who is white as Senior Vice President to lead the wind down of financial operations, a role that Gupta was slated to take on before his discrimination complaint.  In addition, whereas defendants represented to Gupta that he was a critical member of the wind down team and that they needed him to work until defendants completed the wind down in the fall of 2016, defendants now claim to have no need for Gupta beyond the summer of 2016.

2

5.      Plaintiff brings this action to remedy discrimination on the basis of race and retaliation for opposition to unlawful practices, in violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981").

6.      Plaintiff also brings this action to remedy race discrimination and retaliation for opposition to unlawful practices, in violation of the New York State Human Rights Law, N.Y. Exec. Law §296 et seq. (the "NYSHRL") and the Administrative Code of the City of New York § 8-107 et seq. (the "NYCHRL").

<u>JURISDICTION AND VENUE</u>

7.      This Court has jurisdiction over plaintiff's Section 1981 claims under 28 U.S.C. § 1331.

8.      Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over plaintiff's NYSHRL and NYCHRL claims because these claims closely relate to the Section 1981 claims, having arisen from a common nucleus of operative facts, such that all claims form part of the same case or controversy.

9.      Pursuant to Section 8-502(c) of the New York City Human Rights Law, plaintiff has caused to be served a copy of the Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because AJAM does business in New York, New York and the acts of discrimination and retaliation occurred in New York.

PARTIES

11.     Gupta has worked for AJAM since 2013.  He is the Executive Vice President of Finance at AJAM.  Gupta resides in New York and works in New York City.

12.     AJAM is a corporation organized under the laws of the State of Delaware with headquarters in New York City.

13.     Anstey has worked for AJAM as CEO since May 2015.  He resides in New York and works in New York City.

14.     At all times relevant to this litigation, defendants have been plaintiff's employer within the meaning of the NYSHRL and NYCHRL.

FACTUAL ALLEGATIONS

Plaintiff's Background

15.     Gupta is a naturalized United States citizen of Indian origin.

16.     Gupta has worked in accounting and finance for over twenty years.  He has a Bachelor's of Science Degree from Bangalore University, a Bachelor's of Accountancy Degree from Oxford Brookes University, and a Master's of Business Administration Degree from the Wharton School of Business.  He also belongs to prestigious professional organizations, including being a member the American Institute of Certified Public Accountants and a Fellow of the Institute of Chartered Accountants in England and Wales.

17.     Gupta began his career in the United Kingdom offices of BDO Stoy Hayward, an international network of accounting and business advisory firms.  He worked as an auditor there from 1991 through 1996.

4

18.     Then, from 1996 until 2000, Gupta worked for KPMG as a Manager in its Business Advisory and Assurance Practice, first in the United Kingdom and then in the United States.

19.     From 2000 until 2005, Gupta worked in San Francisco for Eidos Inc., which was the United States subsidiary of Eidos plc. Eidos plc and its subsidiaries created and sold video games. Gupta served initially as Vice President of Business Development and then as CFO of the United States subsidiary. Eidos plc, which was listed on both the London Stock Exchange and Nasdaq, now operates under the name Square Enix in Europe and Square Inc. in the United States.

20.     In 2005, Gupta began working for Warner Bros. Home Entertainment, Inc. ("Warner Bros.") as Vice President of Financial Planning & Analysis. In this role, he developed corporate strategies for entering the video game market, managed global investments, and streamlined Warner Bros.' manufacturing and distribution network.

21.     He worked at Warner Bros. until the end of 2011, and then joined Home Box Office Inc. ("HBO") in January 2012 as Vice President of Business Planning and Operations. While at HBO, he was responsible for overseeing media production investments and building HBO's global supply chain. He left HBO for AJAM in September 2013.

<u>Defendants' Background</u>

22.     AJAM is an American cable news channel with an online presence.

23.     AJAM is a subsidiary of the Al Jazeera Media Network ("AJMN"). AJMN is a Qatar-based media conglomerate that owns various "Al Jazeera" media networks, including AJAM. AJMN also owns Al Jazeera International (USA), Inc. ("AJI"). AJI in turn owns Al Jazeera English Channel, which produces news content for international TV

broadcasting outside the United States, and AJ+, which produces web based digital content for Facebook and YouTube.

24.     On its website, AJAM touts 17 leadership positions within the organization.  12 of those positions are currently held by white employees, two are held by African-American employees, and two are held by Arab-American employees.  Gupta is the only employee of South Asian descent to hold a leadership position at AJAM.

25.     AJAM was formed on or about January 3, 2013, and started broadcasting the Al Jazeera America cable TV channel on or about August 20, 2013.

26.     AJAM replaced Current TV, a cable news station, after AJMN purchased the station in January 2013.  By replacing Current TV, AJAM obtained a pre-existing network of cable providers that would carry the station.

27.     AJAM's corporate mission, as explained in its employee handbook, was to become "the world's leading and most trusted media network" by, among other things, "engaging talented, creative and spirited people," "rebalancing global media by respecting the diversity and humanity of the world," and "giving a voice to the voiceless."  AJAM's initial business plan reflected this mission.  From the outset, AJAM attempted to build a loyal audience based on editorial integrity and journalism that affects society.  According to the initial business plan, AJAM expected to pursue efforts to bolster its profits only after 2020.

