UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

ANAND GUPTA,                                        :

                Plaintiff,               :       Case No.  1:16-cv-02980 (VEC)

    -against-                                      :

AL JAZEERA AMERICA, LLC and AL             :
ANSTEY,

            Defendants.               :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the Southern District of New York, Defendants Al Jazeera America, LLC ("AJAM") and Al Anstey ("Anstey") (collectively, "Defendants"), by and through their attorneys, DLA Piper LLP (US), respectfully submit this Statement of Undisputed Material Facts in support of their Motion for Summary Judgment against Plaintiff Anand Gupta ("Plaintiff" or "Gupta").

**Background**

1.      Plaintiff purports to bring claims for race discrimination and retaliation, allegedly in violation of 42 U.S.C. § 1981, the N.Y.S. Human Rights Law and the N.Y.C. Human Rights Law.  (Docket No. 1).

2.      Gupta claims he was discriminated against because he was Indian, not because of age, medical leave, disability or any other characteristic. (Gupta Dep. at 79 [Kaplan Ex. 1]).[1]

---

[1] Unless otherwise noted, all citations to "Kaplan Ex.___" are to exhibits annexed to the accompanying Declaration of Brian S. Kaplan in Support of Defendants' Motion for Summary Judgment, dated May 12, 2017.  All citations to "_____Dep." and "____ Dep. Ex. __" are to relevant portions of the deposition transcripts and exhibits, respectively, as cited in Defendants' Memorandum of Law in Support of their Motion for Summary Judgment.

3.     Gupta claims that Anstey was the only AJAM employee who discriminated or retaliated against him. (Gupta Dep. at 261, 388-89 [Kaplan Ex. 1]).

4.     AJAM operated a television channel and digital news website in or about August 2013 until April 2016. (Anstey Dep. at 26, 56-57 [Kaplan Ex. 2]; O'Brian Dep. at 69 [Kaplan Ex. 3]).

5.     Gupta commenced employment with AJAM as Senior Vice President ("SVP"), Finance on or about September 15, 2013, pursuant to a written employment agreement dated as of August 8, 2013 (the "Employment Agreement") (Gupta Dep. Ex. 26 [Kaplan Ex. 4]).

6.     The "term" of the Employment Agreement ran for two years, through September 14, 2015, and the Company possessed an exclusive option to extend it. (Gupta Dep. Ex. 26 [Kaplan Ex. 4]).

7.     Gupta's salary was three hundred and fifty thousand dollars ($350,000) per year. (Gupta Dep. Ex. 26 [Kaplan Ex. 4]).

8.     The Company had no obligation under the Employment Agreement to increase Gupta's salary at any time. (Gupta Dep. Ex. 26 [Kaplan Ex. 4]).

**Gupta Claims Al-Shihabi Promised Him a Salary Increase**

9.     Upon hiring, Gupta reported to AJAM's Interim CEO Ehab Al-Shihabi ("Al-Shihabi"). (Gupta Dep. Ex. 26 [Kaplan Ex. 4]; Anstey Dep. at 17 [Kaplan Ex. 2]; Gupta Dep. at 55 [Kaplan Ex. 1]).

10.     Gupta claims that on or about March 20, 2015, Al-Shihabi orally promised him that his salary would be increased in May of that year. (Gupta Dep. at 80-85 [Kaplan Ex. 1]).

11.     Gupta claims that he told no one else about this alleged promise. (Gupta Dep. at 85 [Kaplan Ex. 1]).

12.     On March 21, 2015, Al-Shihabi instructed Diana Lee ("Lee"), who was then the Company's Executive Vice President ("EVP") for Human Resources, via e-mail to change Gupta's title to EVP, but explicitly stated that Gupta was to receive "no salary increase." (Gupta Ex. 10 [Kaplan Ex. 5]).

13.     Included in the March 21, 2015 e-mail from Al-Shihabi to Lee was an instruction that another AJAM employee, Francis Kane ("Kane") was to receive a title change to EVP, and no salary increase. (Gupta Dep. at 89 [Kaplan Ex. 1]); Gupta Exs. 10, 12 [Kaplan Exs. 5, 6]).

