UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X

ANAND GUPTA,

              Plaintiff,

        -against-

AL JAZEERA AMERICA, LLC and AL
ANSTEY,

              Defendants.

------------------------------------- X

:

:     Case No.  1:16-cv-02980 (VEC)

:

:

:

:

### PLAINTIFF'S RESPONSE TO DEFENDANTS' LOCAL CIVIL RULE 56.1 STATEMENT OF MATERIAL FACTS ON MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S COUNTERSTATEMENT OF DISPUTED FACTS

Plaintiff Anand Gupta ("plaintiff" or "Gupta"), pursuant to Local Civil Rule

56.1(c), submits this response in opposition to the Statement Pursuant to Local Rule 56.1(a) of

defendants Al Jazeera America, LLC ("AJAM") and Al Anstey ("Anstey") (collectively,

"defendants").

**Background**

1.     Plaintiff purports to bring claims for race discrimination and retaliation, allegedly in violation of 42 U.S.C. § 1981, the N.Y.S. Human Rights Law and the N.Y.C. Human Rights Law.  (Docket No. 1).

     Plaintiff's Response:

     Admit.

2.     Gupta claims he was discriminated against because he was Indian, not because of age, medical leave, disability or any other characteristic. (Gupta Dep. at 79 [Kaplan Ex. 1]).

     Plaintiff's Response:

     Admit.

3.     Gupta claims that Anstey was the only AJAM employee who discriminated or retaliated against him. (Gupta Dep. at 261, 388-89 [Kaplan Ex. 1]).

Plaintiff's Response:

Admit.

4.    AJAM operated a television channel and digital news website in or about August 2013 until April 2016. (Anstey Dep. at 26, 56-57 [Kaplan Ex. 2]; O'Brian Dep. at 69 [Kaplan Ex. 3]).

Plaintiff's Response:

Admit that AJAM broadcast from August 2013 until April 2016.  AJAM was

formed on or about January 3, 2013 after AJMN acquired Current TV, an American cable TV

channel, and rebranded it as AJAM.  (Iadevaia Dec., Ex. K)[1]

5.    Gupta commenced employment with AJAM as Senior Vice President ("SVP"), Finance on or about September 15, 2013, pursuant to a written employment agreement dated as of August 8, 2013 (the "Employment Agreement") (Gupta Dep. Ex. 26 [Kaplan Ex. 4]).

Plaintiff's Response:

Admit.

6.    The "term" of the Employment Agreement ran for two years, through September 14, 2015, and the Company possessed an exclusive option to extend it. (Gupta Dep. Ex. 26 [Kaplan Ex. 4]).

Plaintiff's Response:

Admit.  AJAM had an exclusive option to extend Gupta's contract for two years

and not for any shorter period of time.  (Kaplan Dec., Ex. 4)[2]  Defendants unilaterally extended

Gupta's contract by one month in June 2015 and a further two months in July 2015, so that it

---

[1] All references to "Iadevaia Dec." refer to the Declaration of Jeremiah Iadevaia ("Iadevaia Dec." or "Iadevaia Declaration").  Similarly, all references to "Iadevaia Dec., Ex. __" refer to exhibits attached to the Iadevaia Declaration.

[2] All references to "Kaplan Dec." refer to the Declaration of Brian S. Kaplan ("Kaplan Dec." or "Kaplan Declaration").  (Dkt. No. 55)  Similarly, all references to "Kaplan Dec., Ex. __" refer to exhibits attached to the Kaplan Declaration.

841294 v2

would end on December 15, 2015. (Gupta Dec. ¶¶ 16-17[3]; Iadevaia Dec., Exs. L, M, N; Gupta Dep. 179:10-22)[4]

7.    Gupta's salary was three hundred and fifty thousand dollars ($350,000) per year. (Gupta Dep. Ex. 26 [Kaplan Ex. 4]).

Plaintiff's Response:

Admit.

8.    The Company had no obligation under the Employment Agreement to increase Gupta's salary at any time. (Gupta Dep. Ex. 26 [Kaplan Ex. 4]).

Plaintiff's Response:

Admit in part, deny in part.  Admit that Gupta's contract did not obligate AJAM to increase Gupta's salary.  However, Gupta's contract obligated AJAM to review Gupta's performance "on a periodic basis" and required AJAM, "[b]ased upon that review," to "consider" granting Gupta a salary increase. (Kaplan Dec., Ex. 4)  Ehab Al Shihabi ("Al Shihabi") did conduct a review of Gupta's performance in early 2015 and, based upon that review of Gupta's performance, awarded Gupta a salary increase from $350,000 to $500,000 plus a $50,000 bonus

---

[3] All references to "Gupta Dec." refer to the Declaration of Anand Gupta ("Gupta Dec.").

[4] The following deposition transcripts are attached to the Iadevaia Declaration and referred to herein as follows: the deposition of Gupta, dated January 25, 2017 ("Gupta Dep."), attached as Exhibit A; the deposition of defendant Anstey, dated January 27, 2017 ("Anstey Dep."), attached as Exhibit B; the deposition of Kate O'Brian, dated January 31, 2017; Feburay 2, 2017; and March 1, 2017 ("O'Brian Dep."), attached as Exhibit C; the deposition of Toby Winer, dated January 18, 2017 ("Winer Dep."), attached as Exhibit D; excerpts of the deposition of Edwina Triche-Newman, dated January 20, 2017 ("Triche-Newman Dep."), attached as Exhibit E; the deposition of HJ Chang, dated February 1, 2017 ("Chang Dep."), attached as Exhibit F; the deposition of Abdulla Al Najjar,  dated Februray 8, 2017 ("Al Najjar Dep."), attached as Exhibit G; the deposition of Eric Danner, dated February 14, 2017 ("Danner Dep."), attached as Exhibit H; excerpts of the deposition of Joonam Hwang, dated February 15, 2017 ("Hwang Dep."), attached as Exhibit I; the deposition of Ehab Al Shihabi, dated February 21, 2017 ("Al Shihabi Dep."), attached as Exhibit J.

for overseeing HR effective May 2015.  (Al Shihabi Dep. 48:1-5, 48:23-49:4, 121:11-123:9;

Gupta Dep. 84:8-15, 84:21-85:2, 167:23-168:6, 238:7-11; Al Shihabi Dec. ¶ 7)[5]

**Gupta Claims Al-Shihabi Promised Him a Salary Increase**

9.      Upon hiring, Gupta reported to AJAM's Interim CEO Ehab Al-Shihabi ("Al-Shihabi"). (Gupta Dep. Ex. 26 [Kaplan Ex. 4]; Anstey Dep. at 17 [Kaplan Ex. 2]; Gupta Dep. at 55 [Kaplan Ex. 1]).

        Plaintiff's Response:

        Admit in part, deny in part.  Upon joining AJAM, Gupta reported to both Al

Shihabi and to the interim Chief Financial Officer, Muftah Al Suwaidan ("Al Suwaidan").

(Gupta Dep. 193:9-15; Kaplan Dec., Ex. 13; Iadevaia Dec., Exs. O, P)  Al Suwaidan oversaw

AJAM's Finance department when Gupta joined.  (Al Shihabi Dep. 116:11-23)  Al Suwaidan

was involved in hiring Gupta, including sitting in on Gupta's interview.  (Iadevaia Dec., Ex. Q)

10.     Gupta claims that on or about March 20, 2015, Al-Shihabi orally promised him that his salary would be increased in May of that year. (Gupta Dep. at 80-85 [Kaplan Ex. 1]).

        Plaintiff's Response:

        Admit that Al Shihabi promised Gupta "around March 20, 21 time frame" that

Gupta would receive a salary increase in May 2015, "after the restructuring" in April 2015.

(Gupta Dep. 80:2-81:11)

11.     Gupta claims that he told no one else about this alleged promise. (Gupta Dep. at 85 [Kaplan Ex. 1]).

        Plaintiff's Response:

        Admit that Gupta did not discuss the salary increase with others.

12.     On March 21, 2015, Al-Shihabi instructed Diana Lee ("Lee"), who was then the Company's Executive Vice President ("EVP") for Human Resources, via e-mail to change Gupta's title to EVP, but explicitly stated that Gupta was to receive "no salary increase." (Gupta Ex. 10 [Kaplan Ex. 5]).

---

[5] All references to "Al Shihabi Dec." refer to the Declaration of Ehab Al Shihabi ("Al Shihabi Dec.").

Plaintiff's Response:

Admit that Al Shihabi instructed Diana Lee ("Lee") not to give Gupta a salary increase at this time.  Al Shihabi told Gupta that the salary increase would not occur until they finished AJAM's proposed budget and a related restructuring in April 2015.  (Gupta Dep. 80:2-11, 91:8-18, 167:23-168:6; Al Shihabi Dep. 46:12-15, 88:7-89:13)

13.    Included in the March 21, 2015 e-mail from Al-Shihabi to Lee was an instruction that another AJAM employee, Francis Kane ("Kane") was to receive a title change to EVP, and no salary increase. (Gupta Dep. at 89 [Kaplan Ex. 1]); Gupta Exs. 10, 12 [Kaplan Exs. 5, 6]).

Plaintiff's Response:

Admit that Al Shihabi instructed Lee to change Francis Kane's ("Kane") title to "EVP." (Kaplan Dec., Ex. 5)  Admit further that Kane did not receive a salary increase with this title change.  (Kaplan Dec., Ex. 6)  Al Shihabi intended to increase Kane's salary at the same time as he increased Gupta's in May 2015 but Al Shihabi never communicated this to Kane and there is no evidence that Kane requested a salary increase.  (Gupta Dep. 201:10-16)

14.    In or about March 2015, John Sollecito ("Sollecito"), Kevin Cohen ("Cohen"), Ross Henderson ("Henderson") and Tony Caron ("Caron") received title changes to EVP or SVP, and none of them received salary increases to accompany their title changes at such time. (Gupta Dep. at 92-96, 211-14 [Kaplan Ex. 1]; Gupta Exs. 11, 12 [Kaplan Exs. 7, 6]).

Plaintiff's Response:

Deny.  In or around March 2015, Tony Karon ("Karon")[6] was promoted to Acting Senior Vice President of Digital and Social Media.  (Iadevaia Dec., Ex. R)  However, this was a temporary title before Karon formally became Senior Vice President of Digital and Social Media on or about May 5, 2015.  (Gupta Dec. ¶ 143; Iadevaia Dec., Ex. S)  Karon received a salary increase from ██████ to ██████ upon his promotion to Senior Vice President.  (Iadevaia Dec., Ex. S; Kaplan Dep., Exs. 8-9)

─────────────
[6] Defendants misspell Karon's last name as "Caron."

In or around March 2015, ▮▮▮▮▮▮▮▮▮▮ was <u>demoted</u> from Executive Vice President to Senior Vice President. ▮▮▮▮ did not receive a salary increase with his demotion nor was his salary reduced. (Al Shihabi Dep. 41:12-14, 44:18-24; Iadevaia Dec., Ex. T)

Ross Henderson ("Henderson") and Kevin Cohen ("Cohen"), unlike Gupta and the other AJAM employees promoted on or about May 5, 2015, received title changes but not formal promotions. Both were Vice Presidents given the title of Senior Vice President in or around March 2015. (Kaplan Dec., Exs. 6-7) Neither Henderson nor Cohen received any additional responsibilities upon receiving these new titles. (Gupta Dec. ¶ 144)

In addition, AJAM had a custom of not giving salary increases to any employees who had worked at AJAM for less than one year such as Cohen and Henderson. (Gupta Dec. ¶ 145) Henderson joined AJAM in August 2014 and Cohen joined AJAM in December 2014 so both had worked at AJAM for fewer than six months when AJAM adjusted their titles. (Iadevaia Dec., Ex. U)

15. None of Kane, Sollecito, Cohen, Henderson or Caron is Indian. (Gupta Dep. at 93, 211-14 [Kaplan Ex. 1]).

Plaintiff's Response:

Admit.

16. In early May 2015 (before Anstey joined AJAM as CEO), four Company employees, including HJ Chang ("Chang"), a Korean-American female, and Caron, who had been promoted along with Gupta in March, received title changes *and* salary increases. (Gupta Dep. at 98-101 [Kaplan Ex. 1]; Gupta Exs. 13, 14 [Kaplan Exs. 8, 9]).

Plaintiff's Response:

Admit in part, deny in part. Admit that HJ Chang ("Chang"), Jocelyn Austin ("Austin"), Jeff Polikoff ("Polikoff"), and Karon all received promotions and salary increases in May 2015. (Iadevaia Dec., Ex. S; Kaplan Dec., Exs. 8-9; Chang Dep. 23:4-10, 29:14-16) Al

6

Shihabi announced their promotions in an email dated May 5, 2015.  (Iadevaia Dec., Ex. S)  In

this same email, Al Shihabi announced the promotion of Gupta to Executive Vice President of

Finance and Business Operations.  (Iadevaia Dec., Ex. S; Gupta Dep. 168:24-169:4)

Deny that Chang had been promoted in March 2015.  Chang joined AJAM in or

around August 2014 as a consultant in AJAM's Human Resources ("HR") department.  Chang

became a full-time AJAM employee in or around January 2015 with the title of Vice President of

HR, where she received a salary of ███████.  (Chang Dep. 11:19-12:2, 14:25-15:22; Kaplan

Dec., Ex. 8; Chang Dec. ¶¶ 2-4)  Chang was not promoted until in or around May 2015, when

she received the title of Senior Vice President of HR and a salary increase from ███████ to

███████  (Iadevaia Dec., Ex. S; Kaplan Dec., Exs. 8-9; Chang Dep. 23:4-10, 29:14-16)

In or around March 2015, AJAM promoted Karon to Acting Senior Vice

President of Digital and Social Media.  (Iadevaia Dec., Ex. R)  However, this was a temporary

title before Karon formally became Senior Vice President of Digital and Social Media on or

about May 5, 2015.  (Gupta Dec. ¶ 143; Iadevaia Dec., Ex. S)  Karon received a salary increase

from ███████ to ███████ upon his promotion to Senior Vice President.  (Iadevaia Dec., Ex. S;

Kaplan Dep., Exs. 8-9)

17.     Gupta did not receive an increase in early May 2015, nor did Gupta object at such
time to the salary increases received by Chang or Caron.  (Gupta Dep. at 80-82; 98-101 [Kaplan
Ex. 1]).

Plaintiff's Response:

Admit that Gupta did not object to salary increases for Chang or Karon.  Further

admit that Gupta did not receive his raise before Al Shihabi left on May 6, 2015, but would have

received the raise in May 2015 if Al Shihabi was not unexpectedly replaced.  (Al Shihabi Dec.

¶ 9)

7

18.     Gupta himself approved these increases received by Chang and Caron in early May 2015. (Gupta Dep. at 98-99 [Kaplan Ex. 1]; Gupta Ex. 14 [Kaplan Ex. 9]).

Plaintiff's Response:

Admit that Gupta approved those raises in his capacity as head of Finance and at

Al Shihabi's direction.  (Gupta Dec. ¶ 146)

**Anstey Replaces Al-Shihabi as CEO**

19.     On May 6, 2015, Anstey became CEO of AJAM, replacing Al-Shihabi. (Al Najjar Dep. at 67-68, 73-74 [Kaplan Ex. 10]; Al Najjar Ex. 3 [Kaplan Ex. 11]; Anstey Dep. at 16-17 [Kaplan Ex. 2]; Declaration of HJ Chang ("Chang Dec.") at ¶ 6).

Plaintiff's Response:

Admit.

20.     Anstey was appointed as CEO by Abdulla Al Najjar ("Al Najjar"), the Vice Chairman and Managing Director of AJAM's Board of Directors, in the midst of a "PR crisis" at the Company. (Al Najjar Dep. at 10, 68-70 [Kaplan Ex. 10]; Anstey Dep. at 17-18 [Kaplan Ex. 2]).

Plaintiff's Response:

Admit that AJMN's decision to replace Al Shihabi was related to Al Shihabi's

handling of personnel matters and not any concerns about the financial status of AJAM.  (Al

Shihabi Dep. 146:11-150:9; Al Najjar Dep. 69:3-70:21)

21.     Early on, in the midst of his overall assessment of AJAM, Anstey had certain reservations concerning Gupta that he shared with Ibrahim Abdulla Al-Obaidli ("Al-Obaidli"), the Executive Director of Finance at Al Jazeera Media Network (AJAM's parent company). (Anstey Dep. at 124-28, 145-49, 169-71 [Kaplan Ex. 2]).

Plaintiff's Response:

Admit in part, deny in part.  Admit that Anstey told Ibrahim Al Obaidli ("Al

Obaidli") about purported, unspecified concerns with Gupta's performance and that one option

Anstey considered was firing plaintiff.  (Kaplan Dec., Ex. 12; Anstey Dep. 127:22-128:16)

Anstey claimed to have concerns about Gupta's performance, including time management skills,

8

his leadership skills, and his failure to inform Anstey about an office relocation from California to New York, although there is no evidence that he raised these specific issues with Al Obaidli. (Anstey Dep. 124:10-128:21)

Deny that Anstey's reservations were grounded in Gupta's actual performance. Gupta had never been subject to these criticisms before Anstey became CEO. (Gupta Dec. ¶ 20) In fact, Gupta's exceptional performance caused Al Shihabi to promote Gupta just days before Anstey became CEO and grant him a substantial raise pursuant to his contract. (Al Shihabi Dec. ¶¶ 5-7; Kaplan Dec., Ex. 11)

Moreover, Anstey had not yet had an opportunity to evaluate Gupta's performance. Between early May 2015, when Anstey became CEO, and June 10, 2015, when Anstey supposedly expressed concern about Gupta's performance, Anstey had only met one-on-one with Gupta once. (Gupta Dec. ¶ 21; Gupta Dep. 115:16-18) Not only that, Anstey could not recall a single concern about any other AJAM executive's performance during all of 2015. (Anstey Dep. 144:12-146:5) From this, a jury could believe that Anstey did not have genuine concerns about Gupta's performance.

22.     In a June 19, 2015 e-mail to Anstey, Al-Obaidli stated that he shared Anstey's concerns, noting that Gupta "lacks strategic plans and forward thinking to efficiently manage/lead Finance for AJAM." (Anstey Ex. 8 [Kaplan Ex. 12]).

Plaintiff's Response:

Admit in part, deny in part. Admit that Al Obaidli wrote an email to Anstey containing the quoted language. (Kaplan Dec., Ex. 12) Deny that these concerns were grounded in Gupta's actual performance. Al Obaidli met Gupta only once, briefly and during that meeting never discussed with Gupta any matters relating to the criticisms contained in Al Obaidli's email to Anstey. (Anstey Dep. 127:22-128:16, 146:6-19)

Contrary to Al Obaidli's email, Gupta excelled at both strategic planning and forward thinking under Al Shihabi. Gupta helped Al Shihabi prepare the market outlook and AJAM distribution and operational strategy presentations to AJAM's board of directors during 2014. Gupta also worked with Al Shihabi to develop the financial and operational roadmap contained in the business plan submitted to Dr. Mostefa Souag ("Souag"), the Director General of Al Jazeera Media Network ("AJMN"), in April 2015. This roadmap identified overhead and cost-cutting initiatives which would allow AJAM to operate at a significantly lower budget from 2015 through 2021 and become self-sustainable by 2022. (Al Shihabi Dec. ¶ 4)

Gupta's strategic skills were recognized by his peers. Chang acknowledged that Gupta's strengths were that "he is very smart and has a good grasp of strategy, big picture thinking, and he knows the business. He has historical knowledge." (Chang Dep. 146:9-16)

Al Obaidli's other criticisms were similarly inaccurate. Al Obaidli said Gupta's budget preparation was poor because Gupta's "projections are purely dependent on existing CAPEX/OPEX." (Kaplan Dec., Ex. 12) However, all budget projections are based on considering capital expenditures and operating expenditures. (Gupta Dec. ¶ 19; Al Shihabi Dep. 136:20-24) Al Obaidli did not suggest an alternative basis for a budget projection. (Kaplan Dec., Ex. 12)

Al Obaidli also stated his belief that Gupta was not the right person given "challenges [AJMN is] facing with [Ministry of Finance] on budget reduction" and the need to "offer creative solutions on Financial issues." (Kaplan Dec., Ex. 12) This criticism is especially incredible because Gupta had already managed to cut AJAM's budget by over ▬▬▬▬ since joining AJAM in 2013, from almost ▬▬▬▬ at the time of launch to just ▬▬▬▬ as of Spring 2015, and had plans in place to cut further if required. (Iadevaia Dec., Exs. V, W; Al

10

Shihabi Dep. 30:11-16, 69:20-71:6)  Al Shihabi "depended" on Gupta's financial skills; Gupta

was "excellent in being able to identify fat" in order to cut the budget without reducing the

quality of the output. (Al Shihabi Dep. 29:19-24, 59:7-11, 72:25-73:14)

23.    Gupta testified that it was Anstey's prerogative as CEO to rely on Al-Obaidli's
email. (Gupta Dep. at 189-90 [Kaplan Ex. 1]).

Plaintiff's Response:

Deny.  Gupta testified that "it is [Anstey's] prerogative to" give weight to Al

Obaidli's criticisms, "but [Al Obaidli] and [Gupta] hadn't worked enough closely for him to make

a judgment." (Gupta Dep. 190:3-5 (emphasis added))  Gupta further testified that even if Anstey

could rely on Al Obaidli's criticisms, it did not make sense to do so given Al Obaidli had only

briefly met Gupta on one occasion.   (Gupta Dep. 189:8-190:5)

24.    As Gupta's Employment Agreement was set to expire in mid-September 2015,
Anstey extended the term of Gupta's Employment Agreement for another month to allow him
more time to evaluate Gupta.  (Anstey Dep. at 149-50, 170-72 [Kaplan Ex. 2]; Anstey Ex. 8
[Kaplan Ex. 12]).

Plaintiff's Response:

Admit that Gupta's contract was for a two-year term ending in mid-September

2015.  Gupta's contract gave AJAM the option to renew for a further two years and not for any

shorter period of time, but needed to provide Gupta at least 90 days' notice regarding whether it

intended to renew his contract or not.  (Kaplan Dec., Ex. 4 ¶ 1)  Admit further that, in or around

June 2015, Anstey told Gupta that he would extend Gupta's contract by one month.  (Gupta Dep.

179:10-22; Gupta Dec. ¶ 16)

25.    After the one-month extension, Gupta remained employed by AJAM "at-will."
(Anstey Dep. at 150-51 [Kaplan Ex. 2]).

Plaintiff's Response:

Deny.  On or about July 21, 2015, Anstey unilaterally extended Gupta's contract a further two months, so as to end on December 15, 2015.  (Gupta Dec. ¶ 17; Iadevaia Dec., Exs. L, M, N)  In or around late September 2015, Anstey and Chang decided to convert Gupta's employment to at-will status following the expiration of his contract on December 15, 2015.  (Gupta Dep. 191:13-23; Chang Dep. 192:14-194:6; Iadevaia Dec., Exs. X, Y, Z)  On or about October 8, 2015, Chang presented Gupta with a letter formalizing his conversion to at-will employment but Gupta rejected the agreement because he was still attempting to obtain the salary increase Al Shihabi promised him.  (Gupta Dec. ¶ 63; Chang Dep. 192:14-194:6; Iadevaia Dec., Ex. X)

26.     On or about July 17, 2015, Gupta requested a salary increase, handing Anstey a memorandum purportedly supporting an increase. (Anstey Dep. at 185-87 [Kaplan Ex. 2]; Anstey Ex. 10 [Kaplan Ex. 13]).

Plaintiff's Response:

Admit in part, deny in part.  Admit that Gupta gave a memo to Anstey regarding his compensation.  (Kaplan Dec., Ex. 13)  Deny that plaintiff sought a salary increase.  Rather, plaintiff asked that Anstey honor Al Shihabi's promise to increase his salary in accordance with his contract.  (Kaplan Dec., Ex. 13)

27.     Anstey told Gupta that they would review his salary at a later date. (Anstey Dep. at 189-90, 192 [Kaplan Ex. 2]).

Plaintiff's Response:

Deny.   On or about July 22, 2015, Anstey told Gupta that he would look into Gupta's promised salary increase but Anstey would need approval from AJMN to increase Gupta's salary.  (Gupta Dec. ¶ 60)  As the CEO of AJAM, Anstey had complete authority to increase salaries.  (Al Shihabi Dep. 79:10-80:10; Gupta Dep. 140:24-141:10; O'Brian Dep.

12

841294 v2

196:12-18)  There is no evidence that Anstey consulted with Abdulla Al Najjar ("Al Najjar") or any other AJMN employee before increasing the salary of other executives during his tenure. (Iadevaia Dec., Exs. AA, BB; Gupta Dep. 308:18-309:5; Anstey Dep. 240:15-241:2; Al-Najjar Dep. 27:12-15; O'Brian Dep. 241:19-242:2)

28.     Gupta regularly attended weekly leadership meetings with Anstey.  (Gupta Dep. at 151-52 [Kaplan Ex. 1]).

   <u>Plaintiff's Response:</u>

   Admit in part, deny in part.   Admit that Gupta attended weekly leadership meetings.   However, Anstey did not attend every such meeting because of his travel commitments.  (Gupta Dep. 151:7-18)  Between May 6, 2015, when Anstey first started, and July 17, 2015, when Gupta submitted a memorandum asking defendants to increase his salary pursuant to Al Shihabi's promise, Anstey had been out of the office for several meetings.  (Gupta Dec. ¶ 22; Gupta Dep. 151:7-18; Anstey Dep. 164:15-165:7)

**<u>Anstey Supports Gupta's Renewed Request But AJAM Begins to Wind-Down</u>**

29.     By e-mail dated December 11, 2015, Gupta renewed his request for a salary increase. (Anstey Dep. at 199-200 [Kaplan Ex. 2]; Anstey Ex. 11 [Kaplan Ex. 14]).

   <u>Plaintiff's Response:</u>

   Admit in part, deny in part.  Admit that on or about December 11, 2015, Gupta at Anstey's direction sent Anstey a justification for a salary increase.  (Gupta Dep. 297:15-299:25; Kaplan Dec., Ex. 14)  Deny that this was the first time Gupta "renewed" his request that defendants honor Al Shihabi's promise to increase his salary since the July 17, 2015 memorandum.  Gupta had repeated his request that Anstey honor Al Shihabi's salary increase at least once a month from July through November 2015.  (Gupta Dec. ¶¶ 58-66; see infra ¶¶ 224-53)  Anstey had told Gupta since at least August 2015 that he was communicating with Al Najjar

13

about increasing Gupta's salary although this was not true.  (Gupta Dec. ¶ 61; Kaplan Dec., Ex. 16; Gupta Dep. 303:7-17, 304:4-10)

30.     In support, Gupta claimed, among other things, that "[t]here are many more folks who do less and make much more."  (Anstey Ex. 11 [Kaplan Ex. 14]).  At the time his request was made, Gupta was the fifth highest paid EVP or SVP in the entire Company, out of a total of 22 employees at those levels.  (Chang Dec. at ¶ 6, Ex. 1).

       Plaintiff's Response:

       Admit that Gupta's email contains the quoted language.  Gupta identified three employees who "do less" but "make much more" – Ken Ripley ("Ripley") who earned ████████ David Harleston ("Harleston") who earned ██████ and was suspended for engaging in serious misconduct; and David Doss ("Doss") who earned ██████ (Kaplan Dec., Ex. 14; Iadevaia Dec., Ex. CC)  In addition to the Senior Vice Presidents and Executive Vice Presidents, Anstey and Kate O'Brian ("O'Brian") had salaries of over ████████ (Anstey Dep. 37:8-11; O'Brian Dep. 15:2-16:17)  As of January 2016, out of ten Executive Vice Presidents, Gupta's salary was fourth highest.  (Iadevaia Dec., Ex. DD)

31.     Gupta testified that, at the time he sent his December 11, 2015 email to Anstey, he did not believe that Anstey was a racist.  (Gupta Dep. at 301-02 [Kaplan Ex. 1]).

       Plaintiff's Response:

       Admit.

32.     Anstey supported a raise for Gupta at this time.  (Anstey Dep. at 206 [Kaplan Ex. 2]; Gupta Dep. at 301-05 [Kaplan Ex. 1]).

       Plaintiff's Response:

       Deny.  Anstey claimed to support Gupta's request for a salary increase but a jury could conclude that Anstey did not genuinely support Gupta's request.  By December 2015, Anstey had misled Gupta for months about seeking approval for a salary increase.  Anstey had told Gupta from August 2015 onward that he was communicating with Al Najjar about Gupta's

proposed salary increase but this was not true.  (Gupta Dec. ¶ 61; Kaplan Dec., Ex. 16; Gupta

Dep. 303:7-17, 304:4-10)  Further, as Anstey later admitted, he misled Gupta when he claimed

that he needed AJMN's approval before increasing Gupta's salary.  (Gupta Dec. ¶ 96)  As the

CEO of AJAM, Anstey had complete authority to increase salaries.  (Al Shihabi Dep. 79:10-

80:10; Gupta Dep. 140:24-141:10; O'Brian Dep. 196:12-18)  There is no evidence that Anstey

consulted with Al Najjar or any other AJMN employee before increasing Amir Ahmed's

("Ahmed") salary in September 2015 or Chang's salary in October 2015.  (Iadevaia Dec., Ex.

AA, BB; Gupta Dep. 308:18-309:5; Anstey Dep. 240:15-241:2; Al-Najjar Dep. 27:12-15;

O'Brian Dep. 241:19-242:2)

        A jury could also conclude that Anstey delayed raising Gupta's salary increase

request until he knew that the request would not be approved.   Anstey waited until late

December 2015, when preparations for the wind down of AJAM were well underway and AJAM

was on the verge of shutting down, before raising Gupta's request for a salary increase with Al

Najjar. (Kaplan Dec., Ex. 16; Gupta Dec. ¶ 24)  On or about December 23, 2016, Anstey told Al

Najjar for the first time about Gupta's request for a salary increase and told Al Najjar that he

"was going to recommend [Gupta's salary increase] in December anyway, and then heard about

project digital." (Kaplan Dec., Ex. 16)  If Anstey supported Gupta's salary increase as of

December 11, 2015, when Gupta first learned of Project Digital, there would be no need to wait a

further two weeks before bringing Gupta's salary increase request to Al Najjar's attention.

(Kaplan Dec., Ex. 16)  Defendants' witnesses testified that salary increases are almost never

awarded during a wind down.  (Danner Dep. 60:9-23, 63:4-8; Al Najjar Dep. 28:5-14; Chang

Dep. 75:22-76:9)

841294 v2

Moreover, a jury could determine that Anstey only reached out to Al Najjar in late December 2015 because defendants needed Gupta's services at that time. As noted, Anstey did not raise with Al Najjar Gupta's salary increase until December 23, 2015, despite repeatedly telling Gupta that he was in discussions with Al Najjar before that date. (Gupta Dec. ¶¶ 58-66; Kaplan Dec., Ex. 16; Gupta Dep. 303:7-17, 304:4-10) On or about December 18, 2015, O'Brian warned Anstey that Gupta was "working late hours and early mornings responding to Deloitte's queries" and will be "absolutely needed" during the wind down but she was "concerned about holding on to" Gupta if they did not "get incentives to [him] and [Chang] asap." (Iadevaia Dec., Ex. EE) Further, Gupta's contract expired in mid-December 2015 and Gupta could leave AJAM without notice. (Gupta Dep. 78:12-16, 198:19-199:3) A jury could believe that Anstey did not genuinely support Gupta's request for a salary increase, but needed to mollify Gupta for the time being.

In addition, despite repeated questions during his deposition about a key issue in this case, Anstey could not remember any details about Al Najjar's response to Anstey's communications concerning Gupta's salary increase. Anstey could not recall the "form of [Al Najjar's] response" or even whether Al Najjar had a response to Gupta's salary increase. (Anstey Dep. 225:9-229:13) A jury could skeptically interpret Anstey's efforts to obtain Gupta's salary increase in light of Anstey's inability to recall important facts relevant to the decision not to give that salary increase.

33.  Gupta testified that he believed Anstey was advocating for a raise for Gupta throughout 2015. (Gupta Dep. at 301-05, 309-19 [Kaplan Ex. 1]).

Plaintiff's Response:

Admit that Gupta believed Anstey was advocating for Gupta's salary increase throughout 2015. (Gupta Dep. 301:20-303:17) Beginning at the end of February 2016, however,

16

and continuing through to the time that Gupta filed this lawsuit, Gupta realized that Anstey's advocacy had not been genuine. (Gupta Dep. 260:1-22)   In particular, on or about February 23, 2016, Anstey told Gupta that he had the authority to approve Gupta's salary increase the whole time but chose to consult with Al Najjar instead.  (Gupta Dec. ¶ 96)  Gupta learned that Anstey never communicated with Al Najjar before the start of the wind down process in December 2015 despite Anstey's claims to the contrary. (Gupta Dec. ¶ 108; Kaplan Dec., Ex. 16; Gupta Dep. 303:7-17, 304:4-10)  Gupta also learned that Anstey had been accused of discrimination against Indians previously.  (Iadevaia Dec., Exs. FFF, LLLLL; Gupta Dec. ¶ 109)

34.     Anstey met with Gupta on or about December 22, 2015 to discuss Gupta's request, and Gupta e-mailed Anstey further justification for an increase. (Anstey Ex. 14 [Kaplan Ex. 15]).

Plaintiff's Response:

Admit.

35.     The next day, Anstey forwarded Gupta's rationale to Al Najjar and advocated that Gupta's request be granted, as Anstey "believe[d] Anand deserved a pay rise." (Anstey Ex. 16 [Kaplan Ex. 16]; Gupta Dep. at 313-14 [Kaplan Ex. 1]; Gupta Ex. 49 [Kaplan Ex. 17]).

