UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

ANAND GUPTA,
                               Plaintiff,

                -against-

AL JAZEERA AMERICA, LLC, and
AL ANSTEY,

                            Defendants.

------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/29/2018

16-CV-2980 (VEC)

MEMORANDUM
OPINION AND ORDER

VALERIE CAPRONI, United States District Judge:

Plaintiff Anand Gupta brings this action against Defendants Al Jazeera America, LLC and Al Anstey for employment discrimination and retaliation, pursuant to 42 U.S.C. § 1981; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. § 290 *et seq.*; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq. See* Compl., Dkts. 1, 23. Defendants have moved for summary judgment on all claims. *See* Notice of Mot., Dkt. 52. For the following reasons, Defendants' motion is DENIED. The parties are ordered to appear for a conference on **April 13, 2018 at 10:00 a.m.**, Courtroom 443, Thurgood Marshall U.S. Courthouse, to set a trial schedule.

## BACKGROUND

### I.    Gupta's Employment Under Ehab Al Shihabi

#### A.    Gupta Joins Al Jazeera America

Al Jazeera Media Network ("AJMN") is one of the largest news organizations in the world. Pl.'s 56.1 Stmt. ¶ 137.[1] Headquartered in Doha, Qatar, it owns numerous cable and

---

[1] All facts stated herein are undisputed unless otherwise noted. The Court refers to the parties' filings with the following abbreviations: Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment, Dkt. 53, as "Defs.' Mem. of Law"; Defendants' Statement of Undisputed Material Facts, Dkt. 54, as "Defs.' 56.1

online news channels, such as Al Jazeera English, Al Jazeera Balkans, and others. *Id.* In August 2013, AJMN launched a new, ill-fated channel for American audiences, Defendant Al Jazeera America ("AJAM" or the "Company"). Defs.' 56.1 Stmt. ¶ 4; Pl.'s 56.1 Stmt. ¶¶ 138–139. When AJAM first launched, the Company's CEO was Ehab Al Shihabi, and its acting Chief Financial Officer was Muftah Al Suwaidan. Pl.'s 56.1 Stmt. ¶¶ 144, 156.

Soon after its launch, AJAM hired Gupta as Senior Vice President of Finance, a position under Al Suwaidan. Pl.'s 56.1 Stmt. ¶¶ 148, 156. Gupta, a U.S. citizen of Indian origin, signed a two-year contract with AJAM and began work on September 15, 2013, at an annual salary of $350,000. Defs.' 56.1 Stmt. ¶ 7; Pl.'s 56.1 Stmt. ¶¶ 127, 147, 149; Kaplan Decl. Ex. 4. At the time of Gupta's hire, David Harleston, AJAM's General Counsel, told Gupta that AJAM would "make up the gap" between Gupta's compensation at AJAM and his compensation at his prior position "if [Gupta] was an effective employee."[2] Gupta Decl. ¶ 54; *see also* Pl.'s 56.1 Stmt. ¶ 154; Gupta Dep. 28:12–29:16. The contract was clear that it "supersede[d] any and all prior and contemporaneous agreements, negotiations and communications." Kaplan Decl. Ex. 4 at

---

Stmt."; Declaration of Brian S. Kaplan, Dkt. 55, filed in support of Defendants' motion, as "Kaplan Decl."; Declaration of H.J. Chang, Dkt. 56, filed in support of Defendants' motion, as "Chang Decl."; Gupta's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, Dkt. 67, as "Pl.'s Mem. of Law"; Gupta's Response to Defendants' Local Civil Rule 56.1 Statement of Material Facts on Motion for Summary Judgment and Counterstatement of Disputed Facts, Dkt. 68, as "Pl.'s 56.1 Stmt."; Declaration of Jeremiah Iadevaia, Dkts. 69, 81, filed in opposition to Defendants' motion, as "Iadevaia Decl."; Declaration of Anand Gupta, Dkt. 70, filed in opposition to Defendants' motion, as "Gupta Decl."; Declaration of Ehab Al Shihabi, Dkt. 71, filed in opposition to Defendants' motion, as "Al Shihabi Decl."; Declaration of Tian Chen, Dkt. 72, filed in opposition to Defendants' motion, as "Chen Decl."; Defendants' Reply Memorandum of Law in Further Support of Their Motion for Summary Judgment, Dkt. 74, as "Defs.' Reply Mem. of Law"; Defendants' Response to Plaintiff's Counterstatement of Disputed Facts, Dkt. 75, as "Defs.' 56.1 Resp."; Supplemental Declaration of Brian S. Kaplan, Dkt. 76, filed in support of Defendants' motion, as "Suppl. Kaplan Decl." The deposition transcripts associated with this motion are docketed as exhibits to the Declaration of Jeremiah Iadevaia, Dkt. 69.

[2] The parties dispute whether Gupta actually took a pay cut when he went to work at AJAM and, if so, by how much. *See* Pl.'s 56.1 Stmt. ¶ 150; Defs.' 56.1 Resp. ¶ 150; Gupta Dep. 20:18–28:11. This dispute is immaterial. Regardless of whether the pay cut was real, Defendants do not dispute that Harleston told Gupta that AJAM would "make up the gap" in pay if Gupta performed well. *See* Defs.' 56.1 Resp. ¶ 154; Gupta Dep. 28:12–29:25.

000277.  This contract obligated AJAM to review Gupta's performance annually and to

"consider . . . in [the Company's] sole discretion" whether to increase Gupta's salary "[b]ased

upon that review."  *Id.* at 000269.  The contract made plain that AJAM had "no obligation to

increase" Gupta's salary.  *Id.*

In January 2014, Al Suwaidan left the Company.  Pl.'s 56.1 Stmt. ¶ 157.  The parties

dispute the extent to which Gupta inherited Al Suwaidan's responsibilities, but there is no

dispute that, at that time, Gupta became the most senior financial officer at the Company.[3]  *See*

Pl.'s 56.1 Stmt. ¶¶ 158–162; Defs.' 56.1 Resp. ¶¶ 158–162.  Although Gupta was not given a

title change or salary increase at this time, the Company's then-CEO, Al Shihabi, told Gupta that

he would receive a salary increase if he performed well with these new responsibilities over the

next year.  *See* Pl.'s 56.1 Stmt. ¶¶ 162, 175; Gupta Decl. ¶ 55; Gupta Dep. 193:16–194:12.

### B.      Al Shihabi Attempts to Restructure Al Jazeera America

In March 2015, Al Shihabi announced an overhaul of AJAM's operations.  *See* Pl.'s 56.1

Stmt. ¶ 182.  Al Shihabi planned to cut costs through a restructuring that would include merging

several departments, terminating a number of executives, and consolidating responsibility among

the remaining staff.  *See* Pl.'s 56.1 Stmt. ¶¶ 182–183; Al Shihabi Dep. 38:19, 39:7, 75:5–82:1;

Iadevaia Decl. Ex. W at 2107–10.  Consistent with their new responsibilities, several executives

received new titles at this time.  *See, e.g.*, Pl.'s 56.1 Stmt. ¶¶ 190–193; Kaplan Decl. Exs. 6, 7;

Iadevaia Decl. Ex. BBBB.  Some, but not all, of the executives who received title changes also

---

[3]      Defendants maintain that Gupta's new responsibilities were consistent with—and did not represent an
expansion of—the responsibilities outlined in his employment contract.  *See* Defs.' 56.1 Resp. ¶¶ 160–161.  Gupta
maintains that he took over all of Al Suwaidan's responsibilities and effectively became the Company's CFO.
*See* Pl.'s 56.1 Stmt. ¶¶ 158–162.  Although this dispute is immaterial, Defendants' position strikes the Court as
implausible.  If a CFO leaves a company, someone must inherit his or her duties.  Nonetheless, as the Court will
explain, Gupta's claims do not turn on whether Gupta's new responsibilities represented a departure from the duties
enumerated in his employment contract.

received salary increases.[4]  *See, e.g.*, Defs.' 56.1 Stmt. ¶¶ 13–14; Pl.'s 56.1 Stmt. ¶¶ 13–14; *see also* Gupta Dep. 213:8–214:19.

As part of the restructuring initiative, Al Shihabi planned to "exit" the head of the Human Resources ("HR") Department from the Company and have the HR Department report to Gupta. Pl.'s 56.1 Stmt. ¶¶ 184, 190; Al Shihabi Dep. 39:13–18, 52:11–24, 75:5–78:16; Iadevaia Decl. Ex. W at 2110. Al Shihabi's plan was that Gupta would manage the Finance and HR Departments simultaneously, saving the Company the salary of the former head of HR.  *See* Pl.'s 56.1 Stmt. ¶¶ 182–184.

In line with Gupta's new role, Al Shihabi changed Gupta's title, from Senior Vice President ("SVP") of Finance to Executive Vice President ("EVP") of Finance, but did not increase Gupta's salary.[5]  *See* Pl.'s 56.1 Stmt. ¶¶ 10, 177–180; Defs.' 56.1 Stmt. ¶¶ 10, 12. Al Shihabi told Gupta that there was some political "sensitivity" about increasing Gupta's salary while the restructuring plan was still in flux and that, consequently, Gupta's salary increase would have to wait.  Al Shihabi Dep. 42:18–43:2, 46:12–16.  Al Shihabi said that once the restructuring was fully implemented, Al Shihabi would increase Gupta's salary from $350,000 a year to $500,000 a year, plus an additional $50,000 bonus.[6]  *See* Pl.'s 56.1 Stmt. ¶¶ 178–180,

---

[4]     The parties do not dispute that three employees were promoted without salary increases at this time:  the Company's EVP of Government and Public Affairs, its SVP of Digital Products and Digital Distribution, and its SVP of Creative.  *See* Defs.' 56.1 Stmt. ¶¶ 13–14; Pl.'s 56.1 Stmt. ¶¶ 13–14; Gupta Dep. 213:8–214:19.  Gupta does not dispute that those three employees' salaries remained flat during this time, although he disputes the reasons that they did not receive raises.