28.     Between August 2013 and January 2016, AJAM received numerous awards, including an International Emmy, prestigious Sigma Delta Chi awards from the Society of Professional Journalists, and multiple Peabody Awards.

29.     At the time of its launch, AJAM's acting CEO was Ehab Al Shihabi ("Al Shihabi").  Al Shihabi was formerly Executive Director for International Operations at AJMN.

30.     AJMN replaced Al Shihabi as CEO on or about May 6, 2015, after a series of high-profile resignations and lawsuits filed by AJAM employees.  For example, the former Supervisor of Media and Archive Management alleged that he had been fired after complaining about a culture of sexism and anti-Semitism.  As another example, the ex-Senior Vice President of Programming and Documentaries sued AJAM for unlawfully discriminating against her because of her gender and because she is not of Arab descent.  In the months leading up to Al Shihabi's dismissal, a number of high-level female employees also resigned, including the Executive Vice President for Human Resources, the Executive Vice President for Communications, and the Senior Vice President of Corporate Outreach.

31.     Despite such allegations of discrimination, AJMN retained Al Shihabi as an Advisor to the Director General, the top executive at AJMN.

32.     On or about May 6, 2015, AJMN announced that it was replacing Al Shihabi with Anstey.

33.     Anstey has worked extensively in the television news industry.  Before moving to AJAM, he worked for 10 years at Al Jazeera English.  From 2010 until May 2015, he was Managing Director of Al Jazeera English.

7

34.     Anstey, like Al Shihabi, has been accused of discrimination.  Reports have alleged that, while in charge of Al Jazeera English, Anstey fired two Washington, D.C.-based anchors of Indian heritage because they made the newsroom "too brown."[1]

<u>Gupta's Recruitment to AJAM</u>

35.     AJAM used a headhunter to recruit Gupta.

36.     Gupta's total compensation at AJAM was about $100,000 less than what he earned at HBO.  Despite the reduced compensation, the idea of working for AJAM  inspired Gupta.   In particular, AJAM's diverse workforce (including a leadership team composed of several women and African-American executives), strong ideals, and commitment to journalism attracted Gupta to the company.

37.     In addition, AJAM presented significant growth potential.   Gupta was excited to be a part of a new organization, even if that meant accepting a lower salary at the outset.  AJAM promoted itself to prospective employees as offering an opportunity to join the organization at the ground floor and reap the rewards as it grows.  AJAM's General Counsel, while negotiating with Gupta over the terms of his employment, told Gupta that AJAM would make up the salary gap between the AJAM and HBO positions within a year, assuming Gupta proved himself to be an effective employee.

---

[1] <u>See</u> David Tereshchuk, Al Jazeera: Management Style Echoes Country-of-Origin, Huffington Post, http://www.huffingtonpost.com/david-tereshchuk/al-jazeera-management-sty_b_7377190.h tml (May 21, 2015).

Gupta Takes on the Role of CFO Without Promotion or Salary Increase

38.     Gupta joined AJAM on or about September 15, 2013, as Senior Vice President of Finance.  In this capacity, he reported directly to AJAM's then-acting CFO, Muftah Al Suwaidan ("Al Suwaidan").

39.     Al Suwaidan left AJAM in January 2014, just a few months after Gupta joined the company.

40.     Rather than hire a new CFO to replace Al Suwaidan, AJAM instead transferred Al Suwaidan's job duties to Gupta in January 2014.  Gupta became responsible for managing the finance side of AJAM.  Although Gupta took on Al Suwaidan's responsibilities, neither his title nor his compensation changed.  Gupta was the only Senior Vice President that reported directly to the CEO; other than Gupta, only Executive Vice Presidents reported directly to the CEO.

41.     Before Al Suwaidan's departure, Gupta was primarily responsible for AJAM's financial reporting.  After Al Suwaidan's departure, Gupta also became responsible for, among other things, organizing AJAM's banking arrangements; structuring AJAM's employee medical plan benefits; serving as the 401(k) plan administrator; managing the entire freelancer process; negotiating with vendors; approving employee pay raises; and preparing and participating alongside the CEO in financial presentations to AJAM's Board of Directors.

42.     When Gupta took on Al Suwaidan's responsibilities, Al Shihabi told Gupta that if he performed well over the following year then Gupta was on track for a 50 percent salary increase.

9

43.     Gupta excelled at AJAM despite the increased workload.  When Gupta joined AJAM, it had annualized operating expenses of almost ███████.  By May 2015, Gupta had managed to generate sufficient productivity and efficiency gains to reduce those expenses to just ███████.  Gupta drastically reduced AJAM's expenses without adversely affecting the editorial and technical quality of AJAM's news coverage and other content, and, at the same time, AJAM increased its live broadcast content from ten hours a day to fourteen hours a day.  Gupta's efforts meant that operating expenses for 2016 and beyond were projected to be even lower.