14.     In or about March 2015, John Sollecito ("Sollecito"), Kevin Cohen ("Cohen"), Ross Henderson ("Henderson") and Tony Caron ("Caron") received title changes to EVP or SVP, and none of them received salary increases to accompany their title changes at such time. (Gupta Dep. at 92-96, 211-14 [Kaplan Ex. 1]; Gupta Exs. 11, 12 [Kaplan Exs. 7, 6]).

15.     None of Kane, Sollecito, Cohen, Henderson or Caron is Indian.  (Gupta Dep. at 93, 211-14 [Kaplan Ex. 1]).

16.     In early May 2015 (before Anstey joined AJAM as CEO), four Company employees, including HJ Chang ("Chang"), a Korean-American female, and Caron, who had been promoted along with Gupta in March, received title changes *and* salary increases. (Gupta Dep. at 98-101 [Kaplan Ex. 1]; Gupta Exs. 13, 14 [Kaplan Exs. 8, 9]).

17.     Gupta did not receive an increase in early May 2015, nor did Gupta object at such time to the salary increases received by Chang or Caron.  (Gupta Dep. at 80-82; 98-101 [Kaplan Ex. 1]).

18.      Gupta himself approved these increases received by Chang and Caron in early May 2015. (Gupta Dep. at 98-99 [Kaplan Ex. 1]; Gupta Ex. 14 [Kaplan Ex. 9]).

**Anstey Replaces Al-Shihabi as CEO**

19.     On May 6, 2015, Anstey became CEO of AJAM, replacing Al-Shihabi. (Al Najjar Dep. at 67-68, 73-74 [Kaplan Ex. 10]; Al Najjar Ex. 3 [Kaplan Ex. 11]; Anstey Dep. at 16-17 [Kaplan Ex. 2]; Declaration of HJ Chang ("Chang Dec.") at ¶ 6).

20.     Anstey was appointed as CEO by Abdulla Al Najjar ("Al Najjar"), the Vice Chairman and Managing Director of AJAM's Board of Directors, in the midst of a "PR crisis" at the Company. (Al Najjar Dep. at 10, 68-70 [Kaplan Ex. 10]; Anstey Dep. at 17-18 [Kaplan Ex. 2]).

21.     Early on, in the midst of his overall assessment of AJAM, Anstey had certain reservations concerning Gupta that he shared with Ibrahim Abdulla Al-Obaidli ("Al-Obaidli"), the Executive Director of Finance at Al Jazeera Media Network (AJAM's parent company). (Anstey Dep. at 124-28, 145-49, 169-71 [Kaplan Ex. 2]).

22.      In a June 19, 2015 e-mail to Anstey, Al-Obaidli stated that he shared Anstey's concerns, noting that Gupta "lacks strategic plans and forward thinking to efficiently manage/lead Finance for AJAM." (Anstey Ex. 8 [Kaplan Ex. 12]).

23.     Gupta testified that it was Anstey's prerogative as CEO to rely on Al-Obaidli's email.  (Gupta Dep. at 189-90 [Kaplan Ex. 1]).

24.     As Gupta's Employment Agreement was set to expire in mid-September 2015, Anstey extended the term of Gupta's Employment Agreement for another month to allow him more time to evaluate Gupta.  (Anstey Dep. at 149-50, 170-72 [Kaplan Ex. 2]; Anstey Ex. 8 [Kaplan Ex. 12]).

25.     After the one-month extension, Gupta remained employed by AJAM "at-will." (Anstey Dep. at 150-51 [Kaplan Ex. 2]).

26.     On or about July 17, 2015, Gupta requested a salary increase, handing Anstey a memorandum purportedly supporting an increase. (Anstey Dep. at 185-87 [Kaplan Ex. 2]; Anstey Ex. 10 [Kaplan Ex. 13]).

27.     Anstey told Gupta that they would review his salary at a later date. (Anstey Dep. at 189-90, 192 [Kaplan Ex. 2]).

28.     Gupta regularly attended weekly leadership meetings with Anstey.  (Gupta Dep. at 151-52 [Kaplan Ex. 1]).

**Anstey Supports Gupta's Renewed Request But AJAM Begins to Wind-Down**

29.     By e-mail dated December 11, 2015, Gupta renewed his request for a salary increase. (Anstey Dep. at 199-200 [Kaplan Ex. 2]; Anstey Ex. 11 [Kaplan Ex. 14]).