Plaintiff's Response:

Admit in part, deny in part.   Admit that Anstey's email contains the quoted language.  Deny that Anstey genuinely supported Gupta's request.  By December 2015, Anstey had misled Gupta for months about seeking approval for a salary increase.   Anstey had told Gupta from August 2015 onward that he was communicating with Al Najjar about Gupta's proposed salary increase but this was not true.  (Gupta Dec. ¶ 61; Kaplan Dec., Ex. 16; Gupta Dep. 303:7-17, 304:4-10)  Further, as Anstey later admitted, he misled Gupta when he claimed that he needed AJMN's approval before increasing Gupta's salary.  (Gupta Dec. ¶ 96)  As the CEO of AJAM, Anstey had complete authority to increase salaries.  (Al Shihabi Dep. 79:10-80:10; Gupta Dep. 140:24-141:10; O'Brian Dep. 196:12-18)  There is no evidence that Anstey

17

consulted with Al Najjar or any other AJMN employee before increasing Ahmed's salary in September 2015 or Chang's salary in October 2015.  (Iadevaia Dec., Ex. AA, BB; Gupta Dep. 308:18-309:5; Anstey Dep. 240:15-241:2; Al-Najjar Dep. 27:12-15; O'Brian Dep. 241:19-242:2)

A jury could also conclude that Anstey delayed raising Gupta's salary increase request until he knew that the request would not be approved.  Anstey waited until late December 2015, when preparations for the wind down of AJAM were well underway and AJAM was on the verge of shutting down, before raising Gupta's request for a salary increase with Al Najjar. (Kaplan Dec., Ex. 16; Gupta Dec. ¶ 24)  On or about December 23, 2016, Anstey told Al Najjar for the first time about Gupta's request for a salary increase and told Al Najjar that he "was going to recommend [Gupta's salary increase] in December anyway, and then heard about project digital."  (Kaplan Dec., Ex. 16)  If Anstey supported Gupta's salary increase as of December 11, 2015, when Gupta first learned of Project Digital, there would be no need to wait a further two weeks before bringing Gupta's salary increase request to Al Najjar's attention. (Kaplan Dec., Ex. 16)  Defendants' witnesses testified that salary increases are almost never awarded during a wind down.  (Danner Dep. 60:9-23, 63:4-8; Al Najjar Dep. 28:5-14; Chang Dep. 75:22-76:9)

Moreover, a jury could determine that Anstey only reached out to Al Najjar in late December 2015 because defendants needed Gupta's services at that time.  As noted, Anstey did not raise with Al Najjar Gupta's salary increase until December 23, 2015, despite repeatedly telling Gupta that he was in discussions with Al Najjar before that date.  (Gupta Dec. ¶¶ 58-66; Kaplan Dec., Ex. 16; Gupta Dep. 303:7-17, 304:4-10)  On or about December 18, 2015, O'Brian warned Anstey that Gupta was "working late hours and early mornings responding to Deloitte's queries" and will be "absolutely needed" during the wind down but she was "concerned about

18

holding on to" Gupta if they did not "get incentives to [him] and [Chang] asap." (Iadevaia Dec., Ex. EE)  Further, Gupta's contract expired in mid-December 2015 and Gupta could leave AJAM without notice.  (Gupta Dep. 78:12-16, 198:19-199:3)  A jury could believe that Anstey did not genuinely support Gupta's request for a salary increase, but needed to mollify Gupta for the time being.

In addition, despite repeated questions during his deposition about a key issue in this case, Anstey could not remember any details about Al Najjar's response to Anstey's communications concerning Gupta's salary increase.  Anstey could not recall the "form of [Al Najjar's] response" or even whether Al Najjar had a response to Gupta's salary increase.  (Anstey Dep. 225:9-229:13)  A jury could skeptically interpret Anstey's efforts to obtain Gupta's salary increase in light of Anstey's inability to recall important facts relevant to the decision not to give that salary increase.

36.     Anstey likewise advocated for an additional increase for Chang, who was promoted to Acting EVP of Human Resources in October 2015.  (Anstey Ex. 16 [Kaplan Ex. 16]).

Plaintiff's Response:

Admit that defendants accurately describe Anstey's email to Al Najjar, but add that as Chang admitted, Gupta's situation was different from her situation because he had never received a salary increase even though he was promoted to Executive Vice President.  (Chang Dep. 219:25-220:25; Anstey Dep. 211:25-212:19)

37.     By December 2015, AJAM had begun to explore whether it would shut down its entire operations. (Anstey Dep. at 66 [Kaplan Ex. 2]).

Plaintiff's Response:

Deny.  A jury could believe that, by December 2015, AJAM had already decided to shut down its operations.  By December 2015, a number of board members had decided that

19

AJAM should be shut down.  (Al Najjar Dep. 44:8-45:4)  Also by December 2015, an Executive Committee, made up of Al Najjar and other AJMN employees, had been formed to oversee "Project Digital" which was the codename given to "the project to wind down and shut down AJAM."  (O'Brian Dep. 77:2-7; Al Najjar Dep. 14:9-15:23)

Gupta and Chang learned about Project Digital for the first time on or about December 11, 2015, by which time AJAM had already retained Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden, Arps"), a law firm, and Deloitte LLP ("Deloitte"), an accounting firm, to run Project Digital.  (Gupta Dep. 255:7-19; Al Najjar Dep. 16:2-17:2; Anstey Dep. 203:14-23; O'Brian Dep. 77:25-79:15; Chang Dep. 47:7-23, 49:23-50:19; Danner Dep. 21:14-22, 27:16-31:19; Iadevaia Dec., Exs. FF, GG)  By this time, Al Najjar had also told Anstey in a one-on-one meeting that AJAM may shut down and Anstey could not recall Al Najjar presenting any alternatives to AJAM shutting down.  (Anstey Dep. 66:4-68:9)

Moreover, on or about December 14, 2015, Yaser Bishr ("Bishr"), AJMN's Executive Director of Strategy and Development and one of the members of the Executive Committee overseeing Project Digital, warned Anstey about the impending wind down of AJAM and provided Anstey with a timeline for when the wind down would be announced.  Bishr asked Anstey "to build certain rules of engagement and habits early on" because "once we begin to execute (by the second week of Jan[uary]) many parts will be moving at the speed of light." (Iadevaia Dec., Ex. FF; Al Najjar Dep. 15:11-15)  Around this same time, at least one member of the Deloitte team understood that the purpose of Project Digital was to wind down AJAM. (Hwang Dep. 27:22-28:15)

38.     Al Najjar testified that it had appeared to AJAM's Board that "the method of operating of AJAM in the media marketplace in the US was not sustainable." (Al Najjar Dep. at 20 [Kaplan Ex. 10]).

Plaintiff's Response:

Deny.  AJAM's business plan all along was to build a loyal audience based on editorial integrity and journalism that affects society and pursue efforts to bolster its profits only after 2020.  (Al Shihabi Dep. 68:5-20; Gupta Dep. 107:22-108:6)

Moreover, AJAM had clear a path to sustainability that Souag had approved in April 2015.  (Al Shihabi Dep. 52:6-54:22; Iadevaia Dec., Ex. W)  Under this path, AJMN would provide additional funds to AJAM through 2022, at which point AJAM expected to receive significant advertising revenue and AJMN would no longer need to fund AJAM.  (Iadevaia Dec., Ex. W)

39.    Deloitte LLP was retained by AJAM's outside counsel as a consultant to advise AJAM regarding the potential wind-down. (Al Najjar Dep. at 39-41 [Kaplan Ex. 10]; Danner Dep. at 15-17 [Kaplan Ex. 18]).

Plaintiff's Response:

Admit in part, deny in part.  Admit that AJAM retained Skadden, Arps which retained Deloitte.  Deny that the wind down was just potential.  A jury could believe that, by the time AJAM retained Deloitte in December 2015, AJAM had already decided to shut down its operations.  By December 2015, a number of board members had decided that AJAM should be shut down.  (Al Najjar Dep. 44:8-45:4)  Also by December 2015, an Executive Committee, made up of Al Najjar and other AJMN employees, had been formed to oversee "Project Digital" which was the codename given to "the project to wind down and shut down AJAM."  (O'Brian Dep. 77:2-7; Al Najjar Dep. 14:9-15:23)

Gupta and Chang learned about Project Digital for the first time on or about December 11, 2015, by which time AJAM had already retained Skadden, Arps and Deloitte to run Project Digital.  (Gupta Dep. 255:7-19; Al Najjar Dep. 16:2-17:2; Anstey Dep. 203:14-23; O'Brian Dep. 77:25-79:15; Chang Dep. 47:7-23, 49:23-50:19; Danner Dep. 21:14-22, 27:16-

21

841294 v2

31:19; Iadevaia Dec., Ex. FF, GG) By this time, Al Najjar had also told Anstey in a one-on-one meeting that AJAM may shut down and Anstey could not recall Al Najjar presenting any alternatives to AJAM shutting down.  (Anstey Dep. 66:4-68:9)

Moreover, on or about December 14, 2015, Bishr warned Anstey about the impending wind down of AJAM and provided Anstey with a timeline for when the wind down would be announced.  Bishr asked Anstey "to build certain rules of engagement and habits early on" because "once we begin to execute (by the second week of Jan[uary]) many parts will be moving at the speed of light."  (Iadevaia Dec., Ex. FF)  Around this same time, at least one member of the Deloitte team understood that the purpose of Project Digital was to wind down AJAM.  (Hwang Dep. 27:22-28:15)

40. The Deloitte team-lead responsible for the engagement, named "Project Digital," was Eric Danner, a senior member of Deloitte's restructuring group."  (Anstey Dep. at 72-73 [Kaplan Ex. 2]; Danner Dep. at 16 [Kaplan Ex. 18]).

Plaintiff's Response:

Admit that Eric Danner ("Danner") was the "leader" of the Deloitte team. (Danner Dep. 16:23-24) Danner operated as the "functional equivalent" of an AJAM employee during the wind down process.  (Danner Dep. 91:9-12)

41. Anstey continued to advocate for a salary increase for Gupta and Chang, both of whom were valuable members of AJAM's core management team who would be entrusted with extremely confidential information concerning the evaluation of alternatives (including potential wind-down) of the Company and Project Digital. (Anstey Ex. 15 [Kaplan Ex. 19]; Danner Dep. at 28-35 [Kaplan Ex. 18]; Gupta Dep. at 255-57, 279-80 [Kaplan Ex. 1]; O'Brian Dep. at 214 [Kaplan Ex. 3].

Plaintiff's Response:

Admit in part, deny in part.  Admit that Gupta and Chang were valuable members of AJAM's core management team.  (Chang Dep. 312:19-313:14; Iadevaia Dec., Exs. HH, II, JJ)

22

841294 v2

Deny that Anstey continued to advocate for a salary increase for Gupta outside of his limited communications with Al Najjar in December 2015. (Kaplan Dec., Ex. 16) For example, on or about January 1, 2016, Gupta asked Anstey to set up a meeting with Danner, who was head of the Deloitte team assisting AJAM with preparing for the wind down. (Kaplan Dec., Ex. 22) However, Anstey never told Danner that he supported Gupta's and Chang's requests for a salary increase. (Danner Dep. 49:18-25, 60:24-61:4)

As another example of Anstey's failure to advocate for a salary increase, Anstey told Gupta on or about January 15, 2016 that it might be possible to increase Gupta's retention bonus to compensate for the failure to increase his salary. (Gupta Dec. ¶ 75; Gupta Dep. 346:11-14; Anstey Dep. 252:16-253:7; Kaplan Dec., Ex. 27) There is no evidence that Anstey ever attempted to obtain an increased retention bonus for Gupta and when Gupta emailed Anstey on or about January 24, 2016 to request an update, Gupta received no response. Gupta continued to follow up with Anstey and filed his discrimination complaint on January 27, 2016 after receiving no response. (Kaplan Dec., Ex. 27; Gupta Dec. ¶ 75)

42. Anstey's e-mail to Al Najjar on December 23, 2015 referenced Gupta's integral role in assisting Deloitte at the outset of their work for AJAM as evidence that Gupta's salary increase was warranted. (Anstey Ex. 16 [Kaplan Ex. 16]).

Plaintiff's Response:

Admit that defendants have accurately described Anstey's email to Al Najjar, but deny that Anstey's advocacy was genuine. By December 2015, Anstey had misled Gupta for months about seeking approval for a salary increase. Anstey had told Gupta from August 2015 onward that he was communicating with Al Najjar about Gupta's proposed salary increase but this was not true. (Gupta Dec. ¶ 61; Kaplan Dec., Ex. 16; Gupta Dep. 303:7-17, 304:4-10) Further, as Anstey later admitted, he misled Gupta when he claimed that he needed AJMN's

23

approval before increasing Gupta's salary.  (Gupta Dec. ¶ 96)  As the CEO of AJAM, Anstey had complete authority to increase salaries.  (Al Shihabi Dep. 79:10-80:10; Gupta Dep. 140:24-141:10; O'Brian Dep. 196:12-18)  There is no evidence that Anstey consulted with Al Najjar or any other AJMN employee before increasing Ahmed's salary in September 2015 or Chang's salary in October 2015.  (Iadevaia Dec., Ex. AA, BB; Gupta Dep. 308:18-309:5; Anstey Dep. 240:15-241:2; Al-Najjar Dep. 27:12-15; O'Brian Dep. 241:19-242:2)

A jury could also conclude that Anstey delayed raising Gupta's salary increase request until he knew that the request would not be approved.  Anstey waited until late December 2015, when preparations for the wind down of AJAM were well underway and AJAM was on the verge of shutting down, before raising Gupta's request for a salary increase with Al Najjar. (Kaplan Dec., Ex. 16; Gupta Dec. ¶ 24)  On or about December 23, 2016, Anstey told Al Najjar for the first time about Gupta's request for a salary increase and told Al Najjar that he "was going to recommend [Gupta's salary increase] in December anyway, and then heard about project digital."  (Kaplan Dec., Ex. 16)  If Anstey supported Gupta's salary increase as of December 11, 2015, when Gupta first learned of Project Digital, there would be no need to wait a further two weeks before bringing Gupta's salary increase request to Al Najjar's attention. (Kaplan Dec., Ex. 16)  Defendants' witnesses testified that salary increases are almost never awarded during a wind down.  (Danner Dep. 60:9-23, 63:4-8; Al Najjar Dep. 28:5-14; Chang Dep. 75:22-76:9)

Moreover, a jury could determine that Anstey only reached out to Al Najjar in late December 2015 because defendants needed Gupta's services at that time.  As noted, Anstey did not raise with Al Najjar Gupta's salary increase until December 23, 2015, despite repeatedly telling Gupta that he was in discussions with Al Najjar before that date.  (Gupta Dec. ¶¶ 58-66;

24

Kaplan Dec., Ex. 16; Gupta Dep. 303:7-17, 304:4-10)  On or about December 18, 2015, O'Brian warned Anstey that Gupta was "working late hours and early mornings responding to Deloitte's queries" and will be "absolutely needed" during the wind down but she was "concerned about holding on to" Gupta if they did not "get incentives to [him] and [Chang] asap."  (Iadevaia Dec., Ex. EE)  Further, Gupta's contract expired in mid-December 2015 and Gupta could leave AJAM without notice.  (Gupta Dep. 78:12-16, 198:19-199:3)  A jury could believe that Anstey did not genuinely support Gupta's request for a salary increase, but needed to mollify Gupta for the time being.

In addition, despite repeated questions during his deposition about a key issue in this case, Anstey could not remember any details about Al Najjar's response to Anstey's communications concerning Gupta's salary increase.  Anstey could not recall the "form of [Al Najjar's] response" or even whether Al Najjar had a response to Gupta's salary increase.  (Anstey Dep. 225:9-229:13)  A jury could skeptically interpret Anstey's efforts to obtain Gupta's salary increase in light of Anstey's inability to recall important facts relevant to the decision not to give that salary increase.

43.     After Gupta informed Anstey that he had spent a number of hours on Christmas Eve assisting the Deloitte team, Anstey told Gupta that "I am supportive of both you and HJ [Chang]. . . [but] that given the discussions and due diligence [regarding Project Digital] that are taking place at the moment, I'm not in a position to approve these [salary increases] without conferring with Abdulla [Al Najjar]." (Anstey Ex. 15 [Kaplan Ex. 19]).

Plaintiff's Response:

Admit that defendants have accurately quoted Anstey's email to Gupta, but deny that Anstey's advocacy was genuine.  By December 2015, Anstey had misled Gupta for months about seeking approval for a salary increase.  Anstey had told Gupta from August 2015 onward that he was communicating with Al Najjar about Gupta's proposed salary increase but this was

not true.  (Gupta Dec. ¶ 61; Kaplan Dec., Ex. 16; Gupta Dep. 303:7-17, 304:4-10)  Further, as Anstey later admitted, he misled Gupta when he claimed that he needed AJMN's approval before increasing Gupta's salary.  (Gupta Dec. ¶ 96)  As the CEO of AJAM, Anstey had complete authority to increase salaries.  (Al Shihabi Dep. 79:10-80:10; Gupta Dep. 140:24-141:10; O'Brian Dep. 196:12-18)  There is no evidence that Anstey consulted with Al Najjar or any other AJMN employee before increasing Ahmed's salary in September 2015 or Chang's salary in October 2015.  (Iadevaia Dec., Ex. AA, BB; Gupta Dep. 308:18-309:5; Anstey Dep. 240:15-241:2; Al-Najjar Dep. 27:12-15; O'Brian Dep. 241:19-242:2)

A jury could also conclude that Anstey delayed raising Gupta's salary increase request until he knew that the request would not be approved.  Anstey waited until late December 2015, when preparations for the wind down of AJAM were well underway and AJAM was on the verge of shutting down, before raising Gupta's request for a salary increase with Al Najjar.  (Kaplan Dec., Ex. 16; Gupta Dec. ¶ 24)  On or about December 23, 2016, Anstey told Al Najjar for the first time about Gupta's request for a salary increase and told Al Najjar that he "was going to recommend [Gupta's salary increase] in December anyway, and then heard about project digital."  (Kaplan Dec., Ex. 16)  If Anstey supported Gupta's salary increase as of December 11, 2015, when Gupta first learned of Project Digital, there would be no need to wait a further two weeks before bringing Gupta's salary increase request to Al Najjar's attention.  (Kaplan Dec., Ex. 16)  Defendants' witnesses testified that salary increases are almost never awarded during a wind down.  (Danner Dep. 60:9-23, 63:4-8; Al Najjar Dep. 28:5-14; Chang Dep. 75:22-76:9)

Moreover, a jury could determine that Anstey only reached out to Al Najjar in late December 2015 because defendants needed Gupta's services at that time.  As noted, Anstey did

26

not raise with Al Najjar Gupta's salary increase until December 23, 2015, despite repeatedly telling Gupta that he was in discussions with Al Najjar before that date. (Gupta Dec. ¶¶ 58-66; Kaplan Dec., Ex. 16; Gupta Dep. 303:7-17, 304:4-10)  On or about December 18, 2015, O'Brian warned Anstey that Gupta was "working late hours and early mornings responding to Deloitte's queries" and will be "absolutely needed" during the wind down but she was "concerned about holding on to" Gupta if they did not "get incentives to [him] and [Chang] asap."  (Iadevaia Dec., Ex. EE)  Further, Gupta's contract expired in mid-December 2015 and Gupta could leave AJAM without notice.  (Gupta Dep. 78:12-16, 198:19-199:3)  A jury could believe that Anstey did not genuinely support Gupta's request for a salary increase, but needed to mollify Gupta for the time being.

In addition, despite repeated questions during his deposition about a key issue in this case, Anstey could not remember any details about Al Najjar's response to Anstey's communications concerning Gupta's salary increase.  Anstey could not recall the "form of [Al Najjar's] response" or even whether Al Najjar had a response to Gupta's salary increase.  (Anstey Dep. 225:9-229:13)  A jury could skeptically interpret Anstey's efforts to obtain Gupta's salary increase in light of Anstey's inability to recall important facts relevant to the decision not to give that salary increase.

44.    Anstey stated that "the current situation may actually help us, as I contacted [Al Najjar] as soon as I received your emails . . . and stressed the urgency given how invaluable you are to Deloitte's due diligence project." (Anstey Ex. 15 [Kaplan Ex. 19]).

Plaintiff's Response:

Admit that defendants have accurately quoted Anstey's email to Gupta, but deny that Anstey's advocacy was genuine.  By December 2015, Anstey had misled Gupta for months about seeking approval for a salary increase.  Anstey had told Gupta from August 2015 onward

27

that he was communicating with Al Najjar about Gupta's proposed salary increase but this was not true. (Gupta Dec. ¶ 61; Kaplan Dec., Ex. 16; Gupta Dep. 303:7-17, 304:4-10) Further, as Anstey later admitted, he misled Gupta when he claimed that he needed AJMN's approval before increasing Gupta's salary. (Gupta Dec. ¶ 96) As the CEO of AJAM, Anstey had complete authority to increase salaries. (Al Shihabi Dep. 79:10-80:10; Gupta Dep. 140:24-141:10; O'Brian Dep. 196:12-18) There is no evidence that Anstey consulted with Al Najjar or any other AJMN employee before increasing Ahmed's salary in September 2015 or Chang's salary in October 2015. (Iadevaia Dec., Ex. AA, BB; Gupta Dep. 308:18-309:5; Anstey Dep. 240:15-241:2; Al-Najjar Dep. 27:12-15; O'Brian Dep. 241:19-242:2)

A jury could also conclude that Anstey delayed raising Gupta's salary increase request until he knew that the request would not be approved. Anstey waited until late December 2015, when preparations for the wind down of AJAM were well underway and AJAM was on the verge of shutting down, before raising Gupta's request for a salary increase with Al Najjar. (Kaplan Dec., Ex. 16; Gupta Dec. ¶ 24) On or about December 23, 2016, Anstey told Al Najjar for the first time about Gupta's request for a salary increase and told Al Najjar that he "was going to recommend [Gupta's salary increase] in December anyway, and then heard about project digital." (Kaplan Dec., Ex. 16) If Anstey supported Gupta's salary increase as of December 11, 2015, when Gupta first learned of Project Digital, there would be no need to wait a further two weeks before bringing Gupta's salary increase request to Al Najjar's attention. (Kaplan Dec., Ex. 16) Defendants' witnesses testified that salary increases are almost never awarded during a wind down. (Danner Dep. 60:9-23, 63:4-8; Al Najjar Dep. 28:5-14; Chang Dep. 75:22-76:9)

28

Moreover, a jury could determine that Anstey only reached out to Al Najjar in late December 2015 because defendants needed Gupta's services at that time.  As noted, Anstey did not raise with Al Najjar Gupta's salary increase until December 23, 2015, despite repeatedly telling Gupta that he was in discussions with Al Najjar before that date.  (Gupta Dec. ¶¶ 58-66; Kaplan Dec., Ex. 16; Gupta Dep. 303:7-17, 304:4-10)  On or about December 18, 2015, O'Brian warned Anstey that Gupta was "working late hours and early mornings responding to Deloitte's queries" and will be "absolutely needed" during the wind down but she was "concerned about holding on to" Gupta if they did not "get incentives to [him] and [Chang] asap."  (Iadevaia Dec., Ex. EE)  Further, Gupta's contract expired in mid-December 2015 and Gupta could leave AJAM without notice.  (Gupta Dep. 78:12-16, 198:19-199:3)  A jury could believe that Anstey did not genuinely support Gupta's request for a salary increase, but needed to mollify Gupta for the time being.

In addition, despite repeated questions during his deposition about a key issue in this case, Anstey could not remember any details about Al Najjar's response to Anstey's communications concerning Gupta's salary increase.  Anstey could not recall the "form of [Al Najjar's] response" or even whether Al Najjar had a response to Gupta's salary increase.  (Anstey Dep. 225:9-229:13)  A jury could skeptically interpret Anstey's efforts to obtain Gupta's salary increase in light of Anstey's inability to recall important facts relevant to the decision not to give that salary increase.

45.    On or about December 27, 2015, Anstey spoke with Al Najjar by phone to follow-up on Gupta's requests. (Anstey Ex. 16 [Kaplan Ex. 16]; Gupta Ex. 52 [Kaplan Ex. 20]).

Plaintiff's Response:

Admit that defendants have accurately described Anstey's December 28, 2016 email to Al Najjar but deny that Anstey advocated for Gupta's salary increase. (See supra Plaintiff's Response to Defendants' 56.1 Statement ("Pl.'s Response") ¶ 44)

46.    On or about December 28, 2015, Anstey forwarded his earlier e-mail supporting the increases along with Gupta's justification for the same, while advising Al Najjar that Gupta and Chang were hoping for "some news by years end, as this has a significant difference for them regarding tax in the USA." (Anstey Ex. 16 [Kaplan Ex. 16]).

Plaintiff's Response:

Admit that defendants have accurately described Anstey's email to Al Najjar, but deny that Anstey's advocacy was genuine.  By December 2015, Anstey had misled Gupta for months about seeking approval for a salary increase.  Anstey had told Gupta from August 2015 onward that he was communicating with Al Najjar about Gupta's proposed salary increase but this was not true.  (Gupta Dec. ¶ 61; Kaplan Dec., Ex. 16; Gupta Dep. 303:7-17, 304:4-10) Further, as Anstey later admitted, he misled Gupta when he claimed that he needed AJMN's approval before increasing Gupta's salary.  (Gupta Dec. ¶ 96)  As the CEO of AJAM, Anstey had complete authority to increase salaries.  (Al Shihabi Dep. 79:10-80:10; Gupta Dep. 140:24-141:10; O'Brian Dep. 196:12-18)  There is no evidence that Anstey consulted with Al Najjar or any other AJMN employee before increasing Ahmed's salary in September 2015 or Chang's salary in October 2015.  (Iadevaia Dec., Ex. AA, BB; Gupta Dep. 308:18-309:5; Anstey Dep. 240:15-241:2; Al-Najjar Dep. 27:12-15; O'Brian Dep. 241:19-242:2)

A jury could also conclude that Anstey delayed raising Gupta's salary increase request until he knew that the request would not be approved.  Anstey waited until late December 2015, when preparations for the wind down of AJAM were well underway and AJAM was on the verge of shutting down, before raising Gupta's request for a salary increase with Al

Najjar. (Kaplan Dec., Ex. 16; Gupta Dec. ¶ 24)  On or about December 23, 2016, Anstey told Al Najjar for the first time about Gupta's request for a salary increase and told Al Najjar that he "was going to recommend [Gupta's salary increase] in December anyway, and then heard about project digital."  (Kaplan Dec., Ex. 16)   If Anstey supported Gupta's salary increase as of December 11, 2015, when Gupta first learned of Project Digital, there would be no need to wait a further two weeks before bringing Gupta's salary increase request to Al Najjar's attention. (Kaplan Dec., Ex. 16)  Defendants' witnesses testified that salary increases are almost never awarded during a wind down.  (Danner Dep. 60:9-23, 63:4-8; Al Najjar Dep. 28:5-14; Chang Dep. 75:22-76:9)

Moreover, a jury could determine that Anstey only reached out to Al Najjar in late December 2015 because defendants needed Gupta's services at that time.  As noted, Anstey did not raise with Al Najjar Gupta's salary increase until December 23, 2015, despite repeatedly telling Gupta that he was in discussions with Al Najjar before that date. (Gupta Dec. ¶¶ 58-66; Kaplan Dec., Ex. 16; Gupta Dep. 303:7-17, 304:4-10)  On or about December 18, 2015, O'Brian warned Anstey that Gupta was "working late hours and early mornings responding to Deloitte's queries" and will be "absolutely needed" during the wind down but she was "concerned about holding on to" Gupta if they did not "get incentives to [him] and [Chang] asap." (Iadevaia Dec., Ex. EE)  Further, Gupta's contract expired in mid-December 2015 and Gupta could leave AJAM without notice.  (Gupta Dep. 78:12-16, 198:19-199:3)  A jury could believe that Anstey did not genuinely support Gupta's request for a salary increase, but needed to mollify Gupta for the time being.

In addition, despite repeated questions during his deposition about a key issue in this case, Anstey could not remember any details about Al Najjar's response to Anstey's

31

communications concerning Gupta's salary increase.  Anstey could not recall the "form of [Al Najjar's] response" or even whether Al Najjar had a response to Gupta's salary increase. (Anstey Dep. 225:9-229:13)  A jury could skeptically interpret Anstey's efforts to obtain Gupta's salary increase in light of Anstey's inability to recall important facts relevant to the decision not to give that salary increase.

47.     Gupta followed up with Anstey on January 1, 2016 to see if Anstey could arrange a conversation between Gupta and Danner, given Danner's role in connection with Project Digital. (Gupta Dep. at 319-23 [Kaplan Ex. 1]; Gupta Ex. 53 [Kaplan Ex. 21]).

Plaintiff's Response:

Admit.

48.     Anstey responded that he would set up a conversation between Gupta and Danner, while emphasizing that he "hope[d] [he] was clear that I'm still pushing for the pay rise for both of you with Abdulla [Al Najjar], I just haven't had a response yet.  So it's not off the radar screen." (Gupta Dep. at 323-24 [Kaplan Ex. 1]; Gupta Ex. 54 [Kaplan Ex. 22]).

Plaintiff's Response:

Admit that defendants have accurately described Anstey's email to Gupta, but deny that Anstey's advocacy was genuine.  By December 2015, Anstey had misled Gupta for months about seeking approval for a salary increase.  Anstey had told Gupta from August 2015 onward that he was communicating with Al Najjar about Gupta's proposed salary increase but this was not true.  (Gupta Dec. ¶ 61; Kaplan Dec., Ex. 16; Gupta Dep. 303:7-17, 304:4-10) Further, as Anstey later admitted, he misled Gupta when he claimed that he needed AJMN's approval before increasing Gupta's salary.  (Gupta Dec. ¶ 96)  As the CEO of AJAM, Anstey had complete authority to increase salaries.  (Al Shihabi Dep. 79:10-80:10; Gupta Dep. 140:24-141:10; O'Brian Dep. 196:12-18)  There is no evidence that Anstey consulted with Al Najjar or any other AJMN employee before increasing Ahmed's salary in September 2015 or Chang's

32

salary in October 2015.   (Iadevaia Dec., Ex. AA, BB; Gupta Dep. 308:18-309:5; Anstey Dep. 240:15-241:2; Al-Najjar Dep. 27:12-15; O'Brian Dep. 241:19-242:2)

A jury could also conclude that Anstey delayed raising Gupta's salary increase request until he knew that the request would not be approved.   Anstey waited until late December 2015, when preparations for the wind down of AJAM were well underway and AJAM was on the verge of shutting down, before raising Gupta's request for a salary increase with Al Najjar.   (Kaplan Dec., Ex. 16; Gupta Dec. ¶ 24)   On or about December 23, 2016, Anstey told Al Najjar for the first time about Gupta's request for a salary increase and told Al Najjar that he "was going to recommend [Gupta's salary increase] in December anyway, and then heard about project digital."   (Kaplan Dec., Ex. 16)   If Anstey supported Gupta's salary increase as of December 11, 2015, when Gupta first learned of Project Digital, there would be no need to wait a further two weeks before bringing Gupta's salary increase request to Al Najjar's attention. (Kaplan Dec., Ex. 16)   Defendants' witnesses testified that salary increases are almost never awarded during a wind down.   (Danner Dep. 60:9-23, 63:4-8; Al Najjar Dep. 28:5-14; Chang Dep. 75:22-76:9)

Moreover, a jury could determine that Anstey only reached out to Al Najjar in late December 2015 because defendants needed Gupta's services at that time.   As noted, Anstey did not raise with Al Najjar Gupta's salary increase until December 23, 2015, despite repeatedly telling Gupta that he was in discussions with Al Najjar before that date.   (Gupta Dec. ¶¶ 58-66; Kaplan Dec., Ex. 16; Gupta Dep. 303:7-17, 304:4-10)   On or about December 18, 2015, O'Brian warned Anstey that Gupta was "working late hours and early mornings responding to Deloitte's queries" and will be "absolutely needed" during the wind down but she was "concerned about holding on to" Gupta if they did not "get incentives to [him] and [Chang] asap." (Iadevaia Dec.,

33

Ex. EE)  Further, Gupta's contract expired in mid-December 2015 and Gupta could leave AJAM

without notice.  (Gupta Dep. 78:12-16, 198:19-199:3)  A jury could believe that Anstey did not

genuinely support Gupta's request for a salary increase, but needed to mollify Gupta for the time

being.

In addition, despite repeated questions during his deposition about a key issue in

this case, Anstey could not remember any details about Al Najjar's response to Anstey's

communications concerning Gupta's salary increase.  Anstey could not recall the "form of [Al

Najjar's] response" or even whether Al Najjar had a response to Gupta's salary increase.  (Anstey

Dep. 225:9-229:13)  A jury could skeptically interpret Anstey's efforts to obtain Gupta's salary

increase in light of Anstey's inability to recall important facts relevant to the decision not to give

that salary increase.

49.     Gupta spoke with Danner on January 4, 2016 and sent him an e-mail the next day
again outlining why he, Chang, and Kim Bondy ("Bondy"), an African American female who
was an SVP at AJAM, should each receive increases. (Gupta Dep. at 323-24 [Kaplan Ex. 1],
Gupta Ex. 55 [Kaplan Ex. 23]).

Plaintiff's Response:

Admit that Gupta spoke with Danner on January 4, 2016 and sent a follow-up

email the next day.  (Kaplan Dec., Ex. 23)  Gupta's situation was different from Chang's and

Bondy's.  As Chang recognized, Gupta's situation was different from her situation because he

had never received a salary increase even though he was promoted to Executive Vice President.

(Chang Dep. 219:25-220:25; Anstey Dep. 211:25-212:19)  In contrast, over the course of six

months, Chang received two pay increases having been promoted to Senior Vice President and

then acting Executive Vice President.  (Kaplan Dec., Ex. 8; Iadevaia Dec., Ex. KK; Chang Dep.

23:4-10, 29:14-16, 34:11-17)  Bondy's situation was also different because she had received

841294 v2

additional compensation in March 2015 and then compensation in the form of covering her

housing costs.  (Iadevaia Dec., Ex. LL)

50.     After meeting with Gupta and Chang, Danner indicated that he would discuss the
issue with AJAM's Executive Committee, including Al Najjar. (Danner Dep. at 63-73 [Kaplan
Ex. 18]).

Plaintiff's Response:

Admit that this is what Danner told Gupta.

51.     Shortly after this meeting, Danner advised the Executive Committee that Gupta,
Chang and Bondy had requested salary increases, and highlighted for the Committee the
specifics of Gupta's "situation" as Gupta had explained it to him. (Danner Dep. at 73-76 [Kaplan
Ex. 18]).