[5]     The parties agree that Gupta became an "EVP" at this time, although they dispute exactly what his new title was.  *See* Pl.'s 56.1 Stmt. ¶ 187; Defs.' 56.1 Resp. ¶ 187.  This dispute is immaterial.

[6]     Defendants do not dispute that Al Shihabi made these oral representations to Gupta.  Defendants note that the email record for this time period shows that Al Shihabi instructed AJAM staff *not* to increase Gupta's salary, *see* Defs.' 56.1 Resp. ¶ 179 (citing Kaplan Decl. Exs. 5, 6), but that record is consistent with Gupta's and Al Shihabi's testimony that Al Shihabi wanted to wait a few months before awarding Gupta a salary increase due to the "sensitivity" of the issue, *see* Gupta Dep. 80:4–82:9, 84:2–85:2, 90:17–92:7, 167:19–171:16; Al Shihabi Dep. 42:18–46:16, 89:7–13.

186; Gupta Dep. 80:4–82:9, 84:2–85:2, 90:17–92:7, 168:1–171:16; Al Shihabi Dep. 42:18–46:16, 89:7–13.

## II. Gupta's Employment Under Al Anstey

### A. Anstey Replaces Al Shihabi as CEO

On May 5, 2015, the HR head resigned, and H.J. Chang, originally a Vice President of Human Resources, became Senior Vice President of Human Resources, with a salary increase. Pl.'s 56.1 Stmt. ¶¶ 190, 278–279; Iadevaia Exs. S, CCCC. Just one day later—before the HR Department overhaul could be fully implemented—Al Shihabi unexpectedly resigned from AJAM. Defs.' 56.1 Stmt. ¶ 19; Pl.'s 56.1 Stmt. ¶ 205. Anstey replaced Al Shihabi as CEO of AJAM on May 6, 2015. Defs.' 56.1 Stmt. ¶ 19; Pl.'s 56.1 Stmt. ¶ 205.

Upon his arrival, Anstey held a brief introductory meeting with Gupta, as he did with several other high-level executives. Pl.'s 56.1 Stmt. ¶¶ 301, 306; Gupta Dep. 115:16–25; Anstey Dep. 93:10–94:2, 96:1–9. Anstey and Gupta discussed Gupta's responsibilities, and Anstey expressed "surprise[]" that the HR Department reported to Gupta, inasmuch as Gupta was a financial officer. Pl.'s 56.1 Stmt. ¶ 302; Gupta Dep. 172:4–14. Gupta then mentioned that he had "a compensation issue" that he wanted to discuss with Anstey after Anstey had settled into his new position. Pl.'s 56.1 Stmt. ¶¶ 230, 304.

Anstey subsequently decided, purportedly with the "unanimous" agreement of Gupta and two other executives, that the HR Department would report directly to Anstey, not to Gupta. Anstey Dep. 85:21–93:5. Within a few weeks—fewer than 30 days after Gupta took on supervision of the HR Department—Anstey removed the HR Department from Gupta's responsibilities. Pl.'s 56.1 Stmt. ¶ 303; Gupta Dep. 171:20–172:19.

### B. Gupta Makes Numerous Requests for a Salary Increase

Between May and November 2015, Gupta repeatedly asked Anstey for a salary increase, arguing that Al Shihabi had promised him the raise.  *See* Pl.'s 56.1 ¶¶ 224, 231, 234, 238, 240, 243, 249, 252; Kaplan Decl. Ex. 13.  On several occasions, Anstey told Gupta that he wanted to consult with a high-level executive at AJMN, Abdulla Al Najjar, before deciding whether to give Gupta a raise.[7]  *See* Pl.'s 56.1 Stmt. ¶¶ 225, 239, 243–244, 252; Gupta Dep. 303:7–304:10.

Meanwhile, in mid-June 2015, Anstey expressed concern about Gupta's performance.  Defs.' 56.1 Stmt. ¶ 21 (citing Kaplan Decl. Ex. 12); Iadevaia Decl. Ex. OOOOOO.  In one June 2015 email, Anstey expressed frustration with the fact that Gupta had failed to inform him of a long-term plan to move San Francisco employees to New York.  *See* Iadevaia Decl. Ex. OOOOOO.  Around the same time, Anstey had concerns about Gupta's time management and leadership, as several members of Gupta's team had complained of being "unsupported."  Anstey Dep. 139:7–140:19; *see also id.* 124:10–127:21, 134:18–137:22.  Anstey shared his concerns with Ibrahim Abdulla Al Obaidli, an AJMN executive, who concurred.  Kaplan Decl. Ex. 12.  Anstey discussed his concerns with Gupta during a July 2015 meeting.[8]  Anstey Dep 136:13–138:19.

---

[7]    While the evidence of these conversations is based almost entirely on Gupta's deposition testimony, Defendants do not dispute that the conversations took place.  Defendants argue that Anstey was unable to recall "the specifics of any conversations" with Gupta about salary increases during this time, *see* Anstey Dep. 207:22–208:21, but Anstey's lack of recollection does not render Gupta's testimony disputed.

[8]    Gupta asserts that Anstey did not communicate concerns about his performance during the July meeting.  Pl.'s 56.1 Stmt. ¶ 274 (citing Gupta Dep. 177:20–24).  The testimony to which Gupta cites does not support his assertion.  The cited testimony states only that Anstey did not discuss the fact that Gupta had missed a scheduled meeting, that he was disorganized, or that he might be fired.  Gupta Dep. 177:20–24.  Nothing in the cited testimony disputes the general point that Anstey discussed his concerns about Gupta's performance, including his time management, leadership, or communication skills.  Thus, the Court considers it undisputed that Anstey communicated concerns about Gupta's performance during the meeting, even if there are disputes about precisely what was said.

At this time, Gupta's employment contract was set to expire in September.  *See* Defs.'
56.1 Stmt. ¶ 24; Pl.'s 56.1 Stmt. ¶ 24.  Anstey discussed with Al Obaidli the possibility of
placing Gupta in a "probation period" or, alternatively, terminating his employment altogether.
Kaplan Decl. Ex. 12; *see also* Anstey Dep. 146:14–147:3.  Ultimately, Anstey decided to extend
Gupta's contract for one or more additional months, to allow himself more time to assess
Gupta's performance.[9]  Defs.' 56.1 Stmt. ¶ 24; Pl.'s 56.1 Stmt. ¶¶ 236, 272; Anstey Dep.
170:25–171:12.  Eventually, Gupta's employment converted to at-will status when the contract
expired sometime in late 2015.  *See* Iadevaia Decl. Ex. X at AJAM003551; *id.* Ex. Y; Gupta
Dep. 191:13–19.

## C.    Al Jazeera America Begins to Wind Down Operations

In December 2015, due to concerns about the Company's financial performance, AJAM
began a "strategic review" to assess its future.  Defs.' 56.1 Stmt. ¶¶ 37–38.  On December 11,
2015, Al Najjar announced the "review" in a private meeting with Anstey, Gupta, and a few
other key executives.  Pl.'s 56.1 Stmt. ¶¶ 367, 372.  Al Najjar said that the review, termed
"Project Digital," would investigate a range of options to make AJAM's business model more
sustainable or, alternatively, formulate a plan to cease broadcasting and wind down the
Company's operations.  *See* Def.'s 56.1 Stmt. ¶¶ 37–40; Pl.'s 56.1 Stmt. ¶ 367.  Al Najjar
assigned Gupta to the "core management team" of Project Digital, tasking him with providing
financial data to the project's outside consultants and attorneys.  Pl.'s 56.1 Stmt. ¶ 454; *see also*
Iadevaia Decl. Exs. EE, NNNNN.

---

[9]    The parties dispute precisely how long Gupta's contract was extended.  *See* Defs.' 56.1 Stmt. ¶¶ 24–25;
Defs.' 56.1 Resp. ¶ 237; Pl.'s 56.1 Stmt. ¶¶ 24–25, 237.  This dispute is immaterial.

The same day that Al Najjar announced Project Digital and floated the possibility of a company shut-down, Anstey asked Gupta to email him a "business justification" for Gupta's requested salary increase. Pl.'s 56.1 Stmt. ¶¶ 394–397; Defs.' 56.1 Resp. ¶ 395. Gupta responded with data on comparable salaries and a list of reasons why he deserved a raise. Kaplan Decl. Exs. 14, 15. Anstey forwarded a version of that list to Al Najjar on December 23, 2015, stating, "As you know I believe [Gupta] deserved a pay rise [sic]. I was going to recommend this in December anyway, and then heard about [P]roject [D]igital, so held this conversation with you. [Gupta] is very experienced, professional, and dedicated." *Id.* Ex. 17. A few days later, Anstey explained to Gupta that Anstey was "supportive" of the pay-raise but that, given the ongoing discussions over a company shut-down, Anstey was "not in a position" to approve a salary increase "without conferring with [Al Najjar]." *Id.* Ex. 19. Gupta followed up on his requested salary increase several times over the next few weeks. *See* Defs.' 56.1 Stmt. ¶¶ 47, 49, 54; Kaplan Decl. Exs. 20–24.

The plans to shut-down AJAM crystallized over the next few weeks. The Company formulated a "Retention Incentive Plan" and a "Special Severance Plan," pursuant to which most employees would be terminated by April 30, 2016. Pl.'s 56.1 Stmt. ¶¶ 385–386; Iadevaia Decl. Exs. LLL, MMM. The Company also formed a "Stay Team," a small group of executives who would remain employed past April 2016 in order to wind down the Company's operations. Pl.'s 56.1 Stmt. ¶ 380. Gupta, Anstey, Chang, and a few others were placed on the Stay Team. Iadevaia Decl. HHHHH.