44.     Gupta also successfully led the process, using an external accounting firm, whereby AJAM's net operating losses as reported in AJAM's 2013 and 2014 tax returns – ████ ████████████████ – could be offset against future profits.  As a result, AJAM is able to operate tax-free in the United States for the foreseeable future.

45.     On or about May 5, 2015, more than a year after Gupta started to take on the responsibilities of CFO, Al Shihabi announced that AJAM was promoting Gupta to Executive Vice President.  This promotion reflected Gupta's exceptional performance.

46.     In addition to Gupta, Al Shihabi announced a number of other promotions on May 5, 2016.  In particular, AJAM promoted HJ Chang ("Chang"), who is an American of Korean descent, from Vice President of Human Resources to Senior Vice President of Human Resources.

47.     AJAM announced these promotions just one day before the company replaced Al Shihabi as CEO, and installed Anstey in his place.

10

Anstey Announces that AJAM Will Shut Down

48.    On or about January 12, 2016, Anstey announced that AJAM would stop broadcasting by the end of April 2016.

49.    Anstey claimed that the decision was made because AJAM's business model was unsustainable given the economic realities of the United States media market.

50.    Contrary to Anstey's claim, AJAM's business model was not unsustainable.  In April 2015, just one month before Anstey took over as CEO, Al Shihabi submitted a business plan to senior managers at AJMN and received their approval.  This plan would have ensured AJAM's continued survival through 2020, at which point AJAM expected to receive significant advertising revenue.  In large part, Gupta's successful efforts to reduce AJAM's costs made this business plan possible.

51.    AJAM was in good financial shape before Anstey became CEO.  To the extent that economic realities made it difficult for AJAM to continue its operations, those realities stem from decisions that Anstey made and not from Gupta's oversight of AJAM's finances.  In particular, Anstey failed to secure any funding from AJMN, thus threatening AJAM's solvency.  The April 2015 business plan, which senior AJMN managers supported, contemplated that AJMN would provide additional funds to AJAM.  Anstey, however, failed to obtain these funds.

52.    Anstey also took steps that seriously jeopardized AJAM.  For example, Anstey authorized AJAM to air its series "The Spy Cables" (a news show exploring the stories contained within leaked secret intelligence papers from the world's spy agencies) online at the same time that AJAM aired the show on television. On information and belief, Anstey's actions

11

constituted a material breach of AJAM's contractual obligations to cable operators, which specifically prohibit AJAM from doing this.  Such a breach was potential grounds for cable operators to cancel the broadcast of AJAM, a death sentence for a cable news channel because it would reduce the number of cable subscribers who could view AJAM and also reduce advertising revenue.

53.     In December 2015, Anstey asked Gupta to assist an accounting firm, Deloitte, and a law firm, Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden, Arps"), to perform due diligence and a strategic review of AJAM's operations.  Gupta correctly interpreted this request as one of the first steps to shutting down the channel.  Anstey stated at the time that no final decision had been made but, if AJAM was shut down, the wind down process would likely last until September or October 2016.  Anstey also stated that Gupta and his team would be indispensible to the wind down process and would be among the last employees that AJAM would let go.

54.     AJAM laid off all employees as of April 12, 2016, but gave approximately 60 employees the opportunity to work on the wind down of AJAM's operations beyond April 12, 2016 as part of a "stay team."  Almost all of Gupta's Finance team have been kept on the stay team for the wind down.

55.     As part of the wind down, AJAM developed a severance plan and retention bonus plan for non-contract employees.  Under the severance plan, employees are eligible for eight weeks of salary.  The retention plan provides eligible employees the equivalent of the salary that each AJAM employee earned between the closure announcement of January

12, 2016, and his final day of employment.   The practical effect of the retention bonus is a doubling of salary for the employee's period of employment beyond January 12, 2016.

56.     The wind down is anticipated to cost over █████████, if AJAM pays all of the contractual obligations to the cable operators in full.   The vast majority of this cost arises from the effect of early termination on AJAM's various contracts with cable operators.   By January 2016, AJAM's operating budget for that year was projected to be even lower than it was for 2015, which had been around ████████   Accordingly, the cost of AJAM's shutdown is roughly equivalent to more than ██████████ of AJAM's annual operating expenses based on the April 2015 business plan that Al Shihabi presented to AJMN.

57.     ████████████████████████████████████ ████████████████████████████████████ ██████████████████████   During the wind down process, AJI, rather than AJMN, has indemnified AJAM's six most senior executives which include the CEO, the President, and the Executive Vice Presidents of Content, Human Resources, Finance, and Distribution.

### Anstey Discriminates Against Gupta by Failing to Honor Gupta's Salary Increase

58.     When Gupta first started at AJAM as a Senior Vice President, his salary was $350,000.

59.     Gupta's salary did not increase after Al Suwaidan, AJAM's former acting CFO, left AJAM, even though Gupta's responsibilities increased significantly.