30.     In support, Gupta claimed, among other things, that "[t]here are many more folks who do less and make much more."  (Anstey Ex. 11 [Kaplan Ex. 14]).  At the time his request was made, Gupta was the fifth highest paid EVP or SVP in the entire Company, out of a total of 22 employees at those levels.  (Chang Dec. at ¶ 6, Ex. 1).

31.     Gupta testified that, at the time he sent his December 11, 2015 email to Anstey, he did not believe that Anstey was a racist.  (Gupta Dep. at 301-02 [Kaplan Ex. 1]).

32.     Anstey supported a raise for Gupta at this time. (Anstey Dep. at 206 [Kaplan Ex. 2]; Gupta Dep. at 301-05 [Kaplan Ex. 1]).

33.     Gupta testified that he believed Anstey was advocating for a raise for Gupta throughout 2015. (Gupta Dep. at 301-05, 309-19 [Kaplan Ex. 1]).

34.     Anstey met with Gupta on or about December 22, 2015 to discuss Gupta's request, and Gupta e-mailed Anstey further justification for an increase. (Anstey Ex. 14 [Kaplan Ex. 15]).

5

35.     The next day, Anstey forwarded Gupta's rationale to Al Najjar and advocated that Gupta's request be granted, as Anstey "believe[d] Anand deserved a pay rise." (Anstey Ex. 16 [Kaplan Ex. 16]; Gupta Dep. at 313-14 [Kaplan Ex. 1]; Gupta Ex. 49 [Kaplan Ex. 17]).

36.     Anstey likewise advocated for an additional increase for Chang, who was promoted to Acting EVP of Human Resources in October 2015.  (Anstey Ex. 16 [Kaplan Ex. 16]).

37.     By December 2015, AJAM had begun to explore whether it would shut down its entire operations. (Anstey Dep. at 66 [Kaplan Ex. 2]).

38.     Al Najjar testified that it had appeared to AJAM's Board that "the method of operating of AJAM in the media marketplace in the US was not sustainable." (Al Najjar Dep. at 20 [Kaplan Ex. 10]).

39.     Deloitte LLP was retained by AJAM's outside counsel as a consultant to advise AJAM regarding the potential wind-down. (Al Najjar Dep. at 39-41 [Kaplan Ex. 10]; Danner Dep. at 15-17 [Kaplan Ex. 18]).

40.     The Deloitte team-lead responsible for the engagement, named "Project Digital," was Eric Danner, a senior member of Deloitte's restructuring group."  (Anstey Dep. at 72-73 [Kaplan Ex. 2]; Danner Dep. at 16 [Kaplan Ex. 18]).

41.     Anstey continued to advocate for a salary increase for Gupta and Chang, both of whom were valuable members of AJAM's core management team who would be entrusted with extremely confidential information concerning the evaluation of alternatives (including potential wind-down) of the Company and Project Digital. (Anstey Ex. 15 [Kaplan Ex. 19]; Danner Dep. at 28-35 [Kaplan Ex. 18]; Gupta Dep. at 255-57, 279-80 [Kaplan Ex. 1]; O'Brian Dep. at 214 [Kaplan Ex. 3].

42.     Anstey's e-mail to Al Najjar on December 23, 2015 referenced Gupta's integral role in assisting Deloitte at the outset of their work for AJAM as evidence that Gupta's salary increase was warranted. (Anstey Ex. 16 [Kaplan Ex. 16]).

43.     After Gupta informed Anstey that he had spent a number of hours on Christmas Eve assisting the Deloitte team, Anstey told Gupta that "I am supportive of both you and HJ [Chang]. . . [but] that given the discussions and due diligence [regarding Project Digital] that are taking place at the moment, I'm not in a position to approve these [salary increases] without conferring with Abdulla [Al Najjar]." (Anstey Ex. 15 [Kaplan Ex. 19]).