Plaintiff's Response:

Deny.  A jury is entitled to disbelieve the testimony of Danner, an interested

witness.  Moreover, Danner did not discuss the specifics of Gupta's salary increase but instead

presented the possibility of a salary increase as a "categorical issue" that potentially implicated

many AJAM employees.  (Danner Dep. 74:10-76:23)

52.     Though the Executive Committee provided no definitive decision at this
time, Danner cautioned Gupta that it did not appear that there was an "appetite" to increase
salaries as the Company was increasingly considering winding down its operations. (Danner
Dep. at 83-85, 95, 99-100 [Kaplan Ex. 18]).

Plaintiff's Response:

Deny.  A jury is entitled to disbelieve the testimony of Danner, an interested

witness.  Moreover, Danner never spoke to Gupta about any of his discussions concerning

Gupta's salary increase and never told Gupta that there was no "appetite" to increase salaries

during the wind down.  (Gupta Dec. ¶ 76)  Chang learned this by January 10, 2016, which is

evidence that the decision to wind down AJAM was made before board approval or the public

announcement on January 13, 2016.  (Chang Dep. 202:2-12, 204:21-205:6; Kaplan Dec., Ex. 25)

Deny further that AJAM was "considering winding down its operations" at this time.  By December 2015, a number of board members had decided that AJAM should be shut down.  (Al Najjar Dep. 44:8-45:4)  Also by December 2015, an Executive Committee, made up of Al Najjar and other AJMN employees, had been formed to oversee "Project Digital" which was the codename given to "the project to wind down and shut down AJAM."  (O'Brian Dep. 77:2-7; Al Najjar Dep. 14:9-15:23)

Gupta and Chang learned about Project Digital for the first time on or about December 11, 2015, by which time AJAM had already retained Skadden, Arps and Deloitte to run Project Digital.  (Gupta Dep. 255:7-19; Al Najjar Dep. 16:2-17:2; Anstey Dep. 203:14-23; O'Brian Dep. 77:25-79:15; Chang Dep. 47:7-23, 49:23-50:19; Danner Dep. 21:14-22, 27:16-31:19; Iadevaia Dec., Ex. FF, GG) By this time, Al Najjar had also told Anstey in a one-on-one meeting that AJAM may shut down and Anstey could not recall Al Najjar presenting any alternatives to AJAM shutting down.  (Anstey Dep. 66:4-68:9)

Moreover, on or about December 14, 2015, Bishr warned Anstey about the impending wind down of AJAM and provided Anstey with a timeline for when the wind down would be announced.  Bishr asked Anstey "to build certain rules of engagement and habits early on" because "once we begin to execute (by the second week of Jan[uary]) many parts will be moving at the speed of light."  (Iadevaia Dec., Ex. FF)  Around this same time, at least one member of the Deloitte team understood that the purpose of Project Digital was to wind down AJAM.  (Hwang Dep. 27:22-28:15)

53.    Danner also reiterated to the Executive Committee that in his experience, increases to compensation were very rarely awarded in wind-down situations because the company is shuttering its business.  (Danner Dep. at 75 [Kaplan Ex. 18]).

36

Plaintiff's Response:

Admit that Danner so testified.   Other witnesses also testified to this effect.  (Al Najjar Dep. 28:5-14; Chang Dep. 75:22-76:9)

54.     On January 9, 2016, Gupta followed up on the issue again with Anstey, who told Gupta that there had been no decision yet as "the conversations are focused on whether this decision [to wind-down the Company] is going to happen or not!" (Gupta Dep. at 325-27 [Kaplan Ex. 1]; Gupta Ex. 56 [Kaplan Ex. 24]).

Plaintiff's Response:

Admit that defendants have accurately described Anstey's email to Gupta. However, a jury could find that defendants decided to shut down AJAM well before January 9, 2015.  By December 2015, a number of board members had decided that AJAM should be shut down.  (Al Najjar Dep. 44:8-45:4)  Also by December 2015, an Executive Committee, made up of Al Najjar and other AJMN employees, had been formed to oversee "Project Digital" which was the codename given to "the project to wind down and shut down AJAM."  (O'Brian Dep. 77:2-7; Al Najjar Dep. 14:9-15:23)

Gupta and Chang learned about Project Digital for the first time on or about December 11, 2015, by which time AJAM had already retained Skadden, Arps and Deloitte to run Project Digital.  (Gupta Dep. 255:7-19; Al Najjar Dep. 16:2-17:2; Anstey Dep. 203:14-23; O'Brian Dep. 77:25-79:15; Chang Dep. 47:7-23, 49:23-50:19; Danner Dep. 21:14-22, 27:16-31:19; Iadevaia Dec., Ex. FF, GG) By this time, Al Najjar had also told Anstey in a one-on-one meeting that AJAM may shut down and Anstey could not recall Al Najjar presenting any alternatives to AJAM shutting down.  (Anstey Dep. 66:4-68:9)

Moreover, on or about December 14, 2015, Bishr warned Anstey about the impending wind down of AJAM and provided Anstey with a timeline for when the wind down would be announced.  Bishr asked Anstey "to build certain rules of engagement and habits early

37

on" because "once we begin to execute (by the second week of Jan[uary]) many parts will be moving at the speed of light." (Iadevaia Dec., Ex. FF) Around this same time, at least one member of the Deloitte team understood that the purpose of Project Digital was to wind down AJAM. (Hwang Dep. 27:22-28:15)

55.     By January 10, 2016, it became apparent that salary increases were not likely to be forthcoming. (Anstey Dep. at 246-47 [Kaplan Ex. 2]; Anstey Ex. 17 [Kaplan Ex. 25]; Al Najjar Dep. at 25-26 [Kaplan Ex. 10]).

Plaintiff's Response:

Deny. Anstey only told Gupta that Gupta would not receive any salary increase on or about January 15, 2016. (Gupta Dec. ¶ 75; Gupta Dep. 346:11-14) However, a jury could conclude that Anstey was aware well before January 15, 2016 that Gupta was not going to get a raise. Anstey waited until late December 2015, when preparations for the wind down of AJAM were well underway and AJAM was on the verge of shutting down, before raising Gupta's request for a salary increase with Al Najjar. (Kaplan Dec., Ex. 16; Gupta Dec. ¶ 124) On or about December 23, 2016, Anstey told Al Najjar for the first time about Gupta's request for a salary increase and told Al Najjar that he "was going to recommend [Gupta's salary increase] in December anyway, and then heard about project digital." (Kaplan Dec., Ex. 16) If Anstey supported Gupta's salary increase as of December 11, 2015, when Gupta first learned of Project Digital, there would be no need to wait a further two weeks before bringing Gupta's salary increase request to Al Najjar's attention. (Kaplan Dec., Ex. 16) Defendants' witnesses testified that salary increases are almost never awarded during a wind down. (Danner Dep. 60:9-23, 63:4-8; Al Najjar Dep. 28:5-14; Chang Dep. 75:22-76:9)

56.     By January 13, 2016, AJAM's Board of Directors had reached a decision to wind-down the Company, which was announced to AJAM's staff and the public. (Danner Dep. at 23 [Kaplan Ex. 18]; Anstey Dep. at 57-61 [Kaplan Ex. 2]).

841294 v2

Plaintiff's Response:

Admit that AJAM's board of directors formally approved the wind down by January 13, 2016. However, plans to wind down AJAM were made well before the board made this decision. By December 2015, a number of board members had decided that AJAM should be shut down. (Al Najjar Dep. 44:8-45:4) Also by December 2015, an Executive Committee, made up of Al Najjar and other AJMN employees, had been formed to oversee "Project Digital" which was the codename given to "the project to wind down and shut down AJAM." (O'Brian Dep. 77:2-7; Al Najjar Dep. 14:9-15:23)

Gupta and Chang learned about Project Digital for the first time on or about December 11, 2015, by which time AJAM had already retained Skadden, Arps and Deloitte to run Project Digital. (Gupta Dep. 255:7-19; Al Najjar Dep. 16:2-17:2; Anstey Dep. 203:14-23; O'Brian Dep. 77:25-79:15; Chang Dep. 47:7-23, 49:23-50:19; Danner Dep. 21:14-22, 27:16-31:19; Iadevaia Dec., Ex. FF, GG) By this time, Al Najjar had also told Anstey in a one-on-one meeting that AJAM may shut down and Anstey could not recall Al Najjar presenting any alternatives to AJAM shutting down. (Anstey Dep. 66:4-68:9)

Moreover, on or about December 14, 2015, Bishr warned Anstey about the impending wind down of AJAM and provided Anstey with a timeline for when the wind down would be announced. Bishr asked Anstey "to build certain rules of engagement and habits early on" because "once we begin to execute (by the second week of Jan[uary]) many parts will be moving at the speed of light." (Iadevaia Dec., Ex. FF) Around this same time, at least one member of the Deloitte team understood that the purpose of Project Digital was to wind down AJAM. (Hwang Dep. 27:22-28:15)

57.     Al Najjar ultimately declined Anstey's proposed pay raise for Gupta "[b]ecause we were in the process of winding down [AJAM]." (Al Najjar Dep. at 25 [Kaplan Ex. 10]).

Plaintiff's Response:

Admit that Al Najjar so testified. (Al Najjar Dep. 25:21-26:3) However, Anstey could not remember any details about Al Najjar's response to Anstey's communications concerning Gupta's salary increase. Anstey could not recall the "form of [Al Najjar's] response" or even whether Al Najjar had a response to Gupta's salary increase. (Anstey Dep. 225:9-229:13)

Moreover, a jury could conclude, based on Al Najjar's testimony, that had Anstey asked for Al Najjar's approval before December 2015, Al Najjar had no reason to decline the request. Anstey, however, did not raise Gupta's salary increase request with Al Najjar until late December 2015, when preparations for the wind down of AJAM were well underway and AJAM was on the verge of shutting down, even though Anstey had falsely told Gupta from August 2015 onward that he was communicating with Al Najjar about Gupta's proposed salary increase. (Gupta Dec. ¶ 61; Kaplan Dec., Ex. 16; Gupta Dep. 303:7-17, 304:4-10)

58.     Chang was told that a salary increase was deemed to be inappropriate in a wind-down situation. (Chang Dep. at 75-82 [Kaplan Ex. 26].

Plaintiff's Response:

Admit that Chang so testified. Chang learned this by January 10, 2016, which is evidence that the decision to wind down AJAM was made before board approval or the public announcement on January 13, 2016. (Chang Dep. 202:2-12, 204:21-205:6; Kaplan Dec., Ex. 25) Other witnesses also testified that salary increases are almost never awarded during a wind down. (Danner Dep. 60:9-23, 63:4-8; Al Najjar Dep. 28:5-14)

**Despite the Wind-Down, Gupta Does Not Abandon the Salary Increase Issue**

59.     Notwithstanding his knowledge that AJAM was in the process of going out of business, in an e-mail to Anstey, Chang, and AJAM's President (Kate O'Brian ("O'Brian")) dated January 24, 2016, Gupta reiterated his request for a salary increase. (Gupta Ex. 57 [Kaplan Ex. 27]).

40

Plaintiff's Response:

Admit that Gupta sent a January 24, 2016 email to Anstey, Chang, and O'Brian reiterating his desire for the salary increase that Al Shihabi promised in May 2015. (Kaplan Dec., Ex. 27) This was not a new request, but a raise Al Shihabi awarded him in May 2015 following his promotion to Executive Vice President of Finance and Business Operations. (Al Shihabi Dec. ¶ 7) Gupta had repeated his request that Anstey honor Al Shihabi's salary increase at least once a month from July 2015 through January 2016. (Gupta Dec. ¶¶ 58-66; see infra ¶¶ 224-53, 391-422)

60.     On January 27, 2016, Gupta again e-mailed Chang, copying others, to complain about not receiving a salary increase. (Gupta Ex. 63 [Kaplan Ex. 28]).

Plaintiff's Response:

Admit that on January 27, 2016, Gupta sent via email a formal complaint of race discrimination to senior AJAM executives, including Chang and others. In this email, Gupta among other things complained that the failure to increase his salary was "discriminatory treatment" in violation of the "fair employment laws." (Kaplan Dec., Ex. 28; Gupta Dep. 353:5-21; see infra ¶ 61) This email followed on from a conversation on or about January 19 or 20, 2016 in which Gupta complained to Chang about race discrimination. (Gupta Dec. ¶ 84) Gupta explained to Chang that AJMN had a "glass ceiling" for Indian employees and that this culture of discrimination was the reason he did not receive a salary increase. (Gupta Dep. 352:12-24, 353:5-11; Gupta Dec. ¶ 84) Gupta told Chang that he wanted to file a formal complaint but was not sure whether it was possible to do so as a senior executive. (Gupta Dep. 352:12-24; Gupta Dec. ¶ 84) Chang told Gupta that nothing prevented him from filing a formal complaint. (Gupta Dec. ¶ 85) Gupta filed his "official complaint" about AJAM's "discriminatory treatment" about one week later. (Kaplan Dec., Ex. 28)

41

61.     This e-mail cited a number of reasons for which Gupta believed AJAM's failure to provide him a salary increase was "very unfair and discriminatory." (Gupta Ex. 63 [Kaplan Ex. 28]).  Nowhere in his e-mail, however, does Gupta state that he believed those reasons were motivated by race-based discriminatory animus.  (Gupta Ex. 63 [Kaplan Ex. 28]).

Plaintiff's Response:

Admit in part, deny in part.  Admit that Gupta complained about "discriminatory treatment" and "discriminatory behavior."  (Kaplan Dec., Ex. 28)

Deny that Gupta failed to make clear that he was complaining of discrimination on the basis of race.  Chang should have understood that Gupta was complaining of race discrimination because, about one week earlier, Gupta complained to Chang that he believed he was being discriminated against because he is Indian.  Gupta explained to Chang that AJMN had a "glass ceiling" for Indian employees and that this culture of discrimination was the reason he did not receive a salary increase.  (Gupta Dep. 352:12-24, 353:5-11; Gupta Dec. ¶ 84)  Gupta asked Chang whether he could file a formal complaint of race discrimination and Chang told Gupta that nothing prevented him from filing a formal complaint, although she doubted that such a complaint would resolve anything.  (Gupta Dep. 352:12-24; Gupta Dec. ¶¶ 84-85)  Gupta filed this "official complaint" the following week and copied Chang on the complaint.  (Kaplan Dec., Ex. 28)

In addition, the January 27, 2016 discrimination complaint references AJAM's failure to abide by "fair employment laws."  (Kaplan Dec., Ex. 28)  O'Brian, who was copied on the complaint, testified that she understood "fair employment laws" to include "EEOC laws" that prohibit unlawful discrimination and could not identify any other types of laws encompassed by the phrase "fair employment laws."  (O'Brian Dep. 260:8-261:5)

42

Gupta also described circumstances leading up to his promotion and promised salary increase as "slave labor" in the email, which could reasonably be interpreted as a challenge to racial discrimination. (Kaplan Dec., Ex. 28)

Further, at the end of the email, Gupta says that he "trust[s] that this complaint will not result in any retaliation . . . but would appreciate confirmation" that no retaliation would be forthcoming. (Kaplan Dec., Ex. 28) Protection from retaliation is a critical component of the anti-discrimination laws, as Anstey understood. (Anstey Dep. 267:7-24)

It appears that defendants understood, at the very least, that Gupta's complaint warranted legal advice. Within hours of Gupta's January 27, 2016 complaint, defendants communicated with lawyers for the purpose of seeking legal advice. (Iadevaia Dec., Exs. MM, NN)

62.    Gupta did not allege or allude to the possibility that his race (Indian) was remotely related to the Company's decision not to increase his salary, nor did he suggest that AJAM or Anstey had done anything "unlawful." (Gupta Ex. 63 [Kaplan Ex. 28]).

Plaintiff's Response:

Deny. Gupta's January 27, 2016 race discrimination complaint accused AJAM of "discriminatory treatment" and "discriminatory behavior." (Kaplan Dec., Ex. 28; Gupta Dep. 353:5-21) Gupta complained that Anstey was supportive of his salary increase but that AJMN had prevented the salary increase from going into effect. Gupta further noted that AJMN did not block the October 2015 salary increase for Chang, who is not Indian. (Kaplan Dec., Ex. 28; Gupta Dep. 261:3-14)

Chang should have understood that Gupta was complaining of race discrimination because, about one week earlier, Gupta complained to Chang that he believed he was being discriminated against because he is Indian. Gupta explained to Chang that AJMN had a "glass

43

ceiling" for Indian employees and that this culture of discrimination was the reason he did not receive a salary increase.  (Gupta Dep. 352:12-24, 353:5-11; Gupta Dec. ¶ 84)  Gupta asked Chang whether he could file a formal complaint of race discrimination and Chang told Gupta that nothing prevented him from filing a formal complaint, although she doubted that such a complaint would resolve anything.  (Gupta Dep. 352:12-24; Gupta Dec. ¶¶ 84-85)  Gupta filed this "official complaint" the following week and copied Chang on the complaint.  (Kaplan Dec., Ex. 28)

In addition, the January 27, 2016 discrimination complaint references AJAM's failure to abide by "fair employment laws."  (Kaplan Dec., Ex. 28)  O'Brian, who was copied on the complaint, testified that she understood "fair employment laws" to include "EEOC laws" that prohibit unlawful discrimination and could not identify any other types of laws encompassed by the phrase "fair employment laws."  (O'Brian Dep. 260:8-261:5)

Gupta also described circumstances leading up to his promotion and promised salary increase as "slave labor" in the email, which could reasonably be interpreted as a challenge to racial discrimination.  (Kaplan Dec., Ex. 28)

Further, at the end of the email, Gupta says that he "trust[s] that this complaint will not result in any retaliation . . . but would appreciate confirmation" that no retaliation would be forthcoming.  (Kaplan Dec., Ex. 28)  Protection from retaliation is a critical component of the anti-discrimination laws, as Anstey understood.  (Anstey Dep. 267:7-24)

It appears that defendants understood, at the very least, that Gupta's complaint warranted legal advice.  Within hours of Gupta's January 27, 2016 complaint, defendants communicated with lawyers for the purpose of seeking legal advice.  (Iadevaia Dec., Exs. MM, NN)

44

63.     Gupta stated he "would like to get clarity on why I am being singled out for such treatment by my management team." (Gupta Ex. 63 [Kaplan Ex. 28]).

Plaintiff's Response:

Admit that defendants selectively quote Gutpa's January 27, 2016 discrimination complaint. (See supra Pl.'s Response ¶¶ 61-62)

64.     The AJAM employees who received the e-mail and Danner testified that he or she did not believe Gupta to be complaining about race discrimination. (Anstey Dep. at 263-65 [Kaplan Ex. 2]; Chang Dep at 208-10 [Kaplan Ex. 26]; Danner Dep. at 104-06 [Kaplan Ex. 18]; O'Brian Dep at 250-57 [Kaplan Ex. 3]).

Plaintiff's Response:

Admit that they so testified but a jury is entitled to disbelieve the testimony of interested witnesses.

In addition, Chang should have understood that Gupta was complaining of race discrimination because, about one week earlier, Gupta complained to Chang that he believed he was being discriminated against because he is Indian. Gupta explained to Chang that AJMN had a "glass ceiling" for Indian employees and that this culture of discrimination was the reason he did not receive a salary increase. (Gupta Dep. 352:12-24, 353:5-11; Gupta Dec. ¶ 84) Gupta asked Chang whether he could file a formal complaint of race discrimination and Chang told Gupta that nothing prevented him from filing a formal complaint, although she doubted that such a complaint would resolve anything. (Gupta Dep. 352:12-24; Gupta Dec. ¶¶ 84-85) Gupta filed this "official complaint" the following week and copied Chang on the complaint. (Kaplan Dec., Ex. 28)

Further, the January 27, 2016 discrimination complaint references AJAM's failure to abide by "fair employment laws." (Kaplan Dec., Ex. 28) O'Brian, who was copied on the complaint, testified that she understood "fair employment laws" to include "EEOC laws" that

45

prohibit unlawful discrimination and could not identify any other types of laws encompassed by the phrase "fair employment laws." (O'Brian Dep. 260:8-261:5)

Defendants also could reasonably have understood that Gupta was complaining of discrimination on the basis of his when he described circumstances leading up to his promotion and promised salary increase as "slave labor" in the email. (Kaplan Dec., Ex. 28)

Moreover, Anstey could not testify as to how he interpreted Gupta's complaint at the time he received it. Instead, Anstey speculated as to how he "would" have reacted. (Anstey Dep. 264:25-265:8) Anstey also understands that retaliation is a critical component of the anti-discrimination laws and Gupta, at the end of the email, says that he "trust[s] that this complaint will not result in any retaliation . . . but would appreciate confirmation" that no retaliation would be forthcoming. (Kaplan Dec., Ex. 28)

It appears that defendants understood, at the very least, that Gupta's complaint warranted legal advice. Within hours of Gupta's January 27, 2016 complaint, defendants communicated with lawyers for the purpose of seeking legal advice. (Iadevaia Dec., Exs. MM, NN)

65.    Chang testified that she understood Gupta's e-mail to be part of a larger "plan" or "scheme" they were "cooking up" to use their "leverage" to obtain a salary increase. (Chang Dep. at 51-52, 59, 61, 195, 211 [Kaplan Ex. 26]).

Plaintiff's Response:

Admit that Chang so testified but a jury is entitled to disbelieve the testimony of Chang, an interested witness. Gupta complained of discrimination because he genuinely believed that he did not receive a salary increase because he is Indian. (Kaplan Dec., Ex. 28; Gupta Dep. 353:5-21)

46

Chang should have understood that Gupta was complaining of race discrimination because, about one week earlier, Gupta complained to Chang that he believed he was being discriminated against because he is Indian. Gupta explained to Chang that AJMN had a "glass ceiling" for Indian employees and that this culture of discrimination was the reason he did not receive a salary increase. (Gupta Dep. 352:12-24, 353:5-11; Gupta Dec. ¶ 84) Gupta asked Chang whether he could file a formal complaint of race discrimination and Chang told Gupta that nothing prevented him from filing a formal complaint, although she doubted that such a complaint would resolve anything. (Gupta Dep. 352:12-24; Gupta Dec. ¶¶ 84-85) Gupta filed this "official complaint" the following week and copied Chang on the complaint. (Kaplan Dec., Ex. 28)

Further, Chang's description of Gupta's January 27, 2016 complaint as part of a "scheme" is not supported by contemporaneous text messages in which Chang expressed concern for Gupta and his situation. (Iadevaia Dec., Ex. OO)

66.     Gupta's e-mail also stated that because of the "stress" and "anxiety" he had experienced that resulted from his demanding job and the lack of a salary increase, he needed to take a medical leave of absence. (Gupta Ex. 63 [Kaplan Ex. 28]).

Plaintiff's Response:

Admit in part, deny in part. Admit that Gupta requested time off because of the "stress" and "anxiety" arising out of his discriminatory treatment. (Kaplan Dec., Ex. 28) Deny that this "stress" and "anxiety" was because of Gupta's demanding job. As Gupta testified, he "was not stressed about the work situation at all, about the workload part of it" but was instead stressed because he "knew that something unfair had happened regarding [his] pay raise and discrimination had happened because [he] was Indian." (Gupta Dep. 351:13-352:5)

47

67.     Anstey replied that Gupta should "take the time you need to attend to your health. When you're feeling better, I suggest we meet to discuss an amicable solution." (Gupta Dep. at 345 [Kaplan Ex. 1]; Gupta Ex. 64 [Kaplan Ex. 29]).

Plaintiff's Response:

Admit that Anstey's email to Gupta contains the quoted language.  A jury is entitled to disbelieve that Anstey, an interested witness, was concerned about Gupta's health. Anstey had misled Gupta for months about seeking approval for a salary increase.  Anstey had told Gupta from August 2015 onward that he was communicating with Al Najjar about Gupta's proposed salary increase but this was not true.  (Gupta Dec. ¶ 61; Kaplan Dec., Ex. 16; Gupta Dep. 303:7-17, 304:4-10)  Further, as Anstey later admitted, he misled Gupta when he claimed that he needed AJMN's approval before increasing Gupta's salary.  (Gupta Dec. ¶ 96)  As the CEO of AJAM, Anstey had complete authority to increase salaries.  (Al Shihabi Dep. 79:10-80:10; Gupta Dep. 140:24-141:10; O'Brian Dep. 196:12-18)

Anstey also continued to use Gupta's health as an excuse to push Gupta into an advisory role even after Gupta had recovered.  (Gupta Dec. ¶¶ 97-98, 102, 105, 107)  A jury could interpret Anstey's purported concern for Gupta's health as a pretext for moving Gupta into an advisory role and replacing Gupta with Winer.

68.     The next day, on January 28, 2016, Gupta sent Anstey, O'Brian and Chang a follow-up e-mail, noting that a physician had approved his request for medical leave through February 8, 2016. (Gupta Ex. 65 [Kaplan Ex. 30]).

Plaintiff's Response:

Admit.

69.     Gupta also noted that he had "the deepest respect and personal affinity for each of you" and clarified that he "hope[d] [they] recognize[d] that my complaint is against the situation and lack of responses to requests from the wind-down team." (Gupta Dep. 345-48 [Kaplan Ex. 1]; Gupta Ex. 65 [Kaplan Ex. 30]).

Plaintiff's Response:

Admit that Gupta's email contains the quoted language.  At this time, Gupta did not believe that Anstey had discriminated against him because of his race.  Gupta instead believed that Al Najjar and other individuals overseeing the wind down had discriminated against him because he is Indian.  (Gupta Dep. 238:20-239:14; 261:3-14; Gupta Dec. ¶ 82) Gupta later learned that Anstey never communicated with Al Najjar before the start of the wind down process in December 2015 despite Anstey's claims to the contrary. (Gupta Dec. ¶ 108; Kaplan Dec., Ex. 16; Gupta Dep. 303:7-17, 304:4-10)  Further, as Anstey later admitted, he misled Gupta when he claimed that he needed AJMN's approval before increasing Gupta's salary.  (Gupta Dec. ¶ 96)  Gupta also learned that Anstey had been accused of discrimination against Indians previously.  (Iadevaia Dec., Exs. FFF, LLLLL; Gupta Dec. ¶ 109)

70.     Gupta also asserted that "one has to feel valued and respected in any organization and I just needed to stand up for that principle . . . for all of us." (Gupta Ex. 65 [Kaplan Ex. 30]).

Plaintiff's Response:

Admit that Gupta's email contains the quoted language.  At this time, Gupta did not believe that Anstey had discriminated against him because of his race.  Gupta instead believed that Al Najjar and other individuals overseeing the wind down had discriminated against him because he is Indian.  (Gupta Dep. 238:20-239:14; 261:3-14; Gupta Dec. ¶ 82) Gupta later learned that Anstey never communicated with Al Najjar before the start of the wind down process in December 2015 despite Anstey's claims to the contrary. (Gupta Dec. ¶ 108; Kaplan Dec., Ex. 16; Gupta Dep. 303:7-17, 304:4-10)  Further, as Anstey later admitted, he misled Gupta when he claimed that he needed AJMN's approval before increasing Gupta's salary.  (Gupta Dec. ¶ 96)  Gupta also learned that Anstey had been accused of discrimination against Indians previously.  (Iadevaia Dec., Exs. FFF, LLLLL; Gupta Dec. ¶ 109)

49

71.    Gupta added that the next week would have been the first birthday of his infant son (who had passed away) so these were "so emotional times for both of us." (Gupta Ex. 65 [Kaplan Ex. 30]).

Plaintiff's Response:

Admit that Gupta's email contains the quoted language.  At this time, Gupta did not believe that Anstey had discriminated against him because of his race.  Gupta instead believed that Al Najjar and other individuals overseeing the wind down had discriminated against him because he is Indian.  (Gupta Dep. 238:20-239:14; 261:3-14; Gupta Dec. ¶ 82) Gupta later learned that Anstey never communicated with Al Najjar before the start of the wind down process in December 2015 despite Anstey's claims to the contrary. (Gupta Dec. ¶ 108; Kaplan Dec., Ex. 16; Gupta Dep. 303:7-17, 304:4-10)  Further, as Anstey later admitted, he misled Gupta when he claimed that he needed AJMN's approval before increasing Gupta's salary.  (Gupta Dec. ¶ 96)  Gupta also learned that Anstey had been accused of discrimination against Indians previously.  (Iadevaia Dec., Exs. FFF, LLLLL; Gupta Dec. ¶ 109)

72.    Gupta noted that he had a "very capable team . . . and due to [them], I am confident that I will not be missed." (Gupta Ex. 65 [Kaplan Ex. 30]).

Plaintiff's Response:

Admit that Gupta's email contains the quoted language.  At this time, Gupta did not believe that Anstey had discriminated against him because of his race.  Gupta instead believed that Al Najjar and other individuals overseeing the wind down had discriminated against him because he is Indian.  (Gupta Dep. 238:20-239:14; 261:3-14; Gupta Dec. ¶ 82) Gupta later learned that Anstey never communicated with Al Najjar before the start of the wind down process in December 2015 despite Anstey's claims to the contrary. (Gupta Dec. ¶ 108; Kaplan Dec., Ex. 16; Gupta Dep. 303:7-17, 304:4-10)  Further, as Anstey later admitted, he misled Gupta when he claimed that he needed AJMN's approval before increasing Gupta's

salary. (Gupta Dec. ¶ 96) Gupta also learned that Anstey had been accused of discrimination against Indians previously. (Iadevaia Dec., Exs. FFF, LLLLL; Gupta Dec. ¶ 109)

73.     He closed the e-mail by stating that "Let's all grab a beer when the dust settles . . . I am in awe of how well and dignified you all were in such tough times . . . sorry for being the emotional wimp :) :)!!" (Gupta Ex. 65 [Kaplan Ex. 30]).

Plaintiff's Response:

Admit that Gupta's email contains the quoted language. At this time, Gupta did not believe that Anstey had discriminated against him because of his race. Gupta instead believed that Al Najjar and other individuals overseeing the wind down had discriminated against him because he is Indian. (Gupta Dep. 238:20-239:14; 261:3-14; Gupta Dec. ¶ 82) Gupta later learned that Anstey never communicated with Al Najjar before the start of the wind down process in December 2015 despite Anstey's claims to the contrary. (Gupta Dec. ¶ 108; Kaplan Dec., Ex. 16; Gupta Dep. 303:7-17, 304:4-10) Further, as Anstey later admitted, he misled Gupta when he claimed that he needed AJMN's approval before increasing Gupta's salary. (Gupta Dec. ¶ 96) Gupta also learned that Anstey had been accused of discrimination against Indians previously. (Iadevaia Dec., Exs. FFF, LLLLL; Gupta Dec. ¶ 109)

74.     Gupta did not suggest any racial discrimination in this e-mail. (Gupta Ex. 65 [Kaplan Ex. 30]).

Plaintiff's Response:

Admit that defendants accurately describe Gupta's email. At this time, Gupta did not believe that Anstey had discriminated against him because of his race. Gupta instead believed that Al Najjar and other individuals overseeing the wind down had discriminated against him because he is Indian. (Gupta Dep. 238:20-239:14; 261:3-14; Gupta Dec. ¶ 82) Gupta later learned that Anstey never communicated with Al Najjar before the start of the wind down process in December 2015 despite Anstey's claims to the contrary. (Gupta Dec. ¶ 108;

51

Kaplan Dec., Ex. 16; Gupta Dep. 303:7-17, 304:4-10)   Further, as Anstey later admitted, he

misled Gupta when he claimed that he needed AJMN's approval before increasing Gupta's

salary. (Gupta Dec. ¶ 96)  Gupta also learned that Anstey had been accused of discrimination

against Indians previously.  (Iadevaia Dec., Exs. FFF, LLLLL; Gupta Dec. ¶ 109)  Moreover,

Gupta saw no reason to repeat the allegations contained in his earlier January 27, 2016 complaint

of discrimination.  (Gupta Dec. ¶ 86)

   75.    Anstey replied, "Thank you Anand, You look after yourself, and let's touch base
when you're feeling rested." (Gupta Dep. at 350 [Kaplan Ex. 1]; Gupta Ex. 66 [Kaplan Ex. 31]).

   Plaintiff's Response:

   Admit that Anstey's email contains the quoted language.  A jury is entitled to

disbelieve that Anstey, an interested witness, was concerned about Gupta's health.  Admit that

Anstey's email to Gupta contains the quoted language.  A jury is entitled to disbelieve that

Anstey, an interested witness, was concerned about Gupta's health.  Anstey had misled Gupta for

months about seeking approval for a salary increase.  Anstey had told Gupta from August 2015

onward that he was communicating with Al Najjar about Gupta's proposed salary increase but

this was not true.  (Gupta Dec. ¶ 61; Kaplan Dec., Ex. 16; Gupta Dep. 303:7-17, 304:4-10)

Further, as Anstey later admitted, he misled Gupta when he claimed that he needed AJMN's

approval before increasing Gupta's salary. (Gupta Dec. ¶ 96)  As the CEO of AJAM, Anstey had

complete authority to increase salaries.  (Al Shihabi Dep. 79:10-80:10; Gupta Dep. 140:24-

141:10; O'Brian Dep. 196:12-18)

   Anstey also continued to use Gupta's health as an excuse to push Gupta into an

advisory role even after Gupta had recovered.  (Gupta Dec. ¶¶ 97-98, 102, 105, 107)  A jury

could interpret Anstey's purported concern for Gupta's health as a pretext for moving Gupta into

an advisory role and replacing Gupta with Winer.

76.     On January 29, 2016, Anstey wrote to Gupta: "I really appreciate you responding to emails while on leave, but I do want you to be as unbothered as much as possible.  We will make sure  everything is attended to going forward, so you don't have to respond.  Of course, if something comes up where we absolutely need you, I'll be in contact directly, but I promise to keep it to a minimum.  Rest well, and look after yourself."  (Gupta Dep. at 359 [Kaplan Ex. 1]; Gupta Ex. 68 [Kaplan Ex. 32]).

Plaintiff's Response:

Admit that Anstey's email contains the quoted language.  Even after this email,

Gupta continued to respond to inquiries from his team and approve payments.  (Gupta Dep.