Sometime in early January 2016, Al Najjar denied Gupta's request for a salary increase, although Al Najjar and Anstey did not tell Gupta right away. *See* Defs.' 56.1 Stmt. ¶ 57; Al Najjar Dep. 23:25–26:10. On January 13, 2016, AJAM publicly announced that it would close,

with all broadcasting to cease on April 12, 2016.  Defs.' 56.1 Stmt. ¶ 56; Pl.'s 56.1 Stmt. ¶¶ 381–

382.  Two days later, Anstey told Gupta that Al Najjar had denied Gupta's salary increase.  Pl.'s

56.1 Stmt. ¶ 420; Gupta Dep. 346:11–14; Anstey Dep. 226:11–229:21.

### III.    Gupta Complains of Discrimination and Takes Medical Leave

#### A.    Gupta's Discrimination Complaint

About two weeks after he was told that his compensation would not be increased, Gupta

sent an email to Anstey, Chang, and others with the subject line, "Anand Gupta – Official

Compliant [sic] against Unfair Employment Practice by AJAM."  Kaplan Decl. Ex. 28.  Gupta

stated that, after numerous requests, he had "no choice but to file an official complaint against

AJAM for its unfair employment practices" because of the Company's "very unfair and

discriminatory treatment" in denying his requests for a salary increase.  *Id.*  In particular, Gupta

complained that Anstey had "singled out" Gupta relative to needing Al Najjar's permission to

grant a request for a salary increase.  *Id.*  Gupta argued that requiring approval from the Qatar-

based AJMN "called into question" the U.S.-based AJAM's compliance with "fair employment

laws and practices."  *Id.*  Gupta closed by stating, "I trust that this complaint will not result in

any retaliation on my continued employment . . . ."  *Id.*

In the same email, Gupta stated that he would take medical leave for ten days due to the

"stress and anxiety" from the "unfairness" of not receiving a raise.  *Id.*  In response, Anstey told

Gupta to "take the time you need to attend to your health."  Kaplan Decl. Ex. 29.

#### B.    The Advisory Role Proposal

Gupta began medical leave on January 28, intending to return to work on February 8 (but

leaving open the possibility of extending his leave for additional time).  Defs.' 56.1 Stmt. ¶ 68;

Pl.'s 56.1 Stmt. ¶¶ 448–449; Kaplan Decl. Ex. 30.  Gupta later extended his medical leave to

February 22.  Defs.' 56.1 Stmt. ¶ 78; Pl.'s 56.1 Stmt. ¶ 476; Kaplan Decl. Exs. 34, 36.

Anstey, Chang, and Gupta all met on February 23, the day after Gupta was due to return to work. Defs.' 56.1 Stmt. ¶ 86; Pl.'s 56.1 Stmt. ¶ 485. What happened at the February 23 meeting is a matter of sharp factual dispute. The parties agree that at this meeting, Anstey offered Gupta an "advisory role" that would have reduced Gupta's responsibilities significantly. *See* Gupta Dep. 370:25–371:3; Anstey Dep. 276:23–279:10. They dispute the extent to which Gupta asked for this diminished role. According to Gupta, he told Anstey that he was "ready" to come back to work, but Anstey refused. Gupta Dep. 370:8–372:10, 382:19–386:10. Gupta viewed the reduced responsibilities as effectively "ban[ning]" him from the office and "suspend[ing] him with pay." *Id.* 370:8–373:7. According to Anstey and Chang, however, Gupta listed a number of his responsibilities and said, "Get me out of those." Anstey Dep. 276:23–279:10; *see also* Chang Dep. 232:3–236:6. Anstey testified that he and Gupta reached an "agreement in principle" in this meeting about reducing Gupta's workload. Defs.' 56.1 Stmt. ¶ 89; Anstey Dep. 278:5–8. Gupta denies that any such agreement was reached. Pl.'s 56.1 Stmt. ¶ 89.

A few days later, Anstey emailed Gupta a "Separation and Release Agreement." Defs.' 56.1 Stmt. ¶ 90; Pl.'s 56.1 Stmt. ¶ 504; Iadevaia Decl. Ex. RRRRR. The agreement would have extended Gupta's employment through June 12, 2016, in an advisory role. Iadevaia Decl. Ex. RRRRR at 3100. In that role, Gupta would have been "reasonably available to answer questions" but "relieved of [other] duties." *Id.* AJAM would have had "no obligation to provide any work" to Gupta during that time. *Id.* Under the agreement, Gupta would have continued to receive his salary and would have remained eligible for severance and a retention bonus. *Id.* at 3100–01; Pl.'s 56.1 Stmt. ¶ 505. The agreement also contained a general release of AJAM for all claims, including employment discrimination claims. Iadevaia Decl. Ex. RRRRR at 3101;

Pl.'s 56.1 Stmt. ¶ 506.  On March 7, 2016, Gupta informed AJAM that he would not sign the agreement.  Defs.' 56.1 Stmt. ¶ 92; Pl.'s 56.1 Stmt. ¶ 518.

Gupta remained out of the office for the next few weeks.  He worked from home on at least one long-term project, but it is unclear whether the Company assigned him additional work during this time.  *See* Pl.'s 56.1 Stmt. ¶ 581; Defs.' 56.1 Resp. ¶ 581.  It is also unclear whether Anstey allowed Gupta to return to the office during this time (as Defendants argue) or whether Anstey ordered Gupta not to return to the office (as Gupta argues).  *Compare* Pl.'s 56.1 Stmt. ¶¶ 516, 522 *with* Defs.' 56.1 Resp. ¶ 522 (citing Kaplan Decl. Ex. 43).  Nevertheless, Gupta remained employed and on AJAM's payroll during this time.  *See* Defs.' 56.1 Stmt. ¶ 85; Pl.'s 56.1 Stmt. ¶ 85.

### C.     AJAM Hires Toby Winer

Meanwhile, throughout February 2016, AJAM interviewed for and hired an outside consultant to take on many of Gupta's day-to-day responsibilities.  The Company began looking for a consultant at a "CFO level" on February 4, just a week after Gupta went out on medical leave.  *See* Iadevaia Decl. Ex. SS at KIWI000107–110.  They interviewed Toby Winer for that position on or around February 16, shortly before Gupta was due to return (and before the February 23 meeting).  *See* Chang Dep. 280:23–281:24; Iadevaia Decl. Ex. SS at KIWI000100.  Winer began work at AJAM as a consultant on March 3 (after Anstey proposed the advisory role to Gupta but before Gupta officially declined it).  Pl.'s 56.1 Stmt. ¶ 556; Iadevaia Decl. Ex. WWWWW.  The parties do not dispute that Winer, a white female, performed the bulk of what had been Gupta's day-to-day responsibilities throughout March and April.  *See* Pl.'s 56.1 Stmt. ¶¶ 566–569, 573–574, 607; Defs.' 56.1 Resp. ¶¶ 566–568, 573–574, 607.

**D.     Gupta Signs AJAM's Stay Agreement and Files the Instant Lawsuit**

In late March, Anstey emailed Gupta a new agreement extending his employment through June 15, 2016 (the "Stay Agreement").  Defs.' 56.1 Stmt. ¶ 97; Pl.'s 56.1 Stmt. ¶ 614; Kaplan Decl. Ex. 44.  Because Gupta had rejected the Separation and Release Agreement (which would have extended his employment through June in an advisory role), like most other AJAM employees, he was subject to termination when the Company ceased broadcasting on April 12. *See* Kaplan Decl. Ex. 44 at 2152.  Under the Stay Agreement, Gupta would continue to be paid through June 15, and AJAM would "assign [Gupta] any duties or responsibilities . . . within [his] capabilities." *Id.*  The agreement also would allow AJAM to ask Gupta to "work remotely" in the Company's "sole discretion." *Id.*  The agreement would provide Gupta with severance pay and a retention bonus but expressly conditioned them on Gupta's executing a general release of claims. *Id.* at 2152–53.

Gupta signed the Stay Agreement but refused to sign the general release. *See* Defs.' 56.1 Stmt. ¶ 98; Pl.'s 56.1 Stmt. ¶¶ 628, 637–638; Kaplan Decl. Ex. 45; Iadevaia Decl. KKKKKK. Six days after executing the Stay Agreement, Gupta filed the Complaint in the instant action. Defs.' 56.1 Stmt. ¶ 101; Pl.'s 56.1 Stmt. ¶ 631; Compl., Dkt. 1.

The wind-down of AJAM continued through 2016.  Anstey departed in May 2016, a month before Gupta did.  Pl.'s 56.1 Stmt. ¶ 639.  Chang and several finance employees stayed on through December 2016, at which point they were converted to independent contractors.  Pl.'s 56.1 Stmt. ¶¶ 652–653.  As of mid-2017, Winer was still providing services to AJAM as a consultant. *Id.* ¶¶ 656–657.

# DISCUSSION

## I.      Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).  To defeat summary judgment, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial."  *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006).  Courts "construe the facts in the light most favorable to the nonmoving party . . . and resolve all ambiguities and draw all reasonable inferences against the movant."  *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014) (per curiam) (omission in original) (internal quotation marks omitted) (quoting *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 79–80 (2d Cir. 2009)).

"At summary judgment in an employment discrimination case, a court should examine the record as a whole, just as a jury would, to determine whether a jury could reasonably find an invidious discriminatory purpose on the part of an employer."  *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 102 (2d Cir. 2001).  "A motion for summary judgment may be defeated where 'a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.'"  *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)).

## II. Defendants Are Not Entitled to Summary Judgment on Gupta's Employment Discrimination Claims

The first, third, and fifth causes of action in the Complaint allege that Defendants discriminated against Gupta on account of his race when they denied his requests for a salary increase. Gupta argues this discrimination violated § 1981, the NYSHRL, and the NYCHRL, respectively. *See* Compl. ¶¶ 116–119, 124–126, 130–132. Defendants move for summary judgment as to all three claims. *See* Notice of Mot.