60.     At the time AJAM promoted Gupta to Executive Vice President of Finance, Al Shihabi promised to increase Gupta's salary to $500,000.

61.     When Anstey became CEO in May 2015, Gupta discussed with Anstey the promised raise.  Anstey acknowledged Gupta's promotion but claimed that he needed to clear Gupta's salary increase with executives at AJMN.

62.     Anstey's claim was incorrect; AJAM had significant autonomy in setting pay rates.  On information and belief, the CEO had the authority to approve pay raises and there was no need to consult AJMN.  For example, Anstey unilaterally approved two raises for Chang. Defendants increased her salary from ██████████████ after Al Shihabi promoted her from Vice President of Human Resources to Senior Vice President of Human Resources in May 2015. Then, on information and belief, Anstey unilaterally increased Chang's salary again in October 2015, from ██████████████ because she was performing the functions of an acting Executive Vice President after the previous Executive Vice President of Human Resources resigned in May 2015.

63.     Despite Anstey's dubious explanation, Gupta did not press the matter in May 2015.  However, over the next nine months, from May 2015 until January 2016, Gupta continued to follow up on the status of his raise.  Anstey continued to deflect responsibility, blaming the lack of any raise on AJMN.

64.     In December 2015, Gupta and Anstey had further conversations about Gupta's promised raise.  Anstey again voiced his purported in-principle support for Gupta's salary increase and also the prospect of making that increase retroactively apply as of May 2015.

65.     On December 29, 2015, Anstey told Gupta that if the company did not approve the new salary by the end of the year, defendants would further increase Gupta's salary to take into account the negative tax consequences caused by their delay.  AJAM would therefore

14

increase Gupta's promised salary by $25,000, from $500,000 to $525,000. Anstey reiterated that he would try to make the salary increase retroactive.

66.     On or about January 15, 2016, just a few days after announcing the wind down, Anstey told Gupta that Gupta would not receive any salary increase. Anstey said he would provide Gupta with a proposed increase to his retention package by January 19, 2016, but never did.

67.     Gupta followed up with Anstey by email on or about January 24, 2016, but received no response.

68.     On information and belief, Anstey's actual reason for not increasing Gupta's compensation was Gupta's race and ethnicity. As set forth above, in the past Anstey was accused of targeting South Asian employees due to their "brown" skin.

69.     Gupta is the only senior AJAM executive of Indian ethnicity. Almost every other Executive Vice President received a salary increase upon assuming that position.

70.     In addition, as set forth above, Al Shihabi promoted several other AJAM employees in May 2015. Gupta is one of the few, if not the only, promoted employees in May 2015 not to receive a raise.

Anstey Discriminates Against Gupta by Disregarding His<br>Financial Recommendations or Bypassing Him Entirely

71.     Despite Gupta's financial experience and deep knowledge of AJAM's operations, Anstey repeatedly undermined Gupta's position and made numerous financial decisions without consultation or over Gupta's objections. Anstey's numerous financial missteps would not have occurred if not for his discriminatory disregard for Gupta's experience and

knowledge.  Anstey did not ignore or undermine the other, non-Indian members of the leadership team.

72.     Anstey made it difficult for Gupta to perform his job.  He repeatedly delayed meeting with Gupta to discuss the financial state of AJAM, despite Gupta's efforts to schedule such meetings.  Conversely, he met with senior non-Indian executives a number of times shortly after becoming CEO.  From approximately May through July, 2015, Anstey met regularly with Mary Murano ("Murano"), who is white and the Executive Vice President of Distribution, where they would discuss important financial matters regarding AJAM's relationship with cable operators and potential liabilities to those operators.  Gupta was rarely invited to attend these meetings and only on occasion permitted to consult on the financial effect of the decisions that Anstey made during these meetings.  Anstey also met often with Ken Ripley ("Ripley"), who is white and the Executive Vice President of Ad Sales, even though Ripley's department only minimally contributed to AJAM's finances.

73.     Anstey also failed to apprise Gupta when he made decisions that potentially breached AJAM's contractual restrictions with cable operators.  For example, as set forth above, Anstey may have materially breached AJAM's contractual obligations to cable operators because he improperly permitted AJAM to make available online the show "The Spy Cables" at the same time that it was televised on cable.  Gupta is obligated to disclose such breaches to auditors and thus Anstey should have informed Gupta before he took this action.  Before Gupta had the chance to disclose this breach as part of AJAM's audit process, Anstey sidelined Gupta and stripped him of his responsibilities because he complained of discrimination.

74.     Further, Anstey did not provide appropriate institutional support to Gupta as Gupta sought to fix serious budgetary and cash flow issues.  For example, Gupta advised Anstey in September 2015 that ███████████████████████████████████ ███████████████████████████████████████████████████, thus making it difficult for AJAM to continue operations as a going concern.  If AJAM became insolvent, it would be unlawful to continue operating and generating payroll debt.  Despite these warnings, Anstey took no action to obtain the necessary additional funding from AJMN.  On information and belief, had Anstey attempted to obtain such funding, AJMN would have provided some financial assistance.  Because of Anstey's failure to support Gupta, Gupta was placed in the difficult position of implementing temporary fixes to AJAM's financial shortfall in the hope of future funds that, as a result of Anstey's actions, never arrived.