44.     Anstey stated that "the current situation may actually help us, as I contacted [Al Najjar] as soon as I received your emails . . .  and stressed the urgency given how invaluable you are to Deloitte's due diligence project." (Anstey Ex. 15 [Kaplan Ex. 19]).

45.     On or about December 27, 2015, Anstey spoke with Al Najjar by phone to follow-up on Gupta's requests. (Anstey Ex. 16 [Kaplan Ex. 16]; Gupta Ex. 52 [Kaplan Ex. 20]).

46.     On or about December 28, 2015, Anstey forwarded his earlier e-mail supporting the increases along with Gupta's justification for the same, while advising Al Najjar that Gupta and Chang were hoping for "some news by years end, as this has a significant difference for them regarding tax in the USA."  (Anstey Ex. 16 [Kaplan Ex. 16]).

47.     Gupta followed up with Anstey on January 1, 2016 to see if Anstey could arrange a conversation between Gupta and Danner, given Danner's role in connection with Project Digital. (Gupta Dep. at 319-23 [Kaplan Ex. 1]; Gupta Ex. 53 [Kaplan Ex. 21]).

48.     Anstey responded that he would set up a conversation between Gupta and Danner, while emphasizing that he "hope[d] [he] was clear that I'm still pushing for the pay rise for both

of you with Abdulla [Al Najjar], I just haven't had a response yet.  So it's not off the radar screen." (Gupta Dep. at 323-24 [Kaplan Ex. 1]; Gupta Ex. 54 [Kaplan Ex. 22]).

49.     Gupta spoke with Danner on January 4, 2016 and sent him an e-mail the next day again outlining why he, Chang, and Kim Bondy ("Bondy"), an African American female who was an SVP at AJAM, should each receive increases. (Gupta Dep. at 323-24 [Kaplan Ex. 1], Gupta Ex. 55 [Kaplan Ex. 23]).

50.     After meeting with Gupta and Chang, Danner indicated that he would discuss the issue with AJAM's Executive Committee, including Al Najjar. (Danner Dep. at 63-73 [Kaplan Ex. 18]).

51.     Shortly after this meeting, Danner advised the Executive Committee that Gupta, Chang and Bondy had requested salary increases, and highlighted for the Committee the specifics of Gupta's "situation" as Gupta had explained it to him. (Danner Dep. at 73-76 [Kaplan Ex. 18]).

52.     Though the Executive Committee provided no definitive decision at this time, Danner cautioned Gupta that it did not appear that there was an "appetite" to increase salaries as the Company was increasingly considering winding down its operations. (Danner Dep. at 83-85, 95, 99-100 [Kaplan Ex. 18]).

53.     Danner also reiterated to the Executive Committee that in his experience, increases to compensation were very rarely awarded in wind-down situations because the company is shuttering its business.  (Danner Dep. at 75 [Kaplan Ex. 18]).

54.     On January 9, 2016, Gupta followed up on the issue again with Anstey, who told Gupta that there had been no decision yet as "the conversations are focused on whether this

decision [to wind-down the Company] is going to happen or not!" (Gupta Dep. at 325-27 [Kaplan Ex. 1]; Gupta Ex. 56 [Kaplan Ex. 24]).

55.     By January 10, 2016, it became apparent that salary increases were not likely to be forthcoming. (Anstey Dep. at 246-47 [Kaplan Ex. 2]; Anstey Ex. 17 [Kaplan Ex. 25]; Al Najjar Dep. at 25-26 [Kaplan Ex. 10]).

56.     By January 13, 2016, AJAM's Board of Directors had reached a decision to wind-down the Company, which was announced to AJAM's staff and the public. (Danner Dep. at 23 [Kaplan Ex. 18]; Anstey Dep. at 57-61 [Kaplan Ex. 2]).

57.     Al Najjar ultimately declined Anstey's proposed pay raise for Gupta "[b]ecause we were in the process of winding down [AJAM]." (Al Najjar Dep. at 25 [Kaplan Ex. 10]).

58.     Chang was told that a salary increase was deemed to be inappropriate in a wind-down situation.  (Chang Dep. at 75-82 [Kaplan Ex. 26].