339:16-17, 340:1-3; Chang Dep. 224:9-17)

77.     On February 5, 2016, Chang asked Gupta whether he intended to return to the office on February 8th as originally planned or if he was seeking additional time for his leave of absence. (Gupta Dep. at 360-61 [Kaplan Ex. 1]; Gupta Ex. 70 [Kaplan Ex. 33]).

Plaintiff's Response:

Admit.

78.     Gupta replied that his leave was extended through February 19, but that he planned to work remotely starting February 16th, returning to the office the week of February 22nd. (Gupta Exs. 72-74 [Kaplan Exs. 34, 35, 36]).

Plaintiff's Response:

Admit that AJAM approved the extension of AJAM's medical leave through

February 19, 2016 and that Gupta started working remotely from February 16, 2016.  (Gupta

Dep. 367:19-22; Chang Dep. 226:25-227:6, 228:25-229:6; Kaplan Dec., Exs. 35-36; Iadevaia

Dec., Ex. OO)

79.     Chang continued to communicate with Gupta via text message, reminding him to "take care of yourself," "rest" and "only come back when you're ready." (Pl. 002151-52 [Kaplan Ex. 37]).

Plaintiff's Response:

Admit that Chang's messages contain the quoted language.  A jury is entitled to

disbelieve that Chang, an interested witness, was concerned about Gupta's health.  In particular, a

53

jury could find that Chang's purported concerns for Gupta's health are inconsistent with her description of Gupta's January 27, 2016 complaint, in which he requested medical leave, as part of a "scheme" to increase his salary and not a "real, quote unquote, complaint" of discrimination. (Chang Dep. 211:13-21, 215:5-24)

80.     Certain bottlenecks and gaps in finance coverage began to materialize due to Gupta's reduced workload. (Anstey Dep. at 304-05, 312 [Kaplan Ex. 2]; Chang Dep. at 267-268 [Kaplan Ex. 26]; O'Brian Dep. at 281-82, 291-93 [Kaplan Ex. 3]; Gupta Dep. at 363-66 [Kaplan Ex. 1]).

Plaintiff's Response:

Admit in part, deny in part.   Admit that, during the two and a half weeks that Gupta was on medical leave, there were many items on Gupta's "to-do list" that he was not able to complete.   (Gupta Dep. ¶ 93)   However, to the extent that Gupta's absence caused any "bottlenecks," these disappeared when Gupta returned to work on or about February 16, 2016. (Gupta Dec. ¶ 93; Gupta Dep. 365:13-366:7; Iadevaia Dec., Ex. PP)

Defendants' citations do not support the assertion that bottlenecks emerged as a result of any reduced workload after February 16, 2016.   Anstey, Chang, and O'Brian testified that Winer was hired as a result of "bottlenecks" created by Gutpa's purported desire to take on an advisory role.   (Anstey Dep. 305:3-23; Chang Dep. 267:8-268:2, 285:6-13; O'Brian Dep. 292:13-293:14)   However, this timeline makes no sense and a jury is therefore entitled to doubt their testimony that there were bottlenecks at this time.

Gupta started working remotely on or about February 16, 2016.   (Gupta Dep. 367:19-22; Chang Dep. 226:25-227:6, 228:25-229:6; Kaplan Dec., Ex. 35; Iadevaia Dec., Ex. OO)   Gupta was prepared to return to the office on February 22, 2016, but Anstey stopped him. (Gupta Dec. ¶ 95; Kaplan Dec., Exs. 34-35; Iadevaia Dec., Exs. QQ, RR)

54

Defendants began looking for Gupta's replacement during the first week of February 2016. (Iadevaia Dec., Ex. S)  On or about February 19, 2016, defendants decided to retain Winer as Gupta's "replacement." (Iadevaia Dec., Exs. QQ, TT)  There was no discussion with Gupta about a reduced workload before February 19, 2016. (Gupta Dec. ¶ 94)  Then, on or about February 23, 2016, Anstey met with Gupta and Chang and Anstey put forth a proposal that Gupta move into an advisory role. (Gupta Dec. ¶¶ 96-98; Gupta Dep. 370:22-373:13; Chang Dep. 235:18-21; Anstey Dep. 277:14-16; Iadevaia Dec., Ex. UU)  Following this meeting, Anstey told Gupta not to return to the office or do work and instead consider the advisory role proposal. (Gupta Dec. ¶ 107)  Defendants delayed Winer's start date to wait to find out if Gupta would accept the proposal. (Iadevaia Dec., Ex. TT)

Winer started working for defendants on or about March 3, 2016. (Winer Dep. 99:12-16; Iadevaia Dec., Ex. VV)  Defendants immediately transferred most of Gupta's responsibilities to Winer. (See infra ¶¶ 566-76) Gupta rejected the advisory role proposal on or about March 7. (Gupta Dec. ¶ 110)

Defendants could not have hired Winer as a result of bottlenecks that emerged after Anstey offered Gupta an advisory role because defendants made the decision to hire Winer before Anstey presented Gupta with the advisory role proposal and before there was even a discussion with Gupta about a reduced workload. (Iadevaia Dec., Exs. QQ, TT; Gupta Dep. 370:22-371:19)  Together with Gupta's testimony that "bottlenecks" were only an issue while he was on medical leave and that he addressed the issue when he returned to work on February 16, 2016 (Gupta Dec. ¶ 93; Gupta Dep. 365:13-366:7; Iadevaia Dec., Ex. PP), a jury could infer that defendants' reference to bottlenecks is pretext for the real reason that they hired Winer – as Gupta's "replacement" because he complained of discrimination. (Iadevaia Dec., Ex. TT)

55

81.    In a text message, Gupta wrote the following:  "Doha.  They don't give a damn about us.  I went on sick leave- for past 3 weeks- during peak 'audit' season!! Let them manage without me." (Gupta Dep. 341-43 [Kaplan Ex. 1]; Gupta Ex. 62 [Kaplan Ex. 38]).

Plaintiff's Response:

Admit that Gupta complained about AJMN to colleagues.  Gupta was upset at his

treatment and believed that AJMN was responsible for race discrimination.  (Gupta Dep. 238:20-

239:14; 261:3-14; Gupta Dec. ¶ 82)  Gupta had returned to work and was working remotely at

the time that he sent this message.  (Gupta Dep. 367:19-22; Chang Dep. 226:25-227:6, 228:25-

229:6; Kaplan Dec., Ex. 35; Iadevaia Dec., Ex. OO)

82.    AJAM needed someone who would regularly be in the office to handle high-level but day-to-day finance responsibilities when Gupta was unavailable. (Anstey Dep. at 303-05 [Kaplan Ex. 2]; O'Brian Dep. at 281-83 [Kaplan Ex. 3]; Danner Dep. at 124-29, 136-141, 144-150, 155-58, 160-65, 177 [Kaplan Ex. 18]; Chang Dep. at 267-68 [Kaplan Ex. 26]; Triche-Newman Dep. at 92-93 [Kaplan Ex. 39]).

Plaintiff's Response:

Deny.  Defendants hired Winer to "replace[]" Gupta because he complained of

discrimination, not because Gupta was unavailable.  (Iadevaia Dec., Ex. TT)  As Danner

revealed in an email to Yaser Qubbaj ("Qubbaj"), AJMN's Manager of General Accounting and

the leader of the AJMN team that oversees the audit of AJAM's financial statements, defendants'

plan was to find a "replacement" who could take on Gupta's "leadership responsibilities" and at

the same time put Gupta into an advisory role.  (Iadevaia Dec., Ex. TT; Gupta Dec. ¶ 89)

The timeline shows that Gupta was available and working at the time that

defendants decided to bring on Winer.  Gupta started working remotely on or about February 16,

2016.  (Gupta Dep. 367:19-22; Chang Dep. 226:25-227:6, 228:25-229:6; Kaplan Dec., Ex. 35;

Iadevaia Dec., Ex. OO)  Gupta was prepared to return to the office on February 22, 2016, but

Anstey stopped him.  (Gupta Dec. ¶ 95; Kaplan Dec., Exs. 34-35; Iadevaia Dec., Exs. QQ, RR)

56

Defendants began looking for Gupta's replacement during the first week of February 2016. (Iadevaia Dec., Ex. S)  On or about February 19, 2016, defendants decided to retain Winer as Gupta's "replacement." (Iadevaia Dec., Exs. QQ, TT)  There was no discussion with Gupta about a reduced workload before February 19, 2016. (Gupta Dec. ¶ 94)  Then, on or about February 23, 2016, Anstey met with Gupta and Chang and Anstey put forth a proposal that Gupta move into an advisory role. (Gupta Dec. ¶¶ 96-98; Gupta Dep. 370:22-373:13; Chang Dep. 235:18-21; Anstey Dep. 277:14-16; Iadevaia Dec., Ex. UU)  Following this meeting, Anstey told Gupta not to return to the office or do work and instead consider the advisory role proposal. (Gupta Dec. ¶ 107)  Defendants delayed Winer's start date to wait to find out if Gupta would accept the proposal. (Iadevaia Dec., Ex. TT)

Winer started working for defendants on or about March 3, 2016. (Winer Dep. 99:12-16; Iadevaia Dec., Ex. VV)  Defendants immediately transferred most of Gupta's responsibilities to Winer. (See infra ¶¶ 566-76)  Gupta rejected the advisory role proposal on or about March 7. (Gupta Dec. ¶ 110)

Gupta was not "unavailable" at the time defendants decided to hire Winer because he had returned to work on or about February 16, 2016 and worked that week. (Gupta Dep. 367:19-22; Chang Dep. 226:25-227:6, 228:25-229:6; Kaplan Dec., Exs. 35-36; Iadevaia Dec., Ex. OO)  To the extent that Gupta did not come into the office following the February 23, 2016 meeting with Anstey, it was because Anstey had instructed Gupta not to return to work. (Gupta Dec. ¶ 107)  A jury could reasonably conclude that if Gupta was available at the time that defendants decided to bring on Winer, then defendants' assertions of Gupta's purported unavailability are pretext for the real reason that defendants hired Winer – as Gupta's "replacement" because he complained of discrimination. (Iadevaia Dec., Ex. TT)

57

83.    AJAM retained the services of Toby Winer as a consultant to help "fill the void," "keep the wheels turning" and cover these issues created by Gupta's absence. (Anstey Dep. at 303-36 [Kaplan Ex. 2]; O'Brian's Dep. at 282-83 [Kaplan Ex. 3]; Danner Dep. at 132-65 [Kaplan Ex. 18]; Chang Dep. at 267-72, 285 [Kaplan Ex. 26]).

Plaintiff's Response:

Deny.   Defendants hired Winer to "replace[]" Gupta, not to fill any gaps. (Iadevaia Dec., Ex. TT)  As Danner revealed in an email to Qubbaj, defendants' plan was to find a "replacement" who could take on Gupta's "leadership responsibilities" and at the same time put Gupta into an advisory role.   Nowhere does Danner reference a void created by Gupta's absence. (Iadevaia Dec., Ex. TT)

The timeline also shows that Winer could not have been hired to fill a void created by Gupta's absence.   Gupta started working remotely on or about February 16, 2016. (Gupta Dep. 367:19-22; Chang Dep. 226:25-227:6, 228:25-229:6; Kaplan Dec., Ex. 35; Iadevaia Dec., Ex. OO)  Gupta was prepared to return to the office on February 22, 2016, but Anstey stopped him.  (Gupta Dec. ¶ 95; Kaplan Dec., Exs. 34-35; Iadevaia Dec., Exs. QQ, RR)

Defendants began looking for Gupta's replacement during the first week of February 2016.  (Iadevaia Dec., Ex. S)  On or about February 19, 2016, defendants decided to retain Winer as Gupta's "replacement." (Iadevaia Dec., Exs. QQ, TT)  There was no discussion with Gupta about a reduced workload before February 19, 2016.  (Gupta Dec. ¶ 94)  Then, on or about February 23, 2016, Anstey met with Gupta and Chang and Anstey put forth a proposal that Gupta move into an advisory role.   (Gupta Dec. ¶¶ 96-98; Gupta Dep. 370:22-373:13; Chang Dep. 235:18-21; Anstey Dep. 277:14-16; Iadevaia Dec., Ex. UU)  Following this meeting, Anstey told Gupta not to return to the office or do work and instead consider the advisory role proposal.  (Gupta Dec. ¶ 107)  Defendants delayed Winer's start date to wait to find out if Gupta would accept the proposal.  (Iadevaia Dec., Ex. TT)

58

Winer started working for defendants on or about March 3, 2016.  (Winer Dep. 99:12-16; Iadevaia Dec., Ex. VV)   Defendants immediately transferred most of Gupta's responsibilities to Winer.  (See infra ¶¶ 566-76)  Gupta rejected the advisory role proposal on or about March 7.  (Gupta Dec. ¶ 110)

Anstey, Chang, and O'Brian testified that Winer was hired after Anstey presented Gupta with the advisory agreement.  (Anstey Dep. 305:3-23; Chang Dep. 267:8-268:2, 285:6-13; O'Brian Dep. 292:13-293:14)  However, defendants made the decision to hire Winer before they offered Gutpa an advisory role, directly contradicting this testimony.  (Iadevaia Dec., Exs. QQ, TT)  Further, to the extent that defendants assert that Gupta was "absent" following the February 23, 2016 meeting with Anstey, it was because Anstey had instructed Gupta not to return to work. (Gupta Dec. ¶ 107)

84.      Winer was a consultant with a firm called Kiwi Partners who was paid on an hourly basis; she was not employed by AJAM and did not assume Gupta's position or title of EVP, Finance. (Danner Dep. at 124, 144 [Kaplan Ex. 18]; Winer Dep. at 52-53; 110-12 [Kaplan Ex. 40]).

Plaintiff's Response:

Admit in part, deny in part.  Admit that AJAM paid Kiwi Partners ▇▇ an hour for Winer's services.  (Iadevaia Dec., Ex. WW)  From March to December 2016, AJAM paid Kiwi partners a total of ▇▇▇▇▇ almost equal to Gupta's salary for the whole year, for approximately ten months' worth of work.  (Iadevaia Dec., Exs. WW, XX; Kaplan Dec., Ex. 4 ¶ 3(a); Winer Dep. 117:7-9)

Deny that Winer did not assume Gupta's position.  Danner referred to Winer as Gupta's "replacement" (Iadevaia Dec., Ex. TT) and Winer assumed almost all of Gupta's responsibilities, including management of all Finance department employees.  (See infra ¶¶ 566-76)  After Winer started, AJAM's Finance department reported to her, not Gupta, and she

59

reported directly to Anstey.  (Chang Dep. 269:17-22; Winer Dep. 151:22-152:7, 233:6-9; Danner Dep. 137:17-138:11, 140:8-13)  As one Finance department employee testified, "[w]hatever I used to do with [Gupta] and [Lavin] I did with [Winer]."  (Triche-Newman Dep. 58:2-17)

Moreover, Anstey and Winer approved a document to make Winer an authorized signatory for AJAM's account with HSBC in which Winer was described as AJAM's "CFO." (Iadevaia Dec., Ex. YY; Winer Dep. 212:7-25)  Winer believed that she was "performing CFO duties" at AJAM.  (Iadevaia Dec., Ex. ZZ)  As defendants were giving Winer the authority to approve financial transactions, they were discontinuing Gupta's ability to do so.  (Iadevaia Dec., Exs. AAA, BBB)

85.     Gupta continued to be employed by the Company as EVP, Finance at the same salary of $350,000 per year.  (Winer Dep. at 52-53, 110-12 [Kaplan Ex. 40]; Danner Dep. at 124, 144-45, 246-47 [Kaplan Ex.18])

Plaintiff's Response:

Admit in part, deny in part.  Admit that AJAM continued to pay Gupta his salary until June 15, 2016.  (Gupta Dec. ¶ 136)  Deny that his employment did not change between when he complained about race discrimination in January 2016 and June 15, 2016.  First, following Gupta's race discrimination complaint, defendants transferred almost all of Gupta's responsibilities to his "replacement," Winer.  (Iadevaia Dec., Ex. TT; see infra ¶¶ 566-76) Second, following the filing of this lawsuit, defendants banned Gupta from the office, locked him out of AJAM's computer systems, and did not assign him any more work.  (Iadevaia Dec., Ex. CCC, DDD; Kaplan Dec., Ex. 46; Gupta Dec. ¶ 135)

86.     On or about February 23, 2016, when Gupta's leave of absence had concluded, he met with Anstey and Chang to discuss his employment arrangement moving forward. (Anstey Dep. at 275-279 [Kaplan Ex. 2]; Chang Dep. at 234-38 [Kaplan Ex. 26]).

Plaintiff's Response:

Admit in part, deny in part.  Admit that Gupta met with Anstey and Chang on or about February 23, 2016.  Deny that Gupta voluntarily chose to have a meeting with Anstey and Chang to discuss his employment arrangement.  Gupta started working remotely on or about February 16, 2016.  (Gupta Dep. 367:19-22; Chang Dep. 226:25-227:6, 228:25-229:6; Kaplan Dec., Ex. 35; Iadevaia Dec., Ex. OO)  Gupta was prepared to return to the office on February 22, 2016, but Anstey stopped him and scheduled the February 23, 2016 meeting instead.  (Gupta Dec. ¶ 95; Kaplan Dec., Exs. 35-36; Iadevaia Dec., Exs. QQ, RR)

87.     During that meeting, Gupta stated that he preferred to no longer assist with some of his responsibilities. (Chang Dep. at 232-38 [Kaplan Ex. 26]).

Plaintiff's Response:

Deny.  During the February 23, 2016 meeting, Anstey announced his intention to move Gupta into an advisory role for the duration of Gupta's employment, which would end on June 12, 2016.  (Gupta Dec. ¶¶ 96-98; Gupta Dep. 370:25-371:12)  Anstey asked Gupta to list certain tasks that Gupta could advise on under this advisory role proposal and Gupta provided a list of such tasks at Anstey's urging.  (Gupta Dec. ¶¶ 96-98; Gupta Dep. 372:17-373:13)

88.     Anstey testified "I actually remember [Gupta's] words: 'Get me out of those." (Anstey Dep. at 277-78 [Kaplan Ex. 2]).

Plaintiff's Response:

Admit in part, deny in part.  During the February 23, 2016 meeting, Anstey announced his intention to move Gupta into an advisory role for the duration of Gupta's employment, which would end on June 12, 2016.  (Gupta Dec. ¶¶ 96-98; Gupta Dep. 370:25-371:12)  Anstey asked Gupta to list certain tasks that Gupta could advise on under this advisory role proposal and Gupta provided a list of such tasks at Anstey's urging.  (Gupta Dec. ¶¶ 96-98; Gupta Dep. 372:17-373:13)  Gupta explained that, for example, if he accepted the advisory role

61

and worked remotely he could no longer routinely approve financial transactions because he would not know the "context behind" those transactions. (Gupta Dep. 372:17-373:13)  Gupta also wanted to avoid responsibilities that could result in legal liability if he was going to be acting in an advisory, rather than active, executive role. (Chang Dep. 245:2-22)

89.     Anstey testified that he left the meeting thinking they had come to a "positive agreement in principle during that meeting" about the scope, form, and duration of Gupta's employment at AJAM moving forward. (Anstey Dep. at 277-79 [Kaplan Ex. 2]).

Plaintiff's Response:

Admit in part, deny in part.   Admit that Gupta agreed to consider Anstey's advisory role proposal. (Gupta Dep. 372:6-8)  Deny that there was an "agreement in principle." (Gupta Dec. ¶ 100)  During that meeting, Gupta raised concerns about defendants' proposal because it appeared to be little more than a "gardening leave" and was in response to Gupta complaining about defendants' discriminatory conduct. (Gupta Dec. ¶ 98; Gupta Dep. 370:22-371:12; Chang Dep. 235:18-21; Anstey Dep. 277:14-16)  Further, Gupta told Anstey and Chang the next day, on or about February 24, 2016, that a move to an advisory role for the wind down was no different from being suspended with pay for complaining of discrimination. (Gupta Dec. ¶ 101)  Gupta also asked why his employment was due to end in June 2016 rather than the Fall 2016 as originally planned and Anstey responded that Gupta was not needed beyond June 2016 and that there was no option to extend Gupta's employment for a longer period of time. (Gupta Dec. ¶ 103)

Moreover, when Anstey sent Gupta a draft agreement purportedly memorializing the advisory role proposal, Gupta was surprised by its formality and expressed concerns about it being a formal legal document. (Iadevaia Dec., Exs. OO, EEE)  Chang advised Gupta that he could retain a lawyer to review the agreement. (Iadevaia Dec., Ex. OO)

62

90.     A written manifestation of that agreement in principle, for review and execution by all parties, was sent to Gupta on February 27, 2016. (Anstey Dep. at 299-300 [Kaplan Ex. 2]; Anstey Ex. 23 [Kaplan Ex. 41]).

Plaintiff's Response:

Admit in part, deny in part.   Admit that defendants, through counsel, sent to Gupta's lawyer a written agreement that reflected defendants' proposal to move Gupta to an advisory role through June 12, 2016.   (Kaplan Dec., Ex. 41)   Deny that there was an "agreement in principle."   (See supra Pl.'s Response ¶ 89)   Among other things, the agreement did not include the promised reference letter. (Gupta Dep. 349:19-22, 371:13-19)

91.     By this time, Gupta had retained counsel, so this version of the agreement reflected negotiation of its terms. (Anstey Dep. at 299-300 [Kaplan Ex. 2]; Anstey Ex. 23 [Kaplan Ex 41]; Gupta Dep. at 73 [Kaplan Ex. 1]).

Plaintiff's Response:

Admit that Gupta had by this time retained counsel and that defendants agreed to make certain limited changes to the contract, but not material ones.   For example, defendants did not agree to extend Gupta's employment beyond mid-June 2016.   (Kaplan Dec., Ex. 41)   In fact, they made clear that "AJAM is still not interested in extending [Gupta's employment] beyond June 12th." (Kaplan Dec., Ex. 41)

92.     Gupta never signed this proposed agreement. (Chang Dep. at 259-61, 265 [Kaplan Ex. 26]).).

Plaintiff's Response:

Admit.

93.     Gupta testified that he did not believe that Anstey discriminated against him until late February — shortly after he retained counsel — at which time he purportedly lost such respect and affinity for Anstey. (Gupta Dep. at 73, 301-02, 348-50 [Kaplan Ex. 1]).

841294 v2

Plaintiff's Response:

Admit in part, deny in part.  Admit that Gupta realized that Anstey discriminated against him following their February 23, 2016 meeting.  (Gupta Dep. 260:1-22, 348:13-21; Iadevaia Dec., Exs. FFF, LLLLL; Gupta Dec. ¶¶ 108-09)  Deny that Gupta realized Anstey discriminated against him after he retained counsel. (Gupta Dec. ¶¶ 108-09; Gupta Dep. 348:13-21; Iadevaia Dec., Exs. FFF, LLLLL)

Gupta began to realize that Anstey was responsible for Gupta not receiving a salary increase when Anstey failed to explain why Gupta's salary increase was contingent on the approval of an AJMN employee or what health concerns prevented Gupta from returning to work.  (Gupta Dep. 260:1-22)  In fact, during the February 23 meeting, Anstey admitted that he did not require the approval of AJMN at all but rather chose to seek their approval.  (Gupta Dec. ¶ 96)  Gupta further learned that Anstey had misled him about talking to Al Najjar as far back as August 2015 and Anstey had, at best, spoken to Al Najjar no sooner than December 2015. (Gupta Dec. ¶ 61; Kaplan Dec., Ex. 16; Gupta Dep. 303:7-17, 304:4-10)  At the end of February 2016 and continuing through to the time that Gupta filed this lawsuit, Gupta reviewed his time with Anstey and realized that Anstey was discriminating against him because he is Indian. (Gupta Dep. 260:1-22, 348:13-21; Iadevaia Dec., Exs. FFF, LLLLL; Gupta Dec. ¶¶ 108-09)

94.    Gupta testified that "[i]t was only after taking stock with events that happened subsequently to the February meeting and then through the events that occurred from February to April, that's before the lawsuit, I realized that he had discriminated and it was he who had made the call." (Gupta Dep. at 259-60 [Kaplan Ex. 1]).

Plaintiff's Response:

Admit that Gupta testified that, at the end of February 2016, he started to realize that Anstey was responsible for Gupta not getting the promised salary increase and that it was

64

Anstey who discriminated against him because he is Indian.  (Gupta Dep. 260:1-22; see supra Pl.'s Response ¶ 93)

95.     On March 9, 2016, Anstey wrote Gupta to confirm that he could continue to work from home if he wished to do so. (Gupta Ex. 79 [Kaplan Ex. 42]).

Plaintiff's Response:

Admit in part, deny in part.  Admit that Anstey told Gupta that he should continue to work from home "unless and until" defendants "need[ed] [him] to come into the office." (Kaplan Dec., Ex. 42)  Deny that it was Gupta's decision whether to return to the office.  Gupta interpreted Anstey's email as requiring him to work remotely unless he obtained permission to come to the office.  (Gupta Dep. 378:1-17)

96.     On March 10, 2016, Anstey informed Gupta, that "to avoid any misunderstanding, please know that you are welcome to return to work at the office at any time. The company had agreed that you could work from home as an accommodation to you, and you may continue to do so if that is your preference." (Gupta Ex. 80 [Kaplan Ex. 43]).

Plaintiff's Response:

Admit in part, deny in part.  Admit that Anstey emailed Gupta to say that Gupta was "welcome to return to work at the office at any time."  (Kaplan Dec., Ex. 43)  However, Anstey also told Gupta that, before Gupta returned to the office, he should "notify HJ and me." (Kaplan Dec., Ex. 43)  Gupta did not understand why he required Anstey's approval before he could return to the office considering he was purportedly returning to his role as Executive Vice President of Finance and Business Operations.  (Gupta Dep. 382:14-383:11; Gupta Dec. ¶ 117) Gupta knew by this time that Winer had started and that his staff were reporting to her.  (Gupta Dec. ¶¶ 111, 118)

97.     On March 25, 2016, the Company provided a letter agreement to Gupta outlining the proposed terms and conditions of his final months at the Company as it completed its wind-down ("Stay Agreement"). (Kaplan Ex. 44).

65

Plaintiff's Response:

Admit.

98.     On or about April 15, 2016, Gupta executed the Stay Agreement. (Kaplan Ex. 45).

Plaintiff's Response:

Admit that Gupta signed the stay agreement subject to the condition that "[b]y signing this agreement, [he was] not waiving [his] objections" to AJAM's conduct. (Iadevaia Dec., Ex. GGG)  Gupta had no choice but to sign the stay agreement.  Gupta's employment would end in mid-April 2016 unless he agreed to execute the stay agreement.  (Gupta Dec. ¶ 131; Kaplan Dec., Ex. 45)  As Gupta's WARN notice made clear, absent the extension, his "employment with [AJAM] would terminate on April 12, 2016." (Iadevaia Dec., Ex. HHH) Defendants had previously told Gupta that they would not change his end date. (Kaplan Dec., Ex. 41)

Moreover, nothing in the stay agreement prohibited defendants from extending Gupta's employment beyond June 15, 2016 as defendants had done for other AJAM employees, including Chang, but defendants did not do so. (Kaplan Dec., Ex. 45; Iadevaia Dec., Exs. III, JJJ; Gupta Dec. ¶ 137)

99.     Under the Stay Agreement, Gupta agreed that: (1) his salary would remain at $350,000 annually; (2) his final day of employment would be June 15, 2016; and (3) the Stay Agreement would supersede all previous agreements, oral or written, between the parties. (Kaplan Ex. 45).

Plaintiff's Response:

Admit in part, deny in part.  Admit that Gupta signed the stay agreement and that the stay agreement maintained Gupta's salary at $350,000. (Kaplan Dec., Ex. 45)  Gupta had no choice but to sign the stay agreement.  Gupta's employment would end in mid-April 2016 unless he agreed to execute the stay agreement. (Gupta Dec. ¶ 131; Kaplan Dec., Ex. 45)  As Gupta's

66

WARN notice made clear, absent the extension, his "employment with [AJAM] would terminate on April 12, 2016." (Iadevaia Dec., Ex. HHH)  Defendants had previously told Gupta that they would not change his end date. (Kaplan Dec., Ex. 41)  The stay agreement did not require Gupta to sign a release. (Kaplan Dec., Ex. 45)

Deny that the stay agreement made June 15, 2016 Gupta's final day of employment.  Nothing in the stay agreement prohibited defendants from extending Gupta's employment beyond June 15, 2016 as defendants had done for other AJAM employees, including Chang. (Kaplan Dec., Ex. 45; Iadevaia Dec., Exs. III, JJJ)

100.   Gupta was represented by counsel at the time he executed the Stay Agreement. (Gupta Dep. at 73 [Kaplan Ex. 1]).

Plaintiff's Response:

Admit.

101.   Six days after entering into the Stay Agreement, Gupta filed the Complaint. (Docket No. 1).

Plaintiff's Response:

Admit that Gupta filed this lawsuit on April 21, 2016 alleging race discrimination and retaliation claims pursuant to Section 1981 of the Civil Rights Act of 1866, the New York State Human Rights Law, and the New York City Human Rights Law.

102.   Gupta, through counsel, sent a copy of the Complaint to the *New York Times* before it was publicly filed (Gupta Dep. at 273-80 [Kaplan Ex. 1]).

Plaintiff's Response:

Deny.  Gupta, through counsel, sent a copy of the Complaint to a reporter for The New York Times after the Complaint was filed electronically on ECF.  (Iadevaia Dec., Ex. KKK)

103.   Gupta disclosed certain highly confidential data and information of the Company in the Complaint. (Gupta Dep. at 273-80 [Kaplan Ex. 1]).

67

Plaintiff's Response:

Deny. Defendants' citation does not support the assertion that the information Gupta disclosed was highly confidential. Defendants rely on a portion of Gupta's deposition in which counsel for defendants asked Gupta whether he believed that this information was confidential and Gupta said that it was not. Rather, he testified that the information he disclosed could be determined by "any informed analyst" and that it was not "detrimental" to AJAM or AJMN. (Gupta Dep. 276:7-277:11)

Defendants provide zero evidence to support the contention that any of the information contained in the complaint is confidential. In fact, this Court rejected in most respects defendants' request to file much of the Complaint under seal because defendants could not substantiate their claims of confidentiality. (See Dkt. Nos. 10, 16, 22)

Most of the information that defendants suggest is confidential is readily available online or accessible from other sources. For example, defendants complain that plaintiff improperly disclosed the value of Ehab Al Shihabi's former apartment is available through websites such as www.streeteasy.com. (Iadevaia Dec., Ex. BBBBB) Moreover, some of the financial information, while perhaps not available publicly, has been shared with competitors and likely other third parties. For example, AJAM subscribed to services such as SNL Kagan. As part of their subscription, AJAM provided financial information to SNL Kagan, including information about its operating losses, and, in exchange, received similar information regarding their competitors. (Gupta Dec. ¶ 134) To the extent that defendants believe that the salary information of other AJAM executives is confidential, as Gupta testified, this information is "central to [his] case." (Gupta Dep. 278:24-279:7)

68

Further, defendants did not fire plaintiff after he filed this lawsuit containing purportedly confidential information.   (Gupta Dec. ¶¶ 136-37)   In fact, defendants offered plaintiff severance and a retention bonus even though this bonus was only available to employees who "remain in compliance at all times with the terms and conditions of" AJAM's code of conduct, the employee handbook, AJAM's code of business ethics, and any applicable employment agreement between the employee and AJAM.   (Iadevaia Dec., Exs. LLL § 2.6, MMM § 4.3)   If defendants believed that Gupta had revealed confidential information in violation of his AJAM's code of conduct then Gupta would not have been eligible for the severance and retention bonus.

104.   As a result of Plaintiff's disclosure of the Company's confidential information, Gupta's access credentials to AJAM's electronic systems were revoked and he was advised (through counsel) on April 27, 2016 not to come to AJAM's offices unless specifically instructed to do so.   (Supp.  Response to Interrogatory No. 15 [Kaplan Ex. 46]).

Plaintiff's Response:

Deny.   AJAM barred Gupta from AJAM's offices in retaliation for filing this lawsuit, not because plaintiff disclosed purportedly confidential information.  First, to the extent that any of the information in the complaint could be characterized as confidential, defendants decision to ban Gupta from the office and cut off his access to AJAM's computer systems cannot be distinguished from plaintiff's protected activity, i.e., filing the lawsuit.

Second, the information contained in the complaint was not confidential – the information could be determined by "any informed analyst" and it was not "detrimental" to AJAM or AJMN.   (Gupta Dep. 276:7-277:11)   Defendants provide zero evidence to support the contention that any of the information contained in the complaint is confidential.   In fact, this Court rejected in most respects defendants' request to file much of the complaint under seal

69

because defendants could not substantiate their claims of confidentiality.  (See Dkt. Nos. 10, 16, 22)

Most of the information that defendants suggest is confidential is readily available online or accessible from other sources.  For example, defendants complain that plaintiff improperly disclosed the value of Ehab Al Shihabi's former apartment is available through websites such as www.streeteasy.com.  (Iadevaia Dec., Ex. BBBBB)  Moreover, some of the financial information, while perhaps not available publicly, has been shared with competitors and likely other third parties.  For example, AJAM subscribed to services such as SNL Kagan.  As part of their subscription, AJAM provided financial information to SNL Kagan, including information about its operating losses, and, in exchange, received similar information regarding their competitors.  (Gupta Dec. ¶ 134)  To the extent that defendants believe that the salary information of other AJAM executives is confidential, as Gupta testified, this information is "central to [his] case."  (Gupta Dep. 278:24-279:7)

Third, defendants offered plaintiff severance and a retention bonus even though this bonus was only available to employees who "remain in compliance at all times with the terms and conditions of" AJAM's code of conduct, the employee handbook, AJAM's code of business ethics, and any applicable employment agreement between the employee and AJAM.  (Iadevaia Dec., Exs. LLL § 2.6, MMM § 4.3)  If defendants believed that Gupta had revealed confidential information in violation of his AJAM's code of conduct then Gupta would not have been eligible for the severance and retention bonus.

105.   Gupta remained employed by AJAM, pursuant to the terms of the Stay Agreement, through June 15, 2016. (Kaplan Ex. 45).