### A. Applicable Law

Courts analyze employment discrimination claims under § 1981 and the NYSHRL using "the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973)." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012); *see also Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). "Under *McDonnell Douglas*, a plaintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination; it is then the defendant's burden to proffer a legitimate non-discriminatory reason for its actions; the final and ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for unlawful discrimination." *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251 (2d Cir. 2014); *see also Littlejohn v. City of New York*, 795 F.3d 297, 307–08 (2d Cir. 2015).

### B. Gupta Establishes a Prima Facie Case of Discrimination

A plaintiff establishes a prima facie case "if he or she introduces evidence that raises a reasonable inference that the action taken by the employer was based on an impermissible factor. [The plaintiff] must show: (1) that he belonged to a protected class; (2) that he was qualified for the position he held; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory

intent." *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008) (internal quotation marks and citations omitted) (citing *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004)). "The plaintiff's burden of proof as to this first step has been characterized as 'minimal' and '*de minimis*.'" *Zann Kwan v. Adalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013); *see also Littlejohn*, 795 F.3d at 311.

The parties dispute only the final two prongs of this test: whether Gupta suffered an adverse employment action and whether the record raises an inference of discrimination. *See* Defs.' Mem. of Law at 12; Pl.'s Mem. of Law at 8–16.

### 1.    Defendants' Denial of Gupta's Request for a Salary Increase Was an Adverse Employment Action

"To qualify as an adverse employment action, the employer's action toward the plaintiff must be 'materially adverse' with respect to 'the terms and conditions of employment.'" *Davis v. N.Y.C. Dep't of Educ.*, 804 F.3d 231, 235–36 (2d Cir. 2015) (per curiam) (quoting *Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004)). The action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.*; *see also Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006). Additionally, "a plaintiff must set forth objective proof that the alleged action was materially adverse." *Potash v. Florida Union Free Sch. Dist.*, 972 F. Supp. 2d 557, 584 (S.D.N.Y. 2013) (emphasis omitted) (citing *Beyer v. Cty. of Nassau*, 524 F.3d 160, 164 (2d Cir. 2008)).

Failing to increase an employee's compensation can be an adverse employment action if the increase was "customary, expected, [and] warranted," such that it could reasonably be considered part of the "terms and conditions of employment." *Leon v. Dep't of Educ.*, No. 15-CV-7275, 2017 WL 1157146, at *6 (S.D.N.Y. Mar. 27, 2017) (alteration in original) (quoting *Fullwood v. Ass'n for the Help of Retarded Children, Inc.*, No. 08-CV-6739, 2010 WL 3910429,

at *6 (S.D.N.Y. Sept. 28, 2010)); *see also Ebanks v. Neiman Marcus Grp., Inc.*, 414 F. Supp. 2d 320, 331 (S.D.N.Y. 2006). In order to establish that a salary increase was part of the terms and conditions of employment, a plaintiff must prove that the salary increase would have been "awarded as a matter of course or that [she] was otherwise entitled to expect or rely on it." *Boyar v. City of New York*, No. 10-CV-65, 2010 WL 4345737, at *3 (S.D.N.Y. Oct. 28, 2010). A plaintiff may meet this burden by, among other things, showing that he "was denied a salary increase received by similarly situated individuals as a result of discrimination." *Inguanzo v. Hous. & Servs., Inc.*, No. 12-CV-8212, 2014 WL 4678254, at *14 (S.D.N.Y. Sept. 19, 2014) (quoting *Potash*, 972 F. Supp. 2d at 583), *aff'd*, 621 F. App'x 91 (2d Cir. 2015).

### (i)  AJAM's Promises of a Raise Prior to Anstey's Arrival

Gupta points to a series of oral promises to argue that his salary increase was "customary, expected, [and] warranted." *Leon*, 2017 WL 1157146, at *6; *see also* Pl.'s Mem. of Law at 9. First, in 2013 and 2014, respectively, Harleston and Al Shihabi told Gupta that he would receive a salary increase if he performed effectively. *See* Pl.'s Mem. of Law at 9 (citing Pl.'s 56.1 Stmt. ¶¶ 154, 175). Later, in connection with Gupta's contractually-mandated performance review in 2015, Al Shihabi decided that Gupta's performance merited a salary increase. *See* Pl.'s 56.1 Stmt. ¶ 179. Finally, Al Shihabi also promised Gupta a salary increase as part of the plan to put the HR Department under Gupta's supervision. *See* Pl.'s 56.1 Stmt. ¶¶ 185–186.

These promises suffice to create a question of fact as to whether refusing to increase Gupta's salary constituted an adverse action, especially the promise made in connection with Gupta's performance review. Gupta's employment contract obligated the Company to "consider" whether to increase Gupta's salary "[b]ased upon" an annual performance review. Kaplan Decl. Ex. 4 at 000269. Al Shihabi conducted that review, considered Gupta's request for an increase, and decided to increase Gupta's salary "based upon the outcome of that review." Al

Shihabi Decl. ¶ 7; *see also* Al Shihabi Dep. 120:22–123:9. In other words, Al Shihabi fulfilled the contact's express conditions precedent to awarding a salary increase; he only had to execute and implement the decision that he made. Gupta, then, acted reasonably in expecting that a salary increase would be "awarded as a matter of course." *Boyar*, 2010 WL 4345737, at *3. Under these circumstances, a reasonable juror could find that the promised salary increase had become part of the terms and conditions governing Gupta's employment.[10]

Defendants argue that Anstey had the authority to disregard the promises of his predecessor, Al Shihabi, and to make his own decisions about executive salaries after Anstey became CEO. *See* Defs.' Mem. of Law at 14. But Al Shihabi's promise was made in connection with Gupta's employment contract, and that contract remained in effect for a large part of Anstey's tenure. *See* Pl.'s 56.1 Stmt. ¶¶ 236–237; Defs.' 56.1 Stmt. ¶¶ 24–25. A reasonable executive could expect that the terms of his employment contract (and the promises made pursuant to it) would carry over from one CEO to another; indeed, one might argue that type of security is the whole purpose of an employment contract. A reasonable juror could find, therefore, that Gupta was reasonably "entitled to expect or rely" on Al Shihabi's promises throughout Anstey's tenure, absent some indication to the contrary.[11] *Boyar*, 2010 WL 4345737, at *3.

---

[10]     That Gupta's employment contract stated that the Company had "no obligation to increase" Gupta's salary, Kaplan Decl. Ex. 4 at 000269, does not change the Court's analysis. Regardless of whether Defendants had a contractual obligation to follow through on Al Shihabi's promises, those promises altered the terms and conditions governing Gupta's employment for purposes of the anti-discrimination laws. Under the anti-discrimination laws, a court is not bound by the four corners of a contract in determining the terms and conditions of a plaintiff's employment. *See, e.g.*, *Inguanzo*, 2014 WL 4678254, at *14 (looking to the salaries of similarly situated individuals to determine the terms and conditions of the plaintiff's employment). Had Gupta brought a breach of contract claim, and not a discrimination claim, the Court's analysis might be different.

[11]     If Gupta was mistaken in expecting a salary increase, Anstey did nothing to correct his misunderstanding. When asked about the salary increase throughout the summer and fall of 2015, Anstey said only that he needed to consult with Al Najjar about it. *See, e.g.*, Pl.'s 56.1 Stmt. ¶¶ 225, 239, 243, 252. Had Anstey made clear that Gupta would not be receiving a salary increase, or that Al Shihabi's promises no longer applied, the Court's analysis might be different.

Additionally, the Second Circuit has warned that discretion over raises and bonuses does not insulate an employer from the anti-discrimination laws. *See Davis*, 804 F.3d at 235–36 ("The fact that the employer has discretion [over] whether to grant bonuses or raises does not support the conclusion that an employer may freely allocate them on the basis of racial or religious bias, or disability discrimination."); *Tolbert v. Smith*, 790 F.3d 427, 436 (2d Cir. 2015) ("A benefit that is part and parcel of the employment relationship may not be doled out in a discriminatory fashion, even if the employer would be free under the employment contract simply not to provide the benefit at all." (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 75 (1984))). Standing alone, Anstey's discretion is insufficient to defeat Gupta's prima facie case.

### (ii)    The Salary Increases of Other Employees

Next, Gupta argues that several other AJAM executives received salary increases when they were promoted in 2015, demonstrating that it was AJAM's custom to provide "a salary increase to go along with an executive-level promotion." Pl.'s 56.1 Stmt. ¶ 194; *see also id.* ¶¶ 190–202. The data supporting this argument is limited. Gupta points to only seven SVPs or EVPs who received salary increases when they were promoted in 2015. *See* Pl.'s 56.1 Stmt. ¶¶ 106, 190–194. Of these executives, two had employment agreements that mandated salary increases (leaving only five employees who were comparable to Gupta, inasmuch as Gupta's employment agreement contained no such mandate). *See* Defs.' 56.1 Stmt. ¶¶ 113, 116; Pl.'s 56.1 Stmt. ¶¶ 113, 116. Additionally, there were at least three executives who were promoted but who did not receive salary increases during this time, although Gupta argues that two were not similarly situated to him due to their short tenure at AJAM.[12]  *See* Defs.' 56.1 Stmt. ¶¶ 13–

---

[12]    These three employees were the Company's EVP of Government and Public Affairs, its SVP of Digital Products and Digital Distribution, and its SVP of Creative. *See* Defs.' 56.1 Stmt. ¶¶ 13–14.

14; Pl.'s 56.1 Stmt. ¶¶ 13–14. In sum, Gupta can point to five SVP- or EVP-level promotions that support his argument and at least one that does not. This sample size is too small to draw any reasonable conclusions.[13]

Putting aside whether all or most executives at AJAM received a raise when they were promoted, drawing all reasonable inferences from the evidence in Gupta's favor, he has offered sufficient evidence from which a jury could conclude that the promise of a raise was a term or condition of his employment. Thus, a reasonable juror could find that denying Gupta a raise constituted an adverse employment action.