75.     In addition, Anstey prevented Gupta from performing his job.  One of Gupta's roles as Executive Vice President of Finance is to identify and eliminate corporate waste. Anstey repeatedly overruled Gupta when he identified and attempted to eliminate such waste. For example, Gupta notified Anstey in May 2015 that AJAM continued to pay over $11,000 per month for Al Shihabi's residential apartment.  Gupta recommended that since the apartment was a perk for the CEO, Anstey as the new CEO should live there. Instead of appreciating Gupta's efforts, Anstey claimed that Gupta's suggestion was offensive and took no action to eliminate the corporate waste.  AJAM ended up paying for an empty apartment for the duration of the lease.

76.     Gupta, in accordance with his obligations to AJAM, also sought to block questionable payments that AJAM made to Anstey but which Anstey partially overruled.  When Anstey first started at AJAM in May 2015, he had a B-1 temporary business visa rather than the

more appropriate L-1 work permit visa, which Anstey did not obtain until the end of November 2015. On information and belief, the B-1 visa permits its holder to conduct business in the United States on behalf of the overseas parent company but, unlike the L-1 visa, does not permit its holder to actually work in the United States, whether in a paid or unpaid capacity. Despite these restrictions, Anstey worked for AJAM in violation of the requirements and limitations of his B-1 visa. Any compensation that AJAM paid to Anstey while on his B-1 visa would also potentially violate United States immigration laws. Accordingly, Gupta refused to pay Anstey's salary, reimburse his expenses, or cover the costs of his apartment until Anstey received his L-1 visa in November 2015. Anstey reversed Gupta's decision to block the apartment payments and thereby authorized AJAM to cover questionable expenses. Anstey's actions undermined Gupta's ability to perform his job because they prevented Gupta from ensuring that AJAM did not engage in potentially unlawful financial transactions.

77.     Anstey bypassed Gupta, directly assigning work to, and conferring with, Liana Lavin ("Lavin"), who is white and a Director of Finance and second in command of the Finance department after Gupta. Anstey's actions undermined Gupta's authority and made it difficult for team members to know what work to prioritize and to whom they should report. Gupta objected to Anstey's practice but Anstey continued to assign work to Lavin without informing Gupta. Anstey did not treat any other member of the leadership team in this way.

78.     Another of Gupta's responsibilities was presenting financial information to AJAM's board of directors. Anstey asked Gupta to prepare a presentation on five different topics for the November 2015 board meeting. At that meeting, Gupta presented on the first topic and Anstey then told Gupta to leave the meeting. Anstey did not permit Gupta to finish presenting

on the remaining four topics, which contained vital financial information that the board members needed to know.   On information and belief, Anstey did not cut off any other Executive Vice President's presentation to the board.

Anstey Retaliates Against Gupta by Cutting Short His<br>Employment and by Moving Him to an Advisory Role

79.   On or about January 27, 2016, Gupta complained in writing to Chang that he believed defendants' failure to increase his salary was discriminatory.   Gupta believes that defendants treated him differently because of his South Asian heritage.

80.   In his complaint to Chang, Gupta stated that he believed he was the only employee since May 2015 who, despite receiving a promotion, did not receive a promised salary increase.   Gupta is the only employee of South Asian heritage that AJAM promoted in May 2015.

81.   Gupta further complained that Anstey's repeated excuse for not honoring the promised salary increase – that he needed approval from AJMN – conflicted with AJAM's corporate bylaws and guidelines.   The corporate bylaws and guidelines state that AJAM is independent from AJMN and that the CEO has the authority to approve pay raises.

82.   Because of the stress that Gupta suffered as a result of defendants' discriminatory actions, Gupta's doctor directed him to take medical leave from approximately January 28 through February 15, 2016.   Defendants approved Gupta's request for medical leave.

83.   In response to Gupta's discrimination complaint, on or about January 27, 2016, Anstey stated that Gupta should take care of his health and, when Gupta returned from leave, they would arrive at a mutually agreeable solution.

19

84.     On information and belief, even though Gupta's medical leave was temporary, following Gupta's discrimination complaint, defendants determined that they would not allow him return to his full-time job.  On or about January 28 and 29, 2016, Gupta, while on leave, worked from home.  On or about January 29, 2016, Anstey instructed Gupta not to respond to work emails during his leave.  On information and belief, Anstey then advised Gupta's team that Gupta was on medical leave and not likely to return to work, and instructed them not to contact Gupta.

85.     Gupta's medical leave ended on or about Monday, February 15, 2016.  For the period February 16 through February 19, 2016, Gupta requested permission to work remotely while he continued to recover.  Defendants approved Gupta's request and he worked from home for those four days.

86.     On Sunday, February 21, 2016, Anstey called Gupta.  Anstey directed Gupta to continue working from home and not to return to the office.  Anstey said that he would notify Gupta when Gupta should go back to the office.