**Despite the Wind-Down, Gupta Does Not Abandon the Salary Increase Issue**

59.     Notwithstanding his knowledge that AJAM was in the process of going out of business, in an e-mail to Anstey, Chang, and AJAM's President (Kate O'Brian ("O'Brian")) dated January 24, 2016, Gupta reiterated his request for a salary increase. (Gupta Ex. 57 [Kaplan Ex. 27]).

60.     On January 27, 2016, Gupta again e-mailed Chang, copying others, to complain about not receiving a salary increase. (Gupta Ex. 63 [Kaplan Ex. 28]).

61.     This e-mail cited a number of reasons for which Gupta believed AJAM's failure to provide him a salary increase was "very unfair and discriminatory." (Gupta Ex. 63 [Kaplan Ex. 28]).  Nowhere in his e-mail, however, does Gupta state that he believed those reasons were motivated by race-based discriminatory animus.  (Gupta Ex. 63 [Kaplan Ex. 28]).

62.    Gupta did not allege or allude to the possibility that his race (Indian) was remotely related to the Company's decision not to increase his salary, nor did he suggest that AJAM or Anstey had done anything "unlawful."  (Gupta Ex. 63 [Kaplan Ex. 28]).

63.    Gupta stated he "would like to get clarity on why I am being singled out for such treatment by my management team."  (Gupta Ex. 63 [Kaplan Ex. 28]).

64.    The AJAM employees who received the e-mail and Danner testified that he or she did not believe Gupta to be complaining about race discrimination. (Anstey Dep. at 263-65 [Kaplan Ex. 2]; Chang Dep at 208-10 [Kaplan Ex. 26]; Danner Dep. at 104-06 [Kaplan Ex. 18]; O'Brian Dep at 250-57 [Kaplan Ex. 3]).

65.    Chang testified that she understood Gupta's e-mail to be part of a larger "plan" or "scheme" they were "cooking up" to use their "leverage" to obtain a salary increase. (Chang Dep. at 51-52, 59, 61, 195, 211 [Kaplan Ex. 26]).

66.    Gupta's e-mail also stated that because of the "stress" and "anxiety" he had experienced that resulted from his demanding job and the lack of a salary increase, he needed to take a medical leave of absence. (Gupta Ex. 63 [Kaplan Ex. 28]).

67.    Anstey replied that Gupta should "take the time you need to attend to your health. When you're feeling better, I suggest we meet to discuss an amicable solution."  (Gupta Dep. at 345 [Kaplan Ex. 1]; Gupta Ex. 64 [Kaplan Ex. 29]).

68.    The next day, on January 28, 2016, Gupta sent Anstey, O'Brian and Chang a follow-up e-mail, noting that a physician had approved his request for medical leave through February 8, 2016. (Gupta Ex. 65 [Kaplan Ex. 30]).

69.    Gupta also noted that he had "the deepest respect and personal affinity for each of you" and clarified that he "hope[d] [they] recognize[d] that my complaint is against the situation

and lack of responses to requests from the wind-down team." (Gupta Dep. 345-48 [Kaplan Ex. 1]; Gupta Ex. 65 [Kaplan Ex. 30]).

70. Gupta also asserted that "one has to feel valued and respected in any organization and I just needed to stand up for that principle . . . for all of us." (Gupta Ex. 65 [Kaplan Ex. 30]).

71. Gupta added that the next week would have been the first birthday of his infant son (who had passed away) so these were "so emotional times for both of us." (Gupta Ex. 65 [Kaplan Ex. 30]).

72. Gupta noted that he had a "very capable team . . . and due to [them], I am confident that I will not be missed." (Gupta Ex. 65 [Kaplan Ex. 30]).

73. He closed the e-mail by stating that "Let's all grab a beer when the dust settles . . . I am in awe of how well and dignified you all were in such tough times . . . sorry for being the emotional wimp :) :)!!" (Gupta Ex. 65 [Kaplan Ex. 30]).

74. Gupta did not suggest any racial discrimination in this e-mail. (Gupta Ex. 65 [Kaplan Ex. 30]).

75. Anstey replied, "Thank you Anand, You look after yourself, and let's touch base when you're feeling rested." (Gupta Dep. at 350 [Kaplan Ex. 1]; Gupta Ex. 66 [Kaplan Ex. 31]).