Plaintiff's Response:

Admit in part, deny in part.   Admit that defendants continued paying Gupta's salary through June 15, 2016.   However, on or about April 27, 2016, Anstey and O'Brian through counsel informed plaintiff that he was not to return to the office, he no longer had access to AJAM's computer systems, and he had to return his work laptop.   (Iadevaia Dec., Ex. CCC, DDD; Kaplan Dec., Ex. 46)   Defendants stated that Gupta would continue to work for AJAM and would receive both a new laptop and assignments, but Gupta never received a new laptop or any new assignments.   (Iadevaia Dec., Ex. CCC; Gupta Dec. ¶ 135)

**During Anstey's Tenure, Only Four EVPs or SVPs Receive Salary Increases**

106.   During Anstey's tenure, only four AJAM EVPs or SVPs received salary increases (out of a total of approximately 22 employees with those titles).   (Chang Dec. at ¶ 6, Ex. 1 ).

Plaintiff's Response:

Deny.   At least seven Senior Vice Presidents or Executive Vice Presidents received salary increases under Anstey.   AJAM promoted Chang, Austin, Polikoff, and Karon on or about May 5, 2015.   (Iadevaia Dec., Ex. S; Kaplan Dec., Ex. 8)   These four employees did not receive salary increases until the payroll cycle after May 9, 2015, after Anstey became CEO of AJAM and Anstey did nothing to stop or reverse the raises.   (Kaplan Dec., Exs. 9, 11)   In addition, during Anstey's tenure, AJAM increased the salary of Doss, Terry Baker ("Baker"), Ahmed, and Chang again.   (Chang Dec. ¶¶ 7-11)

107.   Chang received a salary increase in October 2015 in connection with her promotion to Acting EVP of HR.   (Chang Dec. at ¶ 7).

Plaintiff's Response:

Admit that in October 2015, Chang received her second promotion and salary increase in a six-month period.   There is no evidence that Anstey consulted Al Najjar when he

decided to promote and increase the salary of Chang.  (Anstey Dep. 240:15-241:2; Al-Najjar

Dep. 27:12-15; O'Brian Dep. 241:19-242:2)

108.    At that time, Chang had been functioning as the head of HR since May 2015.
(Chang Dec. at ¶ 7).

Plaintiff's Response:

Admit that Chang was the most senior HR specialist.  Gupta was the head of HR

for some period in May and June 2015.  (Chang Dep. 17:5-18:9, 23:20-24:19, 27:5-28:8; Gupta

Dep. 171:17-172:19; Iadevaia Dec., Ex. NNN)

109.    Despite that increase, Chang's salary was still substantially less than Ms. Lee's
salary at the time of her resignation.  (Chang Dec. at ¶ 7).

Plaintiff's Response:

Admit in part, deny in part.  Admit that Chang's salary was lower than Lee's

salary at the time that Lee left AJAM.  Deny that the difference is substantial.  Chang was not at

the same level as Lee.  Chang was promoted to Senior Vice President and then acting Executive

Vice President but Chang was never promoted to Executive Vice President.  (Chang Dep. 23:4-

10, 29:14-16, 31:12-22; Kaplan Dec., Ex. 8; Iadevaia Dec., Ex. KK)  Moreover, Gupta was paid

significantly less than his predecessor.  (Kaplan Dec., Ex. 15)

110.    Specifically, Chang's salary was increased from ▮▮▮▮▮ to ▮▮▮▮▮ per year,
but Ms. Lee was paid ▮▮▮▮▮ per year as EVP of HR. (Chang Dec. at ¶ 7).

Plaintiff's Response:

Admit that Chang's salary as of October 2015 was less than Lee's.  However,

Chang was not at the same level as Lee.  Chang was promoted to Senior Vice President and then

acting Executive Vice President but Chang was never promoted to Executive Vice President.

(Chang Dep. 23:4-10, 29:14-16, 31:12-22; Kaplan Dec., Ex. 8; Iadevaia Dec., Ex. KK)

Moreover, Gupta was paid significantly less than his predecessor.  (Kaplan Dec., Ex. 15)

111.    In addition to Chang, only three other AJAM employees with the title of EVP or SVP received a salary increase during Mr. Anstey's tenure as CEO: David Doss ("Doss"), Terry Baker ("Baker") and Amir Ahmed ("Ahmed"). (Chang Dec. at ¶ 8).

Plaintiff's Response:

Deny.   At least seven Senior Vice Presidents or Executive Vice Presidents received salary increases under Anstey.  AJAM promoted Chang, Austin, Polikoff, and Karon on or about May 5, 2015.  (Iadevaia Dec., Ex. S; Kaplan Dec., Ex. 8)  These four employees did not receive salary increases until the payroll cycle after May 9, 2015, after Anstey became CEO of AJAM and Anstey did nothing to stop or reverse the raises.  (Kaplan Dec., Exs. 9, 11)

112.    Doss received a salary increase on or about July 29, 2015.  (Chang Dec. at ¶ 9).

Plaintiff's Response:

Admit.

113.    Doss had entered into a written employment agreement with AJAM in July 2013 which mandated specific salary increases at specific times. (Chang Dec. at ¶ 9).

Plaintiff's Response:

Admit.

114.    Doss's salary increases were non-discretionary and were required by the terms and conditions of the executed contract.  (Chang Dec. at ¶ 9).

Plaintiff's Response:

Admit.

115.    Baker received a salary increase on or about September 15, 2015.  (Chang Dec. at ¶ 10).

Plaintiff's Response:

Admit.

116.    Baker had previously entered into a written employment agreement with AJAM in September 2014 which mandated a specific salary increase at a specific time.  (Chang Dec. at ¶ 10).

Plaintiff's Response:

Admit that Baker's contract mandated a ▓ ) raise in September 2015. Baker's contract further required AJAM to review his performance "on a periodic basis" and "at least once annually." "Based upon that review," AJAM was obligated to "consider" granting Baker a salary increase. (Iadevaia Dec., Ex. OOO § 3(a))

117.    Baker's salary increase was non-discretionary and was required by the terms and conditions of the executed contract. (Chang Dec. at ¶ 10).

Plaintiff's Response:

Admit that Baker's contract mandated a ▓ raise in September 2015. Baker's contract further required AJAM to review his performance "on a periodic basis" and "at least once annually." "Based upon that review," AJAM was obligated to "consider" granting Baker a salary increase. (Iadevaia Dec., Ex. OOO § 3(a))

118.    Ahmed received a salary increase, effective November 1, 2015, from ▓ to ▓ per year. (Chang Dec. at ¶ 11).

Plaintiff's Response:

Admit.  There is no evidence that Anstey consulted Al Najjar when he increased the salary of Ahmed. (Iadevaia Dec., Ex. AA; Gupta Dep. 308:18-309:5)  Anstey changed Ahmed's title and increased his salary to make way for Heather Allan, who is white, and replace Ahmed as the Senior Vice President of Newsgathering. (Iadevaia Dec., Exs. Y, AA)  Allan's salary at AJAM was ▓, which made her the second-highest paid Senior Vice President at AJAM. (Iadevaia Dec., Ex. DD)

119.    At such time, Ahmed's title and duties changed from SVP of Newsgathering to SVP of Planning and the salary increase was provided in connection with an effort to retain Ahmed's services. (Chang Dec. at ¶ 11).

74

Plaintiff's Response:

Admit.  Defendants changed Ahmed's title and increased his salary to make way for Heather Allan, who is white, and replace Ahmed as the Senior Vice President of Newsgathering.  (Iadevaia Dec., Exs. Y, AA)  Allan's salary at AJAM was $████████, which made her the second-highest paid Senior Vice President at AJAM.  (Iadevaia Dec., Ex. DD)

120.    No AJAM SVP or EVP received a salary increase after November 2015.  (Chang Dec. at ¶ 12).

Plaintiff's Response:

Admit that there were no salary increases from December 2015 onward.  Anstey's salary was added to AJAM's payroll in December 2015.  (Anstey Dep. 30:21-32:9, 43:8-45:16; Iadevaia Dec., Ex. PPP)  Given his immigration status, which did not permit him to join AJAM's payroll, AJMN paid Anstey's salary from May to November 2015.  (Anstey Dep. 30:21-32:9, 43:8-45:16; Gupta Dec. ¶ 23)  Anstey joined AJAM's payroll with a salary of ████████, which was a new addition to AJAM's operating budget.  (Anstey Dep. 37:8-11; Gupta Dec. ¶ 24)  By joining AJAM's payroll in December 2015, Anstey also qualified for the retention bonus during the wind down, which cost AJAM twice as much as it otherwise would have.  (Gupta Dec. ¶ 24; Anstey Dep. 74:8-23)

121.    In December 2015, the Company began to evaluate the possibility of shutting down its operations.  (Chang Dec. at ¶ 12).

Plaintiff's Response:

Deny.  A jury could believe that, by December 2015, AJAM had already decided to shut down its operations.  By December 2015, a number of board members had decided that AJAM should be shut down.  (Al Najjar Dep. 44:8-45:4)  Also by December 2015, an Executive Committee, made up of Al Najjar and other AJMN employees, had been formed to oversee

75

"Project Digital" which was the codename given to "the project to wind down and shut down AJAM." (O'Brian Dep. 77:2-7; Al Najjar Dep. 14:9-15:23)

Gupta and Chang learned about Project Digital for the first time on or about December 11, 2015, by which time AJAM had already retained Skadden, Arps and Deloitte to run Project Digital. (Gupta Dep. 255:7-19; Al Najjar Dep. 16:2-17:2; Anstey Dep. 203:14-23; O'Brian Dep. 77:25-79:15; Chang Dep. 47:7-23, 49:23-50:19; Danner Dep. 21:14-22, 27:16-31:19; Iadevaia Dec., Ex. FF, GG) By this time, Al Najjar had also told Anstey in a one-on-one meeting that AJAM may shut down and Anstey could not recall Al Najjar presenting any alternatives to AJAM shutting down. (Anstey Dep. 66:4-68:9)

Moreover, on or about December 14, 2015, Bishr warned Anstey about the impending wind down of AJAM and provided Anstey with a timeline for when the wind down would be announced. Bishr asked Anstey "to build certain rules of engagement and habits early on" because "once we begin to execute (by the second week of Jan[uary]) many parts will be moving at the speed of light." (Iadevaia Dec., Ex. FF) Around this same time, at least one member of the Deloitte team understood that the purpose of Project Digital was to wind down AJAM. (Hwang Dep. 27:22-28:15)

122.   Like Mr. Gupta, Chang requested a salary increase in December 2015, and that request was not granted. (Chang Dec. at ¶ 12).

Plaintiff's Response:

Admit in part, deny in part. Admit that Chang requested a salary increase in December 2015. (Iadevaia Dec., Ex. QQQ)

Deny that Chang's and Gupta's circumstances were the same. Gupta was promised a raise in May 2015. (Gupta Dep. 84:8-15, 84:21-85:2, 167:23-168:6, 238:7-11; Al Shihabi Dep. 48:1-5, 48:23-49:4) Gupta repeatedly asked Anstey to honor the raise but

76

defendants refused.  (See infra ¶¶ 224-53, 391-422)  As Chang admitted, Gupta's situation was different from her situation because he had never received a salary increase even though he was promoted to Executive Vice President.  (Chang Dep. 219:25-220:25; Anstey Dep. 211:25-212:19)  In contrast, over the course of six months, Chang received two pay increases.  (Kaplan Dec., Ex. 8; Chang Dep. 23:4-10, 29:14-16, 34:11-17)

**No First Hand Knowledge of Alleged Prior Discrimination**

123.    Al Shihabi had no personal experience with Anstey's treatment of employees at AJAM after he was replaced as CEO in May 2015. (Al Shihabi Dep. at 13-20, 168-69 [Kaplan Ex. 47]).

Plaintiff's Response:

Admit.    However, Al Shihabi did personally observe Anstey's discriminatory behavior when they worked together at Al Jazeera English. (Al Shihabi Dep. 143:11-25, 168:15-19)  Al Shihabi identified a number of Al Jazeera English employees of Indian ethnicity who Anstey treated less well than white employees.  (Al Shihabi Dep. 16:3-20:3, 144:1-16, 177:3-7, 180:21-182:17)  Al Shihabi even complained to Souag about Anstey's discriminatory treatment of one of these employees. (Al Shihabi Dep. 19:16-20:3)  In addition, Al Shihabi witnessed Anstey discriminating against non-white job applicants when Anstey was assisting with the launch of AJAM.  (Al Shihabi Dep. 177:22-178:22)

124.    Al Shihabi was not involved in the day to day business of AJAM such as decisions to retain or terminate employees after he was replaced as CEO in May 2015.  (Al Shihabi Dep. at 152-53 [Kaplan Ex. 47]).

Plaintiff's Response:

Admit.    However, AJMN retained Al Shihabi as an Advisor to Souag, the top executive at AJMN.  Al Shihabi continued in this advisory capacity until January 2017 and continued to receive the same salary that he had as interim CEO. (Al Shihabi Dep. 150:10-24; Al Najjar Dep. 71:16-24)

125.   Al Shihabi never discussed with Anstey whether or not Gupta's salary should be increased or anything else concerning Gupta. (Al Shihabi Dep. at 157-58 [Kaplan Ex. 47]).

Plaintiff's Response:

Admit that Anstey never discussed Gupta's salary increase with Al Shihabi despite Al Shihabi still working for AJMN.  AJMN retained Al Shihabi as an Advisor to Souag, the top executive at AJMN and Al Shihabi continued in this advisory capacity until January 2017.  (Al Shihabi Dep. 150:10-24)  In fact, Anstey refused to meet with Al Shihabi to discuss any transition plan.  (Al Shihabi Dep. 28:17-23)  Furthermore, Al Shihabi testified that after Gupta filed this lawsuit, he sent an email to Souag in support of Gupta's claims.  (Al Shihabi Dep. 104:2-24)  Defendants never produced this email.

126.   Gupta testified that he has no personal or firsthand knowledge to support an allegation that Anstey "has been accused of discrimination against South Asian employees" and that allegedly "while in charge of Al Jazeera English, Anstey fired two Washington, D.C.-based anchors of Indian heritage because they made the newsroom 'too brown.'" (Gupta Dep. at 215-20, 246-51 [Kaplan Ex. 1]).

Plaintiff's Response:

Admit.  However, Gupta learned about Anstey's discriminatory treatment in or around February or March 2016.  (Gupta Dep. 215:21-219:13)

In addition, Al Shihabi witnessed Anstey discriminating against people of color when they worked together at Al Jazeera English.  (Al Shihabi Dep. 143:11-25, 168:15-19)  In fact, Al Shihabi identified three Al Jazeera English employees of South Asian ethnicity who Anstey treated less well than white employees: ███████████████████████ ██████████ and ████████████████.  (Al Shihabi Dep. 17:20-20:3, 144:1-16; Gupta Dec. ¶ 79)  Al Shihabi testified that Anstey was "not in favor" of ██████████████████, all three of whom were Al Jazeera English anchors or reporters of Indian ethnicity.  (Al Shihabi Dep. 17:20-19:8, 144:1-21)

78

Al Shihabi also witnessed Anstey discriminating against ██, who was Al Jazeera English's head of online content and is Arabic, "because of the color of his skin." Anstey tried to prevent ██ from joining Al Jazeera English and later tried to push ██ out of Al Jazeera English. (Al Shihabi Dep. 177:3-10, 180:21-182:17)

Al Shihabi also witnessed Anstey discriminating against non-white job applicants when Anstey was assisting with the launch of AJAM. (Al Shihabi Dep. 177:22-178:22)

## PLAINTIFF'S COUNTERSTATEMENT OF DISPUTED FACTS

### Plaintiff's Background

127.    Gupta is a naturalized United States citizen of Indian origin. (Gupta Dec. ¶ 2)

128.    Gupta has a Bachelor's of Science Degree from Bangalore University, an Accountancy Diploma from Oxford Brookes University, and a Master's of Business Administration Degree from the Wharton School of Business. (Iadevaia Dec., Ex. RRR)

129.    Gupta is a member the American Institute of Certified Public Accountants and a Fellow of the Institute of Chartered Accountants in England and Wales and accordingly has training in U.S. and international accounting standards. (Iadevaia Dec., Ex. RRR)

130.    Gupta worked in the United Kingdom offices of BDO Stoy Hayward as an auditor from 1991 through 1996. (Iadevaia Dec., Ex. RRR)

131.    From 1996 until 2000, Gupta worked for KPMG as a Manager in its Business Advisory and Assurance Practice, first in the United Kingdom and then in the United States in San Francisco, California. (Anand Dep. 59:2-4; Iadevaia Dec., Ex. RRR)

132.    From 2000 until 2005, Gupta worked in San Francisco, California for Eidos Inc., which was the United States subsidiary of Eidos plc., first as Vice President of Business

Development and then as Chief Financial Officer of the United States subsidiary. (Gupta Dep. 57:2-15; Iadevaia Dec., Ex. RRR)

133.    In 2005, Gupta began working for Warner Bros. Home Entertainment, Inc. as Vice President of Financial Planning in Los Angeles, California until the end of 2011. (Gupta Dep. 57:8-15; Iadevaia Dec., Ex. RRR)

134.    Gupta joined Home Box Office Inc. ("HBO") in January 2012 as Vice President of Business Planning and Operations in New York, New York.  (Iadevaia Dec., Ex. RRR)

<u>AJAM's Background</u>

135.    AJAM was an American cable news channel with an online presence. (Gupta Dec. ¶ 3)

136.    AJAM is a subsidiary of the Al Jazeera Media Network ("AJMN"). (Anstey Dep. 11:18-19)

137.    AJMN is one of the world's largest news organizations and is owned by the government of Qatar and headquartered in Doha, Qatar.  It owns various "Al Jazeera" cable channels across the world, including AJAM; Al Jazeera English Channel, which produces news content for international TV broadcasting outside the United States; and AJ+, which produces web based digital content for Facebook and YouTube.  (Gupta Dec. ¶ 4; Anstey Dep. 11:20-12:18; Dkt. No. 25 ¶ 23)

138.    AJAM was formed on or about January 3, 2013 after AJMN acquired Current TV, an American cable TV channel, and rebranded it as AJAM.  (Iadevaia Dec., Ex. K)

139.    AJAM started broadcasting on or about August 20, 2013.  (Iadevaia Dec., Ex. SSS)

80

140.    AJAM derived almost the entirety of its funding from AJMN.  (Al Shihabi Dep. 37:13-38:13; Al Najjar Dep. 85:7-86:3)

141.    Each year AJAM submitted a budget to AJMN reflecting the proposed funding that AJAM would receive from AJMN.  The AJAM CEO was responsible for submitting the budget to AJMN's budget committee for approval.  If approved, the budget would then be sent to the Qatar Ministry of Finance for final approval and release of funding.  (Gupta Dec. ¶ 14; Al Shihabi Dep. 37:13-25, 52:12-53:5, 71:17-24)

142.    AJAM's corporate mission, as explained in its employee handbook, was to become "the world's leading and most trusted media network" by, among other things, "[e]ngaging talented, creative and spirited people," "[r]ebalancing global media by respecting the diversity and humanity of the world," and "[g]iving a voice to the voiceless." (Iadevaia Dec., Ex. TTT)

143.    AJAM's initial business plan was to build a loyal audience based on editorial integrity and journalism that affects society and pursue efforts to bolster its profits only after 2020.  (Al Shihabi Dep. 68:5-20; Gupta Dep. 107:22-108:6)

144.    At the time of its launch, AJAM's interim CEO was Al Shihabi who is Jordanian.  (Al Shihabi Dep. 24:18-21)

145.    AJAM's president was O'Brian who is white and American.  (O'Brian Dep. 12:25-13:6)

Gupta's Successful Employment at AJAM

A.    Gupta Joins AJAM

146.    Gupta joined AJAM through a headhunter. (Gupta Dep. 12:22-13:14)

147.    When Gupta joined AJAM, he signed a contract.  (Kaplan Dec., Ex. 4)

81

148.   Gupta joined AJAM on or about September 15, 2013, as Senior Vice President of Finance. (Gupta Dep. 43:18-25)

149.   Gupta's starting salary was $350,000.   (Gupta Dep. 163:7-14; Kaplan Dec., Ex. 4 ¶ 3(a))

150.   Gupta's total compensation at AJAM was about $100,000 less than what he earned at HBO. (Gupta Dep. 20:18-21; Iadevaia Dec., Ex. UUU)

151.   AJAM's diverse workforce, strong ideals, and commitment to journalism attracted Gupta to the company. (Gupta Dec. ¶ 6)

152.   Gupta entered into a two-year contract, until September 2015.   At that time, AJAM had the option to renew for a further two years, but needed to provide Gupta at least 90 days' notice regarding whether it intended to renew his contract or not. (Kaplan Dec., Ex. 4 ¶ 1)

153.   Gupta's contract required AJAM to review his performance "on a periodic basis" and "at least once annually."   "Based upon that review," AJAM was obligated to "consider" granting Gupta a salary increase. (Kaplan Dec., Ex. 4 ¶ 3(a); Gupta Dep. 163:19-164:3; Al Shihabi Dec. ¶ 7)

154.   Harleston, AJAM's General Counsel, told Gupta, while negotiating with him over the terms of his employment, that AJAM would make up the gap between total compensation at AJAM and HBO. (Gupta Dec. ¶ 54)

155.   Gupta was the only employee of South Asian descent to hold a leadership position at AJAM at any point. (Gupta Dec. ¶ 7; Iadevaia Dec., Ex. VVV)

156.    As Senior Vice President of Finance, Gupta reported directly to AJAM's then-acting CFO, Al Suwaidan, and Al Shihabi.  (Gupta Dep. 193:9-15; Kaplan Dec., Ex. 13; Iadevaia Dec., Exs. O, WWW)

157.    Al Suwaidan left AJAM in or around January 2014, just a few months after Gupta joined the company.  (Gupta Dec. ¶ 8)

158.    After Al Suwaidan's departure, AJAM transferred Al Suwaidan's job duties to Gupta.  (Al Shihabi Dep. 116:11-117:9; Gupta Dec. ¶ 9)

159.    When Gupta first joined AJAM, he was responsible for, among other things, managing and supervising employees within AJAM's finance and accounting department, ensuring financial compliance with relevant laws and regulations, overseeing monthly closing of the books, and coordinating with external auditors.  (Kaplan Dec., Ex. 4 ¶ 2(a))

160.    As of January 2014, Gupta's responsibilities expanded.  Gupta became responsible for, among other things, organizing AJAM's banking arrangements; managing the travel department; structuring AJAM's employee medical plan benefits; serving as the 401(k) plan administrator; managing the entire freelancer process; negotiating with vendors; managing the procurement process; approving employee pay raises; coordinating taxation filing at state and federal level; managing the payroll department; preparing contractual cable operator liability computations; leading strategic projects; and preparing financial presentations for the CEO to present to AJAM's board of directors and AJMN's senior management.  (Gupta Dec. ¶ 9; Al Shihabi Dep. 100:16-19)

161.    Gupta also became responsible for monitoring AJAM's financial status, ensuring that AJAM was operating within its budget, and developing AJAM's economic strategy. (Gupta Dec. ¶ 10)

162.    Gupta's title and compensation did not change when he took on Al Suwaidan's role and responsibilities, however he was commonly referred to as the CFO by Al Shihabi and other senior executives.  (Gupta Dep. 50:19-51:10, 173:13-23 195:14-196:12; Al Najjar Dep. 17:23-18:3; Iadevaia Dec., Exs. EE, XXX, YYY)

163.    Gupta thrived with these new responsibilities.  (Al Shihabi Dep. 29:19-24, 59:7-11, 72:25-75:4, 100:20-102:14)

164.    Al Shihabi praised Gupta for his "very high ethics" and "very high standards" and "depended" on Gupta's financial skills.  Gupta was "excellent in being able to identify fat" in order to cut the budget without reducing the quality of the output. (Al Shihabi Dep. 29:19-24, 59:7-11, 72:25-73:14)

165.    Gupta generated significant productivity and efficiency gains, which reduced AJAM's annualized operating expenses from almost ▮▮▮▮▮▮ at the time of launch to just ▮▮▮▮▮▮ as of Spring 2015.  (Iadevaia Dec., Exs. V, ZZZ; Iadevaia Dec., Ex. W; Al Shihabi Dep. 30:11-16, 69:20-71:6)

166.    As part of the budget process, Gupta worked with Al Shihabi to identify cost savings.  (Al Shihabi Dep. 72:25-73:14, 115:15-116:7)

167.    Gupta's efforts meant that operating expenses for 2016 and beyond were projected to be reduced even further than required.  He did not simply achieve the mission laid out before him, he "overachieved the mission."  (Al Shihabi Dep. 74:20-75:4; Iadevaia Dec., Ex. W)

168.    In making these cuts, Gupta did not jeopardize AJAM's broadcasting output, which continued to increase in both number of hours and quality.  (Iadevaia Dec., Ex. W; Al Shihabi Dep. 72:25-73:14)

84

169.    Gupta reformed the freelancing process so as to reduce the amount of "contract leakage" – i.e., costs arising out of a failure to monitor freelancer contracts.  Gupta designed "a well-orchestrated process" that allowed AJAM to monitor and control freelancer costs.  (Al Shihabi Dep. 100:20-102:2)

170.    Gupta renegotiated AJAM's contracts with its vendor for travel and "cut massively" the commissions and fees charged by that vendor.  (Al Shihabi Dep. 102:3-14)

171.    Gupta also reformed AJAM's travel policies, reducing local travel expenses associated with company employees' use of cars by more than $1,000,000.  (Gupta Dec. ¶ 11; Al Shihabi Dep. 73:15-74:12)

172.    Gupta led the process, using an external accounting firm, whereby AJAM's net operating losses as reported in AJAM's 2013 and 2014 tax returns could be offset against future profits, allowing AJAM to operate tax-free in the United States.  (Gupta Dec. ¶ 12)

173.    Gupta also coordinated 2013 and 2014 external audits of AJAM, both of which were certified as clean by the external auditor.  (Al Shihabi Dep. 30:5-10; 138:14-15; Iadevaia Dec., Ex. K)

174.    Gupta also coordinated 2013 and 2014 audits of AJAM's 401(k) program which were certified as clean by the auditor.  (Gupta Dec. ¶ 13)

B.    AJAM Promotes Gupta to Executive Vice President and Promises a Raise

175.    When Gupta took on Al Suwaidan's responsibilities in or around January 2014, Al Shihabi told Gupta that if he performed well over the following year Gupta would receive a salary increase.  (Gupta Dec. ¶ 55; Gupta Dep. 193:23-194:12)

85

176.   During 2014, many executives earned significantly more than Gupta.  For example, Marcy McGinnis had a salary of ▉▉▉▉▉ and Shannon High had a salary of ▉▉▉▉▉ both of whom were Senior Vice Presidents.  (Iadevaia Dec., Ex. AAAA)

177.   On or about March 27, 2015, more than a year after Gupta started to take on the responsibilities of head of Finance, Al Shihabi announced that AJAM was promoting Gupta to Executive Vice President of Finance.  (Iadevaia Dec., Ex. BBBB)

178.   This promotion was the first phase in a "two phase[]" process.  First, Al Shihabi gave Gupta the new EVP title in March 2015 and, second, he would expand Gupta's responsibilities following budget approval and restructuring in April 2015.  (Al Shihabi Dep. 42:18-43:15, 46:8-11, 94:1-12; Gupta Dep. 167:23-168:6)

179.   At the same time Al Shihabi engaged in the review of Gupta's salary required by Gupta's contract.  Al Shihabi decided to increase Gupta's salary in accordance with the contractually-mandated salary review.  (Al Shihabi Dep. 121:11-123:9, Al Shihabi Dec. ¶ 7; Kaplan Dec., Ex. 4 ¶ 3(a))

180.   Al Shihabi told Gupta that Gupta would receive a salary increase in May 2015 to go along with his promotion to Executive Vice President once they finished AJAM's proposed budget and a related restructuring, i.e., in the second phase of the process. (Gupta Dep. 80:2-11, 81:6-11, 81:25-82:8, 91:8-18, 167:23-168:6; Al Shihabi Dep. 46:12-15, 88:7-89:13)

181.   Al Shihabi presented the budget to Souag in April 2015 and Souag approved it.  (Al Shihabi Dep. 54:18-55:14)

182.   Al Shihabi's proposed restructuring involved "administrative integration," whereby he would "exit" certain high-salary executives, including ▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉, and make the smaller number of remaining executives

86

responsible for a greater number of administrative functions. (Iadevaia Dec., Ex. W; Al Shihabi Dep. 54:23-55:10, 75:11-78:16, 81:14-82:1)

183.    The savings from this administrative integration, including the departure of ▮▮, were estimated to be approximately ▮ ▮▮▮▮ in 2015 alone. (Iadevaia Dec., Ex. W; Al Shihabi Dep. 81:14-20) The restructuring was projected to reduce AJAM's staffing expenses by over ▮▮▮▮ by 2016. (Iadevaia Dec., Ex. W; Al Shihabi Dep. 75:11-78:16)

184.    As part of this administrative integration, Al Shihabi decided to have the HR department report to Gupta as head of Finance rather than having a separate Executive Vice President in charge of just the HR department. (Gupta Dep. 84:10-19, 238:7-14; Al Shihabi Dep. 41:21-42:3, 46:8-22, 88:7-89:25; Anstey Dep. 91:17-24; Iadevaia Dec., Ex. NNN)

185.    Al Shihabi decided to increase Gupta's salary in return for taking on this expanded role which would more than offset the departure of the ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ (Al Shihabi Dep. 88:7-89:25)

186.    Al Shihabi informed Gupta in or around April 2015 that Gupta's salary would increase by $150,000, from $350,000 to $500,000 to reflect Gupta's promotion to Executive Vice President of Finance and Business Operations. Al Shihabi would also give Gupta a $50,000 bonus to reflect Gupta taking over AJAM's HR functions in May 2015. (Al Shihabi Dep. 48:1-5, 48:23-49:4; Gupta Dep. 84:8-15, 84:21-85:2, 167:23-168:6, 238:7-11)

187.    On or about May 5, 2015, Al Shihabi sent a firm-wide email announcing that AJAM was promoting Gupta to Executive Vice President of Finance and Business Operations. (Gupta Dep. 168:24-169:19; Iadevaia Dec., Ex. S)

188.    The expansion of Gupta's title to Executive Vice President of Finance and Business Operations reflected Gupta's new oversight of the HR department, as well as the

87

responsibilities for other business functions that he had obtained since Al Suwaidan left.  This included travel, procurement, and freelancer hiring.  (Al Shihabi Dep. 49:14-23, 98:23-102:3-21; Chang Dep. 30:17-22; Iadevaia Dec., Ex. ZZZ)

189.    This promotion reflected Gupta's exceptional performance.  (Al Shihabi Dec. ¶ 5-6; Al Shihabi Dep. 29:19-24, 59:7-11, 72:25-73:14)

190.    In addition to Gupta, in the same May 5, 2015 email, Al Shihabi announced a number of other promotions such as the promotion of Chang, who is an American of Korean descent, from Vice President of Human Resources to Senior Vice President of Human Resources, reporting to Gupta.  Chang received a salary increase from ███████ to ███████ with this promotion.  (Iadevaia Dec., Ex. S; Iadevaia Dec., Ex. CCCC; Kaplan Dec., Ex. 8; Chang Dep. 23:4-10, 29:14-16)

191.    The May 5 email also announced the promotion of Jocelyn Austin from Vice President of Communications to Senior Vice President of Communications.  She received a salary increase from ███████ to ██████ (Iadevaia Dec., Ex. S; Iadevaia Dec., Ex. DDDD; Kaplan Dec., Exs. 8-9)

192.    The May 5 email also announced the promotion of Polikoff from Acting Executive Vice President of Broadcast Operations and Technology to Executive Vice President of Broadcast Operations and Technology.  He received a salary increase from ███████ to ███████ (Iadevaia Dec., Ex. S; Iadevaia Dec., Ex. EEEE; Kaplan Dec., Exs. 8-9)

193.    Finally, the May 5 email announced the promotion of Tony Karon from Senior Executive Producer of Digital to Senior Vice President of Digital and Social Media.  He received a salary increase from ██████ to ██████ (Iadevaia Dec., Ex. S; Kaplan Dec., Exs. 8-9)

194.    This reflected a custom of providing a salary increase to go along with an executive-level promotion.  (Iadevaia Dec., Ex. U)

195.    For example, in or around June 2013, AJAM promoted Polikoff to Senior Vice President of Broadcast Operations and awarded him a salary increase from ███████ to ███████ (Iadevaia Dec., Ex. U)

196.    Also in or around June 2013, AJAM promoted Denise Males to Senior Vice President of HR and awarded her a salary increase from ███████ to approximately ███████ (Iadevaia Dec., Ex. U)

197.    At the same time in June 2013, AJAM promoted Gerald Connolly to Senior Vice President of Marketing and awarded him a salary increase from approximately ███████ to ███████.  (Iadevaia Dec., Ex. U)

198.    In or around July 2013, AJAM promoted Sollecito to Executive Vice President of Research and Media Insights and awarded him a salary increase from ███████ to ███████ (Iadevaia Dec., Ex. U)

199.    Also in or around July 2013, AJAM promoted Angela Morgenstern to Executive Vice President of Product Innovation and increased her salary from ███████ to ███████.  (Iadevaia Dec., Ex. U)

200.    In or around August 2013, AJAM promoted Ahmed to Senior Executive Producer and awarded him a salary increase from $███████ to $███████  Ahmed was promoted again to Senior Vice President of Newsgathering in February 2015 and received another salary increase from ███████ to ███████  (Iadevaia Dec., Exs. U, BBBB, FFFF)

89

201.     In or around October 2014, Karon received a salary increase from ▮▮▮▮ to ▮▮▮▮ when AJAM promoted him to Senior Executive Producer. (Iadevaia Dec., Ex. U)

202.     AJAM promoted Mary Caraccioli ("Caraccioli") to Senior Executive Producer in or around February 2015 and awarded her a salary increase from ▮▮▮▮ to ▮▮▮▮ AJAM promoted Caraccioli again in or around April 2015, to Senior Vice President of News Output and awarded her an additional salary increase from ▮▮▮▮ to ▮▮▮▮ (Iadevaia Dec., Ex. U)