### 2. The Circumstances Here Permit a Reasonable Inference of Discrimination

As to the final prong of the prima facie case, a plaintiff must "introduce[] evidence that raises a reasonable inference that the action taken by the employer was based on an impermissible factor." *Holcomb*, 521 F.3d at 138. "An inference of discrimination can arise from circumstances including, but not limited to, 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the [adverse action].'" *Littlejohn*, 795 F.3d at 312 (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009)).

Gupta cites a range of circumstantial evidence in an attempt to raise an inference of discrimination. *See* Pl.'s Mem. of Law at 10–14. Most of this evidence is irrelevant,

---

[13]     Citing to Exhibit U of the Iadevaia Declaration, Gupta also points to a series of promotion-based salary increases in 2013 and 2014. *See* Pl.'s 56.1 Stmt. ¶¶ 195–199, 201–202. Exhibit U is an email that Gupta sent to himself, attaching a spreadsheet of "salary histories" for several AJAM employees. *See* Iadevaia Decl. Ex. U. Because Gupta provides no foundation to authenticate this spreadsheet or otherwise explain its origin, the Court does not consider it admissible evidence for purposes of this motion.

inadmissible, or just not persuasive.[14]  Several circumstances, however, convince the Court that

Gupta has, barely, raised a reasonable inference of discriminatory intent:  (i) evidence that

Anstey misled Gupta about Anstey's consultations with Al Najjar regarding Gupta's request for

a raise (both as to the necessity of consultation and as to whether they actually consulted); (ii)

Anstey's "bypassing" Gupta and choosing instead to interact with a lower-level, white employee

in Gupta's group; (iii) Anstey's personal history of discrimination at another news organization;

and (iv) the circumstances surrounding Gupta's medical leave, including Defendants' hiring of

Toby Winer.

### (i) Evidence that Anstey Misled Gupta About Consulting Al Najjar

Throughout the summer and fall of 2015, Gupta repeatedly asked Anstey for a raise.

*See* Pl.'s 56.1 Stmt. ¶¶ 224–253.  Each time, Anstey responded that he needed permission from

AJMN for the increase, that he would consult with AJMN executive Al Najjar about it, and that

he hoped to have an answer for Gupta shortly.  *See id.* ¶¶ 239, 241, 244, 252.  In August and

---

[14]    For example, Gupta argues that a "discriminatory culture" at AJMN "potentially set the tone" at AJAM, that is, created a culture at AJAM in which discrimination against Indians was commonplace and acceptable.  Pl.'s Mem. of Law at 10.  To prove these allegations, Gupta relies on a news article, a series of United Nations reports, and allegations of discrimination that AJMN employees relayed to him.  *See id.* at 10 n.12; Pl.'s 56.1 Stmt. ¶¶ 427–431.  All of that evidence is inadmissible hearsay.  Gupta's only non-hearsay evidence of AJAM's "culture" is, first, that he did "not come across many Indian[]" executives in his interactions with AJMN and, second, that Al Najjar was unable to recall more than three Indian executives at AJMN.  Pl.'s 56.1 Stmt. ¶ 424; Al Najjar Dep. 48:25–50:22.  This evidence has little, if any, probative value of the culture of a company with thousands of employees.

Similarly, Gupta argues that he was excluded from meetings and that Anstey withheld important financial information from him.  *See* Pl.'s Mem. of Law at 12–14; Pl.'s 56.1 Stmt. ¶¶ 300–356.  Gupta's arguments are unsupported by the record.  Although Gupta argues that Anstey "rarely" met with him to discuss financial matters, *see* Pl.'s Mem. of Law at 13, he concedes that he attended a weekly "leadership meeting" with Anstey and other top executives during this time, Gupta Dep. 150:23–152:10; *see also* Anstey Dep. 130:2–12, 161:13–162:14.  Gupta also alleges that Anstey excluded him from a variety of other meetings, *see* Pl.'s 56.1 Stmt. ¶¶ 315–341, but Gupta provides no reason why it was appropriate for him to attend those meetings.  Gupta complains, for example, that Anstey met with a non-Indian employee about AJAM's television distribution strategy, while excluding Gupta from those meetings.  *See* Pl.'s 56.1 Stmt. ¶¶ 318–324.  But the non-Indian employee was the Company's Executive Vice President of Distribution, who had primary authority over distribution matters.  *See id.*; Defs.' 56.1 Resp. ¶ 319.  No reasonable juror could find that Gupta and this employee were similarly situated vis-à-vis a meeting to discuss distribution.

September 2015, Anstey told Gupta that he was actively discussing the issue with Al Najjar. *See id.* ¶¶ 241, 244. Gupta argues that Anstey never discussed the salary increase with Al Najjar until the very end of December 2015. *See id.* ¶¶ 228, 400. Defendants offer no evidence in response to that assertion. *See* Defs.' 56.1 Resp. ¶¶ 228, 400. The record, then, supports an inference that, in the summer and early fall of 2015, Anstey was not forthcoming with Gupta about his efforts (or lack of efforts) to get Gupta a raise.

Additionally, Defendants concede that, prior to December 2015, Anstey had full discretion to increase Gupta's salary without consulting Al Najjar. *See* Defs.' 56.1 Resp. ¶ 227. They offer no reason why Anstey needed to consult with Al Najjar in the first place, other than that it was within Anstey's discretion to do so. *See id.*; Defs.' Reply Mem. of Law at 7. Gupta points out that Anstey did not consult Al Najjar before granting raises to other employees, such as Chang. *See* Pl.'s Mem. of Law at 12 (citing Pl.'s 56.1 Stmt. ¶ 286).

A jury is entitled to draw "reasonable inference[s]" from "the proffer of a false reason" for an adverse employment action, including "the required ultimate finding of discrimination." *Zimmerman v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001). Here, a reasonable juror could infer that Anstey misled Gupta both about the need to consult Al Najjar and about the fact that he was actually doing so. Thus, this evidence supports an inference of discrimination.

### (ii)    Evidence that Anstey Bypassed Gupta

Gupta argues that Anstey "bypassed" him by assigning work directly to Gupta's subordinate (who is white), while excluding Gupta from various meetings and communications. Pl.'s 56.1 Stmt. ¶¶ 357–365. That Anstey, the Company's CEO, would rely on a lower-level employee for important financial analysis over the Company's most senior financial officer could reasonably raise a question about the good faith of Anstey's intentions. While insufficient

standing alone, this fact supports an inference of discrimination when taken together with the other evidence.

**(iii)    Evidence of Anstey's Discriminatory Conduct at Al Jazeera English**

Gupta offers evidence that Anstey discriminated against Indian employees when he worked at a different AJMN subsidiary. *See* Pl.'s Mem. of Law at 10–11. Prior to working at AJAM, Anstey worked in Qatar as Managing Director of Al Jazeera English ("AJE"). Pl.'s 56.1 Stmt. ¶¶ 212–213. For part of that time, Al Shihabi reported to Anstey. *Id.* ¶ 214. Al Shihabi testified that he believed that Anstey discriminated against people of color at AJE. *Id.* ¶¶ 215–222. Al Shihabi testified that Anstey's preference for white employees was "well known" at AJE and that Anstey demonstrated "consistent behavior of favoring [a] certain type of people," namely, those who were "white with a British accent." Al Shihabi Dep. 17:10–19, 168:6–19; *see also id.* 142:4–143:25, 169:20–170:1. For instance, Al Shihabi testified that Anstey prevented an Indian employee from appearing on camera because AJE was a channel designed "for a certain type," *i.e.*, white, British viewers. *Id.* 18:21–19:5. As another example, Al Shihabi said that he observed Anstey "giving . . . a hard time" to another employee because of that employee's race.[15] *See id.* 177:3–17, 180:21–182:17.

---

[15]    Defendants object to Al Shihabi's testimony as hearsay. *See* Defs.' 56.1 Resp. ¶¶ 215–221. The objection is overruled—for now. While much of Al Shihabi's testimony is inadmissible hearsay, at least some of it is based on his personal knowledge of Anstey's conduct while the two worked together at AJE. *See, e.g.*, Al Shihabi Dep. 12:19–14:5 (Al Shihabi testified that AJE's bureaus were "all British"; that he concluded that Anstey had "a persistent behavior of favoring" white employees; and that Al Shihabi's "mission was to correct [Anstey's] behavior"). Other parts of Al Shihabi's testimony appear to be based on non-hearsay statements, specifically, statements that other employees made within the scope of their employment. *See, e.g.*, Al Shihabi Dep. 18:21–19:17 (the employee whom Anstey prevented from appearing on camera complained to Al Shihabi, who, as AJE Deputy Managing Director, advised the employee to complain to AJMN's Director General); *see also* Fed. R. Evid. 801(d)(2)(D). The Court acknowledges, though, that the foundation for some of Al Shihabi's testimony is shaky (and much of the testimony itself is unresponsive and unclear). At trial, Gupta will need to present this evidence with much greater clarity for it to be admissible.

Drawing all inferences in Gupta's favor, this evidence tends to show that Anstey was racially biased against Gupta. *See Tolbert*, 790 F.3d at 438 ("Statements showing an employer's racial bias . . . are sufficient to support a prima facie case of discrimination."); *Scott v. WPIX, Inc.*, No. 10-CV-4622, 2012 WL 2026428, at *1 (S.D.N.Y. May 17, 2012); *Zubulake v. UBS Warburg LLC*, 382 F. Supp. 2d 536, 545–46 (S.D.N.Y. 2005) (ruling that evidence of an employer's discriminatory conduct toward non-party employees was relevant because it "tended to show the employer's state of mind or attitude toward members of the protected class"). Standing alone, evidence of Anstey's conduct at AJE might not have been sufficient to satisfy Gupta's prima facie case. But combined with the other circumstantial evidence in this case, evidence of Anstey's conduct at AJE could lead a reasonable fact-finder to conclude that Defendants acted with a discriminatory motive in denying Gupta's requested salary increase.