87.     On or about February 22, 2016, Anstey sent a text message to Gupta instructing Gupta to meet with Anstey at the offices of Skadden, Arps.  When Gupta expressed concern about meeting with defendants' lawyers without representation, Anstey changed the meeting location to AJAM's midtown offices.

88.     Anstey and Chang met with Gupta on or about February 23, 2016 at defendants' midtown offices.  At the meeting, Anstey announced his intention to move Gupta into an advisory role for the duration of his employment, which would end on June 12, 2016. Anstey said that based on his concern about Gupta's health, under this arrangement Gupta would

not return to the office and would need to be available only by phone and email no more than a couple of days until June 12, 2016. Gupta objected to defendants' proposal because it appeared to be little more than a "gardening leave" and was intended to punish Gupta for complaining about defendants' discriminatory conduct. Gupta told Anstey and Chang that he was ready to return to work in his job on a full-time basis.

89. During this same meeting on or about February 23, 2016, Gupta also asked Anstey why it took so long to consider Gupta's promised salary increase and why Anstey needed AJMN's approval. Anstey admitted to Gupta that he had the authority to grant the pay raise as CEO but instead "chose" to consult with AJMN. Anstey did not explain his decision to consult with AJMN as to Gupta's proposed salary increase despite approving raises for other promoted non-South Asian employees without first obtaining AJMN's authorization.

90. Anstey told Gupta in December 2015 that the wind down would likely last until September or October 2016. Anstey also said that defendants planned to have Gupta and his team help with the wind down until the conclusion of the process. Anstey repeated these statements to Gupta on or about January 15, 2016, just three days after Anstey announced AJAM's shut down.

91. Anstey's plan to end Gupta's employment in June 2016 thus reduced the length of Gupta's employment by several months. On information and belief, Anstey would not have made this decision absent Gupta's January 27, 2016 complaint of discrimination.

92. On or about February 24, 2016, Gupta spoke by phone with Anstey and Chang about Anstey's proposed arrangement. Gupta stated his belief that a move to an advisory role for the wind down was no different from being suspended with pay for complaining of

21

discrimination. Anstey told Gupta that the decision was not retaliatory but actually driven by a concern for Gupta's health.

93.     During the February 24 call, Gupta also asked why his employment was due to end in June 2016 rather than the fall of 2016 as originally planned. Anstey stated that Gupta was not needed beyond June 2016 and that there was no option to extend Gupta's employment for a longer period of time.

94.     On or about February 25, 2016, defendants sent Gupta a written agreement that reflected their plan to move Gupta to an advisory role through June 12, 2016. During this period, he would receive his current salary and would be eligible for the retention bonus and severance offered to all other non-contract employees at AJAM as long as he did not obtain alternative employment before mid-June 2016. The agreement required Gupta to execute a general release of his legal claims, which meant he would waive, inter alia, his discrimination claims.

95.     On or about February 26, 2016, Anstey called Gupta. Anstey told Gupta that defendants would not permit Gupta to return to work in his previous capacity. Anstey strongly urged Gupta to sign the proposed advisory role agreement. Anstey explained that if Gupta accepted the proposal, defendants would no longer require his services. Further, defendants would not ask him to return to the office except to retrieve his personal belongings and to meet with his team to notify them of his advisory role. Anstey suggested that Gupta could use the time between late February and mid-June 2016 to take care of his health and to travel.

96.     Anstey repeatedly attempted to justify his efforts to move Gupta to an advisory role based on purported concerns about Gupta's health. Anstey, however, never

22

explained his so-called concerns.  In fact, Gupta missed approximately two weeks of work for medical reasons and advised defendants that he was ready to return on a fulltime basis on or about February 23, 2016.  In contrast to defendants' treatment of Gupta, an Executive Vice President at AJAM has ongoing medical problems and, as a result, has missed significant time since the AJAM wind down was announced.  Defendants have not replaced this executive nor forced him to move to a diminished role.

97.    On or about February 26, 2016, after talking earlier in the day, Gupta advised Anstey that he had retained a lawyer and would need time to consider defendants' proposal.  Anstey told Gupta not to return to the office.  Anstey directed Gupta to continue to work from home as he had been doing since he lodged his complaint of discrimination.

98.    On or about March 7, 2016, Gupta, through his lawyers, rejected defendants' advisory role proposal.

Anstey Retaliates Against Gupta by Hiring a Replacement and By Marginalizing Gupta's Role

99.    After Gupta complained of discrimination, defendants hired a consultant, Toby Winer ("Winer"), a white woman, to replace him.  On information and belief, Winer is a consultant who has served in several senior roles, including CFO, in the higher education and professional services sectors.

100.    Defendants hired Winer to manage the financial side of the wind down, which was supposed to be Gupta's responsibility before he submitted his complaint. Indeed, the wind down has not substantially affected defendants' accounting function.