76. On January 29, 2016, Anstey wrote to Gupta: "I really appreciate you responding to emails while on leave, but I do want you to be as unbothered as much as possible. We will make sure everything is attended to going forward, so you don't have to respond. Of course, if something comes up where we absolutely need you, I'll be in contact directly, but I promise to keep it to a minimum. Rest well, and look after yourself." (Gupta Dep. at 359 [Kaplan Ex. 1]; Gupta Ex. 68 [Kaplan Ex. 32]).

77.     On February 5, 2016, Chang asked Gupta whether he intended to return to the office on February 8th as originally planned or if he was seeking additional time for his leave of absence. (Gupta Dep. at 360-61 [Kaplan Ex. 1]; Gupta Ex. 70 [Kaplan Ex. 33]).

78.     Gupta replied that his leave was extended through February 19, but that he planned to work remotely starting February 16th, returning to the office the week of February 22nd. (Gupta Exs. 72-74 [Kaplan Exs. 34, 35, 36]).

79.     Chang continued to communicate with Gupta via text message, reminding him to "take care of yourself," "rest" and "only come back when you're ready." (Pl. 002151-52 [Kaplan Ex. 37]).

80.     Certain bottlenecks and gaps in finance coverage began to materialize due to Gupta's reduced workload. (Anstey Dep. at 304-05, 312 [Kaplan Ex. 2]; Chang Dep. at 267-268 [Kaplan Ex. 26]; O'Brian Dep. at 281-82, 291-93 [Kaplan Ex. 3]; Gupta Dep. at 363-66 [Kaplan Ex. 1]).

81.     In a text message, Gupta wrote the following:  "Doha.  They don't give a damn about us.  I went on sick leave- for past 3 weeks- during peak 'audit' season!! Let them manage without me." (Gupta Dep. 341-43 [Kaplan Ex. 1]; Gupta Ex. 62 [Kaplan Ex. 38]).

82.     AJAM needed someone who would regularly be in the office to handle high-level but day-to-day finance responsibilities when Gupta was unavailable. (Anstey Dep. at 303-05 [Kaplan Ex. 2]; O'Brian Dep. at 281-83 [Kaplan Ex. 3]; Danner Dep. at 124-29, 136-141, 144-150, 155-58, 160-65, 177 [Kaplan Ex. 18]; Chang Dep. at 267-68 [Kaplan Ex. 26]; Triche-Newman Dep. at 92-93 [Kaplan Ex. 39]).

83.     AJAM retained the services of Toby Winer as a consultant to help "fill the void," "keep the wheels turning" and cover these issues created by Gupta's absence. (Anstey Dep. at

303-36 [Kaplan Ex. 2]; O'Brian's Dep. at 282-83 [Kaplan Ex. 3]; Danner Dep. at 132-65 [Kaplan Ex. 18]; Chang Dep. at 267-72, 285 [Kaplan Ex. 26]).

84.    Winer was a consultant with a firm called Kiwi Partners who was paid on an hourly basis; she was not employed by AJAM and did not assume Gupta's position or title of EVP, Finance.  (Danner Dep. at 124, 144 [Kaplan Ex. 18]; Winer Dep. at 52-53; 110-12 [Kaplan Ex. 40]).

85.    Gupta continued to be employed by the Company as EVP, Finance at the same salary of $350,000 per year.  (Winer Dep. at 52-53, 110-12 [Kaplan Ex. 40]; Danner Dep. at 124, 144-45, 246-47 [Kaplan Ex.18])

86.    On or about February 23, 2016, when Gupta's leave of absence had concluded, he met with Anstey and Chang to discuss his employment arrangement moving forward. (Anstey Dep. at 275-279 [Kaplan Ex. 2]; Chang Dep. at 234-38 [Kaplan Ex. 26]).

87.    During that meeting, Gupta stated that he preferred to no longer assist with some of his responsibilities. (Chang Dep. at 232-38 [Kaplan Ex. 26]).

88.    Anstey testified "I actually remember [Gupta's] words: 'Get me out of those." (Anstey Dep. at 277-78 [Kaplan Ex. 2]).