203.     AJAM announced the promotions of Gupta, Chang, Austin, Polikoff, and Karon just one day before the company replaced Al Shihabi as CEO, and installed Anstey, who is white and British, in his place. (Iadevaia Dec., Ex. S; Kaplan Dec., Ex. 11)

204.     If Al Shihabi had not been replaced, he would have given Gupta a salary increase from ▮▮▮▮ to ▮▮▮▮ effective May 2015. (Gupta Dep. 169:9-170:1; Al Shihabi Dec. ¶ 9)

### Anstey Replaces Al Shihabi

205.     AJMN replaced Al Shihabi as CEO on or about May 6, 2015, after a series of high-profile resignations and lawsuits filed by AJAM employees. (Gupta Dep. 101:22-102:7; Al Najjar Dep. 68:23-69:9, 69:24-71:3; Kaplan Dec., Ex. 11)

206.     AJMN's decision to replace Al Shihabi was related to Al Shihabi's handling of personnel matters and not any concerns about the financial status of AJAM. (Al Shihabi Dep.149:25-150:9; Al Najjar Dep. 69:3-70:21)

207.     As CEO, Anstey reported directly to Al Najjar. (Anstey Dep. 26:21-27:9)

90

208.    AJMN retained Al Shihabi as an Advisor to the Director General Dr. Mostefa Souag, the top executive at AJMN.  Al Shihabi continued in this advisory capacity until January 2017.  Al Shihabi continued to receive the same salary as an advisor that he had as interim CEO. (Al Shihabi Dep. 150:10-24; Al Najjar Dep. 71:16-24)

209.    At the time Anstey took over, AJAM was in better financial shape than planned for when the channel launched in 2013.  AJAM had managed to decrease its expenses by more than 50% in fewer than two years and was in a position to further reduce expenses if necessary. (Gupta Dep. 107:22-108:11; Iadevaia Dec., Ex. W)

210.    Further, AJAM had reduced these expenses while at the same time increasing the amount and quality of the programming and seeing an 84% increase in viewership. (Iadevaia Dec., Ex. W)

211.    Anstey's contact at AJMN for financial and administrative matters was Al Najjar, who was Vice Chairman and Managing Director of AJAM's board of directors and Executive Director of Global Brand and Communications for AJMN. (Anstey Dep. 26:21-27:2; Al Najjar Dep. 9:6-8, 10:20-23, 13:15-23)

212.    From 2010 until May 2015, Anstey was Managing Director of Al Jazeera English. (Anstey Dep. 12:25-13:8)

213.    While Managing Director of Al Jazeera English, Anstey was based in Doha, Qatar. (Anstey Dep. 16:20-23)

214.    For part of Anstey's tenure as Managing Director, Al Shihabi was the Deputy Managing Director of Al Jazeera English.  (Al Shihabi Dep. 11:6-13:5; Anstey Dep. 15:2-19)

841294 v2

215.    Al Shihabi witnessed Anstey discriminating against people of color when they worked together at Al Jazeera English and Anstey's preference for white employees was "well known" at Al Jazeera English.  (Al Shihabi Dep. 143:11-25, 168:15-19)

216.    Al Shihabi identified three Al Jazeera English employees of South Asian ethnicity who Anstey treated less well than white employees: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓  (Al Shihabi Dep. 17:20-20:3, 144:1-16; Gupta Dec. ¶ 79)

217.    Al Shihabi testified that Anstey was "not in favor" of ▓▓▓▓▓▓▓▓ ▓▓▓▓, all three of whom were Al Jazeera English anchors or reporters of Indian ethnicity.  (Al Shihabi Dep. 17:20-19:8, 144:1-21)

218.    Anstey did not want ▓▓▓ serving as an anchor at Al Jazeera English.  (Al Shihabi Dep. 19:1-8)

219.    Al Shihabi encouraged ▓▓▓ to complain to Dr. Souag about Anstey's discriminatory conduct but ▓▓▓ was too "risk-adverse" to do so.  (Al Shihabi Dep. 19:16-20:3)

220.    Nevertheless, Al Shihabi informed Dr. Souag of Anstey's discriminatory conduct.  (Al Shihabi Dep. 19:16-20:3)

221.    Al Shihabi also witnessed Anstey discriminating against ▓▓▓, who was Al Jazeera English's head of online content and is Arabic, "because of the color of his skin."  Anstey tried to prevent ▓▓▓ from joining Al Jazeera English and later tried to push ▓▓▓ out of Al Jazeera English.  (Al Shihabi Dep. 177:3-10, 180:21-182:17)

222.    Al Shihabi also witnessed Anstey discriminating against non-white job applicants when Anstey was assisting with the launch of AJAM.  (Al Shihabi Dep. 16:14-17:19, 177:22-178:22)

92

223.    In response to deposition questions, Al Shihabi was prepared to provide more details about Anstey's discriminatory conduct but defendants refused to provide him access to his emails. (Al Shihabi Dep. 168:2-14, 171:6-17, 172:18-173:15, 176:11-21, 178:2-22)

Defendants Discriminate Against Plaintiff

A.    Anstey Refuses to Increase Plaintiff's Compensation From May 2015 to November 2015

224.    Between May and November 2015, Gupta repeatedly asked Anstey for the salary increase that Al Shihabi had promised Gupta.  (Gupta Dec. ¶ 56; Gupta Dep. 303:7-17, 304:4-10, Kaplan Dec., Ex. 13; Iadevaia Dec., Ex. X)

225.    From at least August 2015 onward, Anstey claimed that he needed approval from Al Najjar and that he was in conversation with Al Najjar about Gupta's salary increase. (Gupta Dec. ¶ 61; Gupta Dep. 303:7-17, 304:4-10)

226.    Anstey has since testified that he only needed Al Najjar's approval in the context of Project Digital, the codename used to refer to "the project to wind down and shut down AJAM," which did not begin until December 2015. (Anstey Dep. 206:9-207:12; 230:23-231:18; O'Brian Dep. 77:2-7; Al Najjar Dep. 14:13-16)

227.    The AJAM CEO had the authority to approve pay raises and there was no need to consult AJMN. (Al Shihabi Dep. 79:10-80:10; Gupta Dep. 140:24-141:10; O'Brian Dep. 196:12-18)

228.    Anstey and Al Najjar did not discuss Gupta's salary increase prior to December 2015. (Al Najjar Dep. 24:19-25:6, 35:8-12; Anstey Dep. 206:9-208:21)

229.    O'Brian was not party to any discussions between Al Najjar and Anstey regarding Gupta's salary increase. (O'Brian Dep. 233:24-234:3)

93

230.    In or around mid-May 2015, during their first in-person meeting, Gupta said to Anstey that he had a compensation issue that he would raise with Anstey later, after Anstey settled into his new position. (Gupta Dec. ¶ 57)

231.    On or about July 17, 2015, Gupta submitted a written memorandum to Anstey, O'Brian, and Chang in which he requested his "promised" salary increase.  Gupta explained that the only reason he did not receive this salary increase was the "CEO switch-over." (Kaplan Dec., Ex. 13; Gupta Dec. ¶ 59)

232.    Anstey discussed Gupta's memorandum with O'Brian.  (Anstey Dep. 191:19-192:17; O'Brian Dep. 192:18-194:21)

233.    Anstey did not increase Gupta's salary in July 2015.  (Gupta Dec. ¶ 67)

234.    From July 2015 until January 2016, Gupta continued to follow up on the status of his promised raise.  (Gupta Dec. ¶ 58; Iadevaia Dec., Ex. X)

235.    Anstey now claims that he cannot recall a single request from Gupta for a pay raise for the period between the middle of July and the middle of December 2015.  (Anstey Dep. 207:18-208:21)

236.    In or around June 2015, Anstey extended Gupta's contract by one month because Anstey was "too new" and wanted to better know Gupta and other AJAM personnel. (Gupta Dep. 179:10-22; Gupta Dec. ¶ 16)

237.    On or about July 21, 2015, Anstey unilaterally extended Gupta's contract a further two months, so as to end on December 15, 2015.  (Gupta Dec. ¶ 17; Iadevaia Dec., Exs. L, M, N)

238.    On or about July 22, 2015, Gupta discussed with Anstey the July 17, 2015 memorandum and repeated his request for a salary increase.  Gupta reiterated that Al Shihabi had

94

promised Gupta a salary increase but was replaced before the salary increase took effect.   Gupta

also explained that he now had a better title, more responsibilities, and a different contractual end

date from when he first joined AJAM in 2013.   (Gupta Dec. ¶ 60)

239.   Anstey responded that he would need approval from AJMN.   (Gupta Dec. ¶ 60)

240.   On or about August 22, 2015, just a few days before AJAM's board of

directors meeting on August 24 and 25, 2015, Gupta requested an update from Anstey on the

status of his promised salary increase.   (Gupta Dec. ¶ 61)

241.   Anstey told Gupta that he had started a conversation with Al Najjar about

the salary increase and would continue that conversation once Al Najjar arrived for the upcoming

board meeting.   (Gupta Dec. ¶ 61)

242.   Anstey did not increase Gupta's salary in August 2015.   (Gupta Dec. ¶ 67)

243.   Approximately one month later, in or around the second half of September

2015, Gupta again approached Anstey to request the salary increase Al Shihabi had promised.

Gupta asked Anstey why there was a need to consult with Al Najjar before granting the salary

increase.   (Gupta Dec. ¶ 62)

244.   Anstey said that he was discussing Gupta's salary increase with Al Najjar

in the context of broader discussions about AJAM's strategy going forward.   (Gupta Dec. ¶ 62)

245.   At the same time, Anstey and Chang attempted to have Gupta sign a letter

converting his employment to at will status following the expiration of his contract on December

15, 2015.   Gupta asked AJAM to increase his salary.   (Gupta Dep. 191:13-19; Chang Dep.

180:16-181:10, 192:14-194:6; Iadevaia Dec., Exs. X, Y, Z)

246.     Anstey did not increase Gupta's salary.  Accordingly, on or about October 8, 2015, when Chang presented Gupta with a letter formalizing his conversion to at-will employment, Gupta rejected the agreement because he was still attempting to obtain the salary increase Al Shihabi promised him.  (Gupta Dec. ¶ 63; Chang Dep. 180:16-181:10, 192:14-194:6; Iadevaia Dec., Ex. X)

247.     Anstey did not increase Gupta's salary in September 2015.  (Gupta Dec. ¶ 67)

248.     On or about October 21, 2015, Anstey approved a plan whereby AJAM eliminated the Vice President, Financial Controller position and Gupta took on those responsibilities.  (Iadevaia Dec., Ex. GGGG)

249.     In the course of approving this change in late October 2015, Gupta raised his salary increase with Anstey.  Gupta stated that he was saving AJAM money by taking on additional responsibilities and that he had already earned the salary increase as of May 2015. Gupta further requested that any salary increase take place before the end of the year.  (Gupta Dec. ¶ 64)

250.     Anstey said he was hoping to resolve the issue in the next few weeks. (Gupta Dec. ¶ 64)

251.     Anstey did not increase Gupta's salary in October 2015.  (Gupta Dec. ¶ 67)

252.     In or around late November, just before the Thanksgiving holiday, Gupta asked Anstey for an update on his salary increase.  Anstey said that he would resolve the issue when he returned from the holiday but that he needed AJMN's approval before executing a salary increase.  (Gupta Dec. ¶ 65)

253.   Anstey did not increase Gupta's salary in November 2015.  (Gupta Dec. ¶ 67)

B.   Defendants Fabricated Concerns Regarding Gupta's Performance

254.   Even though AJAM promoted Gupta during the Spring 2015, Anstey claimed, less than a month after becoming CEO, that he had "concerns" about Gupta's performance. (Iadevaia Dep., Ex. OOOOOO; Anstey Dep. 124:16-125:8)

255.   On or about June 10, 2015, Anstey told O'Brian that he had shared these concerns with Al Obaidli, Executive of Finance for AJMN, and that Al Obaidli was travelling to New York where he would have "full visibility of everything in Finance." (Iadevaia Dep., Ex. OOOOOO)

256.   Gupta met with Al Obaidli in or around June 2015.  This is the only time that the two met.  The meeting was in two parts.  During the first part, Gupta and Al Obaidli discussed their respective backgrounds for approximately half an hour. (Gupta Dep. 120:25-121:5)

257.   Al Obaidli was a "newcomer" to AJMN and had no experience with AJAM, "zero media experience," and "zero experience in America." (Al Shihabi Dep. 135:21-136:19)

258.   Following the introductory session, Gupta and Liana Lavin ("Lavin"), a Director of Finance, walked Al Obaidli through AJAM's various cable operator liabilities.  This second part of the meeting lasted a few hours. (Gupta Dep. 121:5-12)

259.   Gupta and Al Obaidli never discussed AJAM's budget or strategic direction during this June 2015 meeting.  Al Obaidli told Gupta that Anstey needed time to

97

evaluate AJAM further and that Anstey would likely start to develop a new strategy in the Fall 2015. (Gupta Dec. ¶ 18; Gupta Dep. 181:25-182:6)

260.    Anstey claims that Al Obaidli met with Gupta for "quite a bit of time" (Anstey Dep. 128:11-16), but they only met for a few hours. (Gupta Dep. 120:22-121:12)

261.    On or about June 17, 2015, approximately one month after Anstey first met Gupta, Anstey sent Al Obaidli an email regarding Gupta's employment. Anstey recommended a one-month extension of Gupta's contract, which was due to expire in a few months time, because Anstey was new to his role. One option Anstey considered was firing Gupta. (Kaplan Dec., Ex. 12)

262.    On or about June 19, 2015, Al Obaidli responded to Anstey and criticized Gupta's qualifications as the head of Finance for AJAM. (Kaplan Dec., Ex. 12; Anstey Dep. 128:11-16)

263.    Al Obaidli's criticisms made little sense.   He said Gupta's budget preparation was poor because Gupta's "projections are purely dependent on existing CAPEX/OPEX." (Kaplan Dec., Ex. 12)

264.    However, all budget projections are based on considering capital expenditures and operating expenditures. (Gupta Dec. ¶ 19; Al Shihabi Dep. 136:20-24) Al Obaidli did not suggest an alternative basis for a budget projection. (Kaplan Dec., Ex. 12)

265.    Al Obaidli also told Anstey that Gupta "lacks strategic plans and forward thinking." (Kaplan Dec., Ex. 12)

266.    Gupta excelled at both strategic planning and forward thinking under Al Shihabi. For example, Gupta helped Al Shihabi prepare the market outlook and AJAM

98

distribution and operational strategy presentations to AJAM's board of directors during 2014. (Al Shihabi Dec. ¶ 4)

267.   Gupta also worked with Al Shihabi to develop the financial and operational roadmap contained in the business plan submitted to Souag in April 2015. This roadmap identified overhead and cost-cutting initiatives that would allow AJAM to operate at a significantly lower budget from 2015 through 2021 and become self-sustainable by 2022. (Al Shihabi Dec. ¶ 4; Iadevaia Dec., Ex. W)

268.   Gupta's strategic skills were recognized by his peers. Chang acknowledged that Gupta's strengths were that "he is very smart and has a good grasp of strategy, big picture thinking, and he knows the business. He has historical knowledge." (Chang Dep. 146:9-16)

269.   Al Obaidli also stated his belief that Gupta was not the right person given "challenges [AJMN is] facing with [Ministry of Finance] on budget reduction" and the need to "offer creative solutions on Financial issues." (Kaplan Dec., Ex. 12)

270.   This criticism is especially incredible because Gupta had already managed to cut AJAM's budget by over 50 percent since joining AJAM in 2013 and had plans in place to cut further if required. (Iadevaia Dec., Exs. V, W; Al Shihabi Dep. 70:17-71:6)

271.   Anstey claims to have relied on Al Obaidli's criticisms even though Al Obaidli met Gupta only briefly, never discussed with Gupta the matters that he criticized, and those criticisms did not make sense. (Anstey Dep. 127:22-128:16, 146:6-19)

272.   Anstey told Gupta in or around June 2015 that he would extend Gupta's contract by one month because Anstey was "too new" and wanted to better know Gupta and

99

other AJAM personnel. (Gupta Dep. 179:10-22; Gupta Dec. ¶ 16) An additional month resulted in Gupta's contract expiring on October 14, 2015. (Kaplan Dec., Ex. 4 ¶ 1(a))

273. Gupta agreed to the one-month extension because at that time, more than one month into Anstey's tenure as CEO, he had only met with Anstey once or twice. (Gupta Dep. 179:24-180:11; Anstey Dep. 171:19-25)

274. Anstey did not raise any concerns about Gupta's performance or tell Gupta that his job was purportedly under threat. (Gupta Dep. 177:20-24)

275. From July 2015 onward, Anstey had no reported or documented concerns about Gupta's performance. (Anstey Dep. 144:7-10)

C. Anstey Treats Gupta Differently than Non-Indian Executives

    1. Anstey Subjected Gupta to a Different Process For Increasing His Salary

        a. Chang

276. Chang joined AJAM in or around August 2014 as a consultant in the HR department and became a full-time AJAM employee in or around January 2015 with the title of Vice President of HR. (Chang Dep. 11:19-12:2, 14:25-15:7)

277. In or around January 2015, when Chang became a full-time employee, she received a salary of ▇▇▇▇ instead of receiving approximately $▇▇ a day as a consultant. (Chang Dep. 12:10-22, 15:18-22; Kaplan Dec., Ex. 8)

278. On or about April 28, 2015, Chang was informed that the head of AJAM's HR department, Diana Lee ("Lee"), was leaving the company and that she would report to Gupta. (Chang Dep. 20:6-21:9; Iadevaia Dec., Ex. NNN)

279.    AJAM promoted Chang from Vice President of Human Resources to Senior Vice President of Human Resources and increased her salary from ███████ to ███████ in or around May 2015.  (Chang Dep. 23:4-10, 29:14-16; Kaplan Dec., Ex. 8)

280.    Upon Lee's departure, Chang became the senior-most HR specialist at AJAM.  (Chang Dep. 27:21-28:3)

281.    In or around June 2015, Anstey changed Chang's reporting structure and Chang began reporting directly to Anstey.  (Chang Dep. 23:20-24:19, 27:5-28:8; Gupta Dep. 171:17-172:19)

282.    AJAM promoted Chang to acting Executive Vice President of HR in October 2015.  (Iadevaia Dec., Ex. KK; Chang Dep. 31:12-22)

283.    As part of this promotion, AJAM increased Chang's salary from ███████ to ███████ (Chang Dep. 34:11-17; Iadevaia Dec., Ex. HHHH)

284.    Although Anstey and O'Brian discussed promoting Chang and increasing her salary, Anstey was the decisionmaker for both.  (Anstey Dep. 215:5-10; O'Brian Dep. 223:23-224:3)

285.    Anstey and O'Brian told Chang that this salary increase was only half of what they intended to give and that Chang would receive another ███████ in the following year. (Chang Dep. 41:18-42:7, 55:16-56:18; Iadevaia Dec., Ex. IIII)

286.    Neither Anstey nor O'Brian discussed Chang's salary increase with Al Najjar or sought Al Najjar's approval.  (Anstey Dep. 240:15-241:2; Al-Najjar Dep. 27:12-15; O'Brian Dep. 241:19-242:2)

287.    O'Brian did not understand why Anstey was able to approve Chang's salary increase without approval from Al Najjar but had been unable to do the same for Gupta. (Iadevaia Dec., Ex. BB)

b. Ahmed

288.    Ahmed joined AJAM in 2013.  On or about March 27, 2015, he was promoted to Senior Vice President Newsgathering.  At the same time, AJAM increased Ahmed's salary from ▮▮▮▮ to ▮▮▮▮ (Iadevaia Dec., Exs. BBB, FFFF, JJJJ)

289.    On or about September 15, 2015, Anstey shifted Ahmed from Senior Vice President of Newsgathering to Senior Vice President of Planning and increased his salary to ▮▮▮▮ effective November 1, 2015.  (Iadevaia Dec., Exs. AA, KKKK; Gupta Dep. 308:18-309:5)

290.    Anstey did not consult Al Najjar when he increased the salary of Ahmed. (Iadevaia Dec., Ex. AA; Gupta Dep. 308:18-309:5)

c. Anstey

291.    When Anstey first joined AJAM in May 2015, AJMN paid him and not AJAM because he did not have a Visa that permitted him to join AJAM's payroll.  (Gupta Dec. ¶ 23; Anstey Dep. 30:21-32:9, 43:8-45:16)

292.    After Anstey obtained the correct Visa in or around late November 2015, he instructed Gupta to enter him in AJAM's payroll.  Anstey did not join AJAM's payroll until December 2015, after Project Digital started and when preparations for the wind down of AJAM were well underway.  (Anstey Dep. 30:21-32:9, 43:8-45:16; Iadevaia Dec., Ex. PPP; Iadevaia Dec., Ex. LLLL; Gupta Dec. ¶ 24)

102

293.   Once on AJAM's payroll, Anstey earned a salary of ████████ (Anstey Dep. 37:8-11)

294.   This expense was added to AJAM's operating budget. (Gupta Dec. ¶ 24)

295.   By joining AJAM's payroll in December 2015, Anstey also qualified for the retention bonus, which cost AJAM twice as much as it otherwise would have. (Gupta Dec. ¶ 24; Anstey Dep. 74:8-23)

296.   There is no evidence that Anstey sought or received Al Najjar's approval when he added himself to AJAM's payroll and increased AJAM's annual personnel costs by more than ████████. (Iadevaia Dec., Ex. PPP; Anstey Dep. 30:21-32:9, 43:8-45:16)

d.   Heather Allan

297.   In or around mid-September 2015, Anstey hired Heather Allan ("Allan"), who is white and British, as Senior Vice President of Newsgathering, taking on Ahmed's role. (Iadevaia Dec., Exs. Y, AA)

298.   Allan began working for AJAM on or about November 2, 2015. (Iadevaia Dec., Exs. Y, AA)

299.   Allan's salary at AJAM was ████████ (Iadevaia Dec., Ex. DD)

2.   Anstey Did Not Meet on a One-On-One Basis With Gupta

300.   Anstey rarely met with Gupta one-on-one to discuss finance and budgeting matters or review the monthly financial statements submitted to AJMN. Instead, Anstey's few one-on-one meetings with Gupta focused on the extension of Gupta's contract or Gupta's salary increase. (Gupta Dec. ¶ 25)

301.   Gupta met with Anstey for the first time in mid-May 2015. (Gupta Dep. 115:16-18)

302.    At that first meeting Anstey expressed "surprise[]" that Gupta oversaw HR.  (Gupta Dep. 172:11-14)

303.    Within one month of this meeting, Anstey decided to have HR report directly to him rather than Gupta.  (Gupta Dep. 171:17-23)

304.    During this meeting, Gupta told Anstey that he had a compensation issue that he would discuss with Anstey at a later date.  (Gupta Dec. ¶ 57)

305.    This first meeting was just "an introduction" and "w[as] [not] about going into the detail."  (Anstey Dep. 96:5-9)

306.    Anstey had similar introductory meetings with all or almost all of his direct reports.  (Anstey Dep. 102:18-24)

307.    Anstey repeatedly delayed meeting with Gupta to discuss the financial state of AJAM, despite Gupta's efforts to schedule such meetings.  (Gupta Dec. ¶ 26)

308.    Gupta did not have an opportunity to meet Anstey one-on-one again until in or around the middle of June 2015, where Anstey proposed extending Gupta's contract by one month, until October 15, 2015.  (Gupta Dep. 179:10-22)

309.    Gupta's next one-on-one meeting with Anstey was not until July 21, 2015, just a few days after requesting the salary increase Gupta had earned under Al Shihabi, at which Anstey extended Gupta's contract for a further two months, to end on December 15, 2015.  (Iadevaia Dec., Ex. M; Kaplan Dec., Ex. 13)

310.    Gupta rarely met Anstey one-on-one during August, September, October, and November 2015.  During their one-on-one meetings in this timeframe, they discussed Gupta's salary increase and not AJAM's finances.  (Gupta Dec. ¶ 27)

104

311.    Such long breaks between one-on-one meetings between a CEO and head of Finance are highly unusual.  For example, Gupta would meet or speak with Al Shihabi nearly every day.  (Gupta Dec. ¶ 28)

312.    Conversely, Anstey would routinely meet one-on-one with other Executive Vice Presidents who are not Indian.  These meetings were more frequent than Anstey's meetings with Gupta.  (Chen Dec. ¶¶ 4-6[7]; Iadevaia Dec., Exs. MMMM, NNNN, OOOO)

313.    Anstey had a regular weekly meeting with Chang and O'Brian but not with Gupta.  (Gupta Dec. ¶ 29; Iadevaia Dec., Ex. PPPP)

314.    Anstey also met often with Ripley, who is white and the Executive Vice President of Ad Sales.  (Anstey Dep. 84:8-11; Al Shihabi Dep. 38:6-13; Chen Dec. ¶ 6; Iadevaia Dec., Ex. MMMM)

    3.    <u>Anstey Excluded Gupta From Important Meetings and Decisions</u>

      a.    <u>Strategy Meetings</u>

315.    When Anstey joined AJAM in May 2015, he announced that he intended to change the "strategy" of AJAM.  (Gupta Dec. ¶ 30)

316.    To that end, Anstey held a series of meetings aimed at redefining AJAM's editorial, multiplatform, and convergence strategy.  He did not invite Gupta to any of these meetings or tell Gupta about the outcome of those meetings.  (Gupta Dec. ¶ 31; Iadevaia Dec., Ex. QQQQ)

317.    Any change in AJAM's editorial strategy would necessarily have a direct effect on AJAM's budget priorities.  Gupta was therefore unable to monitor whether AJAM was meeting its 2015 budget or tailor the 2016 budget to the proposed strategy.  (Gupta Dec. ¶ 31)

---

[7] All references to "Chen Dec." refer to the Declaration of Tian Chen ("Chen Dec.").

b.  Distribution Meetings and Decisions

318.   Anstey would also exclude Gupta from meetings that Gupta had been invited to attend and that directly affected AJAM's finances.  (Gupta Dec. ¶ 32)

319.   From approximately May through July 2015, Anstey met regularly with Mary Murano ("Murano"), who is white and the Executive Vice President of Distribution, where they would discuss important financial matters regarding AJAM's relationship with cable operators and potential liabilities to those operators.  (Gupta Dec. ¶ 32; Anstey Dep. 84:12-15; Iadevaia Dec., Ex. RRRR)

320.   Gupta was rarely invited to attend these meetings with Anstey and Murano and only on occasion permitted to consult on the financial effect of the decisions that Anstey made during these meetings.  (Gupta Dec. ¶ 32)

321.   Gupta's exclusion from these meetings had the potential to damage AJAM's financial standing.  For example, Anstey may have materially breached AJAM's contractual obligations to cable operators because he improperly permitted AJAM to make available online the show "The Spy Cables" at the same time that it was televised on cable.  (Gupta Dec. ¶ 33)

322.   Such a breach was potential grounds for cable operators to cancel the broadcast of AJAM, a death sentence for a cable news channel because it would reduce the number of cable subscribers who could view AJAM and also reduce advertising revenue.  (Gupta Dec. ¶ 33)

323.   Anstey decided to make "The Spy Cables" available online after discussing the issue with Murano and possibly other senior executives but did not discuss the issue with Gupta.  (Gupta Dep. ¶ 33)

324.    Gupta would have advised Anstey of the contractual risks associated with this action if Anstey had consulted with him.  (Gupta Dec. ¶ 33)

c.   Personnel Meetings and Decisions

325.    Anstey also excluded Gupta from meetings concerning personnel and staffing even though Gupta was responsible for AJAM's budget and needed to be kept apprised of staffing decisions in order to perform his job.  (Gupta Dec. ¶ 34)

326.    Anstey would meet with O'Brian, Chang, and occasionally other senior executives to "discuss HR and staffing issues" but did not invite Gupta.  (O'Brian Dep. 185:7-15; Iadevaia Dec., Ex. SSSS)

327.    Gupta was not asked about giving Chang the acting Executive Vice President title or the increase to her salary.  (Gupta Dep. 293:15-18; Gupta Dec. ¶ 35)

328.    Nor was Gupta consulted about the decision to move Ahmed from Senior Vice President of News Gathering to Senior Vice President of Planning and increase his salary.  (Gupta Dec. ¶ 35)

329.    Gupta was also not asked about the decision to hire Allan as Senior Vice President of Newsgathering and give her a starting salary of █████   (Gupta Dec. ¶ 35)

330.    O'Brian recognized that these financial decisions implicated Gupta's job but only informed him of Chang's salary increase after Anstey made the decision.  (O'Brian Dep. 238:19-25)

d.   "TV Everywhere"

331.    Anstey no longer invited Gupta to meetings about the development of "TV Everywhere," an AJAM streaming service that was in development, even though the project

107

required spending money on vendors and negotiating contracts which were Gupta's responsibility. (Chen Dec. ¶¶ 7-9)

332.    Before Anstey became CEO, Gupta participated in discussions about the "TV Everywhere" project along with O'Brian and Murano, among others. (Chen Dec. ¶¶ 7-9; Iadevaia Dec., Exs. TTTT, UUUU)

333.    After Anstey became CEO, O'Brian and Murano continued their involvement with the project but Anstey no longer included Gupta in these discussions about the "TV Everywhere" project. (Chen Dec. ¶¶ 7-9; Iadevaia Dec., Exs. VVVV, WWWW)

e.    2015 Board Meeting

334.    Anstey asked Gupta to prepare a presentation on several different topics for the August 2015 board meeting, including a presentation on AJAM's current cash position, a presentation on AJAM's 10-year financial plan, and a presentation on revising AJAM's Table of Financial Authorities, more commonly referred to as a TOFA, which set forth AJAM's financial authorities for each type of financial transaction. (Gupta Dec. ¶ 36; Iadevaia Dec., Ex. XXXX)

335.    At the beginning of the second day of the board meeting, Gupta presented on one of the topics related to AJAM's current cash position for approximately 20 minutes. (Gupta Dec. ¶ 36)

336.    Following this first presentation, Anstey instructed Gupta to leave the meeting but wait outside just in case he was needed. Anstey then proceeded to discuss AJAM's 10-year financial plan and TOFA with the board of directors for over an hour while Gupta waited outside the meeting room. (Gupta Dec. ¶ 36; Iadevaia Dec., Ex. XXXX)

337.   Gupta remained in the dark about AJAM's financial direction, which directly affected his ability to perform his responsibilities as the head of Finance.  (Gupta Dec. ¶ 37)

f.   Building Locations Meetings

338.   Anstey held a number of meetings designed to determine what to do with AJAM's new and unused headquarters building.  (Gupta Dec. ¶ 38; Iadevaia Dec., Ex. YYYY)

339.   The headquarters building was costing AJAM a significant amount of money each year.  Gupta, as head of Finance, was responsible for monitoring and reviewing all of AJAM's largest expenses.  (Gupta Dec. ¶ 38)

340.   Nevertheless, Anstey excluded Gupta from all discussions concerning the headquarters building.  (Gupta Dec. ¶ 38; Iadevaia Dec., Ex. YYYY)

g.   Public Relations Selection Meetings

341.   Anstey did not include Gupta in meetings concerning the selection of a public relations firm, even though this would be a significant expense.  (Gupta Dec. ¶ 39; Iadevaia Dec., Ex. ZZZZ)

4.   Anstey Withheld Important Financial Information From Gupta

342.   Anstey as CEO was responsible for obtaining funding for AJAM from AJMN.  (Gupta Dep. 113:17-114:9)

343.   In April 2015, just one month before Anstey took over as CEO, Al Shihabi submitted a business plan to senior managers at AJMN and received their approval.  (Al Shihabi Dep. 52:6-54:22; Iadevaia Dec., Ex. W)

344.   Gupta worked closely with Al Shihabi on the business plan.  (Al Shihabi Dep. 51:1-11, 53:14-16, 72:25-73:14, 115:15-116:7)

109

345.    The April 2015 business plan, which senior AJMN managers supported, contemplated that AJMN would provide additional funds to AJAM through 2022, at which point AJAM expected to receive significant advertising revenue.  (Iadevaia Dec., Ex. W; Al Shihabi Dep. 54:20-22, 62:7-11, 63:5-15)

346.    Gupta raised AJAM's need for funding from AJMN in his very first meeting with Anstey.  (Gupta Dep. 115:16-25)

347.    Gupta explained to Anstey that AJAM could operate with the funds that AJMN had already agreed to provide for that year.  However, by early May 2015, AJMN had only provided approximately 10% of the promised funds and more was needed to cover AJAM's expenses.  (Gupta Dep. 115:16-25)

348.    Gupta advised Anstey in September 2015 that AJAM did not have the funds to meet its liabilities to certain cable operators arising out of settlement payments made to a different cable operator, thus making it difficult for AJAM to continue operations as a going concern.  (Gupta Dec. ¶ 40)

349.    Despite the importance of AJMN's funding to AJAM's finances, Anstey did not apprise Gupta of the status of AJAM's funding requests.  (Gupta Dec. ¶ 41)

350.    For example, Anstey did not tell Gupta about correspondence with Al Obaidli in which Al Obaidli informed Anstey that AJMN would cover certain expenses associated with cable operator liabilities, but warned Anstey about AJMN's difficult financial state.  (Gupta Dec. ¶ 42; Iadevaia Dec., Ex. AAAAA)

5.    Anstey Disregarded Gupta's Financial Recommendations

351.    Gupta notified Anstey in May 2015 that AJAM continued to pay over ████ per month for Al Shihabi's residential apartment.  Gupta recommended that since the

110

apartment was a perk for the CEO and since the apartment otherwise constituted corporate waste, Anstey as the new CEO should live there. (Gupta Dec. ¶ 43; Iadevaia Dec., Ex. BBBBB)

352.    Instead of appreciating Gupta's efforts, Anstey claimed that Gupta's suggestion was offensive and took no action to eliminate the corporate waste. AJAM ended up paying for an empty apartment for the duration of the lease. (Gupta Dec. ¶ 44)

353.    Anstey also overruled Gupta's efforts to block questionable payments that AJAM made to Anstey. (Gupta Dec. ¶ 45)

354.    When Anstey first started at AJAM in May 2015, he had a B-1 temporary business Visa rather than the more appropriate L-1 work permit Visa, which Anstey did not obtain until the end of November 2015. (Gupta Dec. ¶ 46; Iadevaia Dec., Ex. LLLL)