### (iv) Evidence of Defendants' Conduct During Gupta's Medical Leave

Next, Gupta offers evidence that Defendants replaced him with a white consultant, Toby Winer, in early 2016. Gupta took medical leave from AJAM for most of February 2016. *See* Defs.' 56.1 Stmt. ¶¶ 68, 78; Pl.'s 56.1 Stmt. ¶¶ 448–449, 476. When Gupta was due to return to work, Defendants offered to place him in an "advisory role" and transfer his day-to-day responsibilities to Winer, a consultant whom they were in the process of hiring. *See* Iadevaia Decl. RRRRR; Gupta Dep. 370:25–371:3; Anstey Dep. 276:23–279:10. Even though Gupta rejected the advisory role, *see* Defs.' 56.1 Stmt. ¶ 92; Pl.'s 56.1 Stmt. ¶ 518, Defendants retained Winer to perform the bulk of Gupta's responsibilities, *see* Pl.'s 56.1 Stmt. ¶¶ 566–569, 573–574, 607. Gupta testified that he did not believe that he was allowed to return to the office during this time. *See id.* ¶ 522.

Although Gupta remained on AJAM's payroll during this time, Winer replaced him vis-à-vis his day-to-day responsibilities. "The fact that a plaintiff was replaced by someone outside the protected class will ordinarily suffice for the required inference of discrimination at the initial prima facie stage . . . ." *Littlejohn*, 795 F.3d at 313 (collecting cases).[16]

### (v)    Conclusion

While the direct evidence of discrimination here is limited, "a plaintiff charging discrimination against an employer is usually constrained to rely on the cumulative weight of circumstantial evidence." *Luciano v. Olsten Corp.*, 110 F.3d 210, 215 (2d Cir. 1997). The combination of circumstances here is sufficient to raise a reasonable inference of discriminatory intent.

Because Gupta has established that he suffered an adverse employment action under circumstances giving rise to an inference of discrimination, and because Defendants do not dispute the other prongs of Gupta's prima facie case, Gupta has established a prima facie case of discrimination.

### C.    Defendants Have Offered Nondiscriminatory Reasons for Refusing to Increase Gupta's Salary, But Gupta Has Raised a Question of Fact as to Whether the Reasons Are Pretextual

#### 1.    Legal Standard

Because Gupta has established a prima facie case, he is entitled to "a presumption that [Defendants] unlawfully discriminated" against him. *James v. N.Y. Racing Ass'n*, 233 F.3d 149,

---

[16]    Defendants sharply dispute the circumstances surrounding Gupta's medical leave, including the inference that Winer was hired as Gupta's replacement. *See* Defs.' 56.1 Stmt. ¶¶ 83–85; Defs.' 56.1 Resp. ¶¶ 525, 545, 549, 603. But the Second Circuit has instructed courts to consider only the plaintiff's evidence in determining whether a prima facie case exists. *See Graham v. Long Island R.R.*, 230 F.3d 34, 41–42 (2d Cir. 2000) ("[S]ince the burden at this stage of the *McDonnell Douglas* analysis rests solely on [plaintiff], it was premature to consider [defendant's] evidence . . . . [W]e think only [plaintiff's] evidence should be considered when deciding whether plaintiff has met his initial burden."). Thus, Defendants' arguments do not change the Court's analysis at this stage. Additionally, for the reasons stated *infra*, in the Court's discussion of Gupta's retaliation claims, Defendants have failed to offer a non-pretextual reason for hiring Winer at the time that they did.

154 (2d Cir. 2000). The burden of production then shifts to Defendants "to proffer a nondiscriminatory reason for [their] action." *Id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07 (1993); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253–54 (1981)); *see also Littlejohn*, 795 F.3d at 307. "[O]nce the employer articulates a non-discriminatory reason for its actions," the presumption created by the prima facie case "drops out of the picture." *James*, 233 F.3d at 154 (citations and internal quotation marks omitted). "[T]he burden [then] shifts back to the plaintiff to prove that the employer's reason was in fact pretext for discrimination," *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015), that is, to "demonstrate that the proffered reason was not the true reason (or in any event not the sole reason) for the employment decision," *Littlejohn*, 795 F.3d at 307. That burden "merges with the plaintiff's ultimate burden of showing that the defendant intentionally discriminated against her." *Id.* at 307–08. The question then becomes "whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred." *James*, 233 F.3d at 156 (citing *Reeves*, 530 U.S. at 146).

## 2. Defendants' Explanations

Defendants offer two inconsistent explanations for their decision not to increase Gupta's salary. First, Defendants argue that Anstey did not give Gupta a raise because of concerns about Gupta's performance. *See* Defs.' Mem. of Law at 4; Defs.' Reply Mem. of Law at 6–7. In June 2015, Anstey sent emails to top executives at AJAM and AJMN expressing concerns about Gupta's time management, leadership, organization, and communication skills. *See* Iadevaia Decl. Ex. OOOOOO; Kaplan Decl. Ex. 12; Anstey Dep. 124:10–127:21, 134:18–140:19, 146:14–147:3. Anstey cited specific examples in these emails, such as Gupta's failure to inform him about a plan to move AJAM employees from San Francisco to New York. *See* Iadevaia Decl. Ex. OOOOOO; Anstey Dep. 124:10–126:16, 134:18–135:3. Al Obaidli, an executive at

AJMN, apparently concurred, as he told Anstey that Gupta "lacks strategic plans and forward thinking to efficiently manage/lead Finance for AJAM." Kaplan Decl. Ex. 12. During this time, Anstey extended Gupta's contract to give himself more time to assess Gupta's performance. *See* Defs.' 56.1 Stmt. ¶ 24; Pl.'s 56.1 Stmt. ¶¶ 236, 272; Anstey Dep. 170:25–171:12. Anstey shared his concerns about Gupta's performance with Gupta during a July 2015 meeting. Anstey Dep. 136:2–138:19.

Reversing course, Defendants next argue that Anstey genuinely supported and advocated for Gupta's salary increase in 2015. *See* Defs.' Mem. of Law at 14; Defs.' Reply Mem. of Law at 7. Defendants point to Anstey's December 23, 2015 email, in which Anstey told Al Najjar that Gupta was "experienced, professional, and dedicated" and that Gupta deserved a salary increase. Defs.' 56.1 Stmt. ¶ 35 (citing Kaplan Decl. Ex. 17). During this time, Anstey genuinely advocated for Gupta to get a raise, according to Defendants. *See* Defs.' Mem. of Law at 14 (citing Defs.' 56.1 Stmt. ¶¶ 35, 41).

To bridge the gap between these two explanations, Defendants suggest that Anstey changed his mind and became supportive of Gupta's requested salary increase at some unspecified time between the July meeting and the December email. *See* Defs.' Mem. of Law at 4–5; Defs.' 56.1 Stmt. ¶ 32. Unfortunately for Gupta, Defendants assert, by the time Anstey changed his mind, AJAM was in the process of shutting down, and all salary-increase requests were being denied. *See* Defs.' Mem. of Law at 5; Defs.' 56.1 Stmt. ¶¶ 37, 57; Pl.'s 56.1 Stmt. ¶¶ 366, 420; Al Najjar Dep. 23:25–26:10.

### 3. Pretext

Defendants' explanations do not withstand scrutiny. As an initial matter, Defendants offer no explanation for *why* Anstey changed his mind in late 2015. Anstey testified that he and Gupta discussed Gupta's performance issues in a July 2015 meeting and that, because the

meeting was "very positive" and because both men promised to "look to the future," "towards year end" Anstey became supportive of increasing Gupta's salary. Anstey Dep. 210:9–17. But Anstey offered no details about how this single meeting miraculously changed Gupta's performance over the next few months. And Defendants offer no evidence that Gupta's performance *actually* changed during this time. In short, Defendants fail to show that Anstey had a reasonable, good-faith basis for changing his mind about Gupta's performance, a point that could lead a juror to question how sincere Anstey's explanations really are.

Additionally, the timing of Anstey's decision to support Gupta's salary increase coincides a bit too conveniently with AJAM's decision to formulate plans for a company shut-down. *See* Defs.' 56.1 Stmt. ¶ 37; Pl.'s 56.1 Stmt. ¶ 366. By the time Anstey emailed Al Najjar to request a raise for Gupta, AJAM had already implemented a hiring freeze, and the Company had begun exploring the possibility of shutting down operations.[17] *See* Kaplan Decl. Ex. 17; Pl.'s 56.1 Stmt. ¶¶ 366, 370; Defs.' 56.1 Resp. ¶ 366. Salary increases are generally not awarded during company wind-downs. *See* Danner Dep. 60:14–23, 63:4–8. Yet Anstey waited until December 11, 2015—the very same day that Al Najjar announced that the Company should start exploring the possibility of a wind-down, *see* Pl.'s 56.1 Stmt. ¶¶ 367, 372; Defs.' 56.1 Stmt. ¶¶ 37–40—to solicit from Gupta a "business justification" for his requested raise, *see* Pl.'s 56.1 Stmt. ¶¶ 394–395; Defs.' 56.1 Resp. ¶ 395; Kaplan Decl. Ex. 14. Anstey then waited until December 23—when the "strategic review" that led to the wind-down was already underway, *see, e.g.*, Kaplan Decl. Ex. 22—to ask Al Najjar about the increase, *see* Kaplan Decl. Ex. 17.