101.    Defendants did not consult with Gupta before hiring Winer even though Gupta is purportedly head of AJAM's Finance department.  On March 2, 2016, Anstey told

Gupta as a "courtesy" that Winer would be joining the Finance team to help with the wind down. On information and belief, defendants began looking for someone to fill this role several weeks before telling Gupta about their decision to hire Winer.

102.   Winer began working for defendants on or about March 4, 2016.  On that same day, Anstey called Gupta's entire Finance team to introduce Winer as their new "boss" and tell them that they reported to Winer.

103.   On information and belief, Winer's consulting fees, when annualized, are equal to or greater than the $525,000 salary that Gupta is owed.

104.   On or about March 9, 2016, Anstey confirmed to Gupta that he should continue to work from home "unless and until" defendants "need[ed] [him] to come into the office."  Anstey also told Gupta that defendants would assign him projects to work on during the wind down and that Anstey and AJAM's President may reach out to Gupta for help.

105.   Despite Anstey's email suggesting that defendants would give Gupta multiple assignments, thus far Gupta has received one ongoing project in connection with AJAM's wind down process.   Specifically, defendants asked Gupta to help Murano, the Executive Vice President of Distribution, to compute AJAM's liabilities owed to cable operators (otherwise referred to as the Most Favored Nation ("MFN") project).

106.   Even Gupta's assignment to the MFN project is limited.  Rather than taking the lead on the project,  Gupta is responsible for assisting Deloitte, a consulting firm that defendants retained to help with the wind down, in determining defendants' MFN liability. Deloitte prepares the calculations and Gupta reviews Deloitte's methodology and provides formula corrections.

107.    In addition to Gupta's belief that his circumscribed MFN role is further retaliation for complaining about discrimination, Gupta raised concerns that Deloitte should not be involved in the MFN process as it poses a conflict of interest.  Deloitte is the auditor for the cable provider Comcast.  In the event that Comcast exercises its right to audit AJAM, AJAM cannot use Deloitte as an expert witness to defend AJAM's computation and methodology, as Deloitte cannot act contrary to Comcast's interests.  Anstey has dismissed Gupta's concerns despite the seriousness of the issue.

108.    On March 11, 2016, Anstey permitted Gupta to meet Murano in the office to discuss the MFN project.  Gupta worked on the project, which was time-sensitive, over the weekend.

109.    On multiple occasions after March 11, 2016, Gupta requested clarification regarding the differences between his role and Winer's role.  Defendants have refused to provide him with any explanation.  Instead, defendants insist that Gupta has retained his role as head of the Finance department.  Yet Gupta's team reports directly to Winer, defendants have identified Winer at least once as serving as AJAM's CFO, and Gupta is no longer consulted on personnel decisions concerning the Finance team.

110.    On or about March 21, 2016, Gupta advised Chang that defendants' actions made it difficult for Gupta to successfully perform his job.  Gupta and his team members were confused about who was in charge given defendants' decision to hire Winer.  For example, in March 2016, Gupta needed assistance from one of his team members, Ruben Lopez ("Lopez"), to gather data for the MFN project.  However, since Gupta's team members reported to Winer, Lopez was working on something else and unavailable to help Gupta.  Lopez was unsure of how

25

he should handle Gupta's request.   Gupta was forced to ask Winer for permission to get help from this team member.

111.    In response to Gupta's concerns, Chang arranged a meeting among Gupta, Anstey, and Chang.   On March 22, 2016, Anstey and Chang assured Gupta that he was still Executive Vice President and head of the Finance department and that defendants had not replaced him.   During this meeting, Anstey asked Gupta to remain on the stay team through mid-July 2016 alongside Murano because of Gupta's expertise regarding the MFN project.   In addition, Anstey stated that Gupta's historical knowledge would be valuable for other wind-down activities related to the company's 401(k) plan and various ongoing audits.   Anstey wanted to set a meeting with Winer and the leadership team the next day to discuss further details regarding the Finance department.

112.    The following day, on or about March 23, 2016, Gupta met Winer for the first time.   In addition, Anstey, Chang, AJAM President Kate O'Brien, and a representative from Deloitte, Eric Danner ("Danner"), attended the meeting.   During this meeting, Gupta asked Anstey for clarification regarding Winer's role.   Anstey did not answer Gupta's question; instead, he told Gupta that defendants hired Winer to help with the wind down.   Gupta complained that Winer had effectively replaced him because Gupta's entire team reported to Winer.   Although Anstey and Chang rejected Gupta's concern, documentation that Anstey submitted to a bank identified Winer as AJAM's CFO.

113.    During this same meeting, Danner asked Gupta whether Gupta would agree to switch roles with Winer.   Under this arrangement, Winer would work on the special

MFN project and Gupta would handle day-to-day responsibilities of the wind down.   When Gupta agreed to do so, Anstey dismissed the idea.

114.   Since the March 23, 2016 meeting, defendants have made other personnel decisions without speaking to Gupta.   For example, AJAM did not offer Lavin continued employment beyond mid-April 2016.   No one discussed this decision with Gupta.   Similarly, defendants removed Lopez, a long-term Finance team member, from the MFN project and replaced him with a junior consultant from Winer's company.   Defendants never discussed this action with Gupta.