89.    Anstey testified that he left the meeting thinking they had come to a "positive agreement in principle during that meeting" about the scope, form, and duration of Gupta's employment at AJAM moving forward. (Anstey Dep. at 277-79 [Kaplan Ex. 2]).

90.    A written manifestation of that agreement in principle, for review and execution by all parties, was sent to Gupta on February 27, 2016. (Anstey Dep. at 299-300 [Kaplan Ex. 2]; Anstey Ex. 23 [Kaplan Ex. 41]).

91.     By this time, Gupta had retained counsel, so this version of the agreement reflected negotiation of its terms. (Anstey Dep. at 299-300 [Kaplan Ex. 2]; Anstey Ex. 23 [Kaplan Ex 41]; Gupta Dep. at 73 [Kaplan Ex. 1]).

92.     Gupta never signed this proposed agreement. (Chang Dep. at 259-61, 265 [Kaplan Ex. 26]).).

93.     Gupta testified that he did not believe that Anstey discriminated against him until late February — shortly after he retained counsel — at which time he purportedly lost such respect and affinity for Anstey. (Gupta Dep. at 73, 301-02, 348-50 [Kaplan Ex. 1]).

94.     Gupta testified that "[i]t was only after taking stock with events that happened subsequently to the February meeting and then through the events that occurred from February to April, that's before the lawsuit, I realized that he had discriminated and it was he who had made the call." (Gupta Dep. at 259-60 [Kaplan Ex. 1]).

95.     On March 9, 2016, Anstey wrote Gupta to confirm that he could continue to work from home if he wished to do so. (Gupta Ex. 79 [Kaplan Ex. 42]).

96.     On March 10, 2016, Anstey informed Gupta, that "to avoid any misunderstanding, please know that you are welcome to return to work at the office at any time. The company had agreed that you could work from home as an accommodation to you, and you may continue to do so if that is your preference." (Gupta Ex. 80 [Kaplan Ex. 43]).

97.     On March 25, 2016, the Company provided a letter agreement to Gupta outlining the proposed terms and conditions of his final months at the Company as it completed its wind-down ("Stay Agreement"). (Kaplan Ex. 44).

98.     On or about April 15, 2016, Gupta executed the Stay Agreement. (Kaplan Ex. 45).

99.     Under the Stay Agreement, Gupta agreed that: (1) his salary would remain at $350,000 annually; (2) his final day of employment would be June 15, 2016; and (3) the Stay Agreement would supersede all previous agreements, oral or written, between the parties. (Kaplan Ex. 45).

100.    Gupta was represented by counsel at the time he executed the Stay Agreement. (Gupta Dep. at 73 [Kaplan Ex. 1]).

101.    Six days after entering into the Stay Agreement, Gupta filed the Complaint. (Docket No. 1).

102.    Gupta, through counsel, sent a copy of the Complaint to the *New York Times* before it was publicly filed (Gupta Dep. at 273-80 [Kaplan Ex. 1]).

103.    Gupta disclosed certain highly confidential data and information of the Company in the Complaint.  (Gupta Dep. at 273-80 [Kaplan Ex. 1]).

104.    As a result of Plaintiff's disclosure of the Company's confidential information, Gupta's access credentials to AJAM's electronic systems were revoked and he was advised (through counsel) on April 27, 2016 not to come to AJAM's offices unless specifically instructed to do so.  (Supp.  Response to Interrogatory No. 15 [Kaplan Ex. 46]).

105.    Gupta remained employed by AJAM, pursuant to the terms of the Stay Agreement, through June 15, 2016. (Kaplan Ex. 45).

**During Anstey's Tenure, Only Four EVPs or SVPs Receive Salary Increases**

106.    During Anstey's tenure, only four AJAM EVPs or SVPs received salary increases (out of a total of approximately 22 employees with those titles).  (Chang Dec. at ¶ 6, Ex. 1 ).

107.    Chang received a salary increase in October 2015 in connection with her promotion to Acting EVP of HR.  (Chang Dec. at ¶ 7).

15

108.    At that time, Chang had been functioning as the head of HR since May 2015. (Chang Dec. at ¶ 7).

109.    Despite that increase, Chang's salary was still substantially less than Ms. Lee's salary at the time of her resignation.  (Chang Dec. at ¶ 7).