355.    Gupta understood that any compensation that AJAM, as opposed to AJMN, paid to Anstey while on his B-1 Visa potentially violated United States immigration laws. Accordingly, Gupta refused to pay Anstey's salary, reimburse his expenses, or cover the costs of his apartment until Anstey received his L-1 Visa in November 2015. (Gupta Dec. ¶ 46)

356.    Anstey reversed Gupta's decision to block the apartment payments and thereby authorized AJAM to cover questionable expenses. Anstey's actions prevented Gupta from ensuring that AJAM did not engage in potentially unlawful financial transactions. (Gupta Dec. ¶ 47)

6.    Anstey Bypassed Gupta

357.    Anstey bypassed Gupta, directly assigning work to, and conferring with Lavin, who is white and was a Director of Finance at AJAM. (Gupta Dec. ¶ 48)

358.    As Director of Finance, Lavin was two levels below Gupta within the hierarchy of AJAM's Finance department. (Gupta Dec. ¶ 49)

111

359.     There is no evidence that Anstey bypassed other, non-Indian Executive Vice Presidents and instead assigned tasks directly to an Executive Vice President's subordinate. (Gupta Dec. ¶ 50)

360.     Gupta was responsible for overseeing AJAM's budget and needed to be aware of all budget-related discussions in order to perform his responsibilities.  (Gupta Dec. ¶ 51)

361.     Anstey assigned work to Lavin, without informing Gupta, within two weeks of joining AJAM.  (Iadevaia Dec., Ex. CCCCC)

362.     On or about June 19, 2015, Gupta arranged a meeting with Anstey, O'Brian, and Lavin in which he requested that Anstey and O'Brian include him in all budget-related meetings and copy him on all budget-related communications with Lavin.  (Gupta Dec. ¶ 52; Iadevaia Dec., Ex. DDDDD)

363.     Despite Gupta's request at the June 19 meeting, Anstey continued to assign tasks to, and communicate with, Lavin without informing Gupta.  (Gupta Dec. ¶ 52)

364.     On or about July 21, 2015, at the same meeting in which Anstey extended Gupta's contract a further two months, Gupta again asked Anstey to keep Gupta informed of all budget-related communications with Lavin.  (Gupta Dec. ¶ 53; Iadevaia Dec., Ex. M)

365.     Even after this second request, Anstey continued to bypass Gupta and communicate with Lavin on budget-related matters.   (Gupta Dec. ¶ 53; Iadevaia Dec., Exs. EEEEE, FFFFF, GGGGG, IIIII)

### AJAM Shuts Down

366.     Defendants decided by December 2015 to shutdown AJAM even though the decision was not formally approved by the board of directors until just days before it was

112

announced publicly on or about January 13, 2016. (Al Najjar Dep. 14:13-16, 44:8-45:4; O'Brian Dep. 77:2-7; Hwang Dep. 27:22-28:15; Iadevaia Dec., Ex. FF)

367.    The codename "Project Digital" was used to refer to "the project to wind down and shut down AJAM." (O'Brian Dep. 77:2-7; Al Najjar Dep. 14:13-16)

368.    Al Najjar was chairman of the committee responsible for overseeing Project Digital. The committee was formed in December 2015 and was made up entirely of AJMN employees. (Al Najjar Dep. 14:9-15:23)

369.    By the time the committee was formed in December 2015, a number of board members had already come to the conclusion that AJAM should be shut down. (Al Najjar Dep. 44:8-45:4)

370.    In or around early December 2015, Anstey told Gupta that there would be a hiring freeze and that he should not make any job offers to prospective employees. (Gupta Dec. ¶ 68)

371.    In or around December 2015, Al Najjar told Anstey that AJAM may shut down. Although Al Najjar allegedly presented the shut down as an option, Anstey could not recall Al Najjar presenting any alternatives to AJAM shutting down. (Anstey Dep. 66:4-69:3)

372.    On or about December 11, 2015, Anstey met with Gupta, Chang, O'Brian, Al Najjar and some other AJMN employees. During this meeting, Al Najjar told the attendees that Deloitte, an accounting firm, and Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden, Arps"), a law firm, would conduct a strategic review to assess AJAM's future. (Al Najjar Dep. 16:2-17:2; O'Brian Dep. 77:25-79:15; Chang Dep. 47:7-23, 50:2-19; Iadevaia Dec., Ex. GG)

373.    At the end of the meeting, Al Najjar thanked each of the attendees for their service to AJAM. (O'Brian Dep. 79:10-15)

113

374.    None of the meeting attendees can recall any option other than the shut down of AJAM being raised as a possible outcome of the assessment.  (Al Najjar Dep. 16:16-17:2; O'Brian Dep. 78:19-79:9; Gupta Dep. 255:7-19)

375.    Al Najjar assigned Gupta and Chang to assist Deloitte and Skadden, Arps to perform due diligence and a strategic review of AJAM's operations.  (Gupta Dec. ¶ 69; Danner Dep. 21:14-22, 27:16-31:19, 191:25-192:9; Hwang Dep. 31:25-32:11, 35:4-24; Chang Dep. 49:23-50:19; Iadevaia Dec., Ex. FF)

376.    Gupta and Chang understood that the strategic review was a necessary first step to the shut down of AJAM.  (Chang Dep. 49:23-50:19; Iadevaia Dec., Ex. GG; Gupta Dec. ¶ 70)

377.    Gupta worked nights, weekends, and holidays in helping Deloitte to prepare for the wind down.  (Hwang Dep. 36:25-37:25; Gupta Dep. 258:2-5, Kaplan Dec., Ex. 19; Iadevaia Dec., Ex. EE)

378.    On or about December 14, 2015, Bishr, AJMN's Executive Director of Strategy and Development and one of the members of the committee overseeing Project Digital, warned Anstey about the impending wind down of AJAM and provided Anstey with a timeline for when the wind down would be announced.  Bishr asked Anstey "to build certain rules of engagement and habits early on" because "once we begin to execute (by the second week of Jan[uary]) many parts will be moving at the speed of light."  (Iadevaia Dec., Ex. FF; Al Najjar Dep. 15:11-15)

379.    By the second half of December 2015, at least one member of the Deloitte team understood that the purpose of Project Digital was to wind down AJAM.  (Hwang Dep. 27:22-28:15)

114

380. During the initial phase of Project Digital, and prior to the board of directors formalizing the shut down of AJAM, Deloitte along with Anstey and O'Brian started to develop a "stay team," meaning a group of employees who would continue to work for AJAM after it ceased broadcasting. At this time, AJAM and Deloitte started to create charts listing, among other things, prospective members of the stay team and their anticipated end dates. (Anstey Dep. 59:16-60:5; Danner Dep. 194:21-195:5, 210:18-213:11; Iadevaia Dec., Exs. II, JJ, HHHHH)

381. On or about January 9 or 10, 2016, AJAM's board of directors voted to wind down the channel. (Anstey Dep. 61:3-8)

382. On or about January 13, 2016, Anstey publicly announced that AJAM would shut down. He announced that the channel would stop broadcasting by the middle of April 2016. (O'Brian Dep. 60:2-8, 63:14-23)

383. Anstey claimed that the decision was made because AJAM's business model was unsustainable given the economic realities of the United States media market. (Anstey Dep. 64:20-65:7; Chang Dep. 109:11-16)

384. AJAM stopped broadcasting on April 12, 2016. (O'Brian Dep. 69:5-18)

385. As part of the wind down, AJAM developed a severance plan and retention bonus plan for employees. Under the severance plan, employees were eligible for eight weeks of salary. (Anstey Dep. 72:3-17; Iadevaia Dec., Ex. LLL § 1.15)

386. The retention plan provided eligible employees the equivalent of the salary that each AJAM employee earned between the closure announcement of January 13, 2016, and his final day of employment. (Anstey Dep. 73:11-74:20; O'Brian Dep. 96:8-24; Danner Dep. 80:2-17; Iadevaia Dec., Ex. MMM § 4.1)

115

387.    The severance plan and retention bonus was only available to employees who "remain in compliance at all times with the terms and conditions of" AJAM's code of conduct, the employee handbook, AJAM's code of business ethics, and any applicable employment agreement between the employee and AJAM.  (Iadevaia Dec., Exs. LLL § 2.6, MMM § 4.3)

388.    The wind down was anticipated to cost approximately $▇▇▇▇▇▇ (Al-Najjar Dep. 28:2-4)  This amount is roughly equivalent to around four years' worth of AJAM's annual operating expenses based on the April 2015 business plan that Al Shihabi presented to AJMN. (Iadevaia Dec., Ex. W)

389.    Souag had approved the April 2015 business plan.  (Al Shihabi Dep. 54:18-55:13)

390.    The vast majority of this cost arose from the effect of early termination on AJAM's various contracts with cable operators.  (Gupta Dec. ¶ 88)

<u>Anstey Continues to Deny Gupta a Salary Increase</u>

391.    Throughout December 2015, Gupta and Anstey had further conversations about Gupta's promised raise in which Anstey again voiced his purported in-principle support for Gupta's salary increase and also the prospect of making that increase retroactively apply as of May 2015. (Iadevaia Dec., Exs. PPP, JJJJJ; Kaplan Decs., Ex. 15-16, 22)

392.    In late December 2015, O'Brian supported Gupta's request for a salary increase and expressed this view to Anstey.  (O'Brian Dep. 201:24-202:23, 213:4-8, 227:5-25; Iadevaia Dec., Exs. BB, EE)

393.    In the first week of December 2015, Gupta asked Anstey to schedule a meeting to discuss his salary increase because Al Najjar and other senior AJMN employees were

116

scheduled to arrive in New York the following week. Anstey agreed to a meeting but never scheduled it. (Gupta Dec. ¶ 66)

394.    On or about December 11, 2015, following the meeting at which Al Najjar told Gupta about Project Digital for the first time (see supra ¶¶ 372-75), Anstey called Gupta and said he was flying to AJMN's headquarters in Doha, Qatar and would obtain approval while he was there. (Gupta Dec. ¶ 71; Gupta Dep. 297:15-299:25)

395.    On or about December 11, 2015, Anstey asked Gupta to send an email reminding Anstey of the basis for Gupta's salary increase, which Gupta did the next day, on or about December 12, 2015. (Gupta Dep. 297:15-299:25; Iadevaia Dec., Ex. JJJJJ)

396.    On or about December 16, 2015, Gupta asked Anstey about his salary increase but Anstey did not communicate with Gupta about Gupta's salary increase between December 12 and December 22, 2015. (Gupta Dec. ¶ 72; Iadevaia Dec., Ex. PPP)

397.    On or about December 22, 2015, Anstey asked Gupta to put the business justification for his salary increase in writing, which Gupta sent to Anstey that day. (Gupta Dep. 310:15-21; Kaplan Dec., Ex. 15)

398.    On December 23, 2015, Anstey forwarded the business justification for Gupta's raise to Al Najjar. Anstey told Al Najjar that he "was going to recommend [Gupta's salary increase] in December anyway, and then heard about project digital." (Kaplan Dec., Ex. 16)

399.    Anstey's claim that he was intending to recommend a salary increase in December 2015 is inconsistent with his telling Gupta that he was speaking to Al Najjar about his salary increase as far back as August 2015. (Gupta Dec. ¶ 61; Kaplan Dec., Ex. 16; Gupta Dep. 303:7-17, 304:4-10)

117

400.   There is no evidence that Anstey ever raised Gupta's salary increase with Al Najjar before December 23, 2015. (Kaplan Dec., Ex. 16)

401.   Gupta first heard about Project Digital on December 11, 2015.  Thus, there would be no need to wait a further two weeks before bringing Gupta's salary increase request to Al Najjar's attention. (Kaplan Dec., Ex. 16)

402.   Anstey made the decision to reach out to Al Najjar on December 23, 2015 despite the fact that salary increases are almost never awarded during a wind down.  (Danner Dep. 60:9-23, 63:4-8; Al Najjar Dep. 28:5-14; Chang Dep. 75:22-76:9)

403.   Anstey acknowledged, in an email to himself that was riddled with inaccuracies, that he could not approve Gupta's salary increase because "we were nearing the final decision to wind down AJAM." (Iadevaia Dec., Ex. HH)

404.   On or about December 25, 2015, in an email to Anstey about various matters related to Project Digital, Gupta noted that final payroll for the year was the following week and that Gupta "would really appreciate" a decision on his salary increase request by that time. (Kaplan Dec., Ex. 22)

405.   Anstey claimed that he "totally underst[oo]d the reasons why the comp requests are important by year end" but that he was "not in a position to approve these without conferring with [Al Najjar]." (Kaplan Dec., Ex. 22)

406.   However, Anstey alleged that he had contacted Al Najjar and "stressed the urgency given how invaluable you are to Deloitte's due diligence project." (Kaplan Dec., Ex. 22)

407.   Anstey purportedly discussed Gupta's salary increase with Al Najjar on December 27, 2015 and forwarded his earlier email to Al Najjar on December 28, 2015. (Kaplan Dec., Ex. 16)

408.    On December 29, 2015, Anstey claimed that if the company did not approve the new salary by the end of the year, defendants would further increase Gupta's salary to take into account the negative tax consequences caused by their delay.  AJAM would therefore increase Gupta's promised salary by $25,000, from $500,000 to $525,000.  (Gupta Dec. ¶ 73)

409.    Anstey also told Gupta that he would prepare a reference letter explaining why Gupta did not receive the salary increase in 2015.  (Gupta Dec. ¶ 73)

410.    Anstey alleged that he would try to make the salary increase retroactive to May 2015.  (Gupta Dec. ¶ 74)

411.    On or about January 1, 2016, Anstey informed Gupta that he allegedly had not received any response yet from Al Najjar on Gupta's salary increase.  (Kaplan Dec., Ex. 22)

412.    On the same day, Chang emailed Anstey and told him that she "support[ed Gupta's] salary adjustment even if mine is not a possibility."  (Chang Dep. 197:12-198:14; Iadevaia Dec., Ex. KKKKK)

413.    Chang further suggested that AJAM "at least go half way" to Gupta's requested salary increase and offer him a $425,000 salary.  (Chang Dep. 200:2-13)

414.    Chang believed that Gupta's situation was different from her situation because he had never received a salary increase even though he was promoted to Executive Vice President.  (Chang Dep. 219:25-220:25; Anstey Dep. 211:25-212:19)

415.    Around this time, Gupta and Chang met with Danner to discuss each receiving a salary increase.  Gupta explained to Danner that Al Shihabi had promised him a salary increase as part of a promotion but that the salary increase was not ever instituted.  (Danner Dep. 47:5-20, 53:3-54:21)

119

416.    Anstey testified that he recalled discussing Gupta's request for a salary increase with Al Najjar "on a few occasions" but could not remember any details about Al Najjar's response.  (Anstey Dep. 225:9-229:13)

417.    All that Anstey claimed to recall was that he "didn't receive the response that enabled [him] to be able to move forward" on Gupta's salary increase.  Anstey could not recall the "form of [Al Najjar's] response."  (Anstey Dep. 226:7-227:21)

418.    Anstey could not even recall whether Al Najjar had a response to Gupta's salary increase or whether Al Najjar just ignored Anstey's communications.  (Anstey Dep. 228:23-229:13)

419.    In or around January 10, 2016, Danner told Chang that she would not receive her requested salary increase.  (Chang Dep. 202:2-12, 204:21-205:6; Kaplan Dec., Ex. 25)

420.    On or about January 15, 2016, just a few days after announcing the shut down, Anstey told Gupta that Gupta would not receive any salary increase.  However, Anstey told Gupta that it might be possible to increase Gupta's retention bonus to compensate for the failure to increase his salary.  (Gupta Dec. ¶ 75; Gupta Dep. 346:11-14; Anstey Dep. 252:16-253:7; Kaplan Dec., Ex. 27)

421.    Anstey did not tell Danner that he supported Gupta's request for a salary increase.  (Danner Dep. 49:18-25, 60:24-61:4)

422.    Gupta followed up with Anstey by email on or about January 24, 2016, but received no response.  (Kaplan Dec., Ex. 27; Gupta Dec. ¶ 75)

### Gupta Complained of Discrimination

423.     Gupta believed that AJMN discriminated against Indians and that AJMN has a "glass ceiling" that employees of Indian descent cannot break.  (Gupta Dep. 238:20-239:14)

424.     Gupta formed this belief because he worked regularly with AJMN employees and did "not come across many Indians" in high-level positions despite a large number of staff of Indian ethnicity working within AJMN.  (Gupta Dep. 238:20-239:14)

425.     Gupta understood that lots of Indians work in Qatar, where they are treated poorly.  (Gupta Dec. ¶ 77)

426.     At AJMN there are no Executive Directors of Indian ethnicity.    An Executive Director at AJMN is equivalent to an Executive Vice President at AJAM.  (Gupta Dep. 83:11-13, 242:9-20; Al Najjar Dep. 48:25-50:20)

427.     In addition, multiple AJMN employees of Indian descent told Gupta about rampant discrimination in AJMN against Indians.  (Gupta Dep. 239:19-243:20)

428.     For example, in or around 2013, shortly after Gupta joined AJAM, Faisal Siddiqi, who worked in AJMN's Finance department for a number years, told Gupta that Indians "could not rise to the top" at AJMN.  (Gupta Dep. 240:14-241:24, 250:19-251:9)

429.     Gupta also learned of AJMN's culture of discrimination against Indians from a colleague at AJAM, Luai Bashir ("Bashir"), who had worked for AJMN for a number of years before joining AJAM.    Before plaintiff filed his January 27, 2016 discrimination complaint, Bashir told Gupta that Indians "cannot expect a pay raise" or "good treatment . . . if the decision-making is done by Doha." (Gupta Dep. 243:4-20; Gupta Dec. ¶ 78)

121

430.    Gupta later learned from Bashir, on or about February 28, 2016, that Anstey acknowledged that "Qatar has a racist society that discriminates against Indians specifically." (Iadevaia Dec., Ex. LLLLL; Gupta Dec. ¶ 78)

431.    Al Shihabi, who worked for AJMN in senior roles for many years, also warned Gupta about AJMN's discrimination against employees of Indian ethnicity.  (Gupta Dec. ¶ 80; Al Shihabi Dep. 10:22-12:6, 23:1-24:1)

432.    After Anstey told Gupta in or around mid-January 2016 that he would not receive a salary increase, Gupta came to believe that he was denied the salary increase because he is Indian. (Gupta Dep. 260:1-22)

433.    At the time Gupta complained of race discrimination in January 2016, he did not believe that Anstey, O'Brian, or Chang were responsible for denying his salary increase because they had all indicated their support for the increase.  (Gupta Dep. 261:2-14; Gupta Dec. ¶ 81)

434.    Gupta initially believed that Al Najjar and other individuals overseeing the wind down had discriminated against him because he is Indian. (Gupta Dec. ¶ 82)

435.    In or around mid-January, Gupta stated to one of the Deloitte team members with whom he worked on matters related to the wind down that he believed that he was being discriminated against because he is Indian.  (Hwang Dep. 61:8-21, 62:23-63:13, 66:6-16; Gupta Dec. ¶ 83)

436.    On or about January 19 or 20, 2016, Gupta told Chang that he believed that he did not receive a salary increase because he is Indian.  Gupta explained to Chang that AJMN had a "glass ceiling" for Indian employees and that this culture of discrimination was the reason he did not receive a pay raise. (Gupta Dep. 352:12-24, 353:5-11; Gupta Dec. ¶ 84)

122

437.   Gupta told Chang that he wanted to file a formal complaint but was not sure whether it was possible to do so as a senior executive. (Gupta Dep. 352:12-24; Gupta Dec. ¶ 84)

438.   Chang told Gupta that nothing prevented him from filing a formal complaint but that such a complaint would not fix anything because AJMN was effectively running AJAM at this point. (Gupta Dec. ¶ 85)

439.   On January 27, 2016, Gupta complained in writing that he believed defendants' failure to increase his salary was discriminatory. (Kaplan Dec., Ex. 28)

440.   In his January 27, 2016 complaint, Gupta stated that he believed he was the only employee who had been promoted and promised a salary increase but did not receive a salary increase.  He further stated his belief that he had been subject to "discriminatory treatment" that violated "fair employment laws" that prohibit unlawful discrimination. (Kaplan Dec., Ex. 28)

441.   O'Brian testified that she understands "fair employment laws" to include "EEOC laws." O'Brian did not identify any other types of laws encompassed by the phrase "fair employment laws." (O'Brian Dep. 260:8-261:5)

442.   Gupta complained that Anstey's repeated excuse for not honoring the promised salary increase – that he needed approval from AJMN – conflicted with AJAM's corporate bylaws and guidelines, which vested that authority in the CEO. (Kaplan Dec., Ex. 28)

443.   Gupta also described circumstances leading up to his promotion and promised salary increase as "slave labor" in the email. (Kaplan Dec., Ex. 28)

123

444.   Further, at the end of the email, Gupta says that he "trust[s] that this complaint will not result in any retaliation . . . but would appreciate confirmation" that no retaliation would be forthcoming. (Kaplan Dec., Ex. 28)

445.   Protection from retaliation is a critical component of the anti-discrimination laws, as Anstey understood. (Anstey Dep. 267:7-24)

446.   Gupta requested time off because the "injustice" and "unfairness" of AJAM's actions had caused him "stress and anxiety." (Kaplan Dec., Ex. 28)

447.   At the time Gupta sent the January 27, 2016 email, he believed that Anstey was supportive of his salary increase but that AJMN, which along with Deloitte was overseeing the wind down, had prevented the salary increase from going into effect. At the same time, AJMN had not blocked the October 2015 salary increase for Chang, who is not Indian. (Kaplan Dec., Ex. 28; Gupta Dep. 261:3-14, 346:11-23)

448.   Because of the stress that Gupta suffered as a result of defendants' discriminatory actions, Gupta's doctor directed him to take medical leave from approximately January 28 through February 8, 2016. (Gupta Dep. 332:6-25, 333:14-22, 343:4-13, 351:13-352:5; Iadevaia Dec., Ex. MMMMM)

449.   Defendants approved Gupta's request for medical leave. (Anstey Dep. 271:17-273:8; Chang Dep. 222:20-22; O'Brian Dep. 268:21-24, 269:17-21; Kaplan Dec., Ex. 29)

450.   Within hours of Gupta's January 27, 2016 complaint, defendants communicated with lawyers for the purpose of seeking legal advice about Gupta, referred to in defendants' privilege logs as "pending dispute." (Iadevaia Dec., Exs. MM, NN)

124

451.   Gupta through counsel in multiple calls, including calls on February 26 and March 7, 2016, complained that defendants discriminated against him because he is Indian. (Gupta Dec. ¶ 87)

Defendants Retaliate Against Gupta by Cutting Short His<br>Employment and by Moving Him to an Advisory Role

A.   Anstey's Representations To Gupta That He Would Be a Core Member of the Stay Team

452.   In December 2015, Anstey told Gupta that defendants planned to have Gupta and his team help with the wind down until the conclusion of the process, which would likely last until September or October 2016.   Gupta would be among the last employees that AJAM let go.   (Gupta Dec. ¶ 90)

453.   Gupta's role would be to oversee the financial aspects of the wind down. (Gupta Dec. ¶ 91; Al-Najjar Dep. 66:16-21)

454.   Gupta was going to be a "core member" of the stay team along with Chang.   (Chang Dep. 312:19-313:14; Iadevaia Dec., Ex. II, JJ)

455.   On or about December 18, 2015, O'Brian noted that "the two people who are absolutely needed" for the wind down "will be the CFO and the accounting person," referring to Gupta and a prospective junior-level employee.   (Iadevaia Dec., Ex. EE; Anstey Dep. 210:18-211:7; O'Brian Dep. 218:22-219:12)

456.   O'Brian believed that Gupta was important to the wind down effort because Gupta "had the most visibility across things in finance."   (O'Brian Dep. 214:4-13)

457.   On or about December 25, 2015, Anstey recognized that Gupta was "invaluable" to the wind down effort.   (Iadevaia Dec., Ex. NNNNN)

458.   A chart entitled "AJAM Stay Team Schedule As of 1/08/16," which listed prospective members of the stay team and their possible end date, put Gupta's end date as July

125

12, 2016. Gupta and Chang were supposed to stay until close to the end of the wind down; only one employee was scheduled to stay on longer. (Iadevaia Dec., Ex. HHHHH)

459. On or about January 8, 2016, Danner sent Anstey an email containing the "prospective durations of the proposed 'Core Team.'" Gupta, along with Chang, was expected to stay on for at least six months, which equaled the longest expected time for any AJAM employee. (Iadevaia Dec., Ex. JJ)

460. Following AJAM's January 13, 2016 public announcement of the shut down, Gupta continued to work hard and assist the Deloitte team with preparations for the wind down. (Hwang Dep. 49:10-22, 55:3-57:22)

461. On or about January 15, 2016, just two days after Anstey announced AJAM's shut down and during the same meeting in which Anstey told Gupta that no salary increase would be forthcoming, Anstey repeated to Gupta that AJAM would need Gupta until the wind down concluded later in the Fall 2016. (Gupta Dec. ¶¶ 90, 92)

B.    Defendants Failed to Investigate Plaintiff's Discrimination Complaints

462. AJAM had a policy prohibiting discrimination and retaliation. (Chang Dep. 88:8-15; Iadevaia Dec., Ex. TTT)

463. The policy "strongly encouraged" employees to report any discrimination "to the employee's supervisor or Human Resources, who will investigate the matter." (Iadevaia Dec., Ex. TTT)

464. Pursuant to its policy, AJAM conducted investigations in response to discrimination complaints. This investigation involved interviewing witnesses, reviewing documents, and reaching a conclusion based on the facts available. (Chang Dep. 94:9-97:5; Iadevaia Dec., Ex. TTT)

126

465.     Chang testified that as head of HR she conducted an investigation "when someone brings forth a formal complaint."  (Chang Dep. 97:3-4)

466.     From May 2015 onward, Chang conducted approximately five investigations into alleged discriminatory conduct.  (Chang Dep. 97:18-98:4)

467.     In one instance, Chang investigated a complaint by a female employee that a male manager was treating individuals within his group unfairly.  Chang investigated this claim even though the individual did not expressly allege that the manager engaged in gender discrimination.  (Chang Dep. 100:20-103:11)

468.     Chang did not investigate Gupta's complaint of discrimination.  (Chang Dep. 215:25-216:5, 217:19-22, 221:23-222:9)

469.     Chang did not consider Gupta's January 27, 2016 email to be a "formal complaint" even though Gupta titled his email as such.  Chang admitted that the email could not be read as anything other than a formal complaint.  (Chang Dep. 211:7-21, 214:21-25)

470.     Chang instead assumed that Gupta's email was part of a "scheme" and that Gupta was "trying anything to try to get" a salary increase.  (Chang Dep. 211:16-21, 212:11-21)

471.     Chang admitted that if she had received this email from any other employee, she would have investigated the complaint.  However, because it came from Gupta, she did not consider it a "real, quote unquote, complaint" of discrimination.  (Chang Dep. 215:5-24)

C.      Defendants Attempt to Force Plaintiff Into an Advisory Role

472.     In response to Gupta's discrimination complaint, on or about January 27, 2016, Anstey stated that Gupta should take care of his health and, when Gupta returned from leave, they would "discuss an amicable solution."  (Kaplan Dec., Ex. 29)

127

473.    On or about January 28 and 29, 2016, Gupta, while on leave, worked from home and responded to questions from his colleagues.  (Anstey Dep. 273:9-24; Iadevaia Dec., Ex. OOOOO; Kaplan Dec., Ex. 32)

474.    On or about January 29, 2016, Anstey instructed Gupta not to respond to work emails during his leave.  (Kaplan Dec., Ex. 32)

475.    Even after Anstey's email, Gupta still responded to inquiries from his team and approved payments.  (Gupta Dep. 339:16-17, 339:25-340:3; Chang Dep. 224:9-17)

476.    Gupta's medical leave was originally set to finish on February 8, 2016.  On his doctor's recommendation, he requested and received an extension of his medical leave until February 19, 2016.  (Kaplan Dec., Ex. 34; Iadevaia Dec., Ex. MMMMM)

477.    For the period February 16 through February 19, 2016, Gupta requested permission to work remotely while he continued to recover.  (Kaplan Dec., Ex. 34)

478.    Defendants approved Gupta's request and he worked from home for those four days.  (Gupta Dep. 367:19-22; Chang Dep. 226:25-227:6, 228:25-229:6; Kaplan Dec., Exs. 35-36; Iadevaia Dec., Ex. OO)

479.    Gupta told defendants that he intended to return to the office to work after his leave ended on February 19, 2016.  (Kaplan Dec., Exs. 35-36)

480.    On or about February 17, 2016, Gupta told Murano that he would "be back soon."  (Iadevaia Dec., Ex. RR)

481.    Unbeknownst to Gupta, while he was on leave, Anstey began discussions with Chang and Danner about making Gupta "an overture" to "work in a reduced capacity." (Danner Dep. 122:15-123:25; Anstey Dep. 289:21-290:25)

128

482.     On Sunday, February 21, 2016, Anstey called Gupta and directed him to continue working from home and not to return to the office.  Anstey said that he would notify Gupta when Gupta should go back to the office.  (Gupta Dec. ¶ 95; Iadevaia Dec., Ex. QQ)

483.     On or about February 22, 2016, Anstey sent a text message to Gupta instructing Gupta to meet with Anstey at the offices of Skadden, Arps.  (Iadevaia Dec., Ex. EEE; Anstey Dep. 276:5-11)

484.     Anstey changed the meeting location to AJAM's midtown offices after Gupta expressed concern about meeting with defendants' lawyers without representation.  (Iadevaia Dec., Ex. QQQQQ; Anstey Dep. 276:5-11)

485.     Anstey and Chang met with Gupta on or about February 23, 2016 for about an hour.  (Gupta Dep. 369:23-370:7)

486.     During the meeting, Gupta asked Anstey why it took so long to consider Gupta's promised salary increase and why Anstey needed AJMN's approval.  Anstey admitted to Gupta for the first time that he had the authority to grant the pay raise as CEO but instead "chose" to consult with AJMN.  (Gupta Dec. ¶ 96; Iadevaia Dec., Ex. HH)

487.     Anstey did not explain his decision to consult with AJMN as to Gupta's salary increase despite approving raises for other non-South Asian employees without first obtaining AJMN's authorization.  (Gupta Dec. ¶ 96)

488.     Anstey criticized Gupta's use of the CFO title.  (Gupta Dep. 370:17-21; Iadevaia Dec., Ex. UU)

489.     Despite this criticism, Anstey himself previously referred to Gupta as the CFO and weeks after this meeting signed a document listing Winer as CFO of AJAM.  (Iadevaia Dec., Exs. YY, YYY)

129

490.     Anstey then announced his intention to move Gupta into an advisory role for the duration of his employment, which would end on June 12, 2016. (Gupta Dec. ¶ 97; Gupta Dep. 370:22-371:19)

491.     Anstey said that based on his concern about Gupta's health, the specifics of which he did not elaborate, under this arrangement Gupta would not return to the office and would need to be available only by phone and email no more than a couple of days for the four-month period until June 12, 2016. (Gupta Dec. ¶ 97; Gupta Dep. 370:22-371:19)

492.     Gupta raised concerns about defendants' proposal because it appeared to be little more than a "gardening leave" and was in response to Gupta complaining about defendants' discriminatory conduct. (Gupta Dec. ¶ 98; Gupta Dep. 370:22-371:12; Chang Dep. 235:18-21; Anstey Dep. 277:14-16)

493.     Gupta told Anstey and Chang that he was ready to return to work in his job on a full-time basis and that there was nothing wrong with his health. (Gupta Dec. ¶ 98; Gupta Dep. 371:4-5)

494.     Anstey urged Gupta to consider his proposal and asked what work Gupta could perform under this advisory role proposal. (Gupta Dep. 372:23-373:13)

495.     In response to Anstey's question, Gupta suggested the sort of responsibilities that he would be willing to fulfill as part of his advisory role, and which responsibilities he would not, should he choose to accept the advisory role proposal. (Gupta Dep. 372:23-373:13)

496.     Anstey stated that he would send Gupta the proposal by email and Gupta agreed to consider Anstey's proposal. (Gupta Dec. ¶ 100; Gupta Dep. 372:6-8)

497.    Anstey testified that the reduced workload was Gupta's idea.  (Anstey Dep. 278:9-279:10)  Chang, for her part, did not identify who raised the idea of reducing Gupta's responsibilities.  (Chang Dep. 232:17-24)

498.    In fact, Anstey went into the February 23, 2016 having already sketched out the details of the advisory proposal.  In notes prepared before the meeting, to be used during the meeting, Anstey wrote down the following:

- "Had to take a fresh look at finance as we enter next phase of wind down"
- "So right now I can confirm your employment through until April 12 but cannot commit beyond this."
- "Want to resolve this in best way possible for you"
- "Employed through June 12th (Full Salary + Benefits)"
- "Working from home on as-needed basis – far less than full time"

(Iadevaia Dec., Ex. UU; Anstey Dep. 284:21-289:20)

499.    Anstey developed this advisory role proposal with O'Brian and probably also with Chang and Danner before he presented it to Gupta on February 23, 2016.  (Anstey Dep. 289:21-290:12; Danner Dep. 122:15-123:25)

500.    Anstey's plan to end Gupta's employment in June 2016 reduced the length of Gupta's anticipated employment by several months.   (Gupta Dec. ¶¶ 90-92, 99)

501.    On or about February 24, 2016, Gupta spoke by phone with Anstey and Chang about Anstey's proposed arrangement.  Gupta stated his belief that a move to an advisory role for the wind down was no different than being suspended with pay for complaining of discrimination.  (Gupta Dec. ¶ 101)

502.    Anstey told Gupta that the decision was not retaliatory but actually driven by a concern for Gupta's health.  When Gupta asked what health concerns prevented him from returning to work, Anstey did not provide any further detail.  (Gupta Dec. ¶ 102)