---

[17] The parties dispute the precise timing of AJAM's decision to shut down. *See, e.g.*, Pl.'s 56.1 Stmt. ¶ 370; Defs.' 56.1 Resp. ¶ 366. This dispute is immaterial. At the very least, the parties agree that, by mid-December 2015, AJAM had begun to explore the possibility of shutting down its operations. *See* Pl.'s 56.1 Stmt. ¶ 370; Defs.' 56.1 Resp. ¶ 366; Anstey Dep. 65:10–66:14.

Gupta, meanwhile, had been asking for the increase repeatedly throughout the year, even as late as the Thanksgiving holiday. *See* Pl.'s 56.1 Stmt. ¶¶ 224–253. In light of these requests, a juror could reasonably ask why Anstey did not support a salary increase for Gupta any earlier than the very day when a possible company shut-down was announced.

### 4. Conclusion

The timing of Anstey's about-face on Gupta's performance is suspicious enough for a reasonable juror to find that Defendants' explanations were "not the true reason[s] (or in any event not the sole reason[s]) for the employment decision." *Littlejohn*, 795 F.3d at 307–08. Of course, at this stage, Gupta bears the burden not only of showing that Defendants' proffered reasons are false, but also that a discriminatory reason was more likely than not a motivation for Defendants' actions. *See Holcomb*, 521 F.3d at 138 (a plaintiff must show that "the employer's proffered reasons . . . were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors"); *James*, 233 F.3d at 154.

The "falsity of the employer's explanation" can have probative value that, combined with the evidence that satisfied the plaintiff's prima facie case, may be "sufficient to sustain a finding of discrimination." *James*, 233 F.3d at 156–57. Specifically, a juror "can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Zimmerman*, 251 F.3d at 383 (quoting *Reeves*, 530 U.S. at 147). Combined with evidence adduced during the prima facie case, this inference may be enough to defeat summary judgment. *See id.* at 382 ("[O]nly occasionally will a prima facie case plus pretext fall short of the burden a plaintiff carries to reach a jury on the ultimate question of discrimination but . . . such occasions do exist."); *see also McGuinness v. Lincoln Hall*, 263 F.3d 49, 55 (2d Cir. 2001) ("'[A] prima facie case plus falsity of the employer's explanation can, without more, be enough

to support a reasonable finding' that an employee was treated differently on the basis of race or gender." (quoting *James*, 233 F.3d at 156)).

Here, the falsity of Defendants' explanation has considerable probative force. Gupta has proffered evidence that renders Anstey's sudden turnaround in his opinion of Gupta's performance implausible. Without an explanation of Anstey's change-of-mind, Defendants are stuck with two contradictory inferences in the record: that Anstey genuinely supported giving Gupta a raise but that Anstey denied Gupta a raise because of concerns about his performance. Combined with evidence that Anstey discriminated against Indian employees in his last job, that Anstey bypassed Gupta to deal with a white subordinate, that Anstey misled Gupta (both about the necessity of consulting Al Najjar and about the fact that he did consult Al Najjar in the summer and fall of 2015), and that Defendants replaced Gupta with Toby Winer, the gaps and contradictions in Defendants' explanations allow a reasonable juror to infer that discrimination is "the most likely alternative explanation." *Zimmerman*, 251 F.3d at 383 (quoting *Reeves*, 530 U.S. at 147).

As the Court has stated, the evidence of racial animus in this case is limited and circumstantial. But Defendants' side of the story simply does not hang together. Under these circumstances, Defendants are not entitled to summary judgment. For all these reasons, Defendants' motion for summary judgment is denied as to Gupta's racial discrimination claims.

## III. Defendants Are Not Entitled to Summary Judgment on Gupta's Retaliation Claims

The second, fourth, and sixth causes of action in the Complaint allege retaliation under § 1981, the NYSHRL, and the NYCHRL, respectively. *See* Compl. ¶¶ 120–123, 127–129, 133–135. Defendants move for summary judgment as to all three claims. *See* Notice of Mot.

### A. Applicable Law

Retaliation claims are also evaluated under the *McDonnell Douglas* burden-shifting

standard.  *See Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (citing *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)); *see also DeLuca v. Sirius XM Radio, Inc.*, No. 12-CV-8239, 2017 WL 3671038, at *23 (S.D.N.Y. Aug. 7, 2017).  First, the plaintiff must establish a prima facie case.  *Hicks*, 593 F.3d at 164.  "If the plaintiff sustains this initial burden, a presumption of retaliation arises.  The defendant must then articulate a legitimate, non-retaliatory reason for the adverse employment action."  *Id.* (citations and internal quotation marks omitted) (quoting *Jute*, 420 F.3d at 173).  Upon such a showing, "'the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action.'  A plaintiff can sustain this burden by proving that 'a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause [of the actions].'"  *Id.* (citations omitted) (quoting *Jute*, 420 F.3d at 173; *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)).

### B.      Gupta Establishes a Prima Facie Case of Retaliation

A plaintiff establishes a prima facie case of retaliation by showing: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."  *Id.*  The parties dispute each prong of this test.  *See* Defs.' Mem. of Law at 19–25; Pl.'s Mem. of Law at 16–22.

#### 1.      Gupta Engaged in a Protected Activity, and Defendants Were Aware of It

As to the first prong, "[a]n employee engages in a protected activity when she complains of an employment practice that she reasonably believes violates the law."  *Mayers v. Emigrant Bancorp, Inc.*, 796 F. Supp. 2d 434, 448 (S.D.N.Y. 2011).  A protected activity "may take the form of either formal or informal complaints."  *Guzman v. City of New York*, 93 F. Supp. 3d 248,

261 (S.D.N.Y. 2015). The employee must have "a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (quoting *Gregory v. Daly*, 243 F.3d 687, 701 (2d Cir. 2001)). "The reasonableness of the plaintiff's belief is to be assessed in light of the totality of the circumstances." *Id.* 14–15 (quoting *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)).

As to the second prong, "implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by [the statute at issue]." *Guzman*, 93 F. Supp. 3d at 262 (alteration in original) (quoting *Galdieri-Ambrosini*, 136 F.3d at 292). "The onus is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally." *Aspilaire v. Wyeth Pharm., Inc.*, 612 F. Supp. 2d 289, 308–09 (S.D.N.Y. 2009).

Gupta's January 27, 2016, email undoubtedly constitutes protected activity. *See* Kaplan Decl. Ex. 28. The subject line of that email was "Anand Gupta – Official Compliant [sic] against Unfair Employment Practice by AJAM," and the email expressly alleged a violation of U.S. "fair employment laws and practices." *Id.* The email stated that Gupta believed that he had been "singled out" for "discriminatory treatment" because Defendants had insisted on obtaining AJMN's approval for his salary increase, while other employees (who were not Indian) had received salary increases without AJMN approval. *Id.* The email then closed by stating, "I trust that this complaint will not result in any retaliation [against] my continued employment . . . ." *Id.* Without question, then, the email reflected a reasonable, good-faith belief that his employer's

actions violated the law.[18]  Although the email did not mention race specifically, its comparisons to employees who were outside of Gupta's protected class, and its references to discrimination and the employment laws, should have put Defendants on notice that Gupta was complaining about unlawful discrimination, rather than unfair treatment generally.

The context of the January 27 email eliminates any doubt that it was protected activity. In the days leading up to this email, Gupta complained to Chang and to a company consultant that he had suffered racial discrimination at AJAM.[19]  *See* Pl.'s 56.1 Stmt. ¶¶ 435–436. Additionally, in a separate email on January 24, Gupta told Anstey, Chang, and another executive that the denial of his salary increase was "a really unfair employment practice." Kaplan Decl. Ex. 27.  Finally, on February 22, when Anstey asked to meet with Gupta following Gupta's return from medical leave, Gupta asked "if AJAM HR is still adhering to the no-retaliation against complaints policy."  Iadevaia Decl. Ex. QQQQQ.  All of these

---

[18]      Defendants argue that Gupta's complaint was not made in good faith, citing two parts of the record.  *See* Defs.' Mem. of Law at 21 (citing Defs.' 56.1 Stmt. ¶¶ 65, 69, 73, 93–94).  First, Chang testified that she understood Gupta's email to be part of a "scheme" that she and Gupta were "cooking up" to increase their salaries.  Defs. 56.1 Stmt. ¶ 65.  Chang's understanding is not dispositive of Gupta's state of mind in sending this email.  At best, it creates a dispute of fact as to Gupta's good faith, which is sufficient to defeat summary judgment.  Additionally, given the email's express references to the anti-discrimination laws, Chang reasonably should have understood the email to be a complaint about unlawful discrimination.

      Second, Gupta testified that, at the time he sent this email, he did not believe that Anstey or AJAM had discriminated against him.  Defs.' 56.1 Stmt. ¶¶ 69, 73, 93–94.  Indeed, Gupta concedes that, at the time of the email, he believed only that Al Najjar and AJMN (who are not named as defendants in this action) had discriminated against him.  *See* Pl.'s Mem. of Law at 19.  This fact does not change the Court's analysis.  To prove that he engaged in a protective activity, Gupta needs to show only that he lodged a reasonable, good-faith complaint about "an unlawful *employment practice* of his *employer*."  *Kelly*, 716 F.3d at 15 (emphasis added).  The denial of Gupta's salary-increase request was undoubtedly an employment practice of his employer, even if Gupta was mistaken about the specific actor who was ultimately responsible for it.  *See Lamberson v. Six W. Retail Acquisition, Inc.*, 122 F. Supp. 2d 502, 512 (S.D.N.Y. 2000) ("[A] good faith mistake, whether of fact or law, regarding the legality of the employer's conduct will not strip the plaintiff of Title VII protection against retaliation.").

[19]      Chang denies that this conversation took place, *see* Defs.' 56.1 Resp. ¶ 436, but that only creates a material dispute of fact as to this issue—again, compelling this Court to deny summary judgment.

communications should have signaled to Defendants that Gupta was engaging in protected activity.