115.   Gupta continues to work for defendants in a limited capacity on the MFN project.   Defendants have extended his employment through June 12, 2016.   In contrast, on information and belief, defendants have invited almost all of the other Finance team members to work through at least September 2016 and likely AJAM will further extend their employment.

FIRST CAUSE OF ACTION
(Race Discrimination: Section 1981)

116.   Plaintiff repeats and realleges paragraphs 1 through 115 as if fully set forth herein.

117.   By the acts and practices described above, defendants discriminated against plaintiff in the terms and conditions of employment on the basis of his race and ethnicity, including, inter alia, by paying a lower salary on the basis of his race and ethnicity, in violation of Section 1981.

118.   Defendants acted with malice and reckless indifference to plaintiff's rights under Section 1981.

27

119.    As a result of defendants' discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damages unless and until this Court grants relief.

## SECOND CAUSE OF ACTION
(Retaliation: Section 1981)

120.    Plaintiff repeats and realleges paragraphs 1 through 119 as if fully set forth herein.

121.    By the acts and practices described above, defendants retaliated against plaintiff for his opposition to unlawful discrimination under Section 1981, including, inter alia, by cutting short his employment, reducing his responsibilities, and hiring a replacement on the basis of his opposition to unlawful discrimination, in violation of Section 1981.

122.    Defendants acted with malice and reckless indifference to plaintiff's rights under Section 1981.

123.    As a result of defendants' retaliation, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damages unless and until this Court grants relief.

## THIRD CAUSE OF ACTION
(Race Discrimination: NYSHRL)

124.    Plaintiff repeats and realleges paragraphs 1 through 123 as if fully set forth herein.

125.    By the acts and practices described above, defendants discriminated against plaintiff in the terms and conditions of employment on the basis of his race and ethnicity,

including, inter alia, by paying a lower salary on the basis of his race and ethnicity, in violation of the NYSHRL.

126.    As a result of defendants' discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damages unless and until this Court grants relief.

FOURTH CAUSE OF ACTION
(Retaliation: Section NYSHRL)

127.    Plaintiff repeats and realleges paragraphs 1 through 126 as if fully set forth herein.

128.    By the acts and practices described above, defendants retaliated against plaintiff for his opposition to unlawful discrimination under the NYSHRL, including, inter alia, by cutting short his employment, reducing his responsibilities, and hiring a replacement on the basis of his opposition to unlawful discrimination, in violation of the NYSHRL.

129.    As a result of defendants' retaliation, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damages unless and until this Court grants relief.

FIFTH CAUSE OF ACTION
(Race Discrimination: NYCHRL)

130.    Plaintiff repeats and realleges paragraphs 1 through 129 as if fully set forth herein.

131.    By the acts and practices described above, defendants discriminated against plaintiff in the terms and conditions of employment on the basis of his race and ethnicity, including,

inter alia, by paying a lower salary on the basis of his race and ethnicity, in violation of the NYCHRL.

132.     As a result of defendants' discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damages unless and until this Court grants relief.

SIXTH CAUSE OF ACTION
(Retaliation: Section NYCHRL)

133.     Plaintiff repeats and realleges paragraphs 1 through 132 as if fully set forth herein.

134.     By the acts and practices described above, defendants retaliated against plaintiff for his opposition to unlawful discrimination under the NYCHRL, including, inter alia, by cutting short his employment, reducing his responsibilities, and hiring a replacement on the basis of his opposition to unlawful discrimination, in violation of the NYCHRL.

135.     As a result of defendants' retaliation, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damages unless and until this Court grants relief.

PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter a judgment:

(a)     declaring that the acts and practices complained of herein are in violation of Section 1981, the NYSHRL, and the NYCHRL;

(b)     enjoining and permanently restraining these violations;

(c)    directing defendants to take such affirmative action as is necessary to ensure that the effects of these violations are eliminated and do not continue to affect plaintiff's employment opportunities;

(d)    directing defendants to place plaintiff in the position he would have occupied but for defendants' discriminatory and retaliatory treatment of him, and to make him whole for all earnings he would have received but for defendants' discriminatory and retaliatory treatment, including but not limited to, wages, pension, interest, and other lost benefits;

(e)    directing defendants to pay plaintiff compensatory damages for his mental anguish, emotional distress, humiliation, and damage to reputation;

(f)    directing defendants to pay plaintiff punitive damages;

(g)    awarding plaintiff pre- and post-judgment interest;

(h)    awarding plaintiff the costs of this action together with reasonable attorneys' fees; and

(i)    granting such other and further relief as this Court deems necessary and proper.

31

<u>DEMAND FOR A TRIAL BY JURY</u>

   Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action.

Dated: New York, New York
   April 21, 2016

         VLADECK, RASKIN & CLARK, P.C.

     By:

         Jeremiah Iadevaia
         Joshua Tarrant-Windt
         Attorneys for Plaintiff
         565 Fifth Avenue, 9th Floor
         New York, New York 10017
         (212) 403-7300