110.    Specifically, Chang's salary was increased from $███████ to $███████ per year, but Ms. Lee was paid $███████ per year as EVP of HR. (Chang Dec. at ¶ 7).

111.    In addition to Chang, only three other AJAM employees with the title of EVP or SVP received a salary increase during Mr. Anstey's tenure as CEO:  David Doss ("Doss"), Terry Baker ("Baker") and Amir Ahmed ("Ahmed"). (Chang Dec. at ¶ 8).

112.    Doss received a salary increase on or about July 29, 2015.  (Chang Dec. at ¶ 9).

113.    Doss had entered into a written employment agreement with AJAM in July 2013 which mandated specific salary increases at specific times. (Chang Dec. at ¶ 9).

114.    Doss's salary increases were non-discretionary and were required by the terms and conditions of the executed contract.  (Chang Dec. at ¶ 9).

115.    Baker received a salary increase on or about September 15, 2015.  (Chang Dec. at ¶ 10).

116.    Baker had previously entered into a written employment agreement with AJAM in September 2014 which mandated a specific salary increase at a specific time.  (Chang Dec. at ¶ 10).

117.    Baker's salary increase was non-discretionary and was required by the terms and conditions of the executed contract.  (Chang Dec. at ¶ 10).

118.    Ahmed received a salary increase, effective November 1, 2015, from $███████ to $███████ per year.  (Chang Dec. at ¶ 11).

16

119.    At such time, Ahmed's title and duties changed from SVP of Newsgathering to SVP of Planning and the salary increase was provided in connection with an effort to retain Ahmed's services.  (Chang Dec. at ¶ 11).

120.    No AJAM SVP or EVP received a salary increase after November 2015.  (Chang Dec. at ¶ 12).

121.    In December 2015, the Company began to evaluate the possibility of shutting down its operations.  (Chang Dec. at ¶ 12).

122.    Like Mr. Gupta, Chang requested a salary increase in December 2015, and that request was not granted.  (Chang Dec. at ¶ 12).

**No First Hand Knowledge of Alleged Prior Discrimination**

123.    Al Shihabi had no personal experience with Anstey's treatment of employees at AJAM after he was replaced as CEO in May 2015. (Al Shihabi Dep. at 13-20, 168-69 [Kaplan Ex. 47]).

124.    Al Shihabi was not involved in the day to day business of AJAM such as decisions to retain or terminate employees after he was replaced as CEO in May 2015.  (Al Shihabi Dep. at 152-53 [Kaplan Ex. 47]).

125.    Al Shihabi never discussed with Anstey whether or not Gupta's salary should be increased or anything else concerning Gupta. (Al Shihabi Dep. at 157-58 [Kaplan Ex. 47]).

126.    Gupta testified that he has no personal or firsthand knowledge to support an allegation that Anstey "has been accused of discrimination against South Asian employees" and that allegedly "while in charge of Al Jazeera English, Anstey fired two Washington, D.C.-based

anchors of Indian heritage because they made the newsroom 'too brown.'" (Gupta Dep. at 215-20, 246-51 [Kaplan Ex. 1]).

Dated: New York, New York
        May 12, 2017

                                        Respectfully submitted,

                                        DLA PIPER LLP (US)

                                        By: /s/ Brian S. Kaplan
                                        Brian S. Kaplan
                                        brian.kaplan@dlapiper.com
                                        Daniel Turinsky
                                        daniel.turinsky@dlapiper.com
                                        1251 Avenue of the Americas, 27th Floor
                                        New York, NY 10020
                                        T: (212) 335-4500
                                        F: (212) 335-4501

                                        Joseph D. Guarino
                                        *Admitted Pro Hac Vice*
                                        joseph.guarino@dlapiper.com
                                        Lisa M. Yennella-Granese
                                        *Admitted Pro Hac Vice*
                                        lisa.yennella-granese@dlapiper.com
                                        51 John F. Kennedy Parkway, Suite 120
                                        Short Hills, NJ 07078
                                        T: (973) 520-2550
                                        F: (973) 520-2551

                                        *Attorneys for Defendants*
                                        *Al Jazeera America, LLC and Al Anstey*