131

503.   During the February 24 call, Gupta also asked why his employment was due to end in June 2016 rather than the Fall 2016 as originally planned.  Anstey stated that Gupta was not needed beyond June 2016 and that there was no option to extend Gupta's employment for a longer period of time.  (Gupta Dec. ¶ 103)

504.   On or about February 25, 2016, defendants sent Gupta a written agreement that reflected their plan to move Gupta to an advisory role through June 12, 2016.  (Iadevaia Dec., Ex. RRRRR)

505.   The agreement provided that Gupta would receive his current salary and would be eligible for the retention bonus and severance offered to all other employees at AJAM as long as he did not obtain alternative employment before mid-June 2016.  (Iadevaia Dec., Ex. RRRRR)

506.   The agreement required Gupta to execute a general release of his legal claims, which meant he would waive, inter alia, his discrimination claims.  (Iadevaia Dec., Ex Ex. RRRRR)

507.   Gupta was surprised to receive a formal agreement and, on the recommendation of Chang, retained counsel to review the agreement.  (Gupta Dec. ¶ 104; Iadevaia Dec., Ex. OO)

508.   On or about February 26, 2016, Anstey called Gupta and urged him to sign the proposed advisory role agreement.  (Gupta Dec. ¶ 105)

509.   Anstey explained that if Gupta accepted the proposal, defendants would no longer require his services and would not ask him to return to the office except to retrieve his personal belongings and to meet with his team to notify them of his advisory role.  (Gupta Dec. ¶ 105)

132

510.   Anstey suggested that Gupta could use the time between late February and mid-June 2016 to take care of his health and to travel.  (Gupta Dec. ¶ 105)

511.   It was around this time that Gupta realized that Anstey had discriminated against him because of his race by denying his salary increase.  (Gupta Dep. 260:1-22, 348:13-21; Iadevaia Dec., Ex. FFF)

512.   In particular, Anstey failed to explain why he needed AJMN's approval to increase Gupta's salary and Gupta learned that Anstey never communicated with Al Najjar before the start of the wind down process in December 2015 despite Anstey's claims to the contrary.  (Gupta Dec. ¶¶ 61, 96, 108)

513.   Gupta also learned that Anstey had been accused of discrimination against Indians previously.  Bashir said that Anstey was "retaliating against" Gupta because Gupta is a "PIO" or "person of Indian origin."  Bashir told Gupta that Anstey "has had a long history of racism and discrimination" and that, among other things, when Anstey worked at Al Jazeera English, he fired Naidoo and Garda "because the news desk was becoming too brown."  When Anstey joined AJAM he again "targeted Garda," who was now working for AJAM, and "forced him to resign."  (Iadevaia Dec., Exs. FFF, LLLLL; Gupta Dec. ¶ 109)

514.   On or about February 26, 2016, after talking earlier in the day, Gupta advised Anstey that he had retained a lawyer and would need time to consider defendants' proposal.  (Gupta Dec. ¶ 106)

515.   On or about February 27, 2016, counsel for defendants sent a copy of the agreement to Gupta's lawyer and stated that it was not possible to extend Gupta's employment beyond June 12, 2016.  (Kaplan Dec., Ex. 41)

133

516.   In response, Anstey told Gupta not to return to the office or do work and instead consider the advisory role proposal.  (Gupta Dec. ¶ 107)

517.   Anstey also suggested that Gupta take a vacation and recover his health. Anstey stated that he had instructed Finance department employees not to contact Gupta.  (Gupta Dec. ¶ 107)

518.   On or about March 7, 2016, Gupta, through his lawyers, rejected defendants' advisory role proposal.  (Gupta Dec. ¶ 110)

519.   On or about March 9, 2016, two days after Gupta rejected Anstey's advisory role proposal, Anstey told Gupta that he should continue to work from home "unless and until" defendants "need[ed] [him] to come into the office."  (Kaplan Dec., Ex. 42)

520.   Anstey also told Gupta that defendants would assign him projects to work on during the wind down and that Anstey and O'Brian may reach out to Gupta for help.  (Kaplan Dec., Ex. 42)

521.   Anstey claimed that "AJAM honored [Gupta's] employment agreement through its term" and did not grant him a salary increase because "AJAM moved into wind-down mode."  (Kaplan Dec., Ex. 42)

522.   Gupta interpreted Anstey's March 9, 2016 email as requiring him to work remotely unless he obtained permission to come to the office.  (Gupta Dep. 378:1-17)

523.   The following day, on or about March 10, 2016, Anstey sent another email to Gupta stating that Gupta was "welcome to return to work at the office at any time" but that before he did so he should "notify HJ and me."  (Kaplan Dec., Ex. 43)

524.    Gupta did not understand why he needed Anstey's approval before he could return to the office considering he was supposedly returning to his role as Executive Vice President of Finance and Business Operations.  (Gupta Dep. 382:14-383:11; Gupta Dec. ¶ 117)

D.    Defendants Hire a Replacement for Gupta

525.    Within a week of Gupta complaining of discrimination, defendants began to search for a consultant who could replace him.  (Chang Dep. 270:2-7; Iadevaia Dec., Ex. SS)

526.    Employees within AJAM's Finance department had been requesting additional assistance in the form of a "junior accountant" but there were not plans to hire a senior Finance employee before Gupta complained of race discrimination on January 27, 2016.  (Triche-Newman Dep. 94:7-17; Gupta Dec. ¶ 112)

527.    Gupta's medical leave was initially supposed to last only two weeks and defendants began interviewing candidates days before Gupta was set to return to work.  (Iadevaia Dec., Exs. S; Iadevaia Dec., Ex. MMMMM)

528.    Defendants considered a number of senior-level candidates and interviewed at least three potential replacements.  (Danner Dep. 131:17-132:3; O'Brian Dep. 329:12-17)

529.    At the time that defendants were considering consultants to replace Gupta, Gupta intended to return to AJAM at the conclusion of his medical leave.  (Chang Dep. 280:2-16)

530.    Defendants were looking for a replacement who had financial experience and knowledge, including knowledge of Great Plains, which was AJAM's internal financial software that maintains AJAM's financial records.  (Chang Dep. 282:11-24; Winer Dep. 174:14-175:6)

135

531.   On or about February 4, 2016, Chang, though a mutual contact, reached out to Kiwi Partners, a consulting firm, for a replacement.  (Iadevaia Dec., Ex. S)

532.   On or about February 5, 2016, Chang spoke with Jacquie Holmes ("Holmes"), the President of Kiwi Partners about bringing in a consultant.  (Iadevaia Dec., Ex. S)

533.   Holmes followed up with Chang on February 9, 2017, and noted that Chang was requesting a consultant with a "CFO skill set."  Accordingly, Holmes recommended a "CFO level staff member" as the "appropriate" level of expertise for the position.  (Iadevaia Dec., Ex. S)

534.   Specifically, she recommended Toby Winer ("Winer"), who is white and American, as the "CFO level" consultant who could meet AJAM's requirements.  (Chang Dep. 277:13-24; Iadevaia Dec., Ex. S)

535.   Winer had been CFO of a number of educational institutions.  (Iadevaia Dec., Ex. TTTTT)

536.   Winer did not have experience with winding down a business.  (Winer Dep. 76:15-19; Iadevaia Dec., Ex. TTTTT)

537.   Winer did not have any experience working for media companies.  (Winer Dep. 76:7-14; O'Brian Dep. 335:8-10; Iadevaia Dec., Ex. TTTTT)

538.   Winer did not have experience as to how to account for liabilities to cable operators (otherwise referred to as Most Favored Nation ("MFN") liabilities), which were AJAM's largest potential liabilities.  (Winer Dep. 186:7-187:10, 287:16-25; Hwang Dep. 83:13-18; Gupta Dec. ¶ 88)

539.   Winer also did not have experience with the Great Plains software.  (Winer Dep. 84:17-19; Chang Dep. 283:6-10)

540.     Defendants interviewed Winer twice, on February 16 and February 29, 2016.  (Iadevaia Dec., Exs. S, UUUUU)

541.     Chang, O'Brian, and Danner, a representative from Deloitte who served as the project leader for the Deloitte team (Danner Dep. 16:20-25; O'Brian Dep. 82:11-17), attended the first interview with Winer.  (Winer Dep. 79:7-13, 80:22-81:23; Iadevaia Dec., Ex. S)  The interview focused on Winer's background, her experience with financial systems, and her availability.  (Winer Dep. 83:16-84:8)

542.     One of the interviewees told Winer that her role would be to "provide financial oversight and to provide accounting services."  (Winer Dep. 86:15-19)

543.     O'Brian, Chang, Danner, and Holmes attended Winer's second interview. During that interview, Winer was told that AJAM was "strongly considering her for the role." (Danner Dep.133:17-134:6; Iadevaia Dec., Ex. UUUUU)

544.     Defendants interviewed Winer and at least one other candidate before they offered Gupta the advisory role on February 23, 2015.  (Chang Dep. 285:14-17; Iadevaia Dec., Ex. S)

545.     As of February 19, 2016, defendants decided to retain Winer as Gupta's replacement.  (Iadevaia Dec., Exs. QQ, TT)

546.     Anstey made the final decision to retain Winer.  (Danner Dep. 124:20-25; Chang Dep. 267:8-20)

547.     Anstey retained Winer because she had "the most experience and maturity" of the candidates presented.  (O'Brian Dep. 330:10-14)

548.     On or about February 24, 2016, Danner told Yaser Qubbaj ("Qubbaj"), AJMN's Manager of General Accounting and the leader of the AJMN team that oversees the

137

audit of AJAM's financial statements, that AJAM was "close" to reaching an agreement whereby Gupta would take on an advisory role and that they were "close to hiring a replacement VP of finance to assume Anand's leadership responsibilities." (Iadevaia Dec., Ex. TT; Gupta Dec. ¶ 89)

549.    Despite referring to Winer as a "replacement" in a contemporaneous email (Iadevaia Dec., Ex. TT), Danner testified to the contrary at his deposition. (Danner Dep. 144:17-21)

550.    On or about March 1, 2016, Danner emailed Holmes, copying Anstey and O'Brian, and stated that they would likely need Winer's services for "at least three months" and "probably longer." (Iadevaia Dec., Ex. VVVVV; Danner Dep. 176:8-18)

551.    AJAM and Kiwi partners signed a retainer that listed the services that Kiwi Partners would provide: (1) "[o]versite of the accounting team"; (2) "[t]reasury," meaning "treasury functions such as signing checks, approving wires, and cash management" as well as "montor[ing] the accounting systems and processes"; (3) "monitor[ing] the team's utilization of Great Plains"; and (4) acting as "the liaison with the external auditors for the year-end 2015 and period-end 2016 audits." (Iadevaia Dec., Ex. WW)

552.    No one at AJAM consulted Gupta about bringing on Winer before Anstey made the decision to retain her. (O'Brian Dep. 332:23-333:4)

553.    On March 2, 2016, Anstey told Gupta as a "courtesy" that someone would be joining the Finance department to help with the wind down. (Gupta Dec. ¶ 111)

554.    Anstey said that this person would assist the Finance department while Gupta was out of the office and considering the advisory role agreement. (Gupta Dec. ¶ 111)

555.    Anstey never identified Winer nor explained to Gupta that Anstey was hiring a senior-level employee and the Finance department would report to her.  (Gupta Dec. ¶ 111)

556.    Winer began working for defendants on or about March 3, 2016.  (Winer Dep. 99:12-16; Iadevaia Dec., Ex. VV)

557.    Anstey was "delighted" and "excited" that Winer was providing her services to AJAM.  (Winer Dep. 241:13-18)

558.    Winer reported directly to Anstey and O'Brian and not to Gupta.  (Chang Dep. 269:17-22; Winer Dep. 151:22-152:7, 233:6-9; Danner Dep. 137:17-138:11)

559.    AJAM continued to negotiate the terms of Winer's consultancy through March 10, 2016, three days after Gupta rejected the advisory role proposal.  (Iadevaia Dec., Ex. WWWWW)

560.    On or about March 4, 2017, Anstey called Gupta's entire Finance team to introduce Winer and tell them that they reported to Winer.  (Chang Dep. 268:14-19; Winer Dep. 205:12-207:14, 232:7-19, 244:11-15; Iadevaia Dec., Ex. VV)

561.    AJAM paid Kiwi Partners ████ per hour for Winer's services and in 2016 paid Kiwi partners a total of ████████ for approximately ten months' worth of work.  This amounted to ████████ for Winer's services in March 2016; ████████ in April 2016; ████████ in May 2016; ████████ in June 2016; ████████ in July 2016; ████████ in August 2016; ████████ in September 2016; ████████ in October 2016; ████████ in November 2016; and ████ in December 2016.  (Iadevaia Dec., Exs. WW, XX; Winer Dep. 117:7-9)

139

562.    The amount AJAM paid Kiwi Partners would have been even higher if Winer had not taken vacation in July and August 2016.  (Winer Dep. 130:14-24. 277:2-4, 277:21-24)

563.    Defendants did not give Chang an advisory role even though she requested one. On or about April 13, 2016, Chang requested the option of "the last 60 days on the bench, i.e. working remote and still be eligible for the full 1:1 during the entire stay period."  (Iadevaia Dec., Ex. XXXXX)

564.    O'Brian told Danner that she was "afraid" of Chang not staying on. (Iadevaia Dec., Ex. XXXXX)

565.    Defendants convinced Chang to stay on and, as of February 2017, she continued to provide services to AJAM.  (Chang Dep. 111:7-11, 125:11-126:18)

E.    Defendants' Enforce the Advisory Agreement

1.    Plaintiff's Reduced Role

566.    Upon joining AJAM, Winer started to perform almost all of the tasks that Gupta had been responsible for before he went on medical leave. (O'Brian Dep. 282:13-17)

567.    Edwina Triche-Newman ("Triche-Newman"), a Finance department employee, testified that "[w]hatever I used to do with [Gupta] and [Lavin] I did with [Winer]." (Triche-Newman Dep. 58:2-17)

568.    For example, Winer attended weekly management meetings and meetings about the Project Digital as the representative for AJAM's Finance department.  (Iadevaia Dec., Ex. VV; Winer Dep. 260:6-262:20)

569.    Prior to his January 27, 2016 complaint, Gupta oversaw accounts payable and was responsible for approving certain financial transactions.  (Gupta Dep. 130:10-11; Chang

140

Dep. 286:23-287:8; Hwang Dep. 33:20-25) Winer took over these responsibilities. (Chang Dep. 141:11-17, 286:23-287:8; Winer Dep. 153:14-24, 161:2-13, 162:2-6; Danner Dep. 42:10-19)

570. Winer started "closing the books" on a monthly basis and providing AJMN with "monthly financial statements." (Winer Dep. 134:4-22, 203:13-204:25; Hwang Dep. 76:24-77:9)

571. Gupta previously performed that task. (Gupta Dec. ¶ 113; Hwang Dep. 70:15-17)

572. Winer oversaw AJAM's payroll, which was previously overseen by Gupta. (Chang Dep. 141:18-25; Winer Dep. 153:14-20, 173:6-10; Anstey Dep. 110:7-11)

573. Winer was responsible for coordinating with the external and internal auditors, which had previously been Gupta's responsibility. (Winer Dep. 161:2-9, 164:19-24; Gupta Dep. 156:23-157:3; Anstey Dep. 113:4-114:10; Hwang Dep. 34:2-6, 76:7-12; Iadevaia Dec., Ex. PPPPPP)

574. Winer also coordinated with a vendor in order to manage AJAM's tax liabilities and signed off on AJAM's tax returns. (Winer Dep. 136:10-22, 161:2-9, 180:8-181:14, 182:24-183:13) This had previously been Gupta's responsibility. (Iadevaia Dec., Ex. PPPPPP)

575. Until plaintiff complained about unlawful discrimination in January 2016, he was leader of the "'Finance & Accounting' work stream group," which was the working group responsible for handling finance-related aspects of the wind down, and provided regular updates to the other work stream groups performing wind down-related tasks. (Danner Dep. 221:19-222:24, 227:13-229:16; Iadevaia Dec., Exs. YYYYY, ZZZZZ)

576. Following the January 27, 2016 race discrimination complaint, Gupta no longer led the "'Finance & Accounting' work stream group" or provided regular updates (Gupta

141

Dec. ¶ 114); instead, Winer performed those roles or, if Winer was not available, Danner. (Danner Dep. 229:8-16).

577.   On or about March 7, 2016, AJAM listed Winer as the "CFO" in a document to make Winer an authorized signatory for AJAM's account with HSBC. Anstey and Winer both signed and approved this document. (Iadevaia Dec., Ex. YY; Winer Dep. 212:7-25)

578.   Winer claims that her title on this document was an "error" even though she instructed the employee who prepared the form to use that title and Anstey signed off on the form.   (Winer Dep. 208:5-8, 212:7-25, 218:13-22, 221:18-22; Triche-Newman Dep. 113:17-114:13, 124:6-12; Iadevaia Dec., Exs. YY; Iadevaia Dec., Ex. AAAAAA)

579.   On or about March 10, 2016, Winer expressed to Holmes her belief that she was "performing CFO duties" at AJAM. However, at her deposition, Winer denied that she performed CFO duties for AJAM. (Iadevaia Dec., Ex. ZZ; Winer Dep. 108:5-12)

580.   Also in March 2016, Winer removed Gupta's status as a "preparer" on all of AJAM's open bank accounts. (Iadevaia Dec., Exs. BBBBBB, CCCCCC)

581.   As of March 2015, defendants only gave Gupta one special project in connection with AJAM's wind down process: helping Murano and Deloitte to compute AJAM's MFN liabilities (otherwise referred to as the MFN project). (Chang Dep. 290:7-13; Anstey Dep. 275:15-23; Winer Dep. 186:19-187:17; Danner Dep. 164:22-165:10, 171:6-16; Hwang Dep. 72:5-8)

582.   For the MFN project, from the middle of March to the end of April 2016, Deloitte prepared the calculations and Gupta reviewed Deloitte's methodology and provided formula corrections. (Gupta Dec. ¶ 116)

583. Prior to Gupta' January 27, 2016 discrimination complaint, Gupta's and Deloitte's roles were reversed, with Gupta preparing the calculations and Deloitte reviewing the calculations. (Gupta Dec. ¶ 115)

584. Gupta warned Anstey that having Deloitte prepare the calculations could represent a conflict of interest because Deloitte is also the auditor for a cable operator but Anstey did not take any action in response to Gupta's concerns. (Gupta Dec. ¶¶ 115-16)

585. On or around March 11, 2016, Gupta complained to Chang that AJAM was enforcing the advisory role proposal even though Gupta had rejected it. (Gupta Dec. ¶ 121)

586. Also on or about March 11, 2016, Anstey permitted Gupta to meet Murano in the office to discuss the MFN project. Gupta worked on the project, which was time-sensitive, over the weekend. (Gupta Dec. ¶ 119)

587. Murano continued to request permission from Anstey and Chang whenever she required Gupta to come into the office. (Iadevaia Dec., Ex. DDDDDD)

588. On multiple occasions after Gupta rejected defendants' advisory role proposal, Gupta requested clarification regarding the differences between his role and Winer's role. (Chang Dep. 293:25-294:14)

589. Gupta did not refuse to perform work and completed the assignments given to him. (Gupta Dec. ¶ 120)

590. In or around March 2016, defendants told Gupta that he retained his role as head of Finance even though his entire team reported to Winer and Winer reported to Anstey and O'Brian. (Gupta Dec. ¶ 122; Chang Dep. 269:17-22; Winer Dep. 151:22-152:7, 233:6-9; Danner Dep. 137:17-138:11)

143

591.    After Winer joined AJAM, defendants no longer consulted Gupta on personnel decisions concerning the Finance team.  (Gupta Dec. ¶ 123)

592.    In March 2016, Gupta needed assistance from one of his team members, Ruben Lopez ("Lopez"), to gather data for the MFN project.  However, since Gupta's team members reported to Winer (Danner Dep. 140:8-13), Lopez was working on something else and unavailable to help Gupta.  (Gupta Dec. ¶ 124)

593.    Murano needed to ask Winer for permission on behalf of Gupta to get help from Lopez on the MFN project.  (Iadevaia Dec., Exs. GGGGGG, HHHHHH)

594.    On March 18, 2016, Anstey told Winer that they would like her to continue working for AJAM through at least August 2016.  (Iadevaia Dec., Ex. VV; Winer Dep. 276:14-277:14)

595.    On or about March 21, 2016, Gupta advised Chang that defendants' actions made it difficult for Gupta to successfully perform his job and that his team members were confused about who was in charge given defendants' decision to retain Winer.  (Gupta Dec. ¶ 125; Chang Dep. 293:25-294:14)

596.    In response to Gupta's concerns, Chang arranged a meeting among Gupta, Anstey, and Chang.  (Gupta Dec. ¶ 125)

597.    On or about March 22, 2016, Anstey and Chang assured Gupta that he was still Executive Vice President and head of the Finance department and that defendants had not replaced him.  (Gupta Dec. ¶ 126)

598.    Anstey wanted to set a meeting with Winer and the leadership team the next day to discuss the division of labor between Gupta and Winer.  (Chang Dep. 295:18-25; Danner Dep. 167:10-17)

144

599.    Before the meeting, Winer was asked to come up with a list of projects for which she needed assistance that AJAM could assign to Gupta.  (Winer Dep. 228:8-21; Iadevaia Dec., Exs. VV; Iadevaia Dec., Ex. GGGGGG)

600.    On or about March 23, 2016, Gupta met Winer for the first time.  In addition, Anstey, Chang, O'Brian, and Danner attended the meeting.  (Anstey Dep. 322:7-23; Danner Dep. 166:15-167:6; Gupta Dec. ¶ 127)

601.    During this meeting, Gupta asked Anstey for clarification regarding Winer's role.  (Danner Dep. 169:13-20)

602.    Instead of answering Gupta's question, Anstey told Gupta that defendants retained Winer to help with the wind down.  (Gupta Dec. ¶ 127)

603.    Gupta complained that Winer had effectively replaced him because Winer had absorbed almost all of Gupta's responsibilities and Gupta's entire team now reported to Winer.  (Gupta Dec. ¶ 127; Chang Dep. 296:19-297:22)

604.    Gupta also produced documentation that Anstey submitted to a bank identifying Winer as AJAM's CFO and which both Anstey and Winer had signed.  (Chang Dep. 296:10-18; Danner Dep. 171:20-172:17; Winer Dep. 212:11-25, Iadevaia Dec., Ex. YY)

605.    During this same meeting, Danner asked Gupta whether Gupta would agree to switch roles with Winer so that Winer would work on the special MFN project and Gupta would handle day-to-day responsibilities of the wind down.  (Danner Dep. 169:21-170:7; Chang Dep. 299:3-9)

606.    Gupta agreed to Danner's proposal but Anstey rejected the idea.  (Danner Dep. 170:8-171:2; Chang Dep. 299:10-15)

145

607.     Following the March 23, 2017 meeting, Anstey discontinued Gupta's ability to approve transactions. (Iadevaia Dec., Exs. AAA, BBB)

608.     Also after the March 23, 2016 meeting, defendants made personnel decisions about the Finance department without speaking to Gupta.  For example, AJAM did not offer Lavin continued employment beyond mid-April 2016.  Defendants did not discuss this decision with Gupta. (Gupta Dec. ¶ 128; Winer Dep. 156:18-21)

609.     Defendants also removed Lopez, a long-term Finance team member, from the MFN project and replaced him with a junior consultant without discussing this action with Gupta. (Gupta Dec. ¶ 129; Iadevaia Dec., Ex. HHHHHH)

610.     Before the April 12, 2016 shut down, Anstey discussed with Chang and Winer which Finance employees would be part of the stay team.  (Chang Dep. 132:3-8; Winer Dep. 149:14-23, 151:9-21, 159:2-18)  Gupta was not included in these discussions.  (Gupta Dec. ¶ 130)

611.     On or about March 23, 2016, AJAM removed Gupta from the list of employees staying beyond April 12, 2016 because he was a "special case[]." (Iadevaia Dec., Ex. MMMMMM)

612.     On or about March 25, 2016, Gupta's name was added back onto the stay team list. (Iadevaia Dec., Ex. NNNNNN)

613.     On or about April 19, 2016, Gupta offered to assist with the audit of AJAM's 401(k) program.  Gupta began to on work the 401(k) audit but defendants banned him from the office before he could complete the project. (Gupta Dec. ¶ 132; Danner Dep. 164:22-165:10, 171:6-16; Gupta Dec. ¶ 132; Iadevaia Dec., Ex. IIIIII)

146

2.    Defendants End Plaintiff's Employment in Mid-June

614.    On or about March 25, 2016, AJAM sent Gupta a stay offer letter that extended Gupta's employment to June 15, 2016. (Kaplan Dec., Ex. 44)

615.    The letter made clear that Gupta could only continue working at AJAM beyond April 12, 2016 if he agreed to the letter and was subject to the terms and conditions contained in the letter. (Kaplan Dec., Ex. 44)

616.    The stay agreement did not require Gupta to sign a release. (Kaplan Dec., Ex. 44)

617.    Nothing in the stay agreement prevented an extension of Gupta's end date beyond June 15, 2016.   In fact, AJAM extended the stay agreements of several employees beyond their initial end date. (Kaplan Dec., Ex. 44; Iadevaia Dec., Exs. III, JJJ)

618.    Plaintiff understood that if he did not sign the stay agreement, his employment would end in mid-April 2016.   (Gupta Dec. ¶ 131)

619.    This end date of June 15, 2016 contained in the stay agreement was almost identical to the end date of June 12, 2016 contained in the advisory role proposal that Anstey made to Gupta. (Kaplan Dec., Ex. 44; Iadevaia Dec., Ex. RRRRR)

620.    AJAM offered stay letters to most of the Finance department as of April 12, 2016. (Winer Dep. 156:13-158:25)

621.    AJAM offered stay agreements to nine Finance department employees: Gupta until June 15, 2016; Carey Barclay, a production accountant, until September 9, 2016; Karima Sewell, a payroll analyst, until July 15, 2016; Lopez, a senior accountant, until September 9, 2016; Nerminda Sagum, a project accountant, until July 15, 2016; Douglas Ramsey ("Ramsey"), a senior accountant, until September 9, 2016; Sharon Yee, a project accountant,

147

until July 15, 2016; Ineke Tambunan, a payroll manager, until June 30, 2016; and Triche-Newman, an accounts payable manager, until September 9, 2016. (Iadevaia Dec., Ex. JJJJJJ)

622.    Of the nine Finance employees retained beyond April 12, 2016, Gupta was the only employee with an end date of June 15, 2016.  AJAM offered all other Finance employees later end dates. (Kaplan Dec., Ex. 44; Iadevaia Dec., Ex. JJJJJJ)

623.    Chang had an initial end date of September 9, 2016.  (Iadevaia Dec., Ex. JJJJJJ)

624.    No senior AJAM employee was able to offer any explanation for Gupta's end date. (Anstey Dep. 301:13-24; O'Brian Dep. 277:20-278:5; Chang Dep. 135:21-24)

625.    Danner testified that the June 15, 2016 end date was chosen because Gupta was a "relatively higher-cost" employee and AJAM wanted to "skinny[] down the organization to mid-to-lower-level individuals." (Danner Dep. 205:8-206:2)

626.    As of January 2017, Winer, who Danner described as Gupta's "replacement," continued to provide services to AJAM.  (Iadevaia Dec., Ex. TT; Winer Dep. 54:20-55:9)

627.    O'Brian, who earned almost            as much as Gupta, continued to work for approximately two months longer than Gupta.  (Danner Dep. 246:25-247:14; O'Brian Dep. 70:16-21)

628.    On April 15, 2016, Gupta sent Chang an executed stay agreement. Gupta notified Chang that "[b]y signing this agreement, [he was] not waiving [his] objections" to AJAM's conduct. (Iadevaia Dec., Ex. GGG; Kaplan Dec., Ex. 45)

629.    By memorandum dated April 15, 2016, Chang issued Gupta the notice required by the Worker Adjustment and Retraining Notification Act. (Iadevaia Dec., Ex. HHH)

148

630. That memorandum informed Gupta that his employment was to be terminated on April 12, 2016. It further stated that, "because you have agreed to continue working for the Company as part of the Company's stay team, assisting with the wind down of the Company, it is now anticipated that your employment will terminate on June 15, 2016." (Iadevaia Dec., Ex. HHH (emphasis added))

G.    Defendants Ban Gupta from the Office and Cut Off Access to His Email

631. Gupta filed this lawsuit on April 21, 2016 complaining of race and ethnicity discrimination and retaliation. (Anstey Dep. 54:16-20)

632. The following week, defendants through counsel informed plaintiff that he was not to return to the office, he no longer had access to AJAM's computer systems, and he had to return his work laptop. (Iadevaia Dec., Ex. CCC, DDD; Kaplan Dec., Ex. 46)

633. Defendants stated that Gupta would continue to work for AJAM and would receive both a new laptop and assignments. (Iadevaia Dec., Ex. CCC)

634. Gupta never received a new laptop or any new assignments. (Gupta Dec. ¶ 135)

635. Although defendants claimed that both Anstey and O'Brian made the decision to ban Gupta from the office, revoke his access to AJAM's computer system, and demand the return of his work laptop, O'Brian was not involved in this decision. (Iadevaia Dec., Ex. DDD; O'Brian Dep. 345:25-346:4)

636. On June 15, 2016, Gupta's employment with AJAM ended. (Gupta Dec. ¶ 137)

149

637.    On or about June 14, 2015, defendants through counsel offered Gupta the retention bonus and severance, "expressly conditioned upon the general release of all claims." (Iadevaia Dec., Ex. KKKKKK)

638.    Gupta through counsel requested a carve-out of his discrimination claims but defendants rejected this request. (Iadevaia Dec., Ex. KKKKKK)

AJAM Continues to Employ a Wind Down Team

639.    Anstey left AJAM in or around May 2016 and O'Brian left in or around August 2016. (Anstey Dep. 57:5-6; O'Brian Dep. 70:16-21)

640.    Following Anstey's and O'Brian's departures, Deloitte ran the wind down on a day-to-day basis. (Chang Dep. 128:9-11, 129:11-23; Winer Dep. 132:11-16)

641.    The Finance department continued to perform work for AJAM after Gupta's employment ended on June 15, 2016. (Iadevaia Dec., Ex. PPPPP)

642.    Winer continued to manage the Finance department. She worked on the external audit and took over responsibility for AJAM's 401(k) audit. (Iadevaia Dec., Ex. PPPPP; Iadevaia Dec., Ex. LLLLLL; Winer Dep. 197:9-24)

643.    Winer also continued to approve financial transactions. (Iadevaia Dec., Ex. PPPPP)

644.    Winer renewed AJAM's insurance policies. (Iadevaia Dec., Ex. PPPPP)

645.    Winer coordinated with AJAM's tax preparers and signed AJAM's tax returns. (Iadevaia Dec., Ex. PPPPP)

646.    Winer sent monthly financial statements to AJMN. (Iadevaia Dec., Ex. PPPPP)

150

647.     The work Triche-Newman's performed for AJAM stayed almost exactly the same throughout the wind down process. (Triche-Newman Dep. 50:18-51:10)

648.     Triche-Newman continued to report to Winer after Gupta's employment ended. (Triche-Newman Dep. 19:24-20:4, 57:17-58:20)

649.     AJAM extended Triche-Newman's employment beyond September 9, 2016 to December 15, 2016. (Iadevaia Dec., Ex. III)

650.     AJAM offered Ramsey, an accountant in AJAM's Finance department, an opportunity to stay at AJAM beyond September 9, 2016 but he declined. (Iadevaia Dec., Ex. SSSSS)

651.     Winer took on Ramsey's Finance responsibilities upon his departure. (Iadevaia Dec., Ex. PPPPP)

652.     AJAM extended Chang's employment to December 2016 along with another HR department employee, Maureen Lowy ("Lowy"). (Chang Dep. 110:18-24; Iadevaia Dec., Ex. JJJ)

653.     In or around late December 2016, all remaining employees were converted to consultants to provide services during 2017. Winer and Chang continued to provide services to AJAM as part of the wind down along with Triche-Newman and Lowy. (Chang Dep. 110:18-111:25, 114:9-13; Danner Dep. 38:21-39:24, 42:20-44:22; Winer Dep. 52:10-21, 69:8-17; Triche-Newman Dep. 15:13-23; Hwang Dep. 81:19-82:2)

654.     Chang earns approximately      an hour for her work for AJAM. Her previous salary of      equated to approximately    per hour based on a forty-hour work week. (Chang Dep. 111:22-25; Gupta Dec. ¶ 138)

151

655.   Triche-Newman continues to report to Winer.   (Triche-Newman Dep. 19:24-20:4; Winer Dep. 147:2-9)

656.   As of January 18, 2017, more than one year after Anstey announced the shut down, there was no end date for Winer's services.   (Winer Dep. 54:20-55:9)

657.   Gupta understands that Winer continues to provide services to AJAM to the present.   (Gupta Dec. ¶ 139)

## Gupta's Lost Income

658.   For 2015, if defendants had awarded Gupta a salary increase to $500,000 effective May 2015, Gupta would have earned at least an additional $100,000 in 2015.   (Gupta Dec. ¶ 140)

659.   For the period January 1, 2016 to June 15, 2016, if defendants had awarded Gupta a salary increase to $500,000, Gupta would have earned approximately an additional $69,000.   (Gupta Dec. ¶ 141)

660.   For the period June 16, 2016 to December 31, 2016, if defendants had awarded Gupta a salary increase to $500,000, Gupta would have earned approximately an additional $270,000.   (Gupta Dec. ¶ 142)

661.   This lost income does not account for the retention bonus and increased severance that Gupta would have received.   (Gupta Dec. ¶¶ 140-42)

662.   If AJAM had not retained Winer to replace Gupta, AJAM would have retained Gupta as a consultant at the end of 2016 at an hourly rate above his salary.   (Chang Dep. 111:22-25; Triche-Newman Dep. 20:23-21:4, 24:21-25)

Dated: New York, New York
        July 12, 2017

                                VLADECK, RASKIN & CLARK, P.C.

                            By: _____
                                Jeremiah Iadevaia
                                Joshua Tarrant-Windt
                                Attorneys for Plaintiff
                                565 Fifth Avenue, 9th Floor
                                New York, New York 10017
                                (212) 403-7300

841294 v2