For all these reasons, Gupta has established that he engaged in a protected activity and that Defendants were (or reasonably should have been) aware of it.[20]

### 2.     Gupta Suffered an Adverse Action

Looking to the third prong, a plaintiff must show that she suffered a "materially adverse" employment action, that is, one that could "dissuade a reasonable worker from making or supporting a charge of discrimination." *Hicks*, 593 F.3d at 162 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). "What qualifies as an 'adverse employment action' for purposes of retaliation claims under federal and state law is broader than what is required for discrimination claims brought under the same statutes." *DeLuca*, 2017 WL 3671038, at *23 (citing *Grimes-Jenkins v. Consol. Edison Co. of New York, Inc.*, No. 16-CV-4897, 2017 WL 2258374, at *10 (S.D.N.Y. May 22, 2017)).

Gupta suffered an adverse action when, beginning February 23, 2016, Defendants reduced his responsibilities and placed him in an "advisory role." Gupta Dep. 370:25–371:3; Anstey Dep. 276:23–279:10. Between February 23 and Gupta's departure in June, Gupta remained out of the office, and Toby Winer performed most of his day-to-day responsibilities. *See* Pl.'s 56.1 Stmt. ¶¶ 566–569, 573–574, 607; Defs.' 56.1 Resp. ¶¶ 566–568, 573–574, 607. Even though Gupta remained on AJAM's payroll at this time, Defs.' 56.1 Stmt. ¶ 85, a jury

---

[20]     Gupta also argues that his filing the instant lawsuit constitutes protected activity. *See* Pl.'s Mem. of Law at 17.  Because Gupta raises this argument for the first time in his opposition brief, the Court will not consider it. *See Penney v. AIG Domestic Claims, Inc.*, No. 04-CV-9071, 2007 WL 541711, at *9 (S.D.N.Y. Feb. 20, 2007) (collecting cases); *Southwick Clothing LLC v. GFT (USA) Corp.*, No. 99-CV-10452, 2004 WL 2914093, at *6 (S.D.N.Y. Dec. 15, 2004) ("A complaint cannot be amended merely by raising new facts and theories in plaintiffs' opposition papers, and hence such new allegations and claims should not be considered in resolving the motion."). Having failed to amend his complaint to add this as a basis of his retaliation claim, should this case go to trial, Gupta will not be permitted to argue that he was retaliated against for filing this lawsuit.

could readily find that hiring a new person to perform his duties and reducing his job responsibilities were materially adverse actions under the anti-retaliation laws. *See Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 209 (2d Cir. 2006) (finding adverse action when a plaintiff "was stripped of [numerous] responsibilities and not allowed to perform those functions").

While a closer call, a reasonable juror could also find that Gupta suffered an adverse action when Defendants "cut short" his employment in mid-2016. *See* Pl.'s Mem. of Law at 20–21. The "Stay Agreement" that Defendants offered Gupta on March 25, 2016 extended Gupta's tenure through June 15, 2016. *See* Defs.' 56.1 Stmt. ¶¶ 97–98; Pl.'s 56.1 Stmt. ¶¶ 614, 628; Kaplan Decl. Exs. 44–45. Gupta presented evidence that, prior to his January 27 discrimination complaint, Defendants intended to keep him employed longer than June 2016, possibly through the fall.[21] *See, e.g.*, Pl.'s 56.1 Stmt. ¶¶ 452–461. A reasonable juror could infer that Defendants shortened Gupta's employment by several months in response to his January 27 email and that this action could dissuade a reasonable person from complaining about discrimination.

### 3. Gupta Can Establish a Causal Connection

As to the fourth prong, "proof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Hicks*, 593 F.3d at 170 (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).

---

[21] It is unclear how long after June 2016 Defendants initially intended to keep Gupta on the payroll. *See, e.g.*, Pl.'s 56.1 Stmt. ¶ 452 (Gupta states that Anstey told him that he would remain employed through September or October 2016); *id.* ¶ 458 (a "Stay Team Schedule As of 1/08/16" lists Gupta's end date as July 2016). The Court does not need to resolve this issue.

The timeline following Gupta's protected activity raises a strong inference of causation. Beginning February 4—that is, only one week after Gupta's January 27 email, and at a time when Defendants expected him to return to work shortly—Defendants began looking for a consultant at a "CFO level." *See* Iadevaia Decl. Ex. SS at KIWI000107–110. Two weeks later, around February 16, Defendants interviewed Winer for the job. *See id.* at KIWI000100–101; Chang Dep. 280:23–281:24. All of this took place *before* Anstey proposed an "advisory role" to Gupta on February 23. Pl.'s 56.1 Stmt. ¶¶ 485, 490; Defs.' 56.1 Resp. ¶¶ 485, 490. Just one week after the February 23 meeting, Winer began working at AJAM and taking over Gupta's day-to-day responsibilities. *See* Pl.'s 56.1 Stmt. ¶¶ 556, 566–569, 573–574, 607; Defs.' 56.1 Resp. ¶¶ 556, 566–568, 573–574, 607; Iadevaia Decl. Ex. WWWWW. And a few days after Gupta *rejected* the advisory role proposal (arguably demonstrating his intent to return to his prior role), Defendants executed an engagement contract with Winer. *See* Iadevaia Decl. Ex. WWWWW. Two weeks after that, Defendants offered Gupta a Stay Agreement that cut his employment short by several months. *See* Defs.' 56.1 Stmt. ¶¶ 97–98; Pl.'s 56.1 Stmt. ¶¶ 614, 628; Kaplan Decl. Exs. 44–45.

That Defendants began looking for the person who ultimately took over Gupta's responsibilities just one week after Gupta lodged a discrimination complaint—and that Defendants retained that person after Gupta expressly declined to give up those responsibilities—is more than enough evidence for a reasonable juror to infer that Gupta's January 27 complaint was the but-for cause of the reduction in responsibilities and of the premature termination of his employment.

**C.**     **Defendants Have Offered Non-Retaliatory Reasons for Their Adverse Actions, But Gupta Has Raised a Question of Fact as to Whether the Reasons Are Pretextual**

To rebut the presumption created by Gupta's prima facie case, Defendants must proffer "a legitimate, non-retaliatory reason for the adverse employment action." *Hicks*, 593 F.3d at 164. If Defendants do so, Gupta must come forward with evidence to show that "retaliation was a substantial reason for the adverse employment action[s]" or that "a retaliatory motive played a part in the adverse employment actions even if it was not [their] sole cause." *Id.*

First, Defendants argue that Gupta *chose* to take the "advisory role" and the corresponding reduction in responsibility. Defs.' Mem. of Law at 22–23. According to Defendants, Gupta asked for the reduction as an "accommodation" for the stress and anxiety that had caused him to take medical leave. *Id.* Whether Gupta asked for the advisory role on February 23 is a disputed question of fact that compels this Court to deny summary judgment. *Compare* Gupta Dep. 370:8–372:10, 382:19–386:10 (Gupta states that he wanted to come back to work but Anstey refused to let him) *with* Anstey Dep. 276:23–279:10 (Anstey states that Gupta asked him to "[g]et me out of" numerous responsibilities).

Next, Defendants argue that Gupta's medical leave created serious "bottlenecks and gaps" in the Company's workflow, requiring the Company to shift Gupta's responsibilities to an outside consultant. *See* Defs.' Mem. of Law at 23. The assertion that Gupta's absence caused "bottlenecks" is supported by the record. *See* Defs.' 56.1 Stmt. ¶¶ 80–83. But Defendants do not explain why they began looking for Winer within just one week of Gupta's departure on medical leave (and presumably before any bottlenecks materialized) or why they began the search for Winer when they expected Gupta to return from medical leave in a matter of days. *See* Iadevaia Decl. Ex. SS (on February 4, Chang contacted a consulting firm to ask for a candidate at a "CFO level"); Defs.' 56.1 Stmt. ¶ 77 (on February 5, Chang asked Gupta whether

he intended to return to the office on February 8 "as originally planned"). Nor do Defendants

explain why they executed Winer's engagement contract after Gupta had rejected the advisory

role proposal (that is, at a time when he wanted to return to work and could have himself cured

whatever bottlenecks his absence had caused). *See* Iadevaia Decl. Ex. WWWWW. And

Defendants do not explain why they allowed Winer to assume Gupta's responsibilities through

March and April, again, after Gupta had rejected the advisory role proposal and was ready to

return to work. *See* Pl.'s 56.1 Stmt. ¶¶ 566–569, 573–574, 607; Defs.' 56.1 Resp. ¶¶ 566–568,

573–574, 607. In short, Gupta offers sufficient evidence to create a question of fact as to

whether Defendants' explanations for sidelining him are pretextual.

In sum, Gupta has carried his burden of providing sufficient evidence to create a material

question of fact for the jury as to whether a retaliatory motive played a part in the reduction of

his responsibilities, even if it was not the sole cause. *See Hicks*, 593 F.3d at 164. For all these

reasons, Defendants' motion for summary judgment as to Gupta's retaliation claims is denied.[22]

## CONCLUSION

For all the foregoing reasons, Defendants' motion for summary judgment is DENIED.

The parties must appear for a conference on **April 13, 2018 at 10:00 a.m.**, Courtroom 443,

Thurgood Marshall U.S. Courthouse, to set a trial schedule.

The Clerk is respectfully directed to close the open motion at Dkt. 52.

**SO ORDERED.**

Date: **March 29, 2018**                         **VALERIE CAPRONI**
     **New York, New York**                   **United States District Judge**

---

[22]      Because "NYCHRL retaliation claims are to be construed more broadly" than their federal and state counterparts, *Pena-Barrero v. City of New York*, No. 14-CV-9550, 2017 WL 1194477, at *19 (S.D.N.Y. Mar. 30, 2017), summary judgment is also denied as to Gupta's NYCHRL retaliation and discrimination